## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **AXA DISTRIBUTORS, LLC and**<br>**AXA ADVISORS, LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **Case No. 1:08cv188** |
| **v.** | ) | |
| | ) | |
| **GAYLE S. BULLARD et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MOTION TO DISMISS OR, IN THE ALTERNATIVE, MOTION TO COMPEL ARBITRATION

COME NOW the Defendants, Gayle Bullard *et al.*, pursuant to Federal Rule of Civil Procedure 12(b)(6), and respectfully request the Court to dismiss the Plaintiffs' Verified Complaint for Preliminary and Permanent Injunction and Declaratory Judgment for lack of subject matter jurisdiction and failure to state a claim or, in the alternative, to compel the Plaintiffs to arbitrate the claims brought by Defendants before FINRA.  The Court has no jurisdiction to determine arbitrability where the agreement at issue, as here, provides for the NASD Director to determine arbitrability.  And, even assuming for the sake of argument that the Court may decide arbitrability here, which it cannot under clearly established Alabama law, the dispute between the parties must be arbitrated pursuant to the

1

clear terms of the arbitration agreement between the parties. In support of this motion, Defendants rely upon the legal memorandum set forth below and the attachments hereto.

**LEGAL MEMORANDUM**

## I.    PARTIES AND CLAIMS

Plaintiff AXA Distributors, LLC ("AXA Distributers") is a wholesale broker-dealer that distributes the securities products, including the Accumulator variable annuity, of its affiliated company, AXA Equitable Life Insurance Company.[1] Defendants are customers who purchased AXA annuities from Ann Holman, whose firm, Raymond James, had a selling agreement with AXA Distributors, LLC. See Affidavit of Ann Holman, attached as Exhibit B. Defendants have filed claims before FINRA against Plaintiffs for fraudulent mispresentations, suppression, negligent training and supervision, breach of contract, conversion, violation of the Alabama Securities Act, and unsuitable investment/suitability review. The claims arise from the fraudulent inducement to purchase the AXA Accumulator annuity based upon representation that the annuity provided a guaranteed rate of return, guarantee of principal, and liquidity at the end of term, and failure to disclose that the Accumulator annuity that Defendants

---

[1] AXA Distributors, LLC is registered with the SEC as a broker-dealer and with FINRA as a brokerage firm. *See* FINRA BrokerCheck, www.finra.org/brokercheck, attached as Exhibit A.

purchased did not provide liquidity at the end of term, did not provide liquidity at the guaranteed rate of return and did not provide a guarantee of principal. Statement of Claim, pp. 5-6.

## II.     PROCEDURAL HISTORY

On January 30, 2008, Defendants filed a Statement of Claim before FINRA (formerly the National Association of Securities Dealers, or "NASD") against, among other parties, the two Plaintiffs, AXA Distributors, LLC and AXA Advisors, LLC. *Gayle S. Bullard et al. v. AXA Equitable Life Ins. Co. et al.*, FINRA Arbitration No. 08-00280 (hereinafter "*Bullard* arbitration"). After receiving service, Plaintiffs commenced this action by filing a complaint for declaratory judgment and injunctive relief on March 18, 2008. On April 3, 2008, the parties moved jointly for a stay of this case, as well as in the *Bullard* arbitration, in anticipation of mediation, which motion the Court granted on April 7, 2008. Although the parties had planned to mediate this and other cases on June 5, 2008, the mediation was cancelled because it became apparent that it would not be successful. Upon notice to counsel for Plaintiffs, Defendants have filed simultaneously herewith a motion to lift the stay.

## III.     STANDARD OF REVIEW

Because the Plaintiffs' complaint was filed in federal court under diversity jurisdiction, Alabama contract law governs the substantive law of this action.

*Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.*, 420 F.3d 1317, 1326 n.5 (11th Cir. 2005) (noting state law governs in diversity cases). The Court must interpret the NASD Code as it would a contract under applicable law. *See Multi-Financial Securities Corp. v. King*, 386 F.3d 1364, 1387 (11th Cir. 2004) (citing *Terry v. Thomas*, 482 U.S. 483, 492 n.9 (1987). However, the Federal Arbitration Act ("FAA") creates a presumption in favor of arbitrability so that parties must clearly express their intent to exclude categories of claims from their arbitration agreement.[2] *See Ivax Corp. v. B. Braun of America, Inc.*, 286 F.3d 1309, 1320 (11th Cir. 2002); *Paladino v. Avnet Computer Techs, Inc.*, 734 F.3d 1054, 1057 (11th cir. 1998); *Brown v. ITT Consumer Financial Corp.*, 211 F.3d 1217, 1222 (11th Cir. 2000) (reh'g denied); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ."). Under the FAA, there is such a strong presumption in favor of arbitration that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Carroll v. W.L.*

---

[2] The FAA applies to disputes such as this one involving sales of securities because they relate to interstate commerce. *Prudential Securities Inc. v. Hornsby*, 865 F. Supp. 447, 449 (N.D. Ill. 1994) ("It is axiomatic that the purchase and sale of securities relates to interstate commerce.") (citing *Austin Municipal Secur., Inc. v. NASD*, 757 F.2d 676, 697 (5th Cir.1985)).

4

*Petrey Wholesale Co., Inc.*, 941 So. 2d 234, 236-37 (Ala. 2006) (internal quotations omitted). *See also Blue Cross Blue Shield of Alabama v. Rigas*, 923 So. 2d 1077, 1085-86 (Ala. 2005).

In reaching a motion to compel arbitration, the court "is not to consider the merits of the claims giving rise to the controversy, but is only to determine ... whether there is a valid agreement to arbitrate." *Great W. Mortgage Corp. v. Peacock,* 110 F.3d 222, 228 (3d Cir.1996) (citing 9 U.S.C. § 2). If the court finds there is an agreement to arbitrate, the disposition of the merits is left to the arbitrator. *Id.*

A motion to compel arbitration is analogous to a motion for summary judgment and thus requires an evidentiary showing on both sides. Therefore, after a movant has satisfied the burden of proving the existence of a contract calling for arbitration and proving that the contract evidences a transaction affecting interstate commerce, the burden is on the non-movant to present evidence that the supposed arbitration agreement is not valid or does not apply to the dispute in question. *Carroll v. W.L. Petrey Wholesale Co., Inc.*, 2006 WL 1046255 (Ala. 2006).

## IV.  LEGAL ARGUMENT

### A. Plaintiffs' Claims Are Due to be Dismissed Because Only FINRA May Decide the Arbitrability of the Claims.

The Alabama Supreme Court requires a trial court to permit arbitration of the issue of arbitrability when the plain language of the agreement unquestionably shows that the parties agreed to arbitrate the issue of arbitrability. *See  Ex parte Johnson*, 2008 WL 2068077 at *6, 10 (Ala. May 16, 2008).   The Alabama Supreme Court has made clear that an arbitration agreement that "incorporates rules that provide for the arbitrator to decide issues of arbitrability clearly and unmistakably evidences the parties' intent to arbitrate the scope of the arbitration provision."  *Citifinancial Corp., LLC v. Peoples*, 973 So. 2d 332 (Ala. 2007); *accord Ex parte Johnson*, 2008 WL 2068077 at *6, 10 (Ala. May 16, 2008); *Apollo Computers, Inc. v. Berg*, 886 F.2d 469, 473 (1st Cir. 1989); *Title Max of Birmingham, Inc. v. Edwards*, 973 So. 2d 1050, 1054 (Ala. 2007); *Jim Burke Automotive, Inc. v. McGrue*, 826 So. 2d 122, 132 (Ala. 2002).   As demonstrated below, the NASD Code of Arbitration Procedure is the arbitration agreement between the parties, and it provides for the issue of arbitrability to be decided by the Director of NASD Dispute Resolution. Accordingly, only the Director of NASD Dispute Resolution has the authority to determine the arbitrability of Defendants' claims.

6

### 1.     The NASD Code Is The Arbitration Agreement

It is uniformly established in the Eleventh Circuit that, for members of the Financial Industry Regulatory Authority ("FINRA"), formerly the NASD[3], the NASD Code of Arbitration Procedure (the "NASD Code" or the "Code") constitutes the arbitration agreement for disputes submitted for arbitration at FINRA upon customer demand.[4] *See MONY Securities Corp. v. Bornstein*, 390 F.3d 1340, 1342 (11th Cir. 2004) (holding that even if there is no direct written agreement to arbitrate, the NASD Code itself serves as a sufficient agreement to arbitrate, binding its members to arbitrate a variety of claims with customers and third parties, and quoting *Multi-Financial Sec. Corp. v. King*, 386 F.3d 1364, 1366 (11th Cir.2004)); *see also Washington Square Sec. Inc. v. Aune,* 385 F.3d 432, 435 (4th Cir.2004) ("The NASD Code constitutes an 'agreement in writing' under the Federal Arbitration Act, 9 U.S.C. § 2, which binds ... [an] NASD member, to submit an eligible dispute to arbitration upon a customer's demand."). Plaintiffs concede, as they must, that they are members of FINRA and that they have agreed to arbitrate

---

[3] FINRA was "[c]reated in July 2007 through the consolidation of NASD and the member regulation, enforcement and arbitration functions of the New York Stock Exchange." *See* http://www.finra.org/AboutFINRA/CorporateInformation/index.htm. A new customer arbitration code, still called the NASD Code of Arbitration Procedure, is effective for all arbitrations filed on or after April 16, 2007. *See* http://www.finra.org/ArbitrationMediation/Arbitration/CodeofArbitrationProcedure/p009566.

[4] Because the NASD Code unquestionably applies to Plaintiffs and provides for a determination of the arbitrability of the dispute by the Director of NASD Dispute Resolution, this Court "is not to consider the merits of the claims giving rise to the controversy, but is only to determine ... whether there is a valid agreement to arbitrate." *Great W. Mortgage Corp. v. Peacock,* 110 F.3d 222, 228 (3d Cir.1996). In any event, as demonstrated in Section B, *infra*, Defendants meet all of the requirements for arbitration as set forth under NASD Code Rule 12200.

certain claims submitted pursuant to the NASD Code. *See* Pls. Compl. at ¶ 23 and 24.

### 2.     The Director of NASD Dispute Resolution Decides Arbitrability Under The NASD Code.

Under the NASD Code as adopted for cases filed on or after April 16, 2007, upon motion, the Director of NASD Dispute Resolution (the "Director") may "decline to permit the use of the arbitration forum if the Director determines that, given the purposes of NASD and the intent of the Code, the subject matter of the dispute is inappropriate . . . ." Rule 12203; *see also* Rule 12503(c)(1).  Further, "[o]nly the Director or the President of the NASD Dispute Resolution may exercise the Director's authority under [Rule 12203]." *See id*.  Thus, the NASD Code specifically provides for the Director, and only the Director, to decide whether or not the subject matter of the dispute falls within the parameters of the NASD Code and is properly before FINRA.

Plaintiffs have, as members of FINRA, clearly and unmistakably agreed to arbitrate the scope of the arbitration provision between themselves and customers and have agreed that only the Director of NASD Dispute Resolution may make a determination of whether or not the subject matter of the dispute is appropriate for FINRA dispute resolution.   Thus, if Plaintiffs believe the FINRA forum is inappropriate and that Defendants' claims fall outside of the scope of the NASD

8

Code such that Plaintiffs have not agreed to arbitrate the pending claims as a member of FINRA, the proper course of action is for Plaintiffs to file a motion with the Director in the *Bullard* arbitration to determine the scope and applicability of FINRA's rules under Rule 12203. *See* NASD Code, Rule 12503(c) (1) ("The Director decides motions relating to use of the forum under Rule 12203 . . . .").[5]

Because the NASD Code provides for the Director of FINRA to determine whether or not the dispute is properly before FINRA, this action must be dismissed. The Director of FINRA is the only proper arbiter to review and interpret the NASD Code of Arbitration to determine whether this dispute is properly pending at FINRA. *See Terminix International Co. v. Palmer Ranch Ltd. Partnership,* 432 F.3d 1327, 1332 (11th Cir.2005); *Ex parte Johnson,* 2008 WL 2068077 at *6, 10 (Ala. May 16, 2008); *Citifinancial Corp., LLC v. Peoples,* 973

---

[5] Rule 12203(a) is a new provision adopted for the first time in the post-April 16, 2007 Code. Significantly, Rule 12203(a), whose comparable predecessor was Rule 10301(b), reserves for the Director the issue of arbitrability of the dispute, or the appropriateness of the subject matter given the purpose of the NASD and the intent of the Code. *Cf.* new Rule 12203(a) and 12503(c) *with* old Rule 10301(b). Rule 10301(b) stated:

> Under this Code, the Director of Arbitration, upon approval of the Executive Committee of the National Arbitration and Mediation Committee, or the National Arbitration and Mediation Committee, shall have the right to decline the use of its arbitration facilities in any dispute, claim, or controversy, where, having due regard for the purposes of the Association and the intent of this Code, such dispute, claim, or controversy is not a proper subject matter for arbitration.

Rule 12203(a) states:

> The Director may decline to permit the use of the NASD arbitration forum if the Director determines that, given the purposes of NASD and the intent of the Code, the subject matter of the dispute is inappropriate, or that accepting the matter would pose a risk to the health or safety of arbitrators, staff, or parties or their representatives. Only the Director or the President of NASD Dispute Resolution may exercise the Director's authority under this rule.

So. 2d 332 (Ala. 2007); *Title Max of Birmingham, Inc. v. Edwards*, 973 So. 2d 1050, 1054 (Ala. 2007); *Jim Burke Automotive, Inc. v. McGrue*, 826 So. 2d 122, 132 (Ala. 2002). Accordingly, Plaintiffs' claims are due to be dismissed as a matter of law for a determination of arbitrability by the Director of FINRA.

### B. AXA Distributors Must Submit To Binding Arbitration Before FINRA.[6]

As set out above, the NASD Code constitutes a binding arbitration agreement for disputes submitted for arbitration at FINRA upon customer demand. *See MONY Securities Corp. v. Bornstein*, 390 F.3d at 1342 (holding that even if there is no direct written agreement to arbitrate, the NASD Code itself serves as a sufficient agreement to arbitrate); *see also Washington Square Sec. Inc. v. Aune*, 385 F.3d 432, 435 (4th Cir.2004) ("The NASD Code constitutes an 'agreement in writing' under the Federal Arbitration Act, 9 U.S.C. § 2 . . . ."). Under the NASD Code Rule 12200, a member firm ***must*** submit to arbitration as requested by a customer if (a) the dispute is between a customer and a member or an associated person of a member and (b) the dispute relates to the business activities of a member of FINRA or an associated person of the member. *See* NASD Code Rule 12200.[7] As demonstrated below, Defendants are "customers" under the Code and

---

[6] Defendants do not intend to pursue claims against AXA Advisors, LLC. That party was added by mistake; however, the proper place for that determination is in arbitration before FINRA.

[7] Specifically, Rule 12200 provides:

the dispute arises out of the business activities of AXA Distributors, a member of FINRA. Especially in light of the presumption favoring arbitration and the mandate to resolve all ambiguities in favor of arbitration, Plaintiff AXA Distributors must submit to arbitration of the dispute and the Complaint is due to be stayed pending arbitration.

### 1. Defendants Are "Customers" Under The NASD Code.

The NASD Code defines "customer" simply and broadly: "A customer shall not include a broker or a dealer." *See* NASD Code 12100(i). Plaintiffs do not allege that Defendants are either brokers or dealers. Thus, it is undisputed that Defendants are customers as defined under the Code.

Significantly, the NASD Code does *not* define "customer" as a party that has engaged in direct transactions with a member or state that the party must be a customer *of* a member. Attempts by brokerage firms and other members to evade FINRA arbitration on those grounds have been broadly rejected. *Multi-Financial*

---

Parties must arbitrate a dispute under the Code if:

Arbitration under the Code is either:

    (1) Required by a written agreement, or
    (2) Requested by the customer;

The dispute is between a customer and a member or associated person of a member; and

The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

*Securities Corp. v. King*, 386 F.3d 1364, 1368 (11th Cir. 2004) (noting, after a review of all other NASD Rules defining "customer," that it is the NASD's "clear and unambiguous choice to leave the term as defined generally" and holding a party satisfied the "customer" requirement under the NASD Code because she was not a broker or a dealer, "even though she may not have been a direct customer of" the member).  *See also MONY*, 390 F.3d 1340, 1343-44; *California Fina Group, Inc. v. Herrin*, 379 F.3d 311 (5th Cir. 2004); *O.N. Equity Sales Co. v. Cattan*, 2008 WL 361549 (S.D. Tex. Feb. 8, 2008); *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 59 (2d Cir. 2001) (rejecting the plaintiff's argument that the defendants must be customers *of* the firm directly rather than of an associated person, and stating that it would be compelled to find in favor of arbitration even if the plaintiff created an ambiguity as to the definition).   Thus, Plaintiffs' argument that Defendants are not "customers of" Plaintiffs is irrelevant under the NASD Code and prevailing Eleventh Circuit jurisprudence.  *Cf.* Pls. Br. at ¶25 *with* NASD Code 12100(i).

**2.    The Dispute Arises In Connection With The Business Activities Of AXA Distributors.**

AXA Distributors alleges in the Complaint that the claims in the *Bullard* arbitration do not arise in connection with its business activities because AXA Equitable, and not AXA Distributors, published the prospectuses and issued the

annuities at issue. They allege that AXA Distributors never held accounts for or issued confirmations to Defendants and never appointed Ann Holman as a representative, agent, or associated person. As set forth below, AXA Distributors is directly subject to liability to Defendants, regardless of its laundry list of those activities it did not undertake. Moreover, AXA Distributors is indirectly liable to Defendants for the acts of Ann Holman as an associated person as that term is defined under the NASD Code. Accordingly, and given the strong presumption of arbitrability and construction of all ambiguities in favor of arbitration, the Complaint is due to be stayed pending arbitration.

### a. Defendants' FINRA Claims Arise from AXA Distributors' Direct Business Activities.

Defendants' FINRA claims all arise in connection with Plaintiffs' business activities. AXA Distributors was AXA Equitable's responsible NASD member, through which the products were sold. *See, e.g.,* Accumulator Certificate Summary, attached as Exhibit C ("Accumulator is issued by the Equitable Life Assurance Society of the United States and distributed by Equitable Distributors, Inc. (member NASD)."); *see also* BrokerCheck Report, Exhibit A. It is undisputed that AXA Distributors was the marketing and sales arm of AXA Equitable for non-affiliated brokers. It is undisputed that AXA Distributors provided the training on

the product and on how to sell the product at issue, which sales techniques give rise to the dispute in the *Bullard* arbitration.

For example, Defendants allege claims in *Bullard* under the Alabama Securities Fraud Act arising from the fraudulent inducement to purchase a variable annuity under the guise that the annuity provided liquidity at the end of the annuity term and provided a guaranteed rate of interest which would be distributed along with the principal at the end of the term of the annuity. Statement of Claim, pp. 10-11. The Alabama Securities Fraud Act applies whether or not the fraud was perpetrated directly or indirectly. Ala. Code Section 8-6-17 states:

> (a) It is unlawful for any person, in connection with the offer, sale, or purchase of any security, ***directly or indirectly***, to:
>
> (1) Employ any device, scheme, or artifice to defraud;
>
> (2) Make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or
>
> (3) Engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

Ala. Code § 8-6-17 (1975) (Emphasis added).

The dispute with AXA Distributors arises from AXA Distributors' business activities as the sales and marketing arm of AXA Equitable, who profited from the sales of associated persons, such as Ann Holman, training her and pushing the

14

product as a "best of both worlds" investment while concealing or misrepresenting its true nature.   In alleging a claim under the Alabama Securities Fraud Act, Defendants claim that AXA Distributors, either directly *or indirectly*, employed a device, scheme, or artifice to defraud by training brokers to sell the product based on liquidity at the end of term, made untrue statements of material fact or omitted to state a material fact necessary to make the statements made not misleading, by failing to disclose to Ms. Holman or train her that the products did not provide liquidity or a guaranteed rate of interest, and by failing to provide Ms. Holman or her clients with a meaningful prospectus relating to the liquidity feature or to train Ms. Holman on the same.   At a minimum, the way in which AXA Distributors trained its associated persons, including Ann Holman, is an act, practice or course of business which operated as a fraud on any person, including Defendants.   It is clear that Defendants' claims under the Alabama Securities Act arise out of AXA Distributors' business activities.

Likewise, Defendants' negligent training and supervision claims arise out AXA's business activities in failing to adequately train and/or supervise Ann Holman on the sale of the annuity and the ensuing scheme to defraud.   It is undisputed that AXA Distributors, LLC provided the training and direction on the sale and marketing of the annuity product.  Having undertaken the duty to train and support Ms. Holman, AXA Distributors had a duty to do so with due care.

*Fireman's Fund American Ins. Co. v. Coleman*, 394 So. 2d 334, 350 (Ala.) (on reh'g, 1981) (J. Jones, concurring); *see also* Michael L. Roberts and Gregory S. Cusimano, Alabama Tort Law (2d ed. 1996) at 30.   Thus, it is clear, at a minimum, Defendants' negligent training and supervision claims arise out of the direct business activities of AXA Distributors.   It is not the province of the court to determine whether or not the Defendants will ultimately prevail on the merits of those arbitration claims, but merely to determine whether there is an enforceable arbitration agreement. *See Great W. Mortgage Corp. v. Peacock*, 110 F.3d at 228. All ambiguities are to be construed in favor of arbitration. *Carroll v. W.L. Petrey Wholesale Co., Inc.*, 941 So. 2d at 236-37.

### b.  The Claims Arise from the Business Activities of Ann Holman.

The NASD Code provides that members must arbitrate disputes arising "in connection with the business activities of the member *or associated person*" upon customer demand.   Rule 12200 (emphasis added).   Here, the dispute arose in connection with sales by Ann Holman of Defendants' annuity products, and, thus, the dispute is clearly "in connection with the business activities" of the Plaintiffs.

### 1)  The Business Activities of an Associated Person are Those of a Member.

For purposes of arbitration under the NASD code, the business activities of an associated person are the activities of the member. *Multi-Financial Securities*

*Corp. v. King*, 386 F.3d 1364, 1370 ("Even if the Code were not written so broadly and a member could only be compelled into arbitration by its own customers, [the investor] still could have compelled [the member] into arbitration. When an investor deals with a member's agent or representative, the investor deals with the member."). Numerous cases have held that where a claim can be brought against an associated person, the NASD member can be brought in as a respondent, even if that member had no knowledge of the activities giving rise to the claim. *See Multi-Financial Securities Corp.*, 386 F.3d at 1370; *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 59 (2d Cir. 2001); *MONY Securities Corp. v. Bornstein*, 390 F.3d at 1344-45 ("It is irrelevant that the [defendants] invested with an unrelated company; what matters is that Keller was also an associated person with MONY;" "[S]upervision of associated persons arises in connection with the member's business.").

### 2) Ann Holman Was an "Associated Person" of AXA Distributors.

It is clear that Ann Holman was an "associated person" of AXA Distributors as that term is broadly defined under the Code. Rule 2100(a) provides that an "associated person" is a "Person Associated With a Member" as defined under Rule 2100(r):

The term "person associated with a member" means:

(1) A natural person registered under the Rules of NASD; or

(2) A sole proprietor, partner, officer, director, or branch manager of a member, or a natural person occupying a similar status or performing similar functions, *or a natural person engaged in the* investment banking or *securities business who is directly or indirectly* controlling or *controlled by a member*, *whether or not any such person is registered* or exempt from registration *with NASD* under the By-Laws or the Rules of NASD.

For purposes of the Code, a person formerly associated with a member is a person associated with a member.

Rule 2100(r) (emphasis added). Thus, a "person associated with a member" need not be a registered or appointed agent or representative of a member; it is sufficient to be engaged in the sale of securities and be at least *indirectly* controlled by a member. Here, it must be undisputed that Ann Holman was a person associated with the wholesale broker-dealer AXA Distributors. As set forth below, AXA Distributors trained Ms. Holman on the product and the product materials, directing her sales techniques and advising how to sell the product, and provided her directly with support, prospectuses, marketing materials, and other literature to aid her in selling AXA products.

In addition, the Securities and Exchange Commission "has consistently taken the position that independent contractors . . . involved in the sale of securities on behalf of a broker-dealer are "controlled by" the broker-dealer, and, therefore, are associated persons of the broker-dealer." *Lawrence v. Richman Group Capital*

*Corp.*, 358 F. Supp. 2d 29, 33 n.4 (D. Conn. 2005) (quoting Securities and Exchange Commission, Books and Records Requirements for Brokers and Dealers Under the Securities Exchange Act of 1934, 66 Fed. Reg. 55818-01, 2001 WL 1343460 (Nov. 2, 2001)).   Ann Holman was an associated person of AXA Distributors.

### a) AXA Distributors Trained Ann Holman.

The undisputed testimony of Ann Holman establishes that AXA Distributors trained her on the product.  AXA Distributors conducted every seminar that Ms. Holman attended on the Accumulator annuity, including those provided by Raymond James.  *See* training seminar rosters, attached as Exhibit D; *see also* Holman Aff., Exhibit B.  AXA Distributors explained the product to her, taught her how to sell it to clients, answered her questions regarding the annuity, and controlled how she sold the product to her clients.  Holman Aff., Exhibit B.  AXA Distributors gave Ms. Holman quotes and illustrations on the product, provided all sales literature and prospectuses that Ms. Holman received on the product, and instructed her on how to interpret the quarterly statements provided to her clients. *Id.*  AXA Distributors personnel also sent letters to Ann Holman and other Raymond James brokers offering marketing and sales support to the brokers who sold AXA annuities.  *See* Letter dated March 8, 2007 from Peter Dunn to Charles Helms of Raymond James, Exhibit E (introducing himself as Mr. Helms'

19

wholesaler and offering him "marketing support and illustrations" and stating that "we provide you with a competitive product [and] effective sales ideas . . . ."). Here, Ms. Holman merely passed along AXA Distributors' representations to her clients. *Id*.

### b) AXA Distributors Provided Ann Holman With the Sales Literature.

AXA Distributors provided Ann Holman with all of the sales and marketing literature, including prospectuses, which she received regarding the AXA annuity products. See Holman Aff., Exhibit B. Ann Holman's affidavit establishes that she received all of the Accumulator product-related literature from AXA Distributors, and also that AXA Distributors failed to provide the Income Manager prospectus to her or her clients. Holman Aff., Exhibit B.

### c) AXA Distributors Profited From Ann Holman's Sales.

Because the issuer, AXA Equitable Life Insurance Co., was not registered as a broker-dealer with the Securities and Exchange Commission (SEC) and was not a member of FINRA or any other securities organization registered with the SEC, its securities products may only be sold through registered broker-dealers such as AXA Distributors (a wholesale broker-dealer and member of FINRA) without

violating Section 15 of the Securities Exchange Act of 1934.[8]  AXA Distributors

cannot dispute that Ann Holman could not have sold the product at issue but for

AXA Distributors.  AXA does not contend that it did not profit from Defendants'

transactions or from the sales of the Accumulator effected by Ms. Holman.

Indeed, the prospectus discloses that AXA Distributors, as the sales and marketing

arm of AXA Equitable Life Insurance Co., receives remuneration for the

distribution and marketing of the annuities directly from AXA Equitable Life

Insurance Co.  *See* Income Manager Prospectus, attached as Exhibit F (stating that

AXA Distributors receives distribution fees from AXA Equitable for acting as a

distributor of its contracts and that AXA Distributors may also receive

"compensation and reimbursement for its marketing services under the terms of

---

[8]  Section 15(a)(1) states:

> It shall be unlawful for any broker or dealer which is either a person other than a natural person or a natural person not associated with a broker or dealer which is a person other than a natural person (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.

Securities Exchange Act of 1934, 15 U.S.C. § 78o(a).  Section 15(b)(8) states:

> It shall be unlawful for any registered broker or dealer to effect any transaction in, or induce or attempt to induce the purchase or sale of, any security (other than commercial paper, bankers' acceptances, or commercial bills), unless such broker or dealer is a member of a securities association registered pursuant to section 15A or effects transactions in securities solely on a national securities exchange of which it is a member.

Securities Exchange Act of 1934, 15 U.S.C. § 78o(b)(8).

their distribution agreements with Equitable Life." Thus, AXA Distributors cannot dispute that it directly profited from sales effected through Ms. Holman, whether for acting as the distributor on those sales or for training Ms. Holman on the product.

### c. AXA Distributors' Literature Demonstrates It Was Involved and that the Claims Relate to Its Business Activities.

Literature and statements sent directly from AXA Equitable Life Insurance Co. to Defendants made clear that AXA Distributors was an involved and a responsible party. The Accumulator Certificate Summary sent to every customer states, "Accumulator is issued by the Equitable Life Assurance Society of the United States and distributed by Equitable Distributors, Inc. (member NASD)." *See* Accumulator Certificate Summary, Exhibit C. Equitable Distributors, Inc. is the former name of AXA Distributors, LLC. See BrokerCheck Report, Exhibit A. Confirmation notices sent to customers state, "Equitable Distributors, Inc. acts as distributor for The Equitable Life Assurance Society of the United States *in connection with the distribution of Separate Account Units under your contract or certificate*. Equitable Distributors, Inc. and Equitable Life are affiliated companies." (Emphasis added). *See* sample Confirmation Notice, attached as Exhibit G.

22

Further, certain disclosures by AXA Equitable demonstrate that AXA Distributors received remuneration for distributing AXA Equitable's contracts as well as for providing marketing services to unaffiliated broker-dealers through selling agreements and that the commissions paid to registered representatives of unaffiliated brokers come from AXA Distributors, not AXA Equitable. Specifically, the Equitable Income Manager Prospectus states on page 38:

Distribution of contracts

*Equitable Distributors, Inc. ("EDI") and EQ Financial Consultants, Inc. ("EQF"), indirect, wholly owned subsidiaries of Equitable Life, are the distributors of the contracts and have responsibility for sales and marketing functions. EDI and EQF are registered with the SEC as broker-dealers and are members of the National Association of Securities Dealers, Inc.* The principal business address of EDI and EQF is 1290 Avenue of the Americas, New York, New York 10104. *Under a distribution agreement between Equitable Life, certain of Equitable Life's separate accounts, including the separate account that contains the fixed maturity options, and EDI, Equitable Life paid EDI distribution fees of $129,520 for 1998, $962,599 for 1997 and $202,400 for 1996, as the distributor of the contracts.* Under a distribution and services contract between EQF, Equitable Life and certain of Equitable Life's separate accounts, including the separate account that contains the fixed maturity options, Equitable Life paid EQF $325,380 for 1998, as the distributor for certain contracts including these contracts. During 1999, EQF plans to change its name to AXA Advisors, Inc.

Equitable Income Manager Prospectus, Exhibit F (Emphasis added).   .  As is apparent from the prospectus, AXA Distributors' contract with AXA Equitable provides remuneration for distribution.  Further:

The contracts will be sold by registered representatives of EDI and EQF as well as by affiliated and *unaffiliated broker-dealers with which EDI and/or EQF has entered into selling agreements*. Broker-dealer sales compensation will generally not exceed 5% of total contributions made under the contracts. *EDI and EQF may also receive compensation and reimbursement for its marketing services under the terms of their distribution agreements with Equitable Life*. *Broker-dealers receiving sales compensation will generally pay a portion of it to their registered representatives as commissions related to sales of the contracts.* The offering of the contracts is intended to be continuous.

Equitable Income Manager Prospectus, Exhibit F (Emphasis added).    As disclosed therein, the sale of the AXA Equitable's annuity products was accomplished by Raymond James representatives, such as Ann Holman, through AXA Distributors' and not as a result of a contract with AXA Equitable. Thus, in order to avoid registration issues incumbent to direct sales or contracts for sales, AXA Equitable effected sales by registered representatives of affiliated and unaffiliated broker-dealers through AXA Distributors.

AXA Equitable's contract with AXA Distributors provides remuneration to AXA Distributors for both distribution and marketing services. AXA Distributors then enters selling agreements with other broker/dealers, such as Raymond James, for Raymond James' representatives to commission sales. AXA Distributors provides sales compensation to Raymond James and Raymond James, in turn, provides a commission to its registered representatives, such as Ann Holman, out of the sale compensation provided by Raymond James. Thus, Ann Holman's

commissions were funded by AXA Distributors and not as a result of a contract with AXA Equitable.

Further, the prospectus discloses that AXA Distributors received compensation from Equitable Life Insurance for providing both distribution and marketing services, such as the training and support provided to Ann Holman. Ann Holman was a registered representative of Raymond James, which had a selling agreement with AXA Distributors. The Statement of the Claim also alleges failure of AXA Distributors to "provide Claimants with a prospectus providing complete, meaningful disclosures of the investment, including its options, risks, fees, expenses, and method of assuring a 90% lump sum pay out without penalty at the close of the maturity period." AXA Distributors cannot dispute that it provided all of the marketing materials, including the provision or failure to provide meaningful prospectuses to support the sales it encouraged and for which it received compensation.

Additionally, with each new account, AXA Distributors, LLC sent the new account certificate, accompanied by a letter thanking the representative for the business and offering support, an information package, and marketing materials and assistance. *See* Letter dated March 2, 2000 from Greg Brakovich, Managing

Director of Equitable Distributors, Inc. (now AXA Distributors, LLC) to Ann S. Holman, attached as Exhibit H.

Thus, the Plaintiffs were involved in the sales of these AXA annuities, even when directly sold to Defendants by independent representatives and brokerage firms, and all sales of AXA annuities are "in connection with the business activities" of the Plaintiffs, particularly AXA Distributors, LLC, but also AXA Advisors.

### C. It is a Violation of FINRA Rules For Plaintiffs Not to Submit The Dispute to Arbitration.

Under NASD Code of Arbitration Procedure Rule IM-12000, "It may be deemed conduct inconsistent with just and equitable principles of trade and a violation of Rule 2110 for a member or a person associated with a member to: (a) fail to submit a dispute for arbitration under the NASD Code of Arbitration Procedure ("Code") as required by the Code." As members of FINRA, Plaintiffs are obligated to submit to FINRA arbitration. Failure to do so is a violation of their obligations under their FINRA membership.

## IV.    <u>CONCLUSION</u>

For the above reasons, this action should be dismissed. The issue of arbitrability is for the Director of FINRA to determine under the FINRA arbitration rules. However, even if the Court determines it is the proper decider of

arbitrability, this dispute is proper for mandatory FINRA arbitration under Rule 12200.

Respectfully Submitted,

/s/ Caroline Smith Gidiere
One of the Attorneys for Defendants

Andrew P. Campbell
Caroline Smith Gidiere
Campbell, Gidiere, Lee, Sinclair
    and Williams, PC
2100A SouthBridge Parkway, Suite 450
Birmingham, Alabama  35209
(205) 803-0051
Fax: (205) 803-0053
acampbell@cgl-law.com
cgidiere@cgl-law.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following on this 20th day of June 2008:

A. Inge Selden III
John N. Bolus
Andrea Morgan Greene
MAYNARD, COOPER & GALE, P.C.
2400 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203-2602
(205) 254-1000


/s/ Caroline Smith Gidiere
One of the Attorneys for Defendants

# EXHIBIT "A"

# BrokerCheck Report

## AXA DISTRIBUTORS, LLC

CRD# 25900

Report #28618-11454 generated on Friday, June 20, 2008.

| Section Title | Page(s) |
|---|---|
| Report Summary | 1 |
| Firm Profile | 2 - 6 |
| Firm History | 7 |
| Firm Operations | 8 - 18 |
| About this BrokerCheck Report | 19 |



**Dear Investor:**

FINRA has generated the following BrokerCheck report for AXA DISTRIBUTORS, LLC. The information contained within this report has been provided by a FINRA brokerage firm(s) and securities regulators as part of the securities industry's registration and licensing process and represents the most current information reported to the Central Registration Depository (CRD®).

FINRA regulates the securities markets for the ultimate benefit and protection of the investor. FINRA believes the general public should have access to information that will help them determine whether to conduct, or continue to conduct, business with a FINRA member. To that end, FINRA has adopted a public disclosure policy to make certain types of information available to you. Examples of information FINRA provides include: regulatory actions, investment-related civil suits, customer disputes that contain allegations of sales practice violations against brokers, all felony charges and convictions, misdemeanor charges and convictions relating to securities violations, and financial events such as bankruptcies, compromises with creditors, judgments, and liens.

When evaluating this report, please keep in mind that it may include items that involve pending actions or allegations that may be contested and have not been resolved or proven. Such items may, in the end, be withdrawn or dismissed, or resolved in favor of the individual broker, or concluded through a negotiated settlement with no admission or finding of wrongdoing.

The information in this report is not the only resource you should consult. FINRA recommends that you learn as much as possible about the individual broker or firm from other sources, such as professional references, local consumer and investment groups, or friends and family members who already have established investment business relationships.

FINRA BrokerCheck is governed by federal law, Securities and Exchange Commission (SEC) regulations and FINRA rules approved by the SEC. State disclosure programs are governed by state law, and may provide additional information on brokers licensed by the state. Therefore, you should also consider requesting information from your state securities regulator. Refer to www.nasaa.org for a complete list of state securities regulators.

Thank you for using FINRA BrokerCheck.



Using this site/information means that you accept the FINRA BrokerCheck Terms and Conditions. A complete list of Terms and Conditions can be found at

brokercheck.finra.org



For additional information about the contents of this report, please refer to the User Guidance or www.finra.org/brokercheck. It provides a glossary of terms and a list of frequently asked questions, as well as additional resources. For more information about FINRA, visit www.finra.org.



www.finra.org/brokercheck



User Guidance

# Report Summary for this Firm

# AXA DISTRIBUTORS, LLC

CRD# 25900

SEC# 8-42123

## Main Office Location

1290 AVENUE OF THE AMERICAS
NEW YORK, NY 10104
Regulated by FINRA New York Office

## Mailing Address

1290 AVENUE OF THE AMERICAS
7TH FLOOR
NEW YORK, NY 10104

The report summary provides an overview of the firm's background. The firm and a securities regulator(s) have provided the information contained in this report as part of the securities industry registration and licensing process. More detailed information for this firm can be found in the firm's PDF report. Select "View Full PDF Report" to view the detailed information about this firm. The information contained in this report was last updated by the firm via Uniform Application for Broker-Dealer Registration (Form BD), the Uniform Request for Broker-Dealer Withdrawal (Form BDW), or a securities regulator via a Uniform Disciplinary Action Reporting Form (Form U6) on 05/21/2008.

## Firm Profile

This firm is classified as a limited liability company.

This firm was formed in Delaware on 01/01/2002.

Its fiscal year ends in December.

## Firm History

Information relating to the firm's history such as Other Business Names, Other Business, and Successions (e.g., mergers or acquisitions) can be found in the firm's full PDF report.

## Firm Operations

### This firm is registered with:

- the SEC
- 1 Self-Regulatory Organization
- 52 U.S. states and territories

Is this brokerage firm currently suspended with any regulator? **No**

This firm conducts 1 type of business.

This firm is affiliated with financial or investment institutions.

This firm does not have referral or financial arrangements with other brokers or dealers.

## Disclosure of Arbitration Awards, Disciplinary, Financial, and Regulatory Events

This section includes details regarding disclosure events reported by or about this firm to CRD as part of the securities industry registration and licensing process. Examples of such disclosure events range from disciplinary actions initiated by regulators to certain criminal charges and/or convictions, to financial disclosures such as bankruptcies, and summary information regarding arbitration awards involving securities and commodities disputes between public customers and FINRA-registered firms.

Are there events disclosed about this firm?    **No**

©2008 FINRA. All rights reserved.    Report# 28618-11454 generated on Friday, June 20, 2008 about AXA DISTRIBUTORS, LLC

www.finra.org/brokercheck

# Firm Profile

This firm is classified as a limited liability company.

This firm was formed in Delaware on 01/01/2002.

Its fiscal year ends in December.

## Firm Names and Locations

This section includes details, as reported by the firm on Form BD, regarding the firm's full legal name, business and mailing addresses, the firm's "doing business as" name (i.e., "DBA" name) if different from the full legal name, and any other name by which the firm conducts business and where such name is used.

**AXA DISTRIBUTORS, LLC**
**Doing business as AXA DISTRIBUTORS, LLC**

**CRD#** 25900
**SEC#** 8-42123

**Main Office Location**
1290 AVENUE OF THE AMERICAS
NEW YORK, NY 10104

**Regulated by FINRA New York Office**

**Mailing Address**
1290 AVENUE OF THE AMERICAS
7TH FLOOR
NEW YORK, NY 10104

**Business Telephone Number**
212-314-3892

©2008 FINRA. All rights reserved.    Report# 28618-11454 generated on Friday, June 20, 2008 about AXA DISTRIBUTORS, LLC

User Guidance



# Firm Profile

## Direct Owners and Executive Officers

This section provides information relating to Direct Owners and Executive Officers as reported by the firm on Form BD.

| | |
|---|---|
| Legal Name & CRD# (if any): | EQUITABLE HOLDINGS, L.L.C. |
| Is this a domestic or foreign entity or an individual? | Domestic Entity |
| Position | OWNER |
| Position Start Date | 09/1993 |
| Percentage of Ownership | 75% or more |
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | No |

| | |
|---|---|
| Legal Name & CRD# (if any): | ABRAMS, NORMAN J. MR. 4072737 |
| Is this a domestic or foreign entity or an individual? | Individual |
| Position | VICE PRESIDENT & COUNSEL |
| Position Start Date | 11/1998 |
| Percentage of Ownership | Less than 5% |
| Does this owner direct the management or policies of the firm? | No |
| Is this a public reporting company? | No |

| | |
|---|---|
| Legal Name & CRD# (if any): | GISMONDI, NICHOLAS J 5439715 |
| Is this a domestic or foreign entity or an individual? | Individual |
| Position | FINANCIAL OPERATIONS PRINCIPAL |
| Position Start Date | 05/2008 |

©2008 FINRA. All rights reserved.    Report# 28618-11454 generated on Friday, June 20, 2008 about AXA DISTRIBUTORS, LLC

finra

User Guidance

3

# Firm Profile

www.finra.org/brokercheck

User Guidance

## Direct Owners and Executive Officers (continued)

| | |
|---|---|
| Percentage of Ownership | Less than 5% |
| Does this owner direct the management or policies of the firm? | No |
| Is this a public reporting company? | No |

| | |
|---|---|
| Legal Name & CRD# (if any): | SHEPHERDSON, JAMES ARDEN |
| | 714560 |
| Is this a domestic or foreign entity or an individual? | Individual |
| Position | CHAIRMAN OF THE BOARD-CEO |
| Position Start Date | 08/2005 |
| Percentage of Ownership | Less than 5% |
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | No |

| | |
|---|---|
| Legal Name & CRD# (if any): | TOUMPAS, MARY |
| Is this a domestic or foreign entity or an individual? | Individual |
| Position | VICE PRESIDENT AND COMPLIANCE OFFICER |
| Position Start Date | 03/2003 |
| Percentage of Ownership | Less than 5% |
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | No |

www.finra.org/brokercheck

# Firm Profile

## Indirect Owners

This section provides information relating to Indirect Owners, if any, as reported by the firm on Form BD.

| | |
|---|---|
| Legal Name & CRD# (if any): | AXA FINANCIAL SERVICES, LLC |
| Is this a domestic or foreign entity or an individual? | Domestic Entity |
| Company through which indirect ownership is established | THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES |
| Relationship to Direct Owner | SHAREHOLDER |
| Relationship Established | 06/2002 |
| Percentage of Ownership | 75% or more |
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | Yes |

| | |
|---|---|
| Legal Name & CRD# (if any): | AXA FINANCIAL, INC. |
| Is this a domestic or foreign entity or an individual? | Domestic Entity |
| Company through which indirect ownership is established | AXA FINANCIAL SERVICES, LLC |
| Relationship to Direct Owner | MEMBER |
| Relationship Established | 06/2002 |
| Percentage of Ownership | 75% or more |
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | Yes |

| | |
|---|---|
| Legal Name & CRD# (if any): | THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES |
| Is this a domestic or foreign entity or an individual? | Domestic Entity |

©2008 FINRA. All rights reserved.     Report# 28618-11454 generated on Friday, June 20, 2008 about AXA DISTRIBUTORS, LLC



User Guidance

5

www.finra.org/brokercheck

# Firm Profile

## Indirect Owners (continued)

| | |
|---|---|
| Company through which indirect ownership is established | EQUITABLE HOLDINGS, L.L.C. |
| Relationship to Direct Owner | 100% OWNER |
| Relationship Established | 12/1989 |
| Percentage of Ownership | 75% or more |
| Does this owner direct the management or policies of the firm? | Yes |
| Is this a public reporting company? | No |

©2008 FINRA. All rights reserved.   Report# 28618-11454 generated on Friday, June 20, 2008 about AXA DISTRIBUTORS, LLC

FINTa

www.finra.org/brokercheck

# Firm History

This section provides information relating to successions (e.g., mergers or acquisitions), if any, as reported by the firm on Form BD.

**This firm was previously:** EQUITABLE DISTRIBUTORS, INC.

**Date of Succession:** 01/01/2002

**Predecessor CRD#:** 25900

**Predecessor SEC#:** 8-42123

**Description** ON 1/01/02, EQUITABLE DISTRIBUTORS, INC. MERGED INTO AXA DISTRIBUTORS, LLC, A NEWLY FORMED LIMITED LIABILITY COMPANY. ALL ASSETS AND LIABILITIES ARE IDENTICAL TO THOSE OF EQUITABLE DISTRIBUTORS, INC. AXA DISTRIBUTORS, LLC HAS THE SAME BOARD OF DIRECTORS AND THE SAME OFFICERS AS ITS PREDECESSOR. ACCORDINGLY, THE MERGER DID NOT RESULT IN EITHER A CHANGE OF CONTROL OR IN THE DAY TO DAY MANAGEMENT OF THE FIRM.

©2008 FINRA. All rights reserved.    Report# 28618-11454 generated on Friday, June 20, 2008 about AXA DISTRIBUTORS, LLC



User Guidance



©2008 FINRA. All rights reserved.    Report# 28618-11454 generated on Friday, June 20, 2008 about AXA DISTRIBUTORS, LLC

# Firm Operations

## Registrations

This section provides information about the regulators (e.g., U.S. Securities and Exchange Commission (SEC), self-regulatory organizations, states and U.S. territories) the firm is currently registered and licensed with, the category of each registration, and the date on which the registration status became effective, as well as certain information about the firm's SEC registration.

**This firm is currently registered with the SEC, 1 SRO and 52 U.S. states and territories.**

| Federal Regulator | Status | Date Effective |
|---|---|---|
| SEC | Approved | 02/16/1990 |

## SEC Registration Questions

This firm is registered with the SEC as:

A broker-dealer:    Yes

A broker-dealer and government securities broker or dealer:    No

A government securities broker or dealer only:    No

This firm has ceased activity as a government securities broker or dealer:    No

| Self-Regulatory Organization | Status | Date Effective |
|---|---|---|
| FINRA | Approved | 08/19/1991 |

8

## Firm Operations

www.finra.org/brokercheck

### Registrations (continued)

| U.S. States & Territories | Status | Date Effective | U.S. States & Territories | Status | Date Effective |
|---|---|---|---|---|---|
| Alabama | Approved | 07/07/1992 | North Carolina | Limited | 04/09/1992 |
| Alaska | Approved | 06/29/1992 | North Dakota | Approved | 05/28/1992 |
| Arizona | Approved | 05/27/1992 | Ohio | Approved | 02/03/1997 |
| Arkansas | Approved | 05/28/1992 | Oklahoma | Approved | 05/13/1992 |
| California | Approved | 02/06/2002 | Oregon | Approved | 04/27/1992 |
| Colorado | Approved | 04/23/1992 | Pennsylvania | Approved | 05/26/1992 |
| Connecticut | Approved | 05/29/1992 | Puerto Rico | Approved | 08/03/1992 |
| Delaware | Approved | 05/21/1992 | Rhode Island | Approved | 05/08/1992 |
| District of Columbia | Approved | 06/07/1992 | South Carolina | Approved | 04/14/1992 |
| Florida | Approved | 04/29/1992 | South Dakota | Approved | 05/19/1992 |
| Georgia | Approved | 04/06/1992 | Tennessee | Approved | 04/10/1992 |
| Hawaii | Approved | 06/30/1992 | Texas | Limited | 05/08/1992 |
| Idaho | Approved | 05/11/1992 | Utah | Limited | 04/24/1992 |
| Illinois | Approved | 04/24/1992 | Vermont | Approved | 02/04/1992 |
| Indiana | Approved | 06/16/1992 | Virginia | Approved | 05/21/1992 |
| Iowa | Approved | 04/27/1992 | Washington | Approved | 04/24/1992 |
| Kansas | Approved | 05/29/1992 | West Virginia | Approved | 06/03/1992 |
| Kentucky | Approved | 04/15/1992 | Wisconsin | Approved | 06/05/1992 |
| Louisiana | Approved | 04/10/1992 | Wyoming | Approved | 05/18/1992 |
| Maine | Approved | 06/08/1992 | | | |
| Maryland | Approved | 04/16/1992 | | | |
| Massachusetts | Approved | 05/11/1992 | | | |
| Michigan | Approved | 07/21/1992 | | | |
| Minnesota | Approved | 05/27/1992 | | | |
| Mississippi | Approved | 05/26/1992 | | | |
| Missouri | Approved | 06/01/1992 | | | |
| Montana | Limited | 06/17/1992 | | | |
| Nebraska | Limited | 06/15/2000 | | | |
| Nevada | Approved | 05/08/1992 | | | |
| New Hampshire | Limited | 07/21/1992 | | | |
| New Jersey | Approved | 06/18/1992 | | | |
| New Mexico | Approved | 12/1/2002 | | | |
| New York | Approved | 02/14/1991 | | | |

©2008 FINRA. All rights reserved.    Report# 28618-11454 generated on Friday, June 20, 2008 about AXA DISTRIBUTORS, LLC



User Guidance

www.finra.org/brokercheck

User Guidance

# Firm Operations

## Types of Business

This section provides the types of business and any other business or other non-securities business the firm is engaged in or is expected to be engaged in as reported by the firm on Form BD.

**This firm currently conducts 1 type of business.**

**Types of Business**

Other

## Other Types of Business

This firm does not affect transactions in commodities, commodity futures, or commodity options.
This firm does not engage in other non-securities business.
Non-Securities Business Description:



www.finra.org/brokercheck

# Firm Operations

## Clearing Arrangements

This firm does not hold or maintain funds or securities or provide clearing services for other broker-dealer(s).

## Introducing Arrangements

This firm does not refer or introduce customers to other brokers and dealers.

©2008 FINRA. All rights reserved.    Report# 28618-11454 generated on Friday, June 20, 2008 about AXA DISTRIBUTORS, LLC

User Guidance



## Firm Operations

### Industry Arrangements

**This firm does have books or records maintained by a third party.**

**Name:** THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES

**CRD #:** 4039

**Business Address:** 1290 AVENUE OF THE AMERICAS
NEW YORK, NY 10104

**Effective Date:** 01/01/1998

**Description:** APPLICANT HAS ENTERED INTO AN AGREEMENT WITH ITS PARENT, EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES ("EQUITABLE"), WHICH PROVIDES FOR JOINT USE OF VARIOUS PERSONNEL, PROPERTY AND SERVICES. APPLICANT WILL PAY EQUITABLE THE COSTS (DIRECT AND INDIRECT) AND EXPENSES INCURRED BY EQUITABLE IN FURNISHING PERSONNEL, PROPERTY AND SERVICES TO APPLICANT. ANY RECORDS CREATED OR MAINTAINED BY EQUITABLE ON BEHALF OF APPLICANT ARE THE SOLE PROPERTY OF APPLICANT AND ARE SPECIFICALLY IDENTIFIED AS SUCH.

**This firm does not have accounts, funds, or securities maintained by a third party.**

**This firm does not have customer accounts, funds, or securities maintained by a third party.**

**This firm does have individuals who control its management or policies through agreement.**

**Control Persons/Financing**

**Name:** AXA

**Business Address:** 9 PLACE VENDOME
PARIS FRANCE 75001

**Effective Date:** 03/01/1999

**Description:** AXA, A FRENCH HOLDING COMPANY, DIRECTLY AND INDIRECTLY OWNS 100% OF THE STOCK OF AXA FINANCIAL, INC.

**This firm does not have individuals who wholly or partly finance the firm's business.**

©2008 FINRA. All rights reserved.    Report# 28618-11454 generated on Friday, June 20, 2008 about AXA DISTRIBUTORS, LLC

www.finra.org/brokercheck



User Guidance

www.finra.org/brokercheck

# Firm Operations

## Organization Affiliates

This section provides information relating to control relationships with entities engaged in the securities, investment advisory, or banking business as reported by the firm on Form BD.

**This firm is, directly or indirectly:**
· in control of
· controlled by
· or under common control with

the following partnerships, corporations, or other organizations engaged in the securities or investment advisory business.

**MONY LIFE INSURANCE COMPANY is under common control with the firm.**

| | |
|---|---|
| Business Address: | 1290 AVENUE OF THE AMERICAS<br>NEW YORK, NY 10104 |
| Effective Date: | 07/08/2004 |
| Foreign Entity: | No |
| Country: | |
| Securities Activities: | No |
| Investment Advisory<br>Activities: | Yes |
| Description: | MONY LIFE INSURANCE COMPANY IS AN INDIRECT, WHOLLY-OWNED<br>SUBSIDIARY OF AXA FINANCIAL, INC. |

**MONY LIFE INSURANCE COMPANY OF AMERICA is under common control with the firm.**

| | |
|---|---|
| Business Address: | 1290 AVENUE OF THE AMERICAS<br>NEW YORK, NY 10104 |
| Effective Date: | 09/09/1999 |
| Foreign Entity: | No |
| Country: | |
| Securities Activities: | No |
| Investment Advisory<br>Activities: | Yes |
| Description: | MONY LIFE INSURANCE COMPANY IS AN INDIRECT, WHOLLY-OWNED<br>SUBSIDIARY OF AXA FINANCIAL, INC. |

**ENTERPRISE CAPITAL MANAGEMENT, INC. is under common control with the firm.**

| | |
|---|---|
| Business Address: | 3343 PEACHTREE ROAD, N.E. |

©2008 FINRA. All rights reserved.    Report# 28618-11454 generated on Friday, June 20, 2008 about AXA DISTRIBUTORS, LLC

www.finra.org/brokercheck

# Firm Operations

## Organization Affiliates (continued)

**ENTERPRISE FUND DISTRIBUTORS, INC. is under common control with the firm.**

| | |
|---|---|
| **Description:** | ENTERPRISE CAPITAL MANAGEMENT IS AN INDIRECT, WHOLLY-OWNED SUBSIDIARY OF AXA FINANCIAL, INC. |
| **Investment Advisory Activities:** | Yes |
| **Securities Activities:** | No |
| **Country:** | |
| **Foreign Entity:** | No |
| **Effective Date:** | 07/08/2004 |
| **Business Address:** | 3343 PEACHTREE ROAD SUITE 700 ATLANTA, GA 30326 |
| **CRD #:** | 883 |

**ENTERPRISE FUND DISTRIBUTORS, INC. is under common control with the firm.**

| | |
|---|---|
| **Description:** | ENTERPRISE FUND DISTRIBUTORS, INC. IS A WHOLLY-OWNED SUBSIDIARY OF ENTERPRISE CAPITAL MANAGEMENT, INC., WHICH IS IN TURN AN INDIREC, WHOLLY-OWNED SUBSIDIARY OF AXA FINANCIAL, INC. |
| **Investment Advisory Activities:** | No |
| **Securities Activities:** | Yes |
| **Country:** | |
| **Foreign Entity:** | No |
| **Effective Date:** | 07/08/2004 |
| **Business Address:** | SUITE 700 ATLANTA, GA 30326 |
| **Foreign Entity:** | No |
| **Effective Date:** | 07/08/2004 |
| **Securities Activities:** | No |
| **Country:** | |

**ALLIANCE CAPITAL MANAGEMENT HOLDING L P is under common control with the firm.**

| | |
|---|---|
| **Business Address:** | 1345 AVENUE OF THE AMERICAS NEW YORK, NY 10105 |
| **Effective Date:** | 09/01/1999 |
| **Foreign Entity:** | No |
| **Country:** | |
| **Securities Activities:** | No |

©2008 FINRA. All rights reserved.    Report# 28618-11454 generated on Friday, June 20, 2008 about AXA DISTRIBUTORS, LLC


FINRA

User Guidance

# Firm Operations

## Organization Affiliates (continued)

| | |
|---|---|
| Investment Advisory Activities: | Yes |
| Description: | ALLIANCE CAPITAL MANAGEMENT HOLDING IS A LIMITED PARTNER OF ALLIANCE CAPITAL MANAGEMENT L.P. |

### SANFORD C. BERNSTEIN & CO., LLC is under common control with the firm.

| | |
|---|---|
| CRD #: | 104474 |
| Business Address: | 767 FIFTH AVENUE<br>NEW YORK, NY 10153 |
| Effective Date: | 10/02/2000 |
| Foreign Entity: | No |
| Country: | |
| Securities Activities: | Yes |
| Investment Advisory Activities: | Yes |
| Description: | SANFORD C. BERNSTEIN & CO., LLC IS AN INDIRECT WHOLLY-OWNED SUBSIDIARY OF ALLIANCE CAPITAL MANAGEMENT L.P. |

### ALLIANCE CAPITAL GLOBAL DERIVATIVES CORP. is under common control with the firm.

| | |
|---|---|
| Business Address: | 1345 AVENUE OF THE AMERICAS<br>NEW YORK, NY 10105 |
| Effective Date: | 08/08/1991 |
| Foreign Entity: | No |
| Country: | |
| Securities Activities: | No |
| Investment Advisory Activities: | Yes |
| Description: | THIS COMPANY IS AN INDIRECT, WHOLLY-OWNED SUBSIDIARY OF ALLIANCE CAPITAL MANAGEMENT L.P. |

### ALLIANCE CAPITAL MANAGEMENT CORPORATION is under common control with the firm.

| | |
|---|---|
| Business Address: | 1345 AVENUE OF THE AMERICAS<br>NEW YORK, NY 10105 |
| Effective Date: | 09/05/1991 |

©2008 FINRA. All rights reserved.   Report# 28618-11454 generated on Friday, June 20, 2008 about AXA DISTRIBUTORS, LLC

www.finra.org/brokercheck



User Guidance

www.finra.org/brokercheck

# Firm Operations

## Organization Affiliates (continued)

**Description:**                    THIS COMPANY IS AN INDIRECT, WHOLLY-OWNED SUBSIDIARY OF THE
                                    EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES.

**Investment Advisory
Activities:**                       Yes

**Securities Activities:**          No

**Country:**

**Foreign Entity:**                 No

---

**ALLIANCE CAPITAL MANAGEMENT L.P. is under common control with the firm.**

**Business Address:**               1345 AVENUE OF THE AMERICAS
                                    NEW YORK, NY  10105

**Effective Date:**                 10/14/1988

**Foreign Entity:**                 No

**Country:**

**Securities Activities:**          No

**Investment Advisory
Activities:**                       Yes

**Description:**                    THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES
                                    DIRECTLY AND INDIRECTLY OWNS MORE THAN 50% OF THIS COMPANY.

---

**ALLIANCE CORPORATE FINANCE GROUP INCORPORATED is under common control with the firm.**

**Business Address:**               1345 AVENUE OF THE AMERICAS
                                    NEW YORK, NY  10105

**Effective Date:**                 05/15/1989

**Foreign Entity:**                 No

**Country:**

**Securities Activities:**          No

**Investment Advisory
Activities:**                       Yes

**Description:**                    THIS COMPANY IS AN INDIRECT, WHOLLY-OWNED SUBSIDIARY OF
                                    ALLIANCE CAPITAL MANAGEMENT, L.P.

---

**ALLIANCEBERNSTEIN INVESTMENT RESEARCH AND MANAGEMENT, INC. is under common control with the
firm.**



User Guidance

# Firm Operations

## Organization Affiliates (continued)

| | |
|---|---|
| CRD #: | 14549 |
| Business Address: | 1345 AVENUE OF THE AMERICAS<br>NEW YORK, NY 10105 |
| Effective Date: | 10/14/1988 |
| Foreign Entity: | No |
| Country: | |
| Securities Activities: | Yes |
| Investment Advisory Activities: | No |
| Description: | THIS COMPANY IS AN INDIRECT, WHOLLY-OWNED SUBSIDIARY OF ALLIANCE CAPITAL MANAGEMENT, L.P. |

**AXA ADVISORS, LLC is under common control with the firm.**

| | |
|---|---|
| CRD #: | 6627 |
| Business Address: | 1290 AVENUE OF THE AMERICAS<br>NEW YORK, NY 10104 |
| Effective Date: | 09/20/1999 |
| Foreign Entity: | No |
| Country: | |
| Securities Activities: | Yes |
| Investment Advisory Activities: | Yes |
| Description: | THIS COMPANY, FORMERLY KNOWN AS EQ FINANCIAL CONSULTANTS, INC., IS AN INDIRECT, WHOLLY-OWNED SUBSIDIARY OF AXA FINANCIAL, INC. |

**AXA EQUITABLE LIFE INSURANCE COMPANY is under common control with the firm.**

| | |
|---|---|
| CRD #: | 104845 |
| Business Address: | 1290 AVENUE OF THE AMERICAS<br>NEW YORK, NY 10104 |
| Effective Date: | 01/05/2000 |
| Foreign Entity: | No |
| Country: | |

©2008 FINRA. All rights reserved.    Report# 28618-11454 generated on Friday, June 20, 2008 about AXA DISTRIBUTORS, LLC



User Guidance

## Firm Operations

### Organization Affiliates (continued)

**Description:**       THIS COMPANY IS AN INDIRECT, WHOLLY-OWNED SUBSIDIARY OF AXA
FINANCIAL, INC.

**Investment Advisory**       Yes
**Activities:**

**Securities Activities:**       No

This firm is not directly or indirectly, controlled by the following:
· bank holding company
· national bank
· state member bank of the Federal Reserve System
· state non-member bank
· savings bank or association
· credit union
· or foreign bank

©2008 FINRA. All rights reserved.    Report# 28618-11454 generated on Friday, June 20, 2008 about AXA DISTRIBUTORS, LLC

www.finra.org/brokercheck

User Guidance



©2008 FINRA. All rights reserved.    Report# 286118-11454 generated on Friday, June 20, 2008 about AXA DISTRIBUTORS, LLC

# About this BrokerCheck Report

www.finra.org/brokercheck

BrokerCheck reports are part of a FINRA initiative to disclose information about FINRA-registered firms and brokers to help investors determine whether to conduct, or continue to conduct, business with these firms and brokers. The information contained within these reports is collected through the securities industry's registration and licensing process.

## Who provides the information in BrokerCheck?

Information made available through FINRA BrokerCheck is derived from the Central Registration Depository (CRD®) as reported on the industry registration and licensing forms brokerage firms and brokers are required to complete.

The forms used by brokerage firms, Forms BD and BDW, are established by the Securities and Exchange Commission (SEC) and adopted by all state securities regulators and self-regulatory organizations (SROs). FINRA and the North American Securities Administrators Association (NASAA) establish the Forms U4 and U5, the forms that collect broker information. Regulators provide information via Form U6, which is used primarily to report certain history about brokerage firms and brokers. These forms are approved by the SEC.

## How current is the information contained in BrokerCheck?

Brokerage firms and brokers are required to keep this information accurate and up-to-date (updates typically are required not later than 30 days after the broker/brokerage firm learns of an event). The report data is updated when a firm, broker, or regulator submits new or revised information to CRD. Generally, updated information is available on BrokerCheck Monday through Friday.

## What information is NOT disclosed through BrokerCheck?

Information that has not been reported to the CRD system, or that is not required to be reported, is not disclosed through FINRA BrokerCheck. Examples of events that are not required to be reported or are no longer reportable include: judgments and liens originally reported as pending that subsequently have been satisfied and bankruptcy proceedings filed more than 10 years ago. Conversely, certain customer complaint information that is not required to be reported may be disclosed provided certain criteria are met.

Additional information not disclosed through BrokerCheck includes Social Security Numbers, residential history information, and physical description information. On a case-by-case basis, FINRA reserves the right to exclude information that contains confidential customer information, offensive and potentially defamatory language or information that raises significant identity theft or privacy concerns that are not outweighed by investor protection concerns. NASD Interpretive Material 8310-2 describes in detail what information is and is not disclosed through BrokerCheck.

Under FINRA's current public disclosure policy, in certain limited circumstances, most often pursuant to a court order, information is expunged from the CRD system. Further information about expungement from the CRD system is available in NASD Notices to Members 99-09, 99-54, 01-65, and 04-16 at www.finra.org.

For further information regarding FINRA's BrokerCheck program, please visit FINRA's Web Site at www.finra.org/brokercheck or call the FINRA BrokerCheck Hotline at (800) 289-9999. The hotline is open Monday through Friday from 8 a.m. to 8 p.m., Eastern Time (ET).

For more information about the following, select the associated link:

- About BrokerCheck Reports:  http://www.finra.org/brokercheck_reports
- Glossary:  http://www.finra.org/brokercheck_glossary
- Questions Frequently Asked about BrokerCheck Reports:  http://www.finra.org/brokercheck_faq
- Terms and Conditions:  http://brokercheck.finra.org/terms.aspx



User Guidance

EXHIBIT "B"

## IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| AXA DISTRIBUTORS, LLC and AXA ADVISORS, LLC, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| GAYLE S. BULLARD et al., | ) ) |
| Defendants. | ) ) ) |

### AFFIDAVIT OF ANN S. HOLMAN

1.    My name is Ann Holman. I am over the age of eighteen and have personal knowledge of the facts set forth herein.

2.    I have been a registered representative of ProEquities since January 2006. Prior to joining ProEquities, I was a registered representative of Raymond James & Associates. I was the Raymond James representative at the time of the sale of the AXA Accumulator variable annuity that forms the basis of the claims in *Bullard et al. v. AXA Equitable Life Insurance Company*, FINRA Arbitration No. 08-00280.

3.    It is my understanding from my dealings with AXA Distributors that AXA Distributors distributed the Accumulator annuities that were issued by AXA Equitable Life Assurance Company. It is also my understanding that AXA Distributors, LLC had a selling agreement with Raymond James which enabled

me, as a registered representative of Raymond James, to attend AXA Distributors' seminars on the Accumulator, to receive direction from AXA Distributors on the Accumulator, and to sell the Accumulator as distributed by AXA Distributors.

4.    During my tenure at Raymond James and at the time of the sale the AXA Accumulator annuities to Claimants, AXA Distributors not only provided the literature and training on the product to effect the sale but continued to provide customer service and support on the product well after the sale was effected.

5.    AXA Distributors provided all of the training that I received on the product. AXA Distributers conducted every seminar that I attended on the Accumulator annuity, including both those seminars independently conducted by AXA Distributors and those seminars provided by Raymond James and conducted by AXA Distributors. AXA Distributors explained the product to me, taught me how to sell the product to my clients, answered my questions on the product, and very much controlled how I sold the product to my clients. AXA Distributors gave me quotes and illustrations on the product. AXA Distributors provided (or failed to provide, as the case may be) the prospectuses on the Accumulator product and any and all other sales literature, including literature that indicated that the product provided the best of both worlds. AXA Distributors directed and instructed me on interpreting the quarterly statements provided to my clients. I sold the product exactly as I was trained by AXA Distributors. I called AXA Distributers several

times to confirm that I was selling the product correctly. I passed on to my clients those representations that were made to me by AXA Distributors.

6.      I am attaching a recent letter I received from an AXA Distributors representative. *See* Exhibit B. As you can see, AXA Distributors explained that its goal was to provide me with the "optimal strategies" to meet my clients' needs and that it had "made every effort to ensure that [they] provide[d] . . . a competitive product, effective sales ideas, and a commitment to service to help [me] and [my] clients achieve their goals." The letter evidences that AXA Distributors provided a "Sales Desk" with an 800 number for "immediate marketing support and illustrations." It further encourages, "Please do not hesitate to contact AXA Distributors for anything that you need to help grow your business. We are confident that our support will have a positive impact on you sales and marketing efforts." *See id.*

7.      Among other things, AXA Distributors represented to me that the Accumulator annuity provided liquidity and a guaranteed rate of return at the end of the annuity term. AXA Distributors represented to me that the Accumulator product, because it provided liquidity and principal protection, was not only suitable for individuals holding mutual funds but was a superior product to a mutual fund. AXA Distributors never provided me an Income Manager prospectus to provide to my clients.

8.     Upon sale of an Accumulator annuity, AXA Distributors provided me the annuity certificate and a packet of materials for the client with instructions to go over the material in the packet with the client and to call AXA Distributors with any questions. *See, e.g.,* Exhibit B.

     Further affiant sayeth naught.

     I declare under the penalty of perjury pursuant to the laws of the State of Alabama that the foregoing is true and correct. Executed this the 17th day of June, 2008, in Dothan, Alabama.

                                        _____
                                        Ann Holman

STATE OF ALABAMA          )
COUNTY OF                 )

     Before me, Ann Holman, who being by me first duly sworn, deposes and says that the facts alleged in the foregoing Affidavit are true and correct to the best of her knowledge and belief.

     Sworn to and subscribed to before me this __17__ day of June, 2008.

                                        _____
                                        Notary Public
                                        My Commission Expires: 10/5/2011

EXHIBIT "C"

 EQUITABLE

November 16, 2000

Dorine Barranco
103 W BROOKWOOD CIRCLE
OZARK AL 36360

Dear Dorine Barranco:

We are pleased to welcome you to the Equitable Life Assurance Society of the United States (Equitable). At Equitable, our aim is to help you achieve your retirement savings and income goals. Enclosed is the Equitable Accumulator$^{SM}$ Certificate along with a summary of its key features and benefits.

Your financial concerns are very important to us. Feel free to contact our customer service help line if you have any questions about your Accumulator$^{SM}$ Certificate. Our customer representatives can be reached at 1-800-789-7771, Monday through Friday during normal business hours.

If you would like additional information about the Accumulator$^{SM}$ distribution options, including our Income Manager® payout annuities, your financial professional can help you choose a strategy that best suits your retirement income goals.

The enclosed folder contains the Certificate, investment allocations and your personalized summary. Please be sure to review these important documents. You may also wish to keep your statements and transaction records here for easy reference.

Once again, welcome. We look forward to serving you in the future.

Sincerely,

Anthony Calcaterra
Vice President

EDI-97-80 (rev. 9/99)

# ACCUMULATOR<sup>SM</sup>

# CERTIFICATE SUMMARY

---

Dorine Barranco
*Annuitant*

Dorine Barranco
*Owner*

Jean C Fuller/ Sidney A Fuller
*Beneficiary*

Accumulator (NQ)
*Certificate Type*

| November 16, 2000 | $25,000.00 | 3-00637931 |
|:---:|:---:|:---:|
| *Contract Date* | *Initial Contribution* | *Certificate Number* |

---

**Your Accumulator<sup>SM</sup> is a combination fixed and variable deferred annuity designed to provide for the accumulation of retirement savings and for income at a future date. Earnings generally accumulate on a tax-deferred basis until withdrawn or when distributions become payable. Withdrawals may be taxable and prior to age 59 1/2 may also be subject to an additional 10% Federal income tax penalty.**

This summary provides information regarding your initial investment allocations and highlights some of your annuity's key features and benefits. It is intended to provide only a brief overview of your Certificate and therefore does not represent all of the terms and conditions that apply under your Certificate.

 EQUITABLE

The Equitable Life Assurance Society of the United States, New York, NY 10104

# baseBUILDER® BENEFITS

## YOUR baseBUILDER® INCOME BENEFIT

The baseBUILDER Income Benefit provides a minimum amount of guaranteed lifetime income as an Income Manager (*Life Annuity with a Period Certain*) level payout annuity. Additional forms of annuity payouts are also available to provide a minimum amount of guaranteed lifetime income. As a result, regardless of how the Variable Investment Options perform, on the 10th and later Contract Date anniversary can convert your Equitable Accumulator[SM] into a guaranteed minimum amount of annual income for life (certain age restrictions apply).

Equitable calculates the baseBUILDER Income Benefit by compounding your Contributions, less any withdrawals, at 5% annually* (until the Annuitant's age 80) and applying that amount to annuity purchase factors guaranteed when the Equitable Accumulator[SM] is issued. The Guaranteed Minimum Income Benefit does not provide an Annuity Account Value or guarantee investment performance. It is based on conservative actuarial factors; the level of income that is guaranteed may be less than would otherwise be provided by application of your Annuity Account Value using current annuity purchase factors. It should be regarded as a safety net.

You may exercise the Guaranteed Minimum Income Benefit within the 30-day period following each of the Contract Date anniversaries, beginning with the 10th Contract Date anniversary but no later than the Annuitant's age 85. The table below shows the **minimum** amount of guaranteed lifetime income **you** would receive if you exercise this benefit on any one of the Contract Date anniversaries shown. **Income levels are based on your initial Contribution of $25,000.00 for all allocations to the Variable Investment Options and Fixed Maturity Options and assume no withdrawals or additional Contributions.**

*\* Contributions allocated to the Alliance Money Market Fund and the Fixed Maturity Options are compounded at 3% annually for this purpose. Contributions allocated to the Special Dollar Cost Averaging Account will be credited with 5% interest. These results will be slightly overstated if you have chosen to allocate to the Alliance Money Market Fund or Fixed Maturity Options.*

## YOUR GUARANTEED MINIMUM INCOME BENEFIT
## ANNUAL INCOME PAYABLE FOR LIFE WITH 10-YEAR PERIOD CERTAIN*

*If Elected on Contract Date Anniversary*

| YEAR 10 | YEAR 15 | YEAR 20 |
|---------|---------|---------|
| $2,195.52 | $3,057.25 | $4,108.72 |

*\*The period certain may be shorter for later election years.*

## YOUR baseBUILDER® DEATH BENEFIT

Should the Annuitant die prior to your receiving annuity benefits, your named Beneficiary will be paid a death benefit. Generally, the death benefit is equal to the amounts in the Variable Investment Options and Fixed Maturity Options, or if greater, the Guaranteed Minimum Death Benefit.

The Guaranteed Minimum Death Benefit is an "Annual Ratchet to Age 80." This simply means that on the Contract Date, the Guaranteed Minimum Death Benefit is equal to $25,000.00, the initial Contribution. Thereafter, the Guaranteed Minimum Death Benefit is reset on each anniversary, until the Annuitant's age 80, to the Annuity Account Value if it is higher than the prior year's Guaranteed Minimum Death Benefit. The Guaranteed Minimum Death Benefit is adjusted for any subsequent Contributions and withdrawals.

No. 96ENMVAI

# base**BUILDER**® **BENEFITS**

## IMPACT OF WITHDRAWALS ON base**BUILDER**® BENEFITS

Please be aware that taking withdrawals from your Annuity Account Value will reduce the amount of the Guaranteed Minimum Death Benefit described above. Please remember that withdrawals may be taxable and prior to age 59 1/2 may also be subject to an additional 10% Federal income tax penalty. Withdrawals may also be subject to a withdrawal charge and/or a positive or negative market value adjustment on Contributions to the Fixed Maturity Options.

No. 96ENMVAI

# SERVICES WE PROVIDE

## DOLLAR COST AVERAGING*

Through a systematic approach to investing, commonly referred to as Dollar Cost Averaging, you can gradually invest in the market and may actually reduce your average cost over time. The Equitable Accumulator[SM] offers two dollar cost averaging programs, General or Special Dollar Cost Averaging, that are available at any time. Each program allows you to gradullay transfer amounts into the Variable Investment Options over a set period of time.

*Dollar Cost Averaging can neither guarantee a profit nor prevent a loss. Because it involves continuous investment in securities regardless of fluctuating price levels of such securities, you should consider your financial ability to continue to invest through periods of low prices before participating in this program.*

## TRANSFERS AMONG INVESTMENT OPTIONS

Because market conditions and/or your personal circumstances may change over time, we've made it easy for you to modify your investments. You may transfer among Variable Investment Options and Fixed Maturity Options and between such Options at any time - without an investment charge and without tax penalty. However, transfers from the Fixed Maturity Options may result in a positive or negative market value adjustment. Call 800/789-7771 to make a change or for assistance from our customer service representatives. Please have your Certificate number available.

## AUTOMATIC INVESTMENT PLAN

You have the ability to systematically invest in the Accumulator[SM] from your bank accounts. The minimum amount for systematic investing is $100 monthly or $300 quarterly.

## REPORTS YOU WILL RECEIVE

**Confirmation Notices.** Each time you make a contribution, transfer assets or take a withdrawal, we will mail you a confirmation of the transaction.

**Quarterly Statements.** You will receive a statement at the end of each calendar quarter which summarizes all transactions since the last statement.

**Annual Statement.** Just after your Contract Date anniversary, you will receive an annual statement summarizing all policy activity, changes in investment performance for the year, as well as your current Annuity Account Value.

**Semi-Annual Reports On Variable Investment Options.** You will receive these reports every 6 months, for the periods ending June 30 and December 31.

## ON THE INTERNET

We know you're on the Internet - the newest way to access timely information - and we are, too. At our website (http://www.equitable.com), simply click on EQAccess to set up a password. Then, you'll be able to get current values for your Certificate (and other Equitable policies), including your total account balance, and total units and values for each Variable Investment Option in your account.

### YOUR FINANCIAL PROFESSIONAL

Ann S. Holman - (334) 677-2812

Accumulator[SM] is a service mark, and Income Manager® and baseBUILDER® are registered service marks of
The Equitable Life Assurance Society of the United States.
Accumulator[SM] is issued by The Equitable Life Assurance Society of the United States
and distributed by Equitable Distributors, Inc. (member NASD) New York, NY 10104

# INVESTMENT ALLOCATIONS

## YOUR VARIABLE INVESTMENT OPTIONS

You have made the following allocations to the Variable Investment Options. You may change your allocations at any time. To learn the daily unit values for each of the available Options, call 800/789-7771.

| Variable Investment Options | Amount Allocated |
| --- | --- |
| Alliance Common Stock Fund | |
| Alliance High Yield Fund | |
| Alliance Money Market Fund | |
| Alliance Small Cap Growth Fund | |
| Capital Guardian International Fund | |
| Capital Guardian Research Fund | |
| Capital Guardian U.S. Equity Fund | |
| EQ Equity 500 Index Fund | |
| EQ International Equity Index Fund | |
| EQ Small Company Index Fund | |
| EQ/Aggressive Stock Fund | |
| EQ/Alliance Premier Growth Fund | |
| EQ/Alliance Technology Fund | |
| EQ/Janus Large Cap Growth Fund | |
| EQ/Putnam Growth & Income Value Fund | |
| EQ/Putnam International Equity Fund | |
| EQ/Putnam Investors Growth Fund | |
| FI Mid Cap Fund | |
| FI Small/Mid Cap Value Fund | |
| JP Morgan Core Bond Fund | |
| Lazard Large Cap Value Fund | |
| Lazard Small Cap Value Fund | |
| MFS Emerging Growth Companies Fund | |
| MFS Growth with Income Fund | |
| MFS Research Fund | |
| Morgan Stanley Emerging Markets Equity Fund | |

No. 96ENMVAI

# INVESTMENT ALLOCATIONS

## YOUR FIXED MATURITY OPTIONS

If you invested in the Fixed Maturity Options, you may change your allocations at any time. Call 800/789-7771 for a recording of guaranteed rates applicable to the Fixed Maturity Options. Please note that any withdrawals (including transfers, surrender and deductions) from a Fixed Maturity Option prior to its expiration date may result in a positive or negative market value adjustment, as well as a withdrawal charge and a 10% Federal income tax penalty for withdrawals prior to age 59 1/2.

| Expiration Date | Guaranteed Interest Rate | Amount Allocated |
|---|---|---|
| February 15, 2001 | | |
| February 15, 2002 | | |
| February 15, 2003 | | |
| February 15, 2004 | | |
| February 15, 2005 | | |
| February 15, 2006 | | |
| February 15, 2007 | | |
| February 15, 2008 | | |
| February 15, 2009 | | |
| February 15, 2010 | | |

## OPTIONS AT EXPIRATION DATE OF FIXED MATURITY OPTIONS

If you invested in the Fixed Maturity Options, each one will reach its expiration date on February 15 in the year shown above. You will be notified on or before December 31st prior to its expiration date. At that time you may transfer the value at expiration into any Fixed Maturity Option we are then offering, or into the Variable Investment Options. You may also choose to withdraw all or part of the value at expiration (subject to any withdrawal charges and tax charges and/or penalties that may apply). If we have not received your election as of the expiration date, the value at expiration will be transferred into the Fixed Maturity Option with the next earliest expiration date.

## YOUR GUARANTEED INTEREST ACCOUNT

$25,000.00 was allocated to the Guaranteed Interest Account which will earn 14.00% through May 16, 2001.

No. 96ENMVAI

EXHIBIT "D"



### RAYMOND JAMES FINANCIAL SERVICES

### 2005 NATIONAL CONFERENCE FOR PROFESSIONAL DEVELOPMENT

#### July 17 – 21, Chicago, Illinois

### Sponsor Attendee List

| Name | Company |
|------|---------|
| Paul Adelson | AIG SunAmerica |
| Michelle Blackstock | AIG SunAmerica |
| Patrick Cahill | AIG SunAmerica |
| John Crosier | AIG SunAmerica |
| Stephanie DeWees | AIG SunAmerica |
| Clay Gallagher | AIG SunAmerica |
| Jeff Grant | AIG SunAmerica |
| Todd McDonough | AIG SunAmerica |
| Conrad Metzger | AIG SunAmerica |
| Kirk Pearcy | AIG SunAmerica |
| Terrence Torrey | AIG SunAmerica |
| Mike Caterbone | AIM Investments |
| Mark Debourg | AIM Investments |
| Bill Gahagan | AIM Investments |
| Jim Gill | AIM Investments |
| John Harley | AIM Investments |
| Scott Widder | AIM Investments |
| Kiley Andresen | Allianz Global Investors |
| Rob Arnott | Allianz Global Investors |
| Fred Bruce | Allianz Global Investors |
| Colin Glinsman | Allianz Global Investors |
| Chris Horan | Allianz Global Investors |
| Brooke Leahy | Allianz Global Investors |
| Stephen Maginn | Allianz Global Investors |
| Stacey Nutt | Allianz Global Investors |
| Stephen Rudman | Allianz Global Investors |
| Chris Stack | Allianz Global Investors |
| Fred Teceno | Allianz Global Investors |
| Rob Connor | American Century Investment Services, Inc. |
| Kristen LaMarca | American Century Investment Services, Inc. |
| Dick MacDonald | American Century Investment Services, Inc. |
| Shelley Monteil | American Century Investment Services, Inc. |
| Mike Turgeon | American Century Investment Services, Inc. |
| Michelle Bergeron | American Funds |
| Chris Conwell | American Funds |
| Dan Frick | American Funds |
| Bob Irish | American Funds |
| Christopher Poisella | American Skandia, A Prudential Financial Company |
| Rodney Allain | American Skandia, A Prudential Financial Company |
| George Laventure | American Skandia, A Prudential Financial Company |
| Eileen McCann | American Skandia, A Prudential Financial Company |
| Duncan McGuffie | American Skandia, A Prudential Financial Company |
| Aleise Van Arnem | American Skandia, A Prudential Financial Company |
| Megan Condron | AXA Distributors, LLC |
| Todd Gentile | AXA Distributors, LLC |
| Brad Knoll | AXA Distributors, LLC |
| Jonathan Kruger | AXA Distributors, LLC |
| Mike McDaniel | AXA Distributors, LLC |
| Dan Munroe | AXA Distributors, LLC |
| Ted Repass | AXA Distributors, LLC |
| Ron Sarra | AXA Distributors, LLC |
| Bron Urbanick | AXA Distributors, LLC |
| Dan Braz | Columbia Management |
| Audrey Devlin | Columbia Management |
| Jay Fradenburg | Columbia Management |
| Michael Gathings | Columbia Management |
| Russ Gentile | Columbia Management |
| Kristin Greeley | Columbia Management |
| Mark Guenard | Columbia Management |
| Mike Harvey | Columbia Management |
| Annie Moberly | Columbia Management |
| Lou Sideropoulos | Columbia Management |
| John Bercini | Eaton Vance |
| Bill Cates | Eaton Vance |
| Todd Dickinson | Eaton Vance |

| | | | |
|---|---|---|---|
| Bill Gillen | Eaton Vance | Jen Hilliard | Heritage / Eagle |
| Perry Hooker | Eaton Vance | Julian Lane | Heritage / Eagle |
| Coleen Lynch | Eaton Vance | Todd McCallister | Heritage / Eagle |
| Joe Nelson | Eaton Vance | Ham Moshell | Heritage / Eagle |
| Tom Roseen | Eaton Vance | John O'Connell | Heritage / Eagle |
| John Bachman | Federated Investors | Richard Rossi | Heritage / Eagle |
| Bryan Burke | Federated Investors | Richard Skeppstrom | Heritage / Eagle |
| Lee England | Federated Investors | Kevin Starnes | Heritage / Eagle |
| Landon Harper | Federated Investors | Jack Van Dyke | Heritage / Eagle |
| Rob Herniman | Federated Investors | Pete Wehle | Heritage / Eagle |
| Scott Kavanagh | Federated Investors | Aaron Werner | Heritage / Eagle |
| Mike Koenig | Federated Investors | Michael Berry | ING |
| Becky Nelson | Federated Investors | Melanie Brown | ING |
| Phil Orlando | Federated Investors | John Deppe | ING |
| Rich Paulson | Federated Investors | Tracy Nance | ING |
| Pat Senkyr | Federated Investors | John West | ING |
| Walter Whalen | Federated Investors | Jon Iverson | Jackson National Life Distributors, Inc. |
| Lewis Williams | Federated Investors | Erica Lund | Jackson National Life Distributors, Inc. |
| Erik Zettelmayer | Federated Investors | Michael Nicola | Jackson National Life Distributors, Inc. |
| Mandy Bigler | Franklin Templeton Investments | Tracy Predmore | Jackson National Life Distributors, Inc. |
| Bob Gauthier | Franklin Templeton Investments | Peter Radloff | Jackson National Life Distributors, Inc. |
| Conrad Herrmann | Franklin Templeton Investments | Cameron Schulte | Jackson National Life Distributors, Inc. |
| Bill Kimbrough | Franklin Templeton Investments | Patrick Clifford | John Hancock Venture Annuities |
| John Michael | Franklin Templeton Investments | Bill Driver | John Hancock Venture Annuities |
| Dan Reinhold | Franklin Templeton Investments | Jeff Duckworth | John Hancock Venture Annuities |
| Doug Allen | Genworth Financial | Megan Glynn | John Hancock Venture Annuities |
| Ron Anwar | Genworth Financial | Tara McCafferty | John Hancock Venture Annuities |
| Christine Bordas | Genworth Financial | Chris Mee | John Hancock Venture Annuities |
| Phil Connolly | Genworth Financial | Tony Pappas | John Hancock Venture Annuities |
| Jim Flynn | Genworth Financial | John Zembron | John Hancock Venture Annuities |
| Tim Gillis | Genworth Financial | John Henseler | Lincoln Financial Distributors, Inc. |
| Justin Hammerbeck | Genworth Financial | Alex MacGillivray | Lincoln Financial Distributors, Inc. |
| Christine Johnson | Genworth Financial | Scott Passias | Lincoln Financial Distributors, Inc. |
| Paul Manning | Genworth Financial | Chris Price | Lincoln Financial Distributors, Inc. |
| Mandi Miculinich | Genworth Financial | Mark Prillaman | Lincoln Financial Distributors, Inc. |
| Joe Milio | Genworth Financial | Steve Shamet | Lincoln Financial Distributors, Inc. |
| Tom Needham | Genworth Financial | John Sullivan | Lincoln Financial Distributors, Inc. |
| Cathy Oken | Genworth Financial | Dan Wellock | Lincoln Financial Distributors, Inc. |
| Lee Owens | Genworth Financial | Michael Conley | LORD ABBETT |
| Scott Sipes | Genworth Financial | Patrick Frame | LORD ABBETT |
| Charles Turnblom | Genworth Financial | Tina Jimenez | LORD ABBETT |
| Liza Tyler | Genworth Financial | Kelly Kraft | LORD ABBETT |
| Chris Weiland | Genworth Financial | Kristen Mortimer | LORD ABBETT |
| Cooper Abbott | Heritage / Eagle | Barry Motz | LORD ABBETT |
| Quentin Anderson | Heritage / Eagle | Christian Pescatore | LORD ABBETT |
| Jamie Atkinson | Heritage / Eagle | Wendy Fishler | MainStay Investments / New York Life Annuities |
| Scott Averitt | Heritage / Eagle | | |
| Jim Awad | Heritage / Eagle | Bill Klein | MainStay Investments / New York Life Annuities |
| Mitch Birner | Heritage / Eagle | | |
| Bert Boksen | Heritage / Eagle | Jennifer Tarsney | MainStay Investments / New York Life Annuities |
| Bob Brady | Heritage / Eagle | Jim Allen | MetLife Investors |
| Denise Downey | Heritage / Eagle | Josh Gerry | MetLife Investors |
| Angela Gay | Heritage / Eagle | Rich Liberante | MetLife Investors |
| Steve Hill | Heritage / Eagle | Jason Morelli | MetLife Investors |

| Name | Company |
|---|---|
| Clarice Yager | MetLife Investors |
| Lori Young | MetLife Investors |
| Jim Adams | MFS Investment Management |
| Jon Hall | MFS Investment Management |
| Wally Knighton | MFS Investment Management |
| Kate Mead | MFS Investment Management |
| Peter Rinaldi | MFS Investment Management |
| Brian Roach | MFS Investment Management |
| Matt Tully | MFS Investment Management |
| Dan Amodeo | Nationwide / BEST of AMERICA® |
| Brett Berg | Nationwide / BEST of AMERICA® |
| Kevin Devine | Nationwide / BEST of AMERICA® |
| Mendy Frost | Nationwide / BEST of AMERICA® |
| Stephanie Giletto | Nationwide / BEST of AMERICA® |
| Rob Kissler | Nationwide / BEST of AMERICA® |
| Bob Leahy | Nationwide / BEST of AMERICA® |
| Tom Marks | Pacific Life Insurance Company |
| Travis McKay | Pacific Life Insurance Company |
| Rob Melin | Pacific Life Insurance Company |
| Liz Mitchell | Pacific Life Insurance Company |
| George Paulik | Pacific Life Insurance Company |
| Bill Shea | Pacific Life Insurance Company |
| Susan Wood | Pacific Life Insurance Company |
| Nate Algiere | Pioneer Investments |
| Rick Falcione | Pioneer Investments |
| John Krekovich | Pioneer Investments |
| Todd Leszczynski | Pioneer Investments |
| Wendy O'Connor | Pioneer Investments |
| Bill O'Leary | Pioneer Investments |
| Rane Robinson | Pioneer Investments |
| Emily Taylor | Pioneer Investments |
| Rick Blaser | PLANCO / The Hartford |
| Brett Gardiner | PLANCO / The Hartford |
| Bill Graves | PLANCO / The Hartford |
| Tony Guzzetta | PLANCO / The Hartford |
| Martha Hart | PLANCO / The Hartford |
| John Holten | PLANCO / The Hartford |
| Jim Lake | PLANCO / The Hartford |
| Jeff Maxwell | PLANCO / The Hartford |
| Trey Schalk | PLANCO / The Hartford |
| Bob Sweitzer | PLANCO / The Hartford |
| Brenda Warkow | PLANCO / The Hartford |
| Chris Bunker | Putnam Investments |
| Jan Gundersen | Putnam Investments |
| Brian Nelson | Putnam Investments |
| Melissa Sloane | Putnam Investments |
| Laura Zografos-Preusser | Putnam Investments |
| Ernie Ankrim | Russell Investment Group |
| Jamie Axford | Russell Investment Group |
| Jessi Brummett | Russell Investment Group |
| Andrew Busalacchi | Russell Investment Group |
| Elizabeth Di Re | Russell Investment Group |
| Jim Dunnigan | Russell Investment Group |
| Troy Espeseth | Russell Investment Group |
| Bill Findley | Russell Investment Group |
| Jay Gentry | Russell Investment Group |
| Ben Hammel | Russell Investment Group |
| Dan Hodo | Russell Investment Group |
| Brian Jacobus | Russell Investment Group |
| Matt Keefe | Russell Investment Group |
| Greg Larson | Russell Investment Group |
| Jim Lathrop | Russell Investment Group |
| Brian Laux | Russell Investment Group |
| Jonathan Rains | Russell Investment Group |
| Mark Schottland | Russell Investment Group |
| Franziska Stiens | Russell Investment Group |
| Bill Talbott | Russell Investment Group |
| Neal Tourdo | Russell Investment Group |
| Anne Witts | Russell Investment Group |
| Bud Cappola | Scudder Investments |
| Liz Clapp | Scudder Investments |
| Jeff Denny | Scudder Investments |
| Steve DiMaio | Scudder Investments |
| Sabrennia Fountain | Scudder Investments |
| Eric Magyar | Scudder Investments |
| Mary-Pat McDonald | Scudder Investments |
| Paul Staniszewski | Scudder Investments |
| John Sullivan | Scudder Investments |
| Dave Taylor | Scudder Investments |
| Rosey Valencia | Scudder Investments |
| Elizabeth Beatty | Transamerica / IDEX |
| Katherine Bray | Transamerica / IDEX |
| Janet Elie | Transamerica / IDEX |
| Bill Evans | Transamerica / IDEX |
| John Gargula | Transamerica / IDEX |
| Arnie Mayster | Transamerica / IDEX |
| Lloyd Sprague | Transamerica / IDEX |
| Jolene Verlich | Transamerica / IDEX |
| Michael Yopko | Transamerica / IDEX |
| Reagan Curl | USAllianz |
| Dru Donatelli | USAllianz |
| Billy Grimes | USAllianz |
| Keith Johnson | USAllianz |
| Becky Malkerson | USAllianz |
| Jennifer McCafferty | USAllianz |
| Jim Moody | USAllianz |
| Ed Oberholtzer | USAllianz |
| Hayward Sawyer | USAllianz |
| Tori Swicegood | USAllianz |
| Corey Walther | USAllianz |
| Scott Chriske | Van Kampen Investments |
| Holly Danziger | Van Kampen Investments |
| Mike Eccleston | Van Kampen Investments |
| Pat Foley | Van Kampen Investments |
| Mike Hibsch | Van Kampen Investments |
| Kevin Holleron | Van Kampen Investments |
| Bill Hunter | Van Kampen Investments |

| | |
|---|---|
| Lisa Kueng | Van Kampen Investments |
| Tim Scholten | Van Kampen Investments |
| Brett Van Bortel | Van Kampen Investments |
| Scott West | Van Kampen Investments |
| Lee Bastidas | WM Group of Funds |
| Mason Billock | WM Group of Funds |
| Scott Chandler | WM Group of Funds |
| Chris Fullerton | WM Group of Funds |
| Tim Hill | WM Group of Funds |
| Tait Lane | WM Group of Funds |
| Aime Miller | WM Group of Funds |
| Don Moffett | WM Group of Funds |
| Ted Ridlehuber | WM Group of Funds |
| Troy Seitz | WM Group of Funds |

# 2006 PCA Academy



## Raymond James & Associates Financial Advisors

| | |
|---|---|
| Annette Alexander | *Portland, IN* |
| Joe Allen | *Newtown, PA* |
| Joshua Anderson | *Newtown, PA* |
| Janice Barlow | *St. Petersburg, FL* |
| Pete Bartel | *Richmond, In* |
| Anne Bedinger | *Orlando, FL* |
| Dennis Briggs | *Clearwater, FL* |
| Walt Burton | *Houston, TX* |
| Brandon Cabaniss | *Greenville, SC* |
| John Childers | *Dearborn, MI* |
| Krista Clarke | *Decatur, GA* |
| Keith Cline | *Fort Myers, FL* |
| Jeffrey Cornell | *Chicago, IL* |
| Tom Davies | *Shelby Twp, MI* |
| Jim Deer | *Columbus, OH* |
| Paula Dumas | *Venice, FL* |
| Todd Fosnow | *Longwood, FL* |
| Michael Garlisi | *Ocala, FL* |
| Drew Grabinski | *Auburn Hills, MI* |
| Michael Hamilton | *Cape Coral, FL* |
| Renato Jarnett | *Dearborn, MI* |
| Mike Jepson | *Houston, TX* |
| Denis Johnson | *Naples, FL* |
| Erwin Katz | *Tampa, FL* |
| Mike Kinghorn | *Indianapolis, IN* |
| Randy Kistler | *Berne, IN* |
| Gary Kleinman | *Tampa, FL* |
| R.J. Koss | *Macomb, MI* |
| Andrea Kotch Duda | *Ann Arbor, MI* |
| Bob Kurvin | *Venice, FL* |
| Ron Looney | *Fort Wayne, IN* |
| James Mack | *Farmington Hills, MI* |
| Mike McStay | *Fort Worth, TX* |
| Amanda Murphy | *Tampa, FL* |
| Ray Paxson | *Bryant, IN* |
| John Pinkley | *Orlando, FL* |
| Dave Stabile | *Sharon, PA* |
| Lori Stimpson | *Hartford City, IN* |
| Sean Suarez | *Jacksonville, FL* |
| Mike Summers | *Fort Wayne, IN* |
| Mark Thompson | *Melbourne, FL* |
| John Thorsen | *Orlando, FL* |
| Michael Tormey | *Sarasota, FL* |
| Jon Tuft | *St. Petersburg, FL* |
| Bill Waters | *St. Petersburg, FL* |
| Steven Wilmarth | *Melbourne, FL* |

# Raymond James Financial Services Financial Advisors

| | | | | |
|---|---|---|---|---|
| Doug Adler | ▪ | East Lansing, MI | Brett Kahrs | ▪ Archbold, OH |
| Darryl Barnes | ▪ | Fredericksburg, VA | Mitch Kauffman | ▪ Pasadena, CA |
| Chris Bartkus | ▪ | Clearwater, FL | Bob Lankin | ▪ Elkins Park, PA |
| Doug Bernath | ▪ | Archbold, OH | Ron May | ▪ Neptune Beach, FL |
| Steve Bernstein | ▪ | Fort Myers, FL | Tim Mohns | ▪ Naperville, IL |
| Keith Bowers | ▪ | Roswell, GA | Susan Moore | ▪ Alexander City, AL |
| Nick Brait | ▪ | Park Ridge, IL | Chip Morton | ▪ Destin, FL |
| Tim Brenner | ▪ | Norton, OH | Jeff Oster | ▪ Alameda, CA |
| Mike Carey | ▪ | Safety Harbor, FL | Brance Parker | ▪ Destin, FL |
| John Casconi | ▪ | Louisville, KY | David Patchen | ▪ St. Petersburg, FL |
| Jeff Davis | ▪ | Brunswick, GA | Ed Perrone | ▪ Metuchen, NJ |
| Glen Eichman | ▪ | Bethlehem, PA | Greg Perrone | ▪ Hernando, FL |
| Nancy Finn | ▪ | Elk River, MN | Dave Pesterfield | ▪ Atlantic Beach, FL |
| Tom Fleishel | ▪ | DeLand, FL | Brian Peterson | ▪ Clearwater, FL |
| Paul Garrett | ▪ | Dallas, TX | Dan Porter | ▪ N. Richland Hills, TX |
| Jeff Haller | ▪ | Naperville, IL | Gary Reynolds | ▪ Lancaster, PA |
| Doug Hedley | ▪ | East Lansing, MI | Bill Russell | ▪ Peoria, IL |
| Ann Holman | ▪ | Dothan, AL | Joe Savio | ▪ Voorhees, NJ |
| George Jackson | ▪ | Heathrow, FL | Al Silvestri | ▪ Mercerville, NJ |
| Steve Jackson | ▪ | Kokomo, IN | Denny Stoddard | ▪ Cedar Rapids, IA |
| David Kahn | ▪ | Clearwater, FL | Phil Zepeda | ▪ Ann Arbor, MI |

## Sponsors

| | | | | |
|---|---|---|---|---|
| AIG SunAmerica | ▪ Greg Alberti | Capitas Financial | ▪ Jane Cox |
| | ▪ Craig Cavanaugh | | ▪ Tiffany King |
| | ▪ Mike England | | ▪ Jim O'Neill |
| | ▪ Tony Farnum | Genworth Financial | ▪ Tim Gillis |
| | ▪ Todd McDonough | | ▪ Joe Millo |
| | ▪ Robert Schlegel | | ▪ Scott Sheehan |
| | ▪ Deb Seabury | Hartford Life | ▪ Beth McBroom |
| | ▪ Ed Wall | | ▪ Ken Moorefield |
| Allianz | ▪ Reagan Curl | ING | ▪ Craig Collins |
| | ▪ Gary Sax | | ▪ Jenn Johnson |
| American Skandia, A Prudential Financial Co. | ▪ Rick Burdick | ING Annuities | ▪ Brent Cozlin |
| | ▪ Eileen McCann | Integrity Life | ▪ Bill Diehl |
| AXA Distributors, LLC | ▪ Diana Keary | | ▪ Jim Kaiser |
| | ▪ Page Long | | ▪ Robert Murphy |
| | ▪ Phil Meserve | Jackson National Life | ▪ Mark Gehring |
| | ▪ Bill Miller | | ▪ Ted Hall Jr |
| | ▪ David O'Leary | | |

## Sponsors (continued)

| | | | | |
|---|---|---|---|---|
| John Hancock | ▪ Chris Donoghue | Pacific Life - Annuities | ▪ Brian Stone | |
| | ▪ Scott Patterson | | ▪ Chris Ritondo | |
| | ▪ John Reynolds | | ▪ Joseph Souza | |
| | ▪ Keith Saunders | Pacific Life Insurance Co.- Life Division | ▪ Tara Eisenbeis | |
| LifeSource | ▪ Rod Brazzell | | ▪ David Shin, JD, CPA | |
| | ▪ Thomas Robb | | ▪ Robert Beardslee | |
| | ▪ Mark Scalercio | PLANCO/The Hartford | ▪ James Lake | |
| Lincoln Financial | ▪ Douglas Brisco | | ▪ Lynn Lorenz | |
| | ▪ Jessica Hughes | | ▪ Joseph Minutolo | |
| | ▪ Bob Lewis | | ▪ Frank Padron | |
| | ▪ Paul McDonald | | ▪ Eric Waller | |
| | ▪ Kristin Modell | Protective Life Insurance Company | ▪ Jeff Marsh | |
| | ▪ Lori Niebuhr | | ▪ Larry Merrill | |
| Long Term Care | ▪ Tim Ripp | | ▪ Joe Ross | |
| MetLife | ▪ Rita L. Rana | Quest Continuing Education | ▪ Cheryl Farrell | |
| MetLife Investors | ▪ Peter Jackson | Sun Life Financial Distributors, Inc. | ▪ Karl Krause | |
| | ▪ Jason Morelli | | ▪ Michael Mulkern | |
| | ▪ Dennis Riddick | | ▪ Curt Olson | |
| Nationwide Financial | ▪ Richard Theiss | Transamerica Capital, Inc | ▪ William Evans | |
| New York Life | ▪ Thomas McKenna | | ▪ Joe Malave | |
| | | | ▪ Arnold Mayster | |

## Guest Speakers

| | | |
|---|---|---|
| Outreach of Hope | ▪ | Dave Dravecky |
| Raymond James Financial | ▪ | Chet Helck, President & COO |

## Planning Corporation of America

Sho Bahng
Mariann Carson
Larry Gilbert
Walter Jones
Vanessa Marcos
Beth Maziad
Scott Stolz
Brian Stull
Jim Swink

## SPONSOR ATTENDEE LIST
## RJFS LEADERS CIRCLE CONFERENCE
### JUNE 19-23, 2002

**AIG ALLIANCE**
Rick & Monica Arreola
Mark Dunbar
Rick Winge

**AIG SUNAMERICA**
Blair Lewis
Mike & Stacie Loftus

**ALLMERICA**
Tara Eisenbeis
Pat Ferrer

**AMERICAN SKANDIA**
Joe Millo
Polly Rae
Hayward Sawyer
John Winans

**AXA DISTRIBUTORS**
Mark Lee
Mark & Amy Scalercio
Eric Rebenkoff & Aimee Pearl

**GE FINANCIAL**
Scott & Sibyl Curtis
Tim Gillis

**ING**
Wright Edler
Anne Marie Lynch

**JACKSON NATIONAL**
Kendall Best
Lee Reynolds

**LINCOLN/AMERICAN FUNDS**
Sherri & Michael Thomas

**MANULIFE WOOD-LOGAN**
Mike Treske

**NATIONWIDE**
Mark Huston
Richard Theiss

**NEW YORK LIFE**
√Bill Feakes
Caroline & Al Johnson

**PACIFIC LIFE**
Kurt & Lisa Damron
Tom Pistole

**PIONEER**
Wendy O'Connor
Deb Wilkinson

**PLANCO**
Tony & Danielle Guzzetta
Brad Radochonski
Tim Seifert
Jessica Thomas

**PUTNAM**
Christina Hong & Eul-Shik
Mina Moutzourogeorgos

**SCUDDER**
Ray & Pat Eissa
Cathy Oken
Jon & Maria Sampson

**SUN LIFE OF CANADA**
Ezra Hartsfield
Dana & Andrea Walston

## 2002 PCA LEADERS CIRCLE
## RAYMOND JAMES FINANCIAL SERVICES, INC.

### INVESTMENT MANAGEMENT DIVISION

1. Mal Makin — Westerly, Rhode Island
2. Jeff Oster — San Francisco, California
3. Randy Carver (absent) — Mentor, Ohio
4. Mark & Patty Smith — Englewood, Colorado
5. Donald Charbonnier — Westerly, Rhode Island
6. Peter Wallace & Katrina Wall — Westerly, Rhode Island
7. Todd Swicegood (absent) — Salisbury, North Carolina
8. Tom Hamlin & Tom Harding — Lake Oswego, Oregon
9. Larry & Michael Grabenstein — Calverton, Maryland
10. Tom & Robyn Payant — Tampa, Florida
11. Patrick & Sheri Lynn Essian — Bad Axe, Michigan
12. Gene Rex & Lisa Hannahs — Ravenna, Ohio
13. Michael Fleury — Silverdale, Washington
14. Donald Roy (absent) — Nashua, New Hampshire
15. Bo & Elizabeth Brown (absent) — Dayton, Ohio
16. Charlene Carter (absent) — Eugene, Oregon
17. Ann Holman & Betty Mitchell — Dothan, Alabama
18. Maxine & Johnny Chappell — Dothan, Alabama
19. John Rafal (absent) — Essex, Connecticut
20. Ricky Meeks (absent) — Kannapolis, North Carolina
21. Bob & Kara Lee — Sarasota, Florida
22. George & Sandi Jackson — Longwood, Florida
23. Dwight Campbell (absent) — Boca Raton, Florida
24. Hoyte & Mary Jane Brown — Hamden, Connecticut
25. Mary Carter & Pete Petersen — Jacksonville Beach, Florida

### SPECIAL GUESTS

Michael & Terry Mazzafro — Cherry Hill, New Jersey
John & Suzanne Casconi — Louisville, Kentucky
Jim & Kim Noto — New Port Richey, Florida
Tom & Kim Buck — Lakewood, Colorado
David Newman & Gloria Maynard — Duncan, Oklahoma

### SECURITIES/FINANCIAL INSTITUTIONS DIVISIONS

1. Chip & Stacey Morton — Destin, Florida
2. Rodney Lankford (absent) — Gadsden, Alabama
3. Philip & Michelle Moses — Lake City, Florida
4. Mark & Staci Erskine — Santa Barbara, California
5. Steve & Cassie Delport — Pueblo, Colorado
6. Daniel & Dustin Bay — Chico, California

## SECURITIES DIVISION (continued)

7.  Donna Vogt (absent)                          Campbellsport, Wisconsin
8.  Greg Driskell & Merry Sieh                   Creston, Iowa
9.  Joe & Kathy Johnson                          Elmwood Park, Illinois
10. Paul & Andrea Stanley                        Oklahoma City, Oklahoma
11. Stuart Vogt (absent)                         North Riverside, Illinois
12. Luke & Susan Haymond                         Cumming, Georgia
13. Mike & Valerie Hill                          Myrtle Beach, South Carolina
14. Bernard Mahon (absent)                       Fredericksburg, Virginia
15. Steve & Rhonda Sell                          Omaha, Nebraska
16. Kent & Jane Dallmeyer                        Washington, Iowa
17. Kevin & Lynda Riley                          Syracuse, New York
18. Pat Keating (absent)                         Manhattan, Kansas
19. Brian & Renee Needleman                      Syracuse, New York
20. Ronald & Lydia Bee                           Redding, California
21. Ed & Patricia Ramevege                       Frederick, Maryland
22. Shelby Hardee & Margie Foxworth              Murrells Inlet, South Carolina
23. Mark & Barb Frieler                          Madison, Wisconsin
24. Suzanne & Bob Trzcienski                     Willimantic, Connecticut
25. John & Kathleen Terzis                       Morton Grove, Illinois

## SPECIAL GUESTS

Tom & Tracey Piche                               Houston, Texas
Ken Smith & Linda Condo                          Haggerstown, Maryland
Chadwick & Betsy Lindsey                         Hattiesburg, Mississippi
Ray & Pat Berger                                 Kirkwood, MO
Greg Horton & Antoinette Ingulli                 Mommouth Beach, New Jersey

## PLANNING CORPORATION OF AMERICA

Jim Sipe, President
Marie Dremann, First Vice President
John Hanlon, Vice President & Mary Hanlon
Vanessa Marcos, Marketing

## RAYMOND JAMES FINANCIAL SERVICES, INC.

Dick Averitt, Chairman & Chief Executive Officer & Sandi Averitt

## FINANCIAL INSTITUTIONS DIVISION

David Doerflinger, Regional Vice President & Emily Doerflinger

EXHIBIT "E"



AXA Distributors, LLC

March 8, 2007

Charles Helms
Raymond James Financial Servic
2431 W Main St
Westwood Park Suite 603
Dothan, AL 36301-1217

Dear Charles:

I'd like to take this opportunity to introduce myself as your dedicated External Wholesaler for AXA Distributors, LLC. My goal is to provide you with the optimal strategies to help you meet your clients' needs.

AXA Distributors has made every effort to ensure that we provide you with a competitive product, effective sales ideas, and a commitment to excellent service to help you and your clients achieve their goals.

I will be in touch soon to see how we can help you grow your business. In the meantime, I can be reached on my cell phone at (205) 913-1225 and via email at peter.dunn@axadistributors.com. For immediate marketing support and illustrations, you may also contact the Sales Desk at (888) 517-9900. Please do not hesitate to contact AXA Distributors for anything that you need to help grow your business. We are confident that our support will have a positive impact on your sales and marketing efforts.

I am excited about the opportunity to work with you, and look forward to speaking with you soon.

Sincerely,

Peter Dunn
Regional Vice President, AXA Distributors, LLC

Accumulator® is a registered service mark of AXA Equitable Life Insurance Company. Accumulator® variable annuities are issued by AXA Equitable Life Insurance Company and distributed by AXA Distributors, LLC, New York, NY 10104
For Financial Professional Use Only. Not to be Distributed to the Public.
NP06554 (rev 2/07-Dunn)

## ✔AXA DISTRIBUTORS

EXHIBIT "F"

Prospectus

# Income Manager

Issued by The Equitable Life Assurance Society of the United States



# Income Manager ®
## Payout annuity contracts

*Please read and keep this prospectus for future reference. It contains important information that you should know before purchasing or taking any other action under your contract.*

## Prospectus dated May 1, 1999

## What is Income Manager?

Income Manager contracts are payout annuity contracts issued by **The Equitable Life Assurance Society of the United States.** They are designed to provide retirement income. We offer two versions of the Income Manager payout annuity contract from which you may choose to receive your retirement income. You may choose to receive income payable for a specified period ("period certain"). Or, you may choose to receive lifetime income payable for at least a specified period ("life annuity with a period certain"). Under the life annuity with a period certain contract you may choose whether payments are made on a single life or a joint and survivor life basis.

**Types of contracts.** We offer the contracts for use as:

- A nonqualified annuity ("NQ") for after-tax contributions only.

- An individual retirement annuity ("IRA"). There are two types of IRAs, Traditional IRAs or Roth IRAs. Because Roth IRAs were newly introduced in 1998 and have a five year aging period before distributions should begin, we do not expect to offer payout annuity Roth IRA contracts before the year 2003.

A contribution of at least $10,000 is required to purchase a contract.

**Fixed maturity options.** We allocate your contributions to a series of fixed maturity options to provide your income payments during the period certain. Amounts allocated to these fixed maturity options will receive a fixed rate of interest during the period certain. Interest is earned at a guaranteed rate we set ("rate to maturity"). We make a market value adjustment (up or down) if you make a withdrawal from a fixed maturity option before its maturity date.

A registration statement relating to this offering has been filed with the Securities and Exchange Commission ("SEC"). This prospectus can be obtained from the SEC's website at http://www.sec.gov.

**The SEC has not approved or disapproved these securities or determined if this prospectus is accurate or complete. Any representation to the contrary is a criminal offense. The contracts are not insured by the FDIC or any other agency. They are not deposits or other obligations of any bank and are not bank guaranteed. They are subject to investment risks and possible loss of principal.**

# Contents of this prospectus

**Income Manager®**

| | |
|---|---|
| Index of key words and phrases | 4 |
| Who is Equitable Life? | 5 |
| How to reach us | 6 |
| Income Manager at a glance — key features | 7 |

**Contract features and benefits  10**

| | |
|---|---|
| How you can purchase and contribute to your contract | 10 |
| Source of contributions | 10 |
| Owner and annuitant requirements | 10 |
| What are your investments under the contract? | 10 |
| What are your contract choices? | 12 |
| Life annuity with a period certain contract | 12 |
| Period certain contract | 18 |

**Other benefits and features of the
    contracts  20**

| | |
|---|---|
| How you can make your contributions | 20 |
| Your right to cancel within a certain number of days | 20 |
| Surrendering your contract to receive its cash value | 20 |
| When to expect payments | 20 |

"We", "our" and "us" refer to Equitable Life.

When we address the reader of this prospectus with words such as "you" and "your," we mean the person who has the right or responsibility that the prospectus is discussing at that point. This is usually the contract owner.

When we use the word "contract" it also includes certificates that are issued under group contracts in some states.

3

**Contents of this prospectus**

| Charges | 21 |
|---|---|
| Withdrawal charges | 21 |
| Amounts applied from other contracts issued by Equitable Life | 21 |
| Charges for state premium and other applicable taxes | 22 |
| Group or sponsored arrangements | 22 |
| Other distribution arrangements | 22 |

| Payment of death benefit | 23 |
|---|---|
| Your beneficiary | 23 |
| Choosing annuity payout options | 23 |

| Tax information | 24 |
|---|---|
| Overview | 24 |
| Taxation of nonqualified annuities | 24 |
| Special rules for NQ contracts issued in Puerto Rico | 25 |
| Individual retirement arrangements (IRAs) | 26 |
| Traditional individual retirement annuities (Traditional IRAs) | 26 |
| Federal and state income tax withholding and information reporting | 33 |

| More information | 35 |
|---|---|
| About our fixed maturity options | 35 |
| About the separate account for the fixed maturity options | 35 |
| About our general account | 36 |
| Other methods of payment | 36 |
| About payments under period certain contracts | 36 |
| Dates and prices at which contract events occur | 37 |
| About our year 2000 progress | 37 |
| About our legal proceedings | 38 |
| About our independent accountants | 38 |
| Transfers of ownership, collateral assignments, loans, and borrowing | 38 |
| Distribution of contracts | 38 |

| Incorporation of certain documents by reference | 39 |
|---|---|

| Appendix: Market value adjustment example | A-1 |
|---|---|

# Index of key words and phrases

This index should help you locate more information on the terms used in this prospectus.

| | Page | | Page |
|---|---|---|---|
| account value | 15 | life annuity with a period certain | 12 |
| annuitant | 10 | life contingent annuity | 13 |
| beneficiary | 23 | market adjusted amount | 11 |
| business day | 37 | market value adjustment | 11 |
| cash value | 15 | maturity value | 11 |
| contract date | 8 | off maturity date | 11 |
| contract year | 8 | NQ | 25 |
| contribution | 10 | payout option | 23 |
| deferral period | 13 | period certain | 7 |
| fixed maturity amount | 10 | Processing Office | 6 |
| fixed maturity options | 10 | rate to maturity | 10 |
| IRA | cover | SEC | cover |
| IRS | 23 | separate account | 35 |
| joint and survivor | 12 | single life | 12 |
| joint owners | 10 | traditional IRA | 26 |

To make this prospectus easier to read, we sometimes use different words than in the contract or supplemental materials. This is illustrated below. Although we use different words, they have the same meaning in the prospectus as in the contract or supplemental materials. Your Equitable associate can provide further explanation about your contract.

| Prospectus | Contract on Supplemental Materials |
|---|---|
| fixed maturity amount | Guaranteed Period Amount |
| fixed maturity options | Guarantee Periods (Guaranteed Interest Rate Options ("GIRO's") in supplemental materials) |
| off maturity date payments | Model Payment Portion |
| market adjusted amount | annuity account value |
| maturity date | Expiration Date |
| rate to maturity | Guaranteed Rate |

# Who is Equitable Life?

We are The Equitable Life Assurance Society of the United States ("Equitable Life"), a New York stock life insurance corporation. We have been doing business since 1859. Equitable Life is a wholly owned subsidiary of The Equitable Companies, Incorporated ("Equitable Companies"), whose majority shareholder is AXA, a French holding company for an international group of insurance and related financial services companies. As a majority shareholder, and under its other arrangements with Equitable Life and Equitable Life's parent, AXA exercises significant influence over the operations and capital structure of Equitable Life and its parent. No company other than Equitable Life, however, has any legal responsibility to pay amounts that Equitable Life owes under the contract. During 1999, Equitable Companies plans to change its name to AXA Financial, Inc.

Equitable Companies and its consolidated subsidiaries managed approximately $347.5 billion in assets as of December 31, 1998. For over 100 years we have been among the largest insurance companies in the United States. We are licensed to sell life insurance and annuities in all fifty states, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands. Our home office is located at 1290 Avenue of the Americas, New York, NY 10104.

6

## How to reach us

You may communicate with our Processing Office listed below for any of the following purposes:

### For contributions sent by regular mail:

Equitable Life
Income Manager
P.O. Box 13014
Newark, NJ 07188-0014

### For contributions sent by express delivery:

Equitable Life
Income Manager
c/o First Chicago National Processing Center
300 Harmon Meadows Boulevard, 3rd Floor
Attn: Box 13014
Secaucus, NJ 07094

### For all other communications (e.g., requests for withdrawals, or required notices) sent by regular mail:

Equitable Life
Income Manager
P.O. Box 1547
Secaucus, NJ 07096-1547

### For all other communications (e.g., requests for withdrawals, or required notices) sent by express delivery:

Equitable Life
Income Manager
200 Plaza Drive, 4th Floor
Secaucus, NJ 07094

### Customer Service Representatives:

During our regular business hours you may also use our toll-free number (1-800-789-7771) to speak with one of our customer service representatives. Our customer service representatives are available on any business day from 8:30 a.m. until 5:30 p.m., Eastern Time.

## Reports we provide:

○ Statement of your contract values as of the last day of the calendar year;

• Three written reports of your contract values each year; and

• Written confirmation of financial transactions.

You should send all contributions, required notices, and requests to exercise any of your rights or privileges to our Processing Office at the address above.

## We have specific forms that we recommend you use for the following types of requests:

1) address changes;

2) beneficiary changes;

3) withdrawal requests; and

4) contract surrender.

You must sign and date all these requests. Any written request that is not on one of our forms must include your name and your contract number along with adequate details about the notice you wish to give or the action you wish us to take.

## Signatures:

The proper person to sign forms, notices and requests would normally be the owner. If there are joint owners both must sign.

# Income Manager at a glance
# — key features

| | Income Manager (life annuity with a period certain) | Income Manager (period certain) |
|---|---|---|
| **Income payments** | NQ — Level or increasing payments. IRA — Level payments only. | NQ and IRA — Level payments only. |
| **Period certain** | You will receive payments for periods ranging from 7 to 15 years depending on the age of the annuitant. | |
| **Form of payment available** | Single life or joint and survivor. | Single life only. |
| **Payments after the end of the period certain** | Payments continue while the annuitant or joint annuitant is living. | None |
| **Contribution amounts:** Initial minimum: Additional minimum: | • $10,000 <br> • $1,000 (subject to restrictions) <br> Maximum investment limitations may apply. | • $10,000 <br> • Not permitted <br> Maximum investment limitations may apply. |
| **Fixed maturity options** | • 15 fixed maturity options with maturities ranging from approximately 1 to 15 years. <br> • Each fixed maturity option offers a guarantee of principal and interest rate if you hold it to maturity. <br> • Principal guarantees. <br>   — If you make withdrawals from a fixed maturity option before maturity, there will be a market value adjustment due to differences in interest rates. This may increase or decrease any value you have left in that fixed maturity option. If you surrender your contract, a market value adjustment may also apply. | |
| **Taxes** | Generally, earnings will be taxed at your ordinary income tax rate when distributions are made from your contract. <br> • NQ — A portion of each payment is generally not considered taxable income until you have received a tax-free recovery of your investment in the contract. <br> • IRA — All amounts distributed are generally taxable. | |
| **Death benefit** | A death benefit is provided if the annuitant dies before the end of the period certain. There is no death benefit after the period certain. | A death benefit is provided if the annuitant dies before the end of the period certain. |

86

|  | Income Manager (life annuity with a period certain) | Income Manager (period certain) |
|---|---|---|
| **Access to your money during the period certain** | • Withdrawals.<br>• Contract surrender.<br><br>A market value adjustment may apply. You may also incur income tax and a penalty tax.<br><br>You cannot take a withdrawal from, or surrender your life contingent annuity. | • Withdrawals.<br>• Contract surrender.<br><br>A market value adjustment may apply. You may also incur income tax and a penalty tax. |
| **Charges** | • We deduct a charge for taxes such as premium taxes that may be imposed in your state. We deduct this charge from your contributions.<br>• During the first seven contract years following a contribution, a charge will be deducted from amounts that you withdraw that exceed 10% of your account value. We use the account value on the most recent contract date anniversary to calculate the 10% amount available. The charge begins at 7% in the first contract year following a contribution. It declines each year to 1% in the seventh contract year. There is no withdrawal charge in the eighth and later contract years following a contribution. | • We deduct a charge for taxes such as premium taxes that may be imposed in your state. We deduct this charge from your contributions.<br>• During the first seven contract years a charge will be deducted from amounts that you withdraw. The charge begins at 7% in the first contract year. It declines each year to 1% in the seventh contract year. There is no withdrawal charge in the eighth and later contract years.<br>• There is no free withdrawal amount. |

*The 12-month period beginning on your contract date and each anniversary of that date is a "contract year." The "contract date" is the effective date of a contract. This usually is the business day we receive your initial contribution.*

| **Annuitant issue ages** | NQ and IRA level payments: 45 — 83<br>NQ increasing payments: 53½ — 83<br>Different ages may apply depending on when annuity payments start. |
|---|---|

**The above is not a complete description of all material provisions of the contract. In some cases restrictions or exceptions apply. Also, all features of the contract are not necessarily available in your state or at certain ages.**

For more detailed information we urge you to read the contents of this prospectus, as well as your contract. Please feel free to speak with your Equitable associate, or call us, if you have any questions.

Income Manager at a glance — key features

# Contract features and benefits

## How you can purchase and contribute to your contract

You may purchase your contract by making payments to us we call "contributions." We require a contribution of at least $10,000 for you to purchase a contract. Under life annuity with a period certain contracts, you may make additional contributions subject to the limitations as described under "Additional contributions" later in this prospectus.

### Source of contributions

**NQ contracts.** We will accept only contributions made with after-tax money. You may make your contributions by check or by transfer of your contract value in a tax-deferred exchange under Section 1035 of the Internal Revenue Code.

**IRA contracts.** Contributions may be made from:

- Rollovers from a qualified plan.

- Rollovers from a Tax Sheltered Annuity (TSA).

- Rollovers from another traditional individual retirement arrangement.

- Direct custodian-to-custodian transfers from another traditional individual retirement arrangement.

See "Tax information" for a more detailed discussion of sources of contributions and contribution limitations. We may refuse to accept any contribution if the sum of all contributions under all Income Manager contracts with the same annuitant would then total more than $1,500,000. We may also refuse to accept any contributions if the sum of all contributions under all Equitable Life annuity payout contracts that you own would then total more than $2,500,000.

For information on when contributions are credited see "Dates and prices at which contract events occur" later in this prospectus.

## Owner and annuitant requirements

**NQ contracts.** The annuitant can be different from the contract owner. A joint owner may also be named provided both owners are of legal age. Only natural persons can be joint owners. This means that an entity such as a corporation or a trust cannot be a joint owner.

*The "annuitant" is the person who is the measuring life for determining contract benefits. The annuitant is not necessarily the contract owner.*

**IRA contracts.** The owner and the annuitant must be the same person. Joint owners are not permitted. A joint annuitant may be named.

## What are your investments under the contract?

### Fixed maturity options

To provide your income payments during the period certain, we allocate your contributions to fixed maturity options that mature in consecutive date order. When we allocate your contributions to the fixed maturity options they become part of our general account assets. They accumulate interest at a rate to maturity for each fixed maturity option. The total amount allocated to and accumulated in each fixed maturity option is called the "fixed maturity amount."

The rate to maturity you will receive for each fixed maturity amount is the interest rate in effect for new contributions allocated to that fixed maturity option on the date we apply your contribution. If you make any withdrawals from a fixed maturity option before the maturity date, we will make a market value adjustment that may increase or decrease any fixed maturity amount you have left in that fixed maturity option. We will discuss market value adjustment below and in greater detail later in this prospectus under "More information."

For applications we receive under certain types of transactions, we may offer you the opportunity to lock in rates to maturity on contributions.

On the maturity date of each of your fixed maturity options your fixed maturity amount, assuming you have not made any withdrawals, will equal your contribution to each fixed maturity option plus interest, at the rate to maturity for that contribution, to the date of calculation. This is the fixed maturity option's "maturity value." Before maturity, the current value we will report for your fixed maturity amount will reflect a market value adjustment. It will reflect the market value adjustment that we would make if you were to withdraw all of your fixed maturity amount on the date of the report. We call this your "market adjusted amount."

**Rates to maturity and price per $100 of maturity value.** We can determine the amount required to be allocated to each fixed maturity option in order to produce specified maturity values. For example, we can tell you how much you need to allocate per $100 of maturity value.

Guaranteed rates to maturity for new allocations as of April 1, 1999 and the related price per $100 of maturity value were as follows:

| Fixed maturity options with February 15th maturity date of maturity year | Rate to maturity as of April 1, 1999 | Price per $100 of maturity value |
|---|---|---|
| 2000 | 3.25% | $97.23 |
| 2001 | 4.04% | $92.83 |
| 2002 | 4.33% | $88.51 |
| 2003 | 4.46% | $84.43 |
| 2004 | 4.52% | $80.60 |
| 2005 | 4.67% | $76.45 |
| 2006 | 4.77% | $72.56 |
| 2007 | 4.79% | $69.16 |
| 2008 | 4.87% | $65.55 |
| 2009 | 4.97% | $61.91 |
| 2010 | 4.90% | $59.41 |
| 2011 | 4.90% | $56.63 |
| 2012 | 4.90% | $53.99 |
| 2013 | 4.90% | $51.46 |
| 2014 | 4.90% | $49.05 |

**Market value adjustment.** If you make any withdrawals, (including surrender of your contract or when we make deductions for withdrawal charges), from a fixed maturity option before it matures we will make a market value

adjustment, which will increase or decrease any fixed maturity amount you have in that fixed maturity option. The amount of the adjustment will depend on two factors:

(a) the difference between the rate to maturity that applies to the amount being withdrawn and the rate to maturity in effect at that time for new allocations to that same fixed maturity option, and

(b) the length of time remaining until the maturity date.

In general, if interest rates rise from the time that we originally allocate an amount to a fixed maturity option to the time that you take a withdrawal, the market value adjustment will be negative. Likewise, if interest rates drop at the end of that time, the market value adjustment will be positive. Also, the amount of the market value adjustment, either up or down, will be greater the longer the time remaining until the fixed maturity option's maturity date. Therefore, it is possible that the market value adjustment could greatly reduce your value in the fixed maturity options, particularly in the fixed maturity options with later maturity dates.

We provide an explanation of how we calculate the market value adjustment, and information concerning our general account under "More information" later in this prospectus. We provide an example of how we calculate the market value adjustment in the Appendix to this prospectus.

**Separate account for the fixed maturity options**

Amounts allocated to the fixed maturity options are held in a "nonunitized" separate account we have established under the New York Insurance Law. This separate account provides an additional measure of assurance that we will make full payment of amounts due under the fixed maturity options. We provide additional information about this separate account later in this prospectus under "More information."

**Off maturity date payments.** Under Income Manager contracts you may choose to receive payments monthly, quarterly or annually. If you choose annual payments, generally your payments will be made on February 15th as each fixed maturity option matures. You may instead

# Contract features and benefits

## How you can purchase and contribute to your contract

You may purchase your contract by making payments to us we call "contributions." We require a contribution of at least $10,000 for you to purchase a contract. Under life annuity with a period certain contracts, you may make additional contributions subject to the limitations as described under "Additional contributions" later in this prospectus.

## Source of contributions

**NQ contracts.** We will accept only contributions made with after-tax money. You may make your contributions by check or by transfer of your contract value in a tax-deferred exchange under Section 1035 of the Internal Revenue Code.

**IRA contracts.** Contributions may be made from:

- Rollovers from a qualified plan.

- Rollovers from a Tax Sheltered Annuity (TSA).

- Rollovers from another traditional individual retirement arrangement.

- Direct custodian-to-custodian transfers from another traditional individual retirement arrangement.

See "Tax information" for a more detailed discussion of sources of contributions and contribution limitations. We may refuse to accept any contribution if the sum of all contributions under all Income Manager contracts with the same annuitant would then total more than $1,500,000. We may also refuse to accept any contributions if the sum of all contributions under all Equitable Life annuity payout contracts that you own would then total more than $2,500,000.

For information on when contributions are credited see "Dates and prices at which contract events occur" later in this prospectus.

## Owner and annuitant requirements

**NQ contracts.** The annuitant can be different from the contract owner. A joint owner may also be named provided both owners are of legal age. Only natural persons can be joint owners. This means that an entity such as a corporation or a trust cannot be a joint owner.

*The "annuitant" is the person who is the measuring life for determining contract benefits. The annuitant is not necessarily the contract owner.*

**IRA contracts.** The owner and the annuitant must be the same person. Joint owners are not permitted. A joint annuitant may be named.

## What are your investments under the contract?

### Fixed maturity options

To provide your income payments during the period certain, we allocate your contributions to fixed maturity options that mature in consecutive date order. When we allocate your contributions to the fixed maturity options they become part of our general account assets. They accumulate interest at a rate to maturity for each fixed maturity option. The total amount allocated to and accumulated in each fixed maturity option is called the "fixed maturity amount."

The rate to maturity you will receive for each fixed maturity amount is the interest rate in effect for new contributions allocated to that fixed maturity option on the date we apply your contribution. If you make any withdrawals from a fixed maturity option before the maturity date, we will make a market value adjustment that may increase or decrease any fixed maturity amount you have left in that fixed maturity option. We will discuss market value adjustment below and in greater detail later in this prospectus under "More information."

For applications we receive under certain types of transactions, we may offer you the opportunity to lock in rates to maturity on contributions

On the maturity date of each of your fixed maturity options your fixed maturity amount, assuming you have not made any withdrawals, will equal your contribution to each fixed maturity option plus interest, at the rate to maturity for that contribution, to the date of calculation. This is the fixed maturity option's "maturity value." Before maturity, the current value we will report for your fixed maturity amount will reflect a market value adjustment. It will reflect the market value adjustment that we would make if you were to withdraw all of your fixed maturity amount on the date of the report. We call this your "market adjusted amount."

**Rates to maturity and price per $100 of maturity value.** We can determine the amount required to be allocated to each fixed maturity option in order to produce specified maturity values. For example, we can tell you how much you need to allocate per $100 of maturity value.

Guaranteed rates to maturity for new allocations as of April 1, 1999 and the related price per $100 of maturity value were as follows:

| Fixed maturity options with February 15th maturity date of maturity year | Rate to maturity as of April 1, 1999 | Price per $100 of maturity value |
|---|---|---|
| 2000 | 3.25% | $97.23 |
| 2001 | 4.04% | $92.83 |
| 2002 | 4.33% | $88.51 |
| 2003 | 4.46% | $84.43 |
| 2004 | 4.52% | $80.60 |
| 2005 | 4.67% | $76.45 |
| 2006 | 4.77% | $72.56 |
| 2007 | 4.79% | $69.16 |
| 2008 | 4.87% | $65.55 |
| 2009 | 4.97% | $61.91 |
| 2010 | 4.90% | $59.41 |
| 2011 | 4.90% | $56.63 |
| 2012 | 4.90% | $53.99 |
| 2013 | 4.90% | $51.46 |
| 2014 | 4.90% | $49.05 |

**Market value adjustment.** If you make any withdrawals, (including surrender of your contract or when we make deductions for withdrawal charges), from a fixed maturity option before it matures we will make a market value

adjustment, which will increase or decrease any fixed maturity amount you have in that fixed maturity option. The amount of the adjustment will depend on two factors:

(a) the difference between the rate to maturity that applies to the amount being withdrawn and the rate to maturity in effect at that time for new allocations to that same fixed maturity option, and

(b) the length of time remaining until the maturity date.

In general, if interest rates rise from the time that we originally allocate an amount to a fixed maturity option to the time that you take a withdrawal, the market value adjustment will be negative. Likewise, if interest rates drop at the end of that time, the market value adjustment will be positive. Also, the amount of the market value adjustment, either up or down, will be greater the longer the time remaining until the fixed maturity option's maturity date. Therefore, it is possible that the market value adjustment could greatly reduce your value in the fixed maturity options, particularly in the fixed maturity options with later maturity dates.

We provide an explanation of how we calculate the market value adjustment, and information concerning our general account under "More information" later in this prospectus. We provide an example of how we calculate the market value adjustment in the Appendix to this prospectus.

**Separate account for the fixed maturity options**

Amounts allocated to the fixed maturity options are held in a "nonunitized" separate account we have established under the New York Insurance Law. This separate account provides an additional measure of assurance that we will make full payment of amounts due under the fixed maturity options. We provide additional information about this separate account later in this prospectus under "More information."

**Off maturity date payments.** Under Income Manager contracts you may choose to receive payments monthly, quarterly or annually. If you choose annual payments, generally your payments will be made on February 15th as each fixed maturity option matures. You may instead

12

choose to have your annual payments made in a month other than February. We refer to payments we make on an annual basis in any month other than February and monthly or quarterly payments, as payments made "off maturity dates." If you choose to have your payments made off maturity dates, we will be required to begin making your payments before the maturity date of a fixed maturity option. In planning for these payments we will allocate a portion of your initial contribution to the separate account, but not to the fixed maturity options contained in the separate account. We will credit these amounts with interest at rates that will not be less than 3%.

After that, as each fixed maturity option expires we will transfer your maturity value from the expired fixed maturity option and hold the maturity value in the separate account. We will credit interest to these amounts at the same rate as the rate to maturity that was credited in the expired fixed maturity option. These amounts will then be used to provide for payments off maturity dates during the period certain.

*Whether you choose monthly, quarterly, or annual payments, your payments will be made on the 15th day of the month.*

We will not make a market value adjustment to the amounts held in the separate account to provide for payments off maturity dates.

## What are your contract choices?

We offer two versions of the Income Manager payout annuity contracts from which you may choose to receive your retirement income, a "life annuity with a period certain" and a "period certain" annuity. We discuss both versions below.

## Life annuity with a period certain contract

This payout annuity contract provides you with guaranteed payments during the period certain. When the period certain ends you will continue to receive payments for as long as an annuitant is living. Payments based solely on the life of one annuitant are called "single life" payments. You may also elect to receive "joint and survivor" payments that are based

on the lives of an annuitant and a joint annuitant. These payments will continue as long as one of the annuitants is living. Payments during the period certain are designed to pay out your entire account value by the end of the period certain.

*"Single life" payments are made to you as long as the annuitant is living. "Joint and survivor" payments continue as long as either annuitant is living. For IRA contracts, if you are married, the joint annuitant must be your spouse.*

For annuitant ages at which the contracts are available see the chart under "Your period certain" below.

### Additional contributions

If your annuity payments are set to begin on February 15, 2000 or later, and you are age 78 or younger, you may make additional contributions of at least $1,000 at any time up until 15 days before your payments actually begin. If the annuitant is over age 78 you can only make additional contributions during the first contract year.

Under IRA contracts we will accept additional contributions that are "regular" contributions, rollover contributions or direct transfers. Additional "regular" contributions may no longer be made after you are age 70½. If you make a direct transfer or rollover contribution after you turn age 70½ you must have taken the required minimum distribution for the year before the contribution is applied to this contract. See "Tax information" later in this prospectus.

If you are using the proceeds from another type of contract issued by us to purchase this contract, you will not be permitted to make additional contributions.

### How we allocate your contributions

We determine the allocation of your contributions based on a number of factors. They are:

- the amount of your contribution;

- the form of payments;

- the age and sex of the annuitant (and the age and sex of the joint annuitant, if joint and survivor annuity payments are elected);

- the frequency of payments; and

- the period certain.

We then allocate your initial contribution among the fixed maturity options, the separate account if we need to make payments to you off maturity dates, and the "life contingent annuity." We will allocate your additional contributions in the same manner. Additional contributions will increase the level of all future payments. You may not change this allocation.

*The life contingent annuity continues the payments after the period certain ends.*

## Payments

**NQ contracts.** If you are age 45 or older, you may elect to receive level payments. You will receive level payments during the period certain and under the life contingent annuity. However, if you are younger than age 59½, there are tax issues that you should consider before you purchase a contract. If you are age 53½ or older you may instead elect to receive payments that increase. However, your payments may not start before you are age 59½. Such payments will increase by 10% every three years during the period certain on each third anniversary of the date annuity payments begin. After the end of the period certain, your first payment under the life contingent annuity will be 10% greater than the final payment made under the period certain. See "Payments after the period certain" below.

**IRA contracts.** Only level payments are available under IRA contracts.

Whether you choose monthly, quarterly or annual payments, you will usually begin receiving payments one payment period from the contract date, unless you elect otherwise as described under "Off maturity date payments" earlier in this prospectus. Your payments will always be made on the 15th

day of the month. However, if you are age 53½ or older, you must defer the date your payments will start until you are 59½. If you are at least age 59½ you may elect to defer the date your payments will start. Generally, you may defer payments for a period of up to 72 months. This is called the deferral period. Deferral of the payment start date permits you to lock in rates at a time when you may consider current rates to be high, while permitting you to delay receiving payments if you have no immediate need to receive income under your contract.

*The deferral period together with the period certain may be referred to as a "liquidity period." Unlike traditional life annuities that provide periodic payments, you will be able to make withdrawals before the end of the period certain. You may also choose to surrender your contract for its cash value while keeping the life contingent annuity in effect.*

Before you decide to defer payments, you should consider the fact that the amount of income you purchase is based on the rates to maturity in effect on the date we allocate your contribution. Therefore, if rates rise during the deferral period, your payments may be less than they would have been if you had purchased a contract at a later date. Deferral of the payment start date is not available if the annuitant is older than age 80. Under IRA contracts, if your deferred payment start date is after you are age 70½, you should consider the effect that deferral may have on your required minimum distributions.

### Your period certain

**Level payments.** Under level payments, you may select a period certain of not less than 7 years nor more than 15 years. The maximum period certain available based on the age of the annuitant when your contract is issued is as follows:

**14**

| NQ contracts | |
|---|---|
| Annuitant's age at issue* | Maximum period certain |
| 45 through 70 | 15 years |
| 71 through 75 | 85 less age at issue |
| 76 through 80 | 10 years |
| 81 though 83 | 90 less age at issue |

| IRA contracts | |
|---|---|
| Annuitant's age at issue* | Maximum period certain |
| 45 through 70 | 15 years |
| 71 through 78 | 85 less age at issue |
| 79 through 83 | 7 years |

*For joint and survivor payments, the period certain is based on the age of the younger annuitant.

The minimum and maximum period certain will be reduced by each year you defer the date your payments will start.

**Increasing payments.** Under NQ contracts if you elect increasing payments, you do not have a choice as to the period certain. Based on the age of the annuitant when your contract is issued, your period certain will be as follows:

| Annuitant's age at issue* | Period certain |
|---|---|
| 53½ through 70 | 15 years |
| 71 through 75 | 12 years |
| 76 through 80 | 9 years |
| 81 through 83 | 6 years |

*For joint and survivor payments, the period certain is based on the age of the younger annuitant.

If you elect increasing payments and defer the date payments will start, your period certain will be as follows:

| Annuitant's age at issue* | Period certain based on deferral period | | |
|---|---|---|---|
| | 1 - 36 months | 37 - 60 months | 61 - 72 months |
| 59½ through 70 | 12 years | 9 years | 9 years |
| 71 through 75 | 9 years | 9 years | n/a |
| 76 through 80 | 6 years | 6 years | n/a |
| 81 through 83 | n/a | n/a | n/a |

* For joint and survivor payments, the period certain is based on the age of the younger annuitant.

The annuitant ages at issue in the above table are also the annuitant ages for which the contracts are available.

Different ages may apply if you purchase a contract by exercising a benefit under another type of contract that we issue.

**Purchase restrictions for joint and survivor annuity payments**

If you elect payments on a joint and survivor basis:

- the joint annuitant must also be the beneficiary under the contract. Under IRA contracts, the joint annuitant must be your spouse;

- neither the annuitant nor the joint annuitant can be over age 83; and

- under level payments the joint and 100% to survivor form is only available for the longest period certain we permit.

**Payments after the period certain**

After the end of the period certain, we will continue your payments under the life contingent annuity if the annuitant or joint annuitant is living. Payments continue throughout the annuitant's lifetime (or the lifetime of the joint annuitant if joint and survivor payments are elected) on the same payment schedule (either monthly, quarterly or annually) as the payments you received during the period certain.

*The portion of your contribution allocated to the life contingent annuity does not have a cash value or an account value and therefore, does not provide for withdrawals.*

There is no death benefit provided under the life contingent annuity and payments are made to you only if the annuitant (or joint annuitant) is living when the payments are scheduled to begin. These payments are only made during the annuitant's lifetime and, if applicable, the lifetime of a joint annuitant. Therefore, you should consider the possibility that no payments will be made to you under the life contingent annuity if the annuitant (or joint annuitant) does not survive to the date payments are to begin.

Under the life contingent annuity you may elect single life or joint and survivor payments. Joint and survivor payments are available on a 100%, one-half or two-thirds to survivor basis. If you elect increasing payments under NQ contracts, your first payment under the life contingent annuity will be 10% greater than the final payment under the period certain. After the period certain we will increase your payments annually on each anniversary of the payment start date under the life contingent annuity. We will base this increase on the annual increase in the Consumer Price Index, but it will never be greater than 3% per year.

## Example of payments

We provide the chart below to illustrate level payments under the contract using the following assumptions:

(1) a male age 70 (who is both the contract owner and the annuitant);

(2) single life annuity payments;

(3) a contribution of $100,000;

(4) no additional contributions; and

(5) a period certain of 15 years.

If you had a contract date of April 1, 1999, based on rates to maturity on that date, an election of either monthly, quarterly, or annual payments with payments starting one payment period from the contract date, the following level payments would be provided:

| Payment period | Monthly | Quarterly | Annual |
|---|---|---|---|
| Start date | 5/15/99 | 7/15/99 | 4/15/00 |
| Payment | $654 | $1,971 | $8,092 |

## Withdrawals

After the first contract year and before the end of the period certain, you may take withdrawals from your account value. You may take one withdrawal per contract year at any time during the contract year. The minimum amount you may withdraw at any time is $1,000. If you request to withdraw more than 90% of your current "cash value" we will treat it

as a request to surrender your contract for its cash value. See "Surrendering your contract to receive its cash value" later in this prospectus.

*Your account value is the sum of your market adjusted amounts in each fixed maturity option plus your amounts held in the separate account to provide for payments off maturity dates. Your cash value is equal to your account value minus any withdrawal charge.*

Withdrawals in excess of a 10% free withdrawal amount may be subject to a withdrawal charge. There is no free withdrawal amount if your contract is surrendered for its cash value. Amounts withdrawn from a fixed maturity option before its maturity date will result in a market value adjustment.

## Allocation of withdrawals

We will subtract your withdrawal from all remaining fixed maturity options to which your account value is allocated as well as from amounts held in the separate account to provide for payments off maturity dates. As a result we will reduce the amount of your payments and the length of your period certain. We will also begin making payments to you under the life contingent annuity at an earlier date. In order to achieve this result we will withdraw additional amounts over the amount of the withdrawal you requested. We will withdraw these amounts from the fixed maturity options and from amounts held in the separate account to provide for payments off maturity dates and allocate them to the life contingent annuity. The exact additional amount we withdraw will depend on how much is necessary to assure that the same pattern of payments will continue in reduced amounts for the annuitant's life, and if it applies, the life of the joint annuitant. If you have elected increasing payments, the first increase in your payments will take place no later than the date of the next planned increase.

**16**

### Example

The example below illustrates the effect of a withdrawal based on:

(1) a single contribution of $100,000 made on April 1, 1999;

(2) level annual payments of $7,601 to be made on February 15th of each year;

(3) joint and two-thirds to survivor payments for a male and female, both age 70;

(4) a period certain of 15 years;

(5) a withdrawal made at the beginning of the fourth contract year of 25% of an account value of $67,907.44 when the annuitants are age 73.

The requested withdrawal amount would be $16,976.86 ($67,907.44 x .25). In this case, $6,790.74 ($67,907.44 x .10) would be the free withdrawal amount and could be withdrawn free of a withdrawal charge. The balance of $10,186.12 ($16,976.86 − $6,790.74) would be considered a withdrawal of a part of the contribution of $100,000. This contribution would be subject to a 4.0% withdrawal charge of $407.44 ($10,186.12 x .04). The account value after the withdrawal is $50,523.14 ($67,907.44 − $16,976.86 − $407.44). The payments would be reduced to $6,254.75 and the remaining period certain would be reduced to 10 years from 12.

### Death benefit

*When the annuitant dies before payments begin*

Generally, when we receive satisfactory proof of the annuitant's death before annuity payments begin we will pay the death benefit to the "beneficiary" named in your contract. See "Your beneficiary" later in this prospectus. If the joint owner who is also the annuitant dies, we will consider the surviving owner to be the beneficiary, taking the place of any other beneficiary designations.

We determine the amount of the death benefit payable to your beneficiary as of the date we receive satisfactory proof

of the annuitant's death and any required instructions for the method of payment. The death benefit is the greater of:

(1) your account value; and

(2) the sum of the fixed maturity amounts in each fixed maturity option plus any amounts held in the separate account to provide for payments off maturity dates.

However, if you are the annuitant and your spouse is the joint owner or the designated beneficiary under the contract, your spouse may elect to receive the payments instead of taking the death benefit if payments have not been deferred, or payments are scheduled to begin within one year. The payments will then begin on the scheduled date. We will not make any payments under the life contingent annuity after the annuitant's death unless you have elected the joint and survivor form of payments. If you elect joint and one-half or joint and two-thirds to survivor payments, at the death of either annuitant, we will reduce the payments by one-half or one-third, whichever applies.

*A death benefit is never payable under the life contingent annuity. The death benefit applies only during the period certain.*

*When the annuitant dies after the annuity payments begin*

If the annuitant dies after the payments begin, we will continue to make payments during the period certain to either the joint owner or the designated beneficiary, whichever applies. The payments will be made on the same schedule that was in effect before the annuitant's death. If you elected joint and survivor payments under the life contingent annuity, the payments will be made as long as one of the annuitants is living.

At the beneficiary's option, payments during the period certain may be discontinued and paid in a single sum. If the single sum is elected within one year after the annuitant's death, the single sum will be equal to the greater of:

(1) the account value; and

(2) the sum of the fixed maturity amounts in each fixed maturity option, plus any amounts held in the separate account to provide for payments off maturity dates.

If a single sum is elected and there is a joint annuitant, we will begin making payments to you under the life contingent annuity at an earlier date. These payments will be made in reduced amounts to compensate for the earlier start date.

*When the NQ contract owner who is not the annuitant dies before the annuitant and before the annuity payments begin*

When you are not the annuitant under an NQ contract and you die before annuity payments begin, the beneficiary named to receive the death benefit upon the annuitant's death will automatically become the new contract owner. You may name a different person that will become the owner at any time by sending an acceptable written form to our Processing Office. If the contract is jointly owned and the first owner to die is not the annuitant, the surviving owner becomes the sole contract owner. This person will be considered the beneficiary for purposes of the distribution rules described below. The surviving owner automatically takes the place of any other beneficiary designation.

Unless the surviving spouse of the deceased owner (or in the case of a joint ownership situation, the surviving spouse of the first owner to die) is the designated beneficiary for this purpose, the entire interest in the contract must be distributed under the following rules:

○ The cash value in the contract must be fully paid to the designated beneficiary (new owner) by December 31st of the fifth calendar year after your death (or in a joint ownership situation, the death of the first owner to die).

○ The new owner may instead elect to receive payments as a life annuity (or payments for a period certain of not longer than the new owner's life expectancy), with payments beginning no later than December 31st following the calendar year of the non-annuitant owner's death. Unless the alternative is elected, we will pay any cash value in the contract as a single sum on

December 31st of the fifth calendar year following the year of your death (or the death of the first owner to die).

○ If the surviving spouse is the designated beneficiary or joint owner, the surviving spouse may elect to continue the contract. No distributions are required as long as the surviving spouse and the annuitant are living.

*When the NQ contract owner who is not the annuitant dies after the annuity payments begin*

If your death occurs after annuity payments begin, payments will continue to be made during the period certain to the designated beneficiary, or in the case of joint owners, to the surviving owner. In either case this person becomes the new contract owner. The payments will be made on the same payment schedule that was in effect before your death. After the period certain, lifetime payments will be made under the life contingent annuity for as long the annuitant (or joint annuitant) is living.

### Surrendering your life annuity with period certain contract

You may surrender your contract for its cash value at any time during the period certain and receive lifetime payments after that under the life contingent annuity. Once your contract is surrendered, the date your payments are to start under the life contingent annuity will be moved forward to the date when you were supposed to receive the next payment under the period certain. However, your payments will be made in reduced amounts. Once your contract is surrendered, we will return it to you with a notation that the life contingent annuity is still in effect. You may not surrender the life contingent annuity.

### Period certain contract

You may purchase the period certain contract if you are age 59½ or older. The annuitant must be at least age 59½, but not older than age 78. This contract provides you with level guaranteed payments for a period certain that you select. The minimum period certain you may select is 7 years and the maximum period certain is 15 years. If the annuitant is over age 70 when the contract is issued, the maximum period certain you may select is 85 less the annuitant's age when the contract is issued.

### Additional contributions

Additional contributions are not permitted under the contract.

### How we allocate your contributions

Based on the amount of your single contribution and the period certain you select, we allocate your contribution among the fixed maturity options and, if necessary, to the separate account to provide for payments off maturity dates. You may not change this allocation. See "More information" for an example of payments.

### Payments

Whether you choose monthly, quarterly, or annual payments, your payments normally will start one payment period from the contract date unless you elect otherwise as described under "Off maturity date payments" earlier in this prospectus. Your payments will always be made on the 15th day of the month.

*The period certain may also be referred to as the "liquidity period" because you have access to your money through withdrawals or surrender of your contract.*

### Withdrawals

After the first contract year you may take withdrawals from your account value. You may take one withdrawal per contract year at any time during the contract year. The minimum amount you may withdraw at any time is $2,000 or 25% of your current cash value if it produces a larger amount. If you request to withdraw more than 90% of your current cash value we will treat it as a request for surrender of the contract for its cash value. See "Surrendering your contract to receive its cash value" later in this prospectus. Any amounts withdrawn from a fixed maturity option, before its maturity date, will result in a market value adjustment. See "Market value adjustment" earlier in this prospectus. Withdrawals made during the first seven contract years may be subject to a withdrawal charge. There is no free withdrawal amount under the period certain contracts.

### Allocation of withdrawals

We will subtract your withdrawals pro rata from all remaining fixed maturity options to which your account value is allocated as well as from amounts held in the separate account to provide for payments off maturity dates. As a result, your payments will continue in reduced level amounts over the remaining term of the period certain.

### Death Benefit

*When the annuitant dies before payments begin*

Generally, when we receive satisfactory proof of the annuitant's death before annuity payments begin we will pay the death benefit to the beneficiary named in your contract. See "Your beneficiary" later in this prospectus. If the joint owner who is also the annuitant dies, we will consider the surviving owner to be the beneficiary, taking the place of other beneficiary designations.

We determine the amount of the death benefit payable to your beneficiary as of the date we receive satisfactory proof of the annuitant's death and any required instructions for method of payment. The death benefit is the greater of:

(1) your account value; and

(2) the sum of the fixed maturity amounts in each fixed maturity option plus any amounts held in the separate account to provide for payments off maturity dates.

However, if you are the annuitant and your spouse is the joint owner or the designated beneficiary under the contract

your spouse may elect to receive the payments instead of taking the death benefit. The payments will then begin on the scheduled date.

*When the annuitant dies after the annuity payments begin*

If the annuitant dies after the annuity payments begin, payments will continue to be made during the period certain to either the joint owner or the designated beneficiary, whichever applies. The payments will be made on the same schedule that was in effect before the annuitant's death.

At the beneficiary's option, payments may be discontinued and paid in a single sum. If the single sum is elected within one year after the annuitant's death, the single sum will be equal to the greater of:

(1)  the account value; and

(2)  the sum of the fixed maturity amounts in each fixed maturity option plus any amounts held in the separate account to provide for payments off maturity dates.

*When the NQ contract owner who is not the annuitant dies before the annuitant and before the annuity payments begin*

When you are not the annuitant under an NQ contract and you die before annuity payments begin, the beneficiary named to receive the death benefit upon the annuitant's death will automatically become the new contract owner. You may instead name a different person to become the new contract owner at any time by sending an acceptable written form to our Processing Office. If the contract is jointly owned and the first owner to die is not the annuitant, the surviving owner becomes the sole contract owner. This person will be considered the beneficiary for purposes of the distribution rules described below. The surviving owner automatically takes the place of any other beneficiary designation.

Unless the surviving spouse of the deceased owner (or in the case of a joint ownership situation, the surviving spouse of the first owner to die) is the designated beneficiary for this purpose, the entire interest in the contract must be distributed under the following rules:

• The cash value in the contract must be fully paid to the

designated beneficiary (new owner) by December 31st of the fifth calendar year after your death (or in a joint ownership situation, the death of the first owner to die).

• The new owner may elect instead to receive payments as a life annuity (or payments for a period certain of not longer than the new owner's life expectancy), with payments beginning no later than December 31st following the calendar year of the non-annuitant owner's death. Unless this alternative is elected, we will pay any cash value in the contract as a single sum on December 31st of the fifth calendar year following the year of your death (or the death of the first owner to die).

• If the surviving spouse is the designated beneficiary or joint owner, the surviving spouse may elect to continue the contract. No distributions are required as long as the surviving spouse and the annuitant are living.

*When the NQ contract owner who is not the annuitant dies after the annuity payments begin*

If your death occurs after annuity payments begin, payments will continue to be made during the period certain to the designated beneficiary or in the case of joint owners to the surviving owner. In either case, this person becomes the new contract owner and receives the payments.

# Other benefits and features of the contracts

## How you can make your contributions

Except as noted below, contributions must be by check drawn on a bank in the U.S. clearing through the Federal Reserve System, in U.S. dollars, and made payable to Equitable Life. We do not accept third party checks endorsed to us except for rollover contributions, tax-free exchanges or trustee checks that involve no refund. All checks are subject to our ability to collect the funds. We reserve the right to reject a payment if it is received in an unacceptable form.

For your convenience, we will accept initial and additional contributions, if applicable, by wire transmittal from certain broker-dealers who have agreements with us for this purpose. These methods of payment are discussed in detail under "More information" later in this prospectus.

Your initial contribution must generally be accompanied by an application and any other form we need to process the payments. If any information is missing or unclear, we will try to obtain that information. If we are unable to obtain all of the information we require within five business days, we will inform the Equitable associate submitting the application, on your behalf. We will then return the contribution to you unless you specifically direct us to keep your contribution until we receive the required information.

*Our "business day" is any day the New York Stock Exchange is open for trading.*

### Section 1035 exchanges

You may apply the value of an existing nonqualified deferred annuity contract (or life insurance or endowment contract) to purchase an Income Manager NQ contract in a tax-deferred exchange if you follow certain procedures as shown in the form that we require you to use. Also see "Tax information" later in this prospectus.

## Your right to cancel within a certain number of days

If for any reason you are not satisfied with your contract, you may return it to us for a refund. To exercise this cancellation right you must mail the contract directly to our Processing Office within 10 days after you receive it. In some states, this "free look" period may be longer.

Generally, your refund will equal your account value under the contract. Your account value reflects any positive or negative market value adjustments in the fixed maturity options through the date we receive your contract. Under the life annuity with a period certain your refund will also include any amount applied to the life contingent annuity. However, some states require that we refund the full amount of your contribution (not including any investment gain or loss). For IRA contracts returned to us within seven days after you receive it, we are required to refund the full amount of your contribution.

If you cancel your contract during the free look period, we may require that you wait six months before you may apply for a contract with us again.

Please see "Tax information" for possible consequences of cancelling your contract.

## Surrendering your contract to receive its cash value

You may surrender your contract to receive its cash value at any time during the period certain. Your cash value is equal to your account value minus any withdrawal charge. There is no free withdrawal amount if you surrender your contract.

For a surrender to be effective, we must receive your written request and your contract at our Processing Office. We will determine your cash value on the date we receive the required information. All benefits under your contract will terminate as of that date unless you have elected the life contingent annuity. See "Surrendering your life annuity with a period certain contract" earlier in this prospectus.

## When to expect payments

Generally, we will fulfill requests for payments within seven days of the transaction to which the request relates. We can defer payment of any portion of the account value (other than for death benefits) for up to six months while you are living. We also may defer payments for any reasonable amount of time (not to exceed 15 days) while we are waiting for a contribution check to clear.

# Charges

## Withdrawal charges

A withdrawal charge applies in two circumstances: (1) if you make a withdrawal during a contract year and it exceeds any applicable free withdrawal amount, described below, or (2) if you surrender your contract to receive its cash value.

The withdrawal charge equals a percentage of each contribution (or single contribution) withdrawn. The percentage that applies depends on how long each contribution has been invested in the contract. We determine the withdrawal charge separately for each contribution according to the following table:

| | Contract Year | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8+ |
| Percentage of Contribution | 7.0% | 6.0% | 5.0% | 4.0% | 3.0% | 2.0% | 1.0% | 0.0% |

For purposes of calculating the withdrawal charge, we treat the contract year in which we receive a contribution as "contract year 1." Amounts withdrawn up to the free withdrawal amount are not considered withdrawal of any contribution. We also treat contributions that have been invested the longest as being withdrawn first. We treat contributions as withdrawn before earnings for purposes of calculating the withdrawal charge. However, federal income tax rules treat earnings under your contract as withdrawn first. See "Tax information."

We deduct the withdrawal charge from your account value in proportion to the amount withdrawn from each fixed maturity option and any amounts held in the separate account to provide for payments off maturity dates. In order to give you the exact dollar amount of the withdrawal you request, we deduct the amount of the withdrawal and the amount of the withdrawal charge from your account value. Any amount deducted to pay a withdrawal charge is also subject to a withdrawal charge.

The withdrawal charge does not apply to the 10% free withdrawal amount described below.

**10% free withdrawal amount applies only to life annuity with a period certain contracts. It does not apply to your period certain contract or if you surrender your contract to receive its cash value.**

Under life annuity with a period certain contracts, each contract year you can withdraw up to 10% of your account value without paying a withdrawal charge. This 10% free withdrawal amount is determined using your account value on the most recent contract date anniversary.

## Amounts applied from other contracts issued by Equitable Life

**Life annuity with a period certain contract.** If you own certain types of contracts that we issue, you may apply the account value under those contracts to purchase the life annuity with a period certain contract provided the issue age and payment restrictions for the new contract are met. If you apply your account value at a time when the dollar amount of the withdrawal charge under such other contract is greater than 2% of remaining contributions (after withdrawals), we reserve the right to waive the remaining withdrawal charge. However, a new withdrawal charge schedule will apply under the new contract. For purposes of the withdrawal charge schedule, the year in which your account value is applied under the life annuity with a period certain contract will be "contract year 1." If you apply your account value when the dollar amount of the withdrawal charge is 2% or less, we reserve the right to waive the withdrawal charges under the new contract. You should consider the timing of your purchase as it relates to the potential for withdrawal charges under the life annuity with a period certain contract.

**Period certain contract.** If you own certain types of contracts that we issue, you may apply your account value to purchase the period certain contract once any withdrawal charges are no longer in effect under the other contracts. No withdrawal charges will apply under the period certain contract.

22

Charges

To purchase any Income Manager contract we require that you return your original contract to us. A new Income Manager contract will be issued putting this annuity into effect.

## Charges for state premium and other applicable taxes

We deduct a charge for applicable taxes such as premium taxes that may be imposed in your state. We deduct the charge from your contributions. The current tax charge that might be imposed varies by state and ranges from 0% to 3.5% (1% in Puerto Rico and 5% in the U.S. Virgin Islands).

## Group or sponsored arrangements

For certain group or sponsored arrangements, we may reduce the withdrawal charge or change the minimum initial contribution requirements. We also may increase the rates to maturity for the fixed maturity options and reduce purchase rates for the life contingent annuity. Group arrangements include those in which a trustee or an employer, for example, purchases contracts covering a group of individuals on a group basis. Sponsored arrangements include those in which an employer allows us to sell contracts to its employees or retirees on an individual basis. IRA contracts are not available for group arrangements.

Our costs for sales, administration, and mortality generally vary with the size and stability of the group or sponsoring organization, among other factors. We take all these factors into account when reducing charges. To qualify for reduced charges, a group or sponsored arrangement must meet certain requirements, such as requirements for size and number of years in existence. Group or sponsored arrangements that have been set up solely to buy contracts or that have been in existence less than six months will not qualify for reduced charges.

We will make these and any similar reductions according to our rules in effect when we approve a contract for issue. We may change these rules from time to time. Any variation in the withdrawal charge will reflect differences in costs or services and will not be unfairly discriminatory.

Group or sponsored arrangements may be governed by federal income tax rules, the Employee Retirement Income Security Act of 1974, or both. We make no representations with regard to the impact of these and other applicable laws on such programs. We recommend that employers, trustees, and others purchasing or making contracts available for purchase under such programs seek the advice of their own legal and benefits advisers.

## Other distribution arrangements

We may reduce or eliminate withdrawal charges when sales are made in a manner that results in savings of sales and administrative expenses. This may include sales through persons who are compensated by clients for recommending investments and who receive no commission or reduced commissions in connection with the sale of the contracts. We will not permit a reduction or elimination of the withdrawal charge where it will be unfairly discriminatory.

# Payment of death benefit

## Your beneficiary

You designate your beneficiary when you apply for your contract. You may change your beneficiary at any time. The change will be effective on the date the written request for change is signed.

## Choosing annuity payout options

If you die before annuity payments begin, your beneficiary may elect to apply the death benefit to an annuity payout option. We offer several annuity payout options to choose from. Restrictions apply, depending on the type of contract you own.

### Annuity payout options

Your beneficiary can choose from among the following annuity payout options:

- Life annuity:  An annuity that guarantees payments for the rest of the annuitant's life. Payments end with the last monthly payment before the annuitant's death. Because there is no death benefit with this payout option, it provides the highest monthly payment of any of the life annuity options, so long as the annuitant is living.

- Life annuity — period certain:  An annuity that guarantees payments for the rest of the annuitant's life, and, if the annuitant dies before the end of a selected period of time ("period certain"), payments to the beneficiary will continue for the balance of the period certain.

- Life annuity — refund certain:  An annuity that guarantees payments for the rest of the annuitant's life. If the annuitant dies before the amount applied to purchase the annuity option has been recovered, payments continue to the beneficiary until that amount has been recovered.

- Period certain annuity:  An annuity that guarantees payments for a specific period of time, usually 5, 10, 15 or 20 years. This option does not guarantee payments for the rest of the annuitant's life. It does not permit any repayment of the unpaid principal, so you cannot elect to receive part of the payments as a single sum payment with the rest paid in monthly annuity payments.

The life annuity, life annuity — period certain and the life annuity — refund certain are available on either single life or joint and survivor life basis. The joint and survivor life annuity guarantees payments for the rest of the annuitant's life and, after the annuitant's death, continuation of payments to the survivor.

All of the above annuity payout options are available as fixed annuities. With fixed annuities, we guarantee fixed annuity payments that will be based either on the tables of guaranteed annuity payments in your contract or on our then current annuity rates, whichever is more favorable for the annuitant.

When the beneficiary selects a payout option, we will issue a separate written agreement confirming the beneficiary's right to receive annuity payments. We require the return of the contract before annuity payments begin.

The amount of the annuity payments will depend on the amount applied to purchase the annuity, the type of annuity chosen and, in the case of a life annuity, the annuitant's age (or the annuitant's and joint annuitant's ages) and in certain instances, the sex of the annuitant(s). Once a payout option has been chosen and payments begin, no change can be made.

At the time that the beneficiary elects a payout option if the amount to be applied is less than $2,000, or the initial payment under the form elected is less than $20 monthly, we reserve the right to pay the account value in a single sum rather than as payments under the payout option chosen.

# Tax information

## Overview

In this part of the prospectus, we discuss the current federal income tax rules that generally apply to Income Manager contracts owned by United States taxpayers. The tax rules can differ, depending on the type of contract, whether NQ or Traditional IRA. Therefore, we discuss the tax aspects of each type of contract separately.

We cannot provide detailed information on all tax aspects of the contracts. Moreover, the tax aspects that apply to a particular person's contract may vary depending on the facts applicable to that person. We do not discuss state income and other state taxes, federal income tax and withholding rules for non-U.S. taxpayers, or federal gift and estate taxes. Transfers of the contract, rights under the contract, or payments under the contract may be subject to gift or estate taxes. You should not rely only on this document, but should consult your tax adviser before your purchase.

Federal income tax rules include the United States laws in the Internal Revenue Code, and Treasury Department Regulations and Internal Revenue Service ("IRS") interpretations of the Internal Revenue Code. These tax rules may change. We cannot predict whether, when, or how these rules could change. Any change could affect contracts purchased before the change.

## Taxation of nonqualified annuities

### Contributions

You may not deduct the amount of your contributions for a nonqualified annuity contract.

### Contract earnings

Generally, you are not taxed on contract earnings until you receive a distribution from your contract, whether as a withdrawal, or as an annuity payment. This contract is intended to be a payout annuity. However, because you may be able to delay beginning payments, rules governing deferred annuity contracts could apply. Earnings in a deferred annuity contract are taxable even without a distribution if you transfer a contract, for example, as a gift to someone other than your spouse (or former spouse).

All nonqualified deferred annuity contracts that we issue to you during the same calendar year are linked together and treated as one contract when figuring out the taxable amount of any distribution from any of those contracts.

Corporations, partnerships, trusts and other non-natural persons generally cannot defer the taxation of current income credited to the contract unless an exception under the federal income tax rules apply. There is an exception for immediate annuities.

*Immediate annuities are generally annuities in which payments begin within one year from purchase and provide for a series of substantially equal payments made at least annually.*

### Annuity payments

Once annuity payments begin, a portion of each payment is taxable as ordinary income. You get the remaining portion without paying taxes on it. This is your "investment in the contract." Generally, your investment in the contract equals the contributions you made, less any amounts you previously withdrew that were not taxable.

The tax-free portion of each payment is determined by (1) dividing your investment in the contract by the total amount you are expected to receive out of the contract, and (2) multiplying the result by the amount of the payment.

Once you have received the amount of your investment in the contract, all payments after that are fully taxable. If payments under a life annuity stop because the annuitant dies, there is an income tax deduction for any unrecovered investment in the contract.

### Payments made before annuity payments begin

If you make withdrawals before annuity payments begin under your contract, they are taxable to you as ordinary income if there are earnings in the contract. Generally, earnings are your account value less your investment in the

contract. If you withdraw an amount which is more than the earnings in the contract as of the date of the withdrawal, the balance of the distribution is treated as a return of your investment in the contract and is not taxable.

### Contracts purchased through exchanges

You may purchase your NQ contract through an exchange of another contract. Normally, exchanges of contracts are taxable events. The exchange will not be taxable under Section 1035 of the Internal Revenue Code if:

- The contract which is the source of the funds you are using to purchase the NQ contract is another nonqualified deferred annuity contract (or life insurance or endowment contract).

- The owner and the annuitant are the same under the source contract and the Income Manager contract (if you are using a life insurance or endowment contract the owner and the insured must be the same on both sides of the exchange transaction).

The tax basis of the source contract carries over to the Income Manager NQ contract.

### Surrenders

If you surrender or cancel the NQ contract, the distribution is taxable as ordinary income (not capital gain) to the extent it exceeds your investment in the contract.

### Withdrawals made after annuity payments begin

If you make a withdrawal that terminates all periodic payments due, it will be taxable as a complete surrender as discussed above. If you make a withdrawal that does not terminate all periodic payments due, then a portion of the remaining reduced payments will be eligible for tax-free recovery of investment. Also, a portion of the withdrawal may not be taxable.

### Death benefit payment made to a beneficiary after your death

For the rules applicable to death benefits, see "Payment of death benefit" and "When the NQ contract owner who is

not the annuitant dies before the annuitant and before the annuity payments begin" earlier in this prospectus. The tax treatment of a death benefit taken as a single sum is generally the same as the tax treatment of a withdrawal from or surrender of your contract. The tax treatment of a death benefit taken as annuity payments is generally the same as the tax treatment of annuity payments under your contract.

### Early distribution penalty tax

If you take distributions before you are age 59½ a penalty tax of 10% of the taxable portion of your distribution applies in addition to the income tax. The extra penalty tax does not apply to pre-age 59½ distributions made:

- on or after your death; or

- because you are disabled (special federal income tax definition); or

- in the form of substantially equal periodic annuity payments for your life (or life expectancy) or the joint lives (or joint life expectancies) of you and a beneficiary; or

- payments under an immediate annuity.

Periodic annuity payments we make to you from the life annuity with a period certain while you are under age 59½ should qualify for the "substantially equal payments for life" exception noted above. However, this exception may not apply if you take a withdrawal, surrender your contract or change the payment pattern in any way.

### Special rules for NQ contracts issued in Puerto Rico

Under current law we treat income from NQ contracts as U.S.-source. A Puerto Rico resident is subject to U.S. taxation on such U.S.-source income. Only Puerto Rico-source income of Puerto Rico residents is excludable from U.S. taxation. Income from NQ contracts is also subject to Puerto Rico tax. The computation of the taxable portion of amounts distributed from a contract may differ in the two jurisdictions. Therefore, you might have to file both U.S. and

Puerto Rico tax returns, showing different amounts of income from the contract for each tax return. Puerto Rico generally provides a credit against Puerto Rico tax for U.S. tax paid. Depending on your personal situation and the timing of the different tax liabilities, you may not be able to take full advantage of this credit.

## Individual retirement arrangements ("IRAs")

### General

"IRA" stands for individual retirement arrangement. There are two basic types of such arrangements, individual retirement accounts and individual retirement annuities. In an individual retirement account, a trustee or custodian holds the assets for the benefit of the IRA owner. The assets can include mutual funds and certificates of deposit. In an individual retirement annuity, an insurance company issues an annuity contract that serves as the IRA.

There are several types of IRAs, as follows:

- Traditional IRAs, typically funded on a pre-tax basis;

- Roth IRAs, first available in 1998, funded on an after-tax basis.

Regardless of the type of IRA, your ownership interest in the IRA cannot be forfeited. You or your beneficiaries who survive you are the only ones who can receive the IRA's benefits or payments.

You can hold your IRA assets in as many different accounts and annuities as you would like, as long as you meet the rules for setting up and making contributions to IRAs. However, if you own multiple IRAs, you may be required to combine IRA values or contributions for tax purposes. For further information about individual retirement arrangements, you can read Internal Revenue Service Publication 590 ("Individual Retirement Arrangements (IRAs)"). This Publication is usually updated annually, and can be obtained from any IRS district office or the IRS website (www.irs.ustreas.gov).

The Income Manager IRA contract is designed to qualify as an "individual retirement annuity" under Section 408(b) of the Internal Revenue Code. This prospectus contains the information that the IRS requires you to have before you purchase an IRA. This section of the prospectus covers some of the special tax rules that apply to IRAs.

The Income Manager IRA contract has been approved by the IRS as to form for use as a Traditional IRA. This IRS approval is a determination only as to the form of the annuity. It does not represent a determination of the merits of the annuity as an investment. The IRS approval does not address every feature possibly available under the Income Manager IRA contract.

### Cancellation

You can cancel an Income Manager IRA contract by following the directions under "Your right to cancel within a certain number of days" earlier in the prospectus. If you cancel an IRA contract, we may have to withhold tax, and we must report the transaction to the IRS. A contract cancellation could have an unfavorable tax impact.

## Traditional individual retirement annuities (Traditional IRAs)

### Contributions to Traditional IRAs

Individuals may make three different types of contributions to a Traditional IRA:

- tax-free "rollover" contributions; or

- direct custodian-to-custodian transfers from other Traditional IRAs ("direct transfers"); or

- "regular" contributions out of earned income or compensation.

We require that your initial contribution to the Income Manager Traditional IRA contract must be either a rollover, a direct custodian-to-custodian transfer. See "Rollovers and transfers" below. Any additional contributions you make may be rollovers, direct transfers, or regular Traditional IRA contributions.

## Limits on contributions

Generally, $2,000 is the maximum amount that you may contribute to all IRAs in any taxable year. When your earnings are below $2,000, your earned income or compensation for the year is the most you can contribute. This $2,000 limit does not apply to rollover contributions or direct custodian-to-custodian transfers into a Traditional IRA. You cannot make regular Traditional IRA contributions for the tax year in which you reach age 70½ or any tax year after that.

## Special rules for spouses

If you are married and file a joint income tax return, you and your spouse may combine your compensation to determine the amount of regular contributions you are permitted to make to Traditional IRAs. Even if one spouse has no compensation or compensation under $2,000, married individuals filing jointly can contribute up to $4,000 for any taxable year to any combination of Traditional IRAs. The maximum amount may be less if earned income is less and the other spouse has made IRA contributions. No more than a combined total of $2,000 can be contributed annually to either spouse's Traditional IRAs. Each spouse owns his or her Traditional IRAs even if the other spouse funded the contributions. A working spouse age 70½ or over can contribute up to the lesser of $2,000 or 100% of "earned income" to a Traditional IRA for a non-working spouse until the year in which the non-working spouse reaches age 70½.

## Deductibility of contributions

The amount of Traditional IRA contributions that you can deduct for a tax year depends on whether you are covered by an employer-sponsored tax-favored retirement plan, as defined under special federal income tax rules. Your Form W-2 will indicate whether or not you are covered by such a retirement plan.

**If you are not covered by a retirement plan during any part of the year,** you can make fully deductible contributions to your Traditional IRAs for each tax year up to $2,000 or, if less, your earned income.

**If you are covered by a retirement plan during any part of the year,** and your adjusted gross income (**AGI**) **is below the lower dollar figure in a phase-out range,** you can make fully deductible contributions to your Traditional IRAs. For each tax year, your fully deductible contribution can be up to $2,000 or, if less, your earned income.

**If you are covered by a retirement plan during any part of the year,** and your AGI falls within a **phase-out** range, you can make **partially deductible contributions** to your Traditional IRAs.

**If you are covered by a retirement plan during any part of the year,** and your AGI falls **above the higher figure in the phase-out range,** you may not deduct any of your regular contribution to your Traditional IRAs.

If you are single and covered by a retirement plan during any part of the taxable year, the deduction for IRA contributions phases out with AGI between $31,000 and $41,000 in 1999. This range will increase every year until 2005 when the range is $50,000-$60,000.

If you are married and file a joint return, and you are covered by a retirement plan during any part of the taxable year, the deduction for Traditional IRA contributions phases out with AGI between $51,000 and $61,000 in 1999. This range will increase every year until 2007 when the range is $80,000-$100,000.

Married individuals filing separately and living apart at all times are not considered married for purposes of this deductible contribution calculation. Generally, the active participation in an employer-sponsored retirement plan of an individual is determined independently for each spouse. Where spouses have "married filing jointly" status, however, the maximum deductible Traditional IRA contribution for an individual who is not an active participant (but whose spouse is an active participant) is phased out for taxpayers with AGI of between $150,000 and $160,000.

To determine the deductible amount of the contribution in 1999, you determine AGI and subtract $31,000 if you are single, or $51,000 if you are married and file a joint return

with your spouse. The resulting amount is your excess AGI. You then determine the limit on the deduction for Traditional IRA contributions using the following formula:

$$\frac{(\$10{,}000 - \text{excess AGI})}{\text{divided by } \$10{,}000} \quad \underset{\text{x}}{\text{times}} \quad \begin{array}{c}\$2{,}000 \text{ (or earned} \\ \text{income, if less)}\end{array} \quad \underset{=}{\text{equals}} \quad \begin{array}{c}\text{the adjusted} \\ \text{deductible} \\ \text{contribution} \\ \text{limit}\end{array}$$

### Nondeductible contributions

If you are not eligible to deduct part or all of the Traditional IRA contribution, you may still make nondeductible contributions on which earnings will accumulate on a tax-deferred basis. The combined deductible and nondeductible contributions to your Traditional IRA (or the non-working spouse's Traditional IRA) may not, however, exceed the maximum $2,000 per person limit. See "Excess contributions" below. You must keep your own records of deductible and nondeductible contributions in order to prevent double taxation on the distribution of previously taxed amounts. See "Withdrawals, payments and transfer of funds out of Traditional IRAs" below.

If you are making nondeductible contributions in any taxable year, or you have made nondeductible contributions to a Traditional IRA in prior years and are receiving distributions from any Traditional IRA, you must file the required information with the IRS. Moreover, if you are making nondeductible Traditional IRA contributions, you must retain all income tax returns and records pertaining to such contributions until interests in all Traditional IRAs are fully distributed.

### When you can make contributions

If you file your tax returns on a calendar year basis like most taxpayers, you have until the April 15th return filing deadline (without extensions) of the following calendar year to make your regular Traditional IRA contributions for a tax year.

### Excess contributions

Excess contributions to IRAs are subject to a 6% excise tax for the year in which made and for each year after until withdrawn. The following are excess contributions to IRAs:

- regular contributions of more than $2,000;

- regular contributions of more than earned income for the year, if that amount is under $2,000;

- regular contributions to a Traditional IRA made after you reach age 70½; and

- rollover contributions of amounts which are not eligible to be rolled over. For example, after-tax contributions to a qualified plan or minimum distributions required to be made after age 70½.

You can avoid the excise tax by withdrawing an excess contribution (rollover or regular) before the due date (including extensions) for filing your federal income tax return for the year. If it is an excess regular Traditional IRA contribution, you cannot take a tax deduction for the amount withdrawn. You do not have to include the excess contribution withdrawn as part of your income. It is also not subject to the 10% additional penalty tax on early distributions discussed below under "Early distribution penalty tax." You do have to withdraw any earnings that are attributed to the excess contribution. The withdrawn earnings would be included in your gross income and could be subject to the 10% penalty tax.

Even after the due date for filing your return, you may withdraw an excess rollover contribution, without income inclusion or 10% penalty, if:

(1) the rollover was from a qualified retirement plan to a Traditional IRA;

(2) the excess contribution was due to incorrect information that the plan provided; and

(3) you took no tax deduction for the excess contribution.

### Rollovers and transfers

Rollover contributions may be made to a Traditional IRA from these sources:

- qualified plans;

- TSAs (including Internal Revenue Code Section 403(b)(7) custodial accounts); and

- other Traditional IRAs.

Any amount contributed to a Traditional IRA after you reach age 70½ must be net of your required minimum distribution for the year in which the rollover or direct transfer contribution is made.

### Rollovers from qualified plans or TSAs

There are two ways to do rollovers:

- Do it yourself

  You actually receive a distribution that can be rolled over and you roll it over to a Traditional IRA within 60 days after the date you receive the funds. The distribution from your qualified plan or TSA will be net of 20% mandatory federal income tax withholding. If you want, you can replace the withheld funds yourself and roll over the full amount.

- Direct rollover

  You tell your qualified plan trustee or TSA issuer/custodian/fiduciary to send the distribution directly to your Traditional IRA issuer. Direct rollovers are not subject to mandatory federal income tax withholding.

All distributions from a TSA or qualified plan are eligible rollover distributions and may be rolled over tax-free to an IRA unless the distribution is:

- only after-tax contributions you made to the plan;

- required minimum distributions after age 70½ or separation from service;

- substantially equal periodic payments made at least annually for your life (or life expectancy) or the joint lives (or joint life expectancies) of you and your designated beneficiary;

- substantially equal periodic payments made for a specified period of 10 years or more;

- a hardship withdrawal;

- corrective distributions which fit specified technical tax rules;

- loans that are treated as distributions;

- a death benefit payment to a beneficiary who is not your surviving spouse; and

- a qualified domestic relations order distribution to a beneficiary who is not your current spouse or former spouse.

### Rollovers from Traditional IRAs to Traditional IRAs

You may roll over amounts from one Traditional IRA to one or more of your other Traditional IRAs if you complete the transaction within 60 days after you receive the funds. You may make such a rollover only once in every 12-month period for the same funds. Trustee-to-trustee or custodian-to-custodian direct transfers are not rollover transactions. You can make these more frequently than once in every 12-month period.

The surviving spouse beneficiary of a deceased individual can roll over or directly transfer an inherited Traditional IRA to one or more other Traditional IRAs. Also, in some cases, Traditional IRAs can be transferred on a tax-free basis between spouses or former spouses as a result of a court ordered divorce or separation decree.

### Withdrawals, payments and transfers of funds out of Traditional IRAs

*No federal income tax law restrictions on withdrawals*

You can withdraw any or all of your funds from a Traditional IRA at any time. You do not need to wait for a special event like retirement.

### Taxation of payments

Earnings in Traditional IRAs are not subject to federal income tax until you or your beneficiary receive them. Taxable payments or distributions include withdrawals from your contract, surrender of your contract and annuity payments

from your contract. Death benefits are also taxable. Except as discussed below, the total amount of any distribution from a Traditional IRA must be included in your gross income as ordinary income.

If you have ever made nondeductible IRA contributions to any Traditional IRA (it does not have to be to this particular Traditional IRA contract), those contributions are recovered tax free when you get distributions from any Traditional IRA. You must keep permanent tax records of all of your nondeductible contributions to Traditional IRAs. At the end of any year in which you have received a distribution from any Traditional IRA, you calculate the ratio of your total nondeductible Traditional IRA contributions (less any amounts previously withdrawn tax free) to the total account balances of all Traditional IRAs you own at the end of the year plus all Traditional IRA distributions made during the year. Multiply this by all distributions from the Traditional IRA during the year to determine the nontaxable portion of each distribution.

In addition, a distribution is not taxable if:

- the amount received is a withdrawal of excess contributions, as described under "Excess contributions" above;

- the entire amount received is rolled over to another Traditional IRA (see "Rollovers and transfers" above); or

- in certain limited circumstances, where the Traditional IRA acts as a "conduit," you roll over the entire amount into a qualified plan or TSA that accepts rollover contributions. To get this "conduit" Traditional IRA treatment:

  — the source of funds you used to establish the Traditional IRA must have been a rollover contribution from a qualified plan, and

  — the entire amount received from the Traditional IRA (including any earnings on the rollover contribution) must be rolled over into another qualified plan within 60 days of the date received.

Similar rules apply in the case of a TSA.

However, you may lose conduit treatment, if you make an eligible rollover distribution contribution to a Traditional IRA and you commingle this contribution with other contributions. In that case, you may not be able to roll over these eligible rollover distribution contributions and earnings to another qualified plan or TSA at a future date. Since the Income Manager annuity is intended to be a payout contract, it may not be an appropriate contract if you plan to use it as a conduit IRA.

Distributions from a Traditional IRA are not eligible for favorable five-year averaging (or, in some cases, ten-year averaging and long-term capital gain treatment) available to certain distributions from qualified plans.

### Required Minimum Distributions

*Lifetime required minimum distributions*

You must start taking annual distributions from your Traditional IRAs beginning at age 70½.

*When you have to take the first required minimum distribution*

The first required minimum distribution is for the calendar year in which you turn age 70½. You have the choice to take this first required minimum distribution during the calendar year you actually reach age 70½, or to delay taking it until the first three-month period in the next calendar year (January 1 – April 1). Distributions must start no later than your "required beginning date," which is April 1st of the calendar year after the calendar year in which you turn age 70½. If you choose to delay taking the first annual minimum distribution, then you will have to take two minimum distributions in that year — the delayed one for the first year and the one actually for that year. Once minimum distributions begin, they must be made at some time each year.

### How you can calculate required minimum distributions

There are two approaches to taking required minimum distributions — "account-based" or "annuity-based."

### Account based method

If you choose an "account-based" method, you divide the value of your Traditional IRA as of December 31st of the past calendar year by a life expectancy factor from IRS tables. This gives you the required minimum distribution amount for that particular IRA for that year. The required minimum distribution amount will vary each year as the account value and your life expectancy factors change.

You have a choice of life expectancy factors, depending on whether you choose a method based only on your life expectancy, or the joint life expectancies of you and another individual. You can decide to "recalculate" your life expectancy every year by using your current life expectancy factor. You can decide instead to use the "term certain" method, where you reduce your life expectancy by one every year after the initial year. If your spouse is your designated beneficiary for the purpose of figuring out annual account-based required minimum distributions, you can also annually "recalculate" your spouse's life expectancy if you want. If you choose someone who is not your spouse as your designated beneficiary for the purpose of figuring out annual account-based required minimum distributions, you have to use the "term certain" method of calculating that person's life expectancy. If you pick a nonspouse designated beneficiary, you may also have to do another special calculation.

You can later apply your Traditional IRA funds to a life annuity-based payout. You can only do this if you already chose to recalculate your life expectancy annually (and your spouse's life expectancy if you select a spousal joint annuity).

### Annuity based method

If you choose an "annuity-based" method, you do not have to do annual calculations. You apply the account value to an annuity payout for your life or the joint lives of you and a designated beneficiary, or for a period certain not extending beyond applicable life expectancies.

*Do you have to pick the same method to calculate your required minimum distributions for all of your Traditional IRAs and other retirement plans?*

No. If you want, you can choose a different method and a different beneficiary for each of your Traditional IRAs and other retirement plans. For example, you can choose an annuity payout from one IRA, a different annuity payout from a qualified plan, and an account-based annual withdrawal from another IRA.

*Will we pay you the annual amount every year from your Traditional IRA based on the method you choose?*

No, we do not automatically make distributions from your contract before your annuity payments begin.

*What if you take more than you need to for any year?*

The required minimum distribution amount for your Traditional IRAs is calculated on a year-by-year basis. There are no carry-back or carry-forward provisions. Also, you cannot apply required minimum distribution amounts you take from your qualified plans to the amounts you have to , take from your Traditional IRAs and vice-versa. However, the IRS will let you figure out the required minimum distribution for each Traditional IRA that you maintain, using the method that you picked for that particular IRA. You can add these required minimum distribution amount calculations together. As long as the total amount you take out every year satisfies your overall Traditional IRA required minimum distribution amount, you may choose to take your annual required minimum distribution from any one or more Traditional IRAs that you own.

*What if you take less than you need to for any year?*

Your IRA could be disqualified, and you could have to pay tax on the entire value. Even if your IRA is not disqualified, you could have to pay a 50% penalty tax on the shortfall (required amount for Traditional IRAs less amount actually taken). It is your responsibility to meet the required minimum distribution rules. We will remind you when our records show that your age 70½ is approaching. If you do not select

**32**

a method with us, we will assume you are taking your required minimum distribution from another Traditional IRA that you own.

*What are the required minimum distribution payments after you die?*

If you die after either (a) the start of annuity payments, or (b) your required beginning date, your beneficiary must receive payment of the remaining values in the contract at least as rapidly as under the distribution method before your death. In some circumstances, your surviving spouse may elect to become the owner of the Traditional IRA and halt distributions until he or she reaches age 70½.

If you die before your required beginning date and before annuity payments begin, federal tax rules require complete distribution of your entire value in the contract within five years after your death. Payments to a designated beneficiary over the beneficiary's life or over a period certain that does not extend beyond the beneficiary's life expectancy are also permitted, if these payments start within one year of your death. A surviving spouse beneficiary can also (a) delay starting any payments until you would have reached age 70½ or (b) roll over your Traditional IRA into his or her own Traditional IRA.

*Important information about minimum distributions under your contract*

Although the life contingent annuity portion of the life annuity with a period certain does not have a cash value, it will be assigned a value for tax purposes. This value will generally be changed each year. When you determine the amount of account-based required minimum distributions from your IRA this value must be included. This must be done before annuity payments begin even though the life contingent annuity may not be providing a source of funds to satisfy the required minimum distribution.

You will generally be required to determine your required minimum distribution by annually recalculating your life expectancy. Recalculation is no longer required once the only payments you or your spouse receive are under the life contingent annuity.

If you surrender your contract, or withdraw any remaining account value before your annuity payments begin, it may be necessary for you to satisfy your required minimum distribution by moving forward the start date of payments under your life contingent annuity. Or to the extent available, you have to take distributions from other IRA funds you may have. Or, you may convert your IRA life contingent annuity under the IRA contract to a nonqualified life contingent annuity. This would be viewed as a distribution of the value of the life contingent annuity from your IRA, and therefore, would be a taxable event. However, since the life contingent annuity would no longer be part of the IRA, you would not have to include its value when determining future required minimum distributions.

If you have elected a joint and survivor form of the life contingent annuity, the joint annuitant must be your spouse. You must determine your required minimum distribution by annually recalculating both your life expectancy and your spouse's life expectancy. Once the only payments you or your spouse are receiving are under the life contingent annuity recalculation is no longer required. In the event of your death or the death of your spouse the value of such annuity will change. For this reason, it is important that someone tell us if you or your spouse dies before the life contingent annuity has started payments so that a lower valuation can be made. Otherwise, a higher tax value may result in an overstatement of the amount that would be necessary to satisfy your required minimum distribution amount.

Allocation of funds to the life contingent annuity may prevent the contract from later receiving conduit IRA treatment.

**Successor annuitant and owner**

If your spouse is the sole primary beneficiary and elects to become the successor annuitant and owner, no death benefit is payable until your surviving spouse's death.

**Payments to a beneficiary after your death**

IRA death benefits are taxed the same as IRA distributions.

### Borrowing and loans are prohibited transactions

You cannot get loans from a Traditional IRA. You cannot use a Traditional IRA as collateral for a loan or other obligation. If you borrow against your IRA or use it as collateral, its tax-favored status will be lost as of the first day of the tax year in which this prohibited event occurs. If this happens, you must include the value of the Traditional IRA in your federal gross income. Also, the early distribution penalty tax of 10% will apply if you have not reached age 59½ before the first day of that tax year.

### Early distribution penalty tax

A penalty tax of 10% of the taxable portion of a distribution applies to distributions from a Traditional IRA made before you reach age 59½. The extra penalty tax does not apply to pre-age 59½ distributions made:

- on or after your death;

- because you are disabled (special federal income tax definition);

- used to pay certain extraordinary medical expenses (special federal income tax definition);

- used to pay medical insurance premiums for unemployed individuals (special federal income tax definition);

- used to pay certain first-time home buyer expenses (special federal income tax definition);

- used to pay certain higher education expenses (special federal income tax definition); or

- in the form of substantially equal periodic payments made at least annually over your life (or your life expectancy), or over the joint lives of you and your beneficiary (or your joint life expectancy) using an IRS-approved distribution method.

### Will payments we make to you from the life annuity with a period certain while you are under age 59½ qualify as substantially equal payments for life?

Same as nonqualified annuities under "Early distribution penalty tax."

### Federal and state income tax withholding and information reporting

We must withhold federal income tax from distributions from annuity contracts. You may be able to elect out of this income tax withholding in some cases. Generally, we do not have to withhold if your distributions are not taxable. The rate of withholding will depend on the type of distribution and, in certain cases, the amount of your distribution. Any income tax withheld is a credit against your income tax liability. If you do not have sufficient income tax withheld or do not make sufficient estimated income tax payments, you may incur penalties under the estimated income tax rules.

You must file your request not to withhold in writing before the payment or distribution is made. Our Processing Office will provide forms for this purpose. You cannot elect out of withholding unless you provide us with your correct Taxpayer Identification Number and a United States residence address. You cannot elect out of withholding if we are sending the payment out of the United States. We might have to withhold on amounts we pay under a free look or cancellation.

Special withholding rules apply to foreign recipients and United States citizens residing outside the United States. We do not discuss these rules here. Certain states have indicated that state income tax withholding will also apply to payments from the contracts made to residents. In some states, you may elect out of state withholding, even if federal withholding applies. Generally, an election out of federal withholding will also be considered an election out of state withholding. If you need more information concerning a particular state or any required forms, call our Processing Office at their toll-free number.

**34**

If you are receiving periodic and/or non-periodic payments, you will be notified of the withholding requirements and of your right to make withholding elections.

### Federal income tax withholding on periodic annuity payments

We withhold differently on "periodic" and "non-periodic" payments. For a periodic annuity payment, for example, unless you specify a different number of withholding exemptions, we withhold assuming that you are married and claiming three withholding exemptions. If you do not give us your correct Taxpayer Identification Number, we withhold as if you are single with no exemptions.

Based on the assumption that you are married and claiming three withholding exemptions, if you receive less than $14,700 in periodic annuity payments in 1999 your payments will generally be exempt from federal income tax withholding. You could specify a different choice of withholding exemption or request that tax be withheld. Your withholding election remains effective unless and until you revoke it. You may revoke or change your withholding election at any time.

### Federal income tax withholding on non-periodic annuity payments

For a non-periodic distribution (total surrender or partial withdrawal) we generally withhold at a flat 10% rate. We apply that rate to the taxable amount in the case of nonqualified contracts, and to the payment amount in the case of IRAs.

# More information

## About our fixed maturity options

**How we determine the market value adjustment.**
We use the following procedure to calculate the market value adjustment (up or down) we make if you withdraw all of your value from a fixed maturity option before its maturity date.

(1) We determine the market adjusted amount on the date of the withdrawal as follows:

    (a) We determine the fixed maturity amount that would be payable on the maturity date, using the rate to maturity for the fixed maturity option.

    (b) We determine the period remaining in your fixed maturity option (based on the withdrawal date) and convert it to fractional years based on a 365-day year. For example, three years and 12 days becomes 3.0329.

    (c) We determine the current rate to maturity that applies on the withdrawal date to new allocations to the same fixed maturity option.

    (d) We determine the present value of the fixed maturity amount payable at the maturity date, using the period determined in (b) and the rate determined in (c).

(2) We determine the fixed maturity amount as of the current date. (3) We subtract (2) from the result in (1)(d). The result is the market value adjustment applicable to such fixed maturity option, which may be positive or negative.

*Your market adjusted amount is the present value of the maturity value discounted at the rate to maturity in effect for new contributions to that same fixed maturity option on the date of the calculation.*

If you withdraw only a portion of the amount in a fixed maturity option, the market value adjustment will be a percentage of the market value adjustment that would have applied if you had withdrawn the entire value in that fixed maturity option. This percentage is equal to the percentage

of the value in the fixed maturity option that you are withdrawing. See the Appendix to this prospectus for an example of how we calculate the market value adjustment.

For purposes of calculating the rate to maturity for new allocations to a fixed maturity option (see (1)(c) above), we use the rate we have in effect for new allocations to that fixed maturity option. We use this rate even if new allocations to that option would not be accepted at that time. This rate will not be less than 3%. If we do not have a rate to maturity in effect for a fixed maturity option to which the "current rate to maturity" in (1)(c) would apply, we will use the rate at the next closest maturity date. If we are no longer offering new fixed maturity options, the "current rate to maturity" will be determined in accordance with our procedures then in effect. We reserve the right to add up to 0.25% to the current rate in (1)(c) above for purposes of calculating the market value adjustment only.

## About the separate account for the fixed maturity options

**Investments.** Under New York Insurance law, the portion of the separate account assets equal to the reserves and other contract liabilities relating to the contracts are not chargeable with liabilities from any other business we may conduct. We own the assets of the separate account, as well as any favorable investment performance on those assets. You do not participate in the performance of the assets held in this separate account. We may, subject to state law which applies, transfer all assets allocated to the separate account to our general account. We guarantee all benefits relating to your account value in the fixed maturity options regardless of whether assets supporting fixed maturity options are held in a separate account or our general account.

We have no specific formula for establishing the rates to maturity for the fixed maturity options. We expect the rates to be influenced by, but not necessarily correspond to, among other things, the yields that we can expect to realize on the separate account's investments from time to time. Our current plans are to invest in fixed-income obligations,

32

a method with us, we will assume you are taking your required minimum distribution from another Traditional IRA that you own.

*What are the required minimum distribution payments after you die?*

If you die after either (a) the start of annuity payments, or (b) your required beginning date, your beneficiary must receive payment of the remaining values in the contract at least as rapidly as under the distribution method before your death. In some circumstances, your surviving spouse may elect to become the owner of the Traditional IRA and halt distributions until he or she reaches age 70½.

If you die before your required beginning date and before annuity payments begin, federal tax rules require complete distribution of your entire value in the contract within five years after your death. Payments to a designated beneficiary over the beneficiary's life or over a period certain that does not extend beyond the beneficiary's life expectancy are also permitted, if these payments start within one year of your death. A surviving spouse beneficiary can also (a) delay starting any payments until you would have reached age 70½ or (b) roll over your Traditional IRA into his or her own Traditional IRA.

*Important information about minimum distributions under your contract*

Although the life contingent annuity portion of the life annuity with a period certain does not have a cash value, it will be assigned a value for tax purposes. This value will generally be changed each year. When you determine the amount of account-based required minimum distributions from your IRA this value must be included. This must be done before annuity payments begin even though the life contingent annuity may not be providing a source of funds to satisfy the required minimum distribution.

You will generally be required to determine your required minimum distribution by annually recalculating your life expectancy. Recalculation is no longer required once the only payments you or your spouse receive are under the life contingent annuity.

If you surrender your contract, or withdraw any remaining account value before your annuity payments begin, it may be necessary for you to satisfy your required minimum distribution by moving forward the start date of payments under your life contingent annuity. Or to the extent available, you have to take distributions from other IRA funds you may have. Or, you may convert your IRA life contingent annuity under the IRA contract to a nonqualified life contingent annuity. This would be viewed as a distribution of the value of the life contingent annuity from your IRA, and therefore, would be a taxable event. However, since the life contingent annuity would no longer be part of the IRA, you would not have to include its value when determining future required minimum distributions.

If you have elected a joint and survivor form of the life contingent annuity, the joint annuitant must be your spouse. You must determine your required minimum distribution by annually recalculating both your life expectancy and your spouse's life expectancy. Once the only payments you or your spouse are receiving are under the life contingent annuity recalculation is no longer required. In the event of your death or the death of your spouse the value of such annuity will change. For this reason, it is important that someone tell us if you or your spouse dies before the life contingent annuity has started payments so that a lower valuation can be made. Otherwise, a higher tax value may result in an overstatement of the amount that would be necessary to satisfy your required minimum distribution amount.

Allocation of funds to the life contingent annuity may prevent the contract from later receiving conduit IRA treatment.

### Successor annuitant and owner

If your spouse is the sole primary beneficiary and elects to become the successor annuitant and owner, no death benefit is payable until your surviving spouse's death.

### Payments to a beneficiary after your death

IRA death benefits are taxed the same as IRA distributions.

### Borrowing and loans are prohibited transactions

You cannot get loans from a Traditional IRA. You cannot use a Traditional IRA as collateral for a loan or other obligation. If you borrow against your IRA or use it as collateral, its tax-favored status will be lost as of the first day of the tax year in which this prohibited event occurs. If this happens, you must include the value of the Traditional IRA in your federal gross income. Also, the early distribution penalty tax of 10% will apply if you have not reached age 59½ before the first day of that tax year.

### Early distribution penalty tax

A penalty tax of 10% of the taxable portion of a distribution applies to distributions from a Traditional IRA made before you reach 59½. The extra penalty tax does not apply to pre-age 59½ distributions made:

- on or after your death;

- because you are disabled (special federal income tax definition);

- used to pay certain extraordinary medical expenses (special federal income tax definition);

- used to pay medical insurance premiums for unemployed individuals (special federal income tax definition);

- used to pay certain first-time home buyer expenses (special federal income tax definition);

- used to pay certain higher education expenses (special federal income tax definition); or

- in the form of substantially equal periodic payments made at least annually over your life (or your life expectancy), or over the joint lives of you and your beneficiary (or your joint life expectancy) using an IRS-approved distribution method.

### Will payments we make to you from the life annuity with a period certain while you are under age 59½ qualify as substantially equal payments for life?

Same as nonqualified annuities under "Early distribution penalty tax."

### Federal and state income tax withholding and information reporting

We must withhold federal income tax from distributions from annuity contracts. You may be able to elect out of this income tax withholding in some cases. Generally, we do not have to withhold if your distributions are not taxable. The rate of withholding will depend on the type of distribution and, in certain cases, the amount of your distribution. Any income tax withheld is a credit against your income tax liability. If you do not have sufficient income tax withheld or do not make sufficient estimated income tax payments, you may incur penalties under the estimated income tax rules.

You must file your request not to withhold in writing before the payment or distribution is made. Our Processing Office will provide forms for this purpose. You cannot elect out of withholding unless you provide us with your correct Taxpayer Identification Number and a United States residence address. You cannot elect out of withholding if we are sending the payment out of the United States. We might have to withhold on amounts we pay under a free look or cancellation.

Special withholding rules apply to foreign recipients and United States citizens residing outside the United States. We do not discuss these rules here. Certain states have indicated that state income tax withholding will also apply to payments from the contracts made to residents. In some states, you may elect out of state withholding, even if federal withholding applies. Generally, an election out of federal withholding will also be considered an election out of state withholding. If you need more information concerning a particular state or any required forms, call our Processing Office at their toll-free number.

**34**

*Tax information*

If you are receiving periodic and/or non-periodic payments, you will be notified of the withholding requirements and of your right to make withholding elections.

### Federal income tax withholding on periodic annuity payments

We withhold differently on "periodic" and "non-periodic" payments. For a periodic annuity payment, for example, unless you specify a different number of withholding exemptions, we withhold assuming that you are married and claiming three withholding exemptions. If you do not give us your correct Taxpayer Identification Number, we withhold as if you are single with no exemptions.

Based on the assumption that you are married and claiming three withholding exemptions, if you receive less than $14,700 in periodic annuity payments in 1999 your payments will generally be exempt from federal income tax withholding. You could specify a different choice of withholding exemption or request that tax be withheld. Your withholding election remains effective unless and until you revoke it. You may revoke or change your withholding election at any time.

### Federal income tax withholding on non-periodic annuity payments

For a non-periodic distribution (total surrender or partial withdrawal) we generally withhold at a flat 10% rate. We apply that rate to the taxable amount in the case of nonqualified contracts, and to the payment amount in the case of IRAs.

# More information

## About our fixed maturity options

**How we determine the market value adjustment.**
We use the following procedure to calculate the market value adjustment (up or down) we make if you withdraw all of your value from a fixed maturity option before its maturity date.

(1) We determine the market adjusted amount on the date of the withdrawal as follows:

    (a) We determine the fixed maturity amount that would be payable on the maturity date, using the rate to maturity for the fixed maturity option.

    (b) We determine the period remaining in your fixed maturity option (based on the withdrawal date) and convert it to fractional years based on a 365-day year. For example, three years and 12 days becomes 3.0329.

    (c) We determine the current rate to maturity that applies on the withdrawal date to new allocations to the same fixed maturity option.

    (d) We determine the present value of the fixed maturity amount payable at the maturity date, using the period determined in (b) and the rate determined in (c).

(2) We determine the fixed maturity amount as of the current date. (3) We subtract (2) from the result in (1)(d). The result is the market value adjustment applicable to such fixed maturity option, which may be positive or negative.

*Your market adjusted amount is the present value of the maturity value discounted at the rate to maturity in effect for new contributions to that same fixed maturity option on the date of the calculation.*

If you withdraw only a portion of the amount in a fixed maturity option, the market value adjustment will be a percentage of the market value adjustment that would have applied if you had withdrawn the entire value in that fixed maturity option. This percentage is equal to the percentage

of the value in the fixed maturity option that you are withdrawing. See the Appendix to this prospectus for an example of how we calculate the market value adjustment.

For purposes of calculating the rate to maturity for new allocations to a fixed maturity option (see (1)(c) above), we use the rate we have in effect for new allocations to that fixed maturity option. We use this rate even if new allocations to that option would not be accepted at that time. This rate will not be less than 3%. If we do not have a rate to maturity in effect for a fixed maturity option to which the "current rate to maturity" in (1)(c) would apply, we will use the rate at the next closest maturity date. If we are no longer offering new fixed maturity options, the "current rate to maturity" will be determined in accordance with our procedures then in effect. We reserve the right to add up to 0.25% to the current rate in (1)(c) above for purposes of calculating the market value adjustment only.

## About the separate account for the fixed maturity options

**Investments.** Under New York Insurance law, the portion of the separate account assets equal to the reserves and other contract liabilities relating to the contracts are not chargeable with liabilities from any other business we may conduct. We own the assets of the separate account, as well as any favorable investment performance on those assets. You do not participate in the performance of the assets held in this separate account. We may, subject to state law which applies, transfer all assets allocated to the separate account to our general account. We guarantee all benefits relating to your account value in the fixed maturity options regardless of whether assets supporting fixed maturity options are held in a separate account or our general account.

We have no specific formula for establishing the rates to maturity for the fixed maturity options. We expect the rates to be influenced by, but not necessarily correspond to, among other things, the yields that we can expect to realize on the separate account's investments from time to time. Our current plans are to invest in fixed-income obligations,

**36**

**More information**

including corporate bonds, mortgage-backed and asset-backed securities and government and agency issues having durations in the aggregate consistent with those of the fixed maturity options.

Although the above generally describes our plans for investing the assets supporting our obligations under the fixed maturity options, we are not obligated to invest those assets according to any particular plan except as we may be required to by state insurance laws. We will not determine the rates to maturity we establish by the performance of the nonunitized separate account.

## About our general account

Our general account supports all of our policy and contract guarantees, including those that apply to the fixed maturity options, as well as our general obligations. Amounts applied under the life contingent annuity become part of our general account.

The general account is subject to regulation and supervision by the Insurance Department of the State of New York and to the insurance laws and regulations of all jurisdictions where we are authorized to do business. Because of exemptions and exclusionary provisions that apply, interests in the general account have not been registered under the Securities Act of 1933, nor is the general account an investment company under the Investment Company Act of 1940. However, the market value adjustment interests under the contracts are registered under the Securities Act of 1933.

We have been advised that the staff of the SEC has not made a review of the disclosure that is included in the prospectus for your information that relates to the general account (other than market value adjustment interests) and the life contingent annuity. The disclosure, however, may be subject to certain generally applicable provisions of the federal securities laws relating to the accuracy and completeness of statements made in prospectuses.

## Other methods of payment

### Wire transmittals

We accept initial contributions sent by wire to our Processing Office by agreement with certain broker-dealers. The transmittals must be accompanied by information we require to allocate your contribution. Wire orders not accompanied by complete information may be retained as described under "How you can make your contributions."

Even if we accept the wire order and essential information, a contract generally will not be issued until we receive and accept a properly completed application. In certain cases we may issue a contract based on information forwarded electronically. Where we require a signed application, no financial transactions will be permitted until we receive the signed application and have issued the contract.

After your contract has been issued, additional contributions under the life annuity with a period certain contract may be transmitted by wire.

## About payments under period certain contracts

The following example illustrates a ten-year level stream of annual payments, each in the amount of $10,000, purchased on April 1, 1999 with the first payment on February 15, 2000. To achieve this result, a single contribution of $78,923.30 is required, and is allocated among the fixed maturity options as indicated below.

| February 15th of calendar year | Payment | Price per $100 of maturity value | Allocation of contribution |
|---|---|---|---|
| 2000 | $10,000 | $97.23 | $ 9,723.50 |
| 2001 | $10,000 | $92.83 | $ 9,282.67 |
| 2002 | $10,000 | $88.51 | $ 8,850.98 |
| 2003 | $10,000 | $84.43 | $ 8,442.76 |
| 2004 | $10,000 | $80.60 | $ 8,059.67 |
| 2005 | $10,000 | $76.45 | $ 7,645.43 |
| 2006 | $10,000 | $72.56 | $ 7,256.47 |
| 2007 | $10,000 | $69.16 | $ 6,915.68 |
| 2008 | $10,000 | $65.55 | $ 6,554.98 |
| 2009 | $10,000 | $61.91 | $ 6,191.16 |
| | | Total | $78,923.30 |

## Dates and prices at which contract events occur

### Business Day

Our "business day" is any day the New York Stock Exchange is open for trading. Each business day ends at the time regular trading on the exchange closes (or is suspended) for the day. Our business day ends at 4:00 p.m., Eastern Time for purposes of determining the date when contributions are applied and any other transaction requests are processed. Contributions will be applied and any other transaction requests will be processed when they are received along with all the required information unless another date applies as indicated below.

If your contribution or any other transaction request containing all the required information, reaches us on a non-business day or after 4:00 p.m. on a business day, we will use the next business day.

### Contributions

- Contributions allocated to the fixed maturity options will receive the rate to maturity in effect for that fixed maturity option on that business day.

- Contributions allocated to the separate account to provide for payments off maturity dates, will receive the interest rate in effect on that business day or the same rate as the rate to maturity that applied to the expired fixed maturity option.

- Contributions allocated to the life contingent annuity will be invested at the purchase rates in effect on that business day.

### About our year 2000 progress

Equitable Life relies upon various computer systems in order to administer your contract and operate the investment options. Some of these systems belong to service providers who are not affiliated with Equitable Life.

In 1995, Equitable Life began addressing the question of whether its computer systems would recognize the year

2000 before, on or after January 1, 2000, and Equitable Life has identified those of its systems critical to business operations that were not year 2000 compliant. By year end 1998, the work of modifying or replacing non-compliant systems was substantially completed. Equitable Life has begun comprehensive testing of its year 2000 compliance and expects that the testing will be substantially completed by June 30, 1999. Equitable Life has contacted third-party service providers to seek confirmation that they are acting to address the year 2000 issue with the goal of avoiding any material adverse effect on services provided to contract owners and on operations of the investment options. Most third-party service providers have provided Equitable Life confirmation of their year 2000 compliance. Equitable Life believes it is on schedule for substantially all such systems and services, including those considered to be mission-critical, to be confirmed as year 2000 compliant, renovated, replaced or the subject of contingency plans, by June 30, 1999, except for one investment accounting system that is scheduled to be replaced by August 31, 1999 and confirmed as year 2000 compliant by September 30, 1999. Additionally, Equitable Life will be supplementing its existing business continuity and disaster recovery plans to cover certain categories of contingencies that could arise as a result of year 2000 related failures. Year 2000 specific contingency plans are anticipated to be in place by June 30, 1999.

There are many risks associated with year 2000 issues, including the risk that Equitable Life's computer systems will not operate as intended. Additionally, there can be no assurance that the systems of third parties will be year 2000 compliant. Any significant unresolved difficulty related to the year 2000 compliance initiatives could result in an interruption in, or a failure of, normal business operations and, accordingly, could have a material adverse effect on our ability to administer your contract and operate the investment options.

To the fullest extent permitted by law, the foregoing year 2000 discussion is a "Year 2000 Readiness Disclosure" within the meaning of The Year 2000 Information and Readiness Disclosure Act, 15 U.S.C. Sec. 1 (1998).

**38**

*More information*

## About legal proceedings

Equitable Life and its affiliates are parties to various legal proceedings. In our view, none of these proceedings is likely to have a material adverse effect upon our obligations under the contracts, or the distribution of the contracts.

## About our independent accountants

The financial statements of Equitable Life incorporated in this prospectus by reference to the Annual Report on Form 10-K at December 31, 1998 and 1997, and for the three years ended December 31, 1998, have been so incorporated in reliance on the report of PricewaterhouseCoopers LLP, independent accountants, given on the authority of said firm as experts in auditing and accounting.

## Transfers of ownership, collateral assignments, loans, and borrowing

The contracts may not be assigned except through surrender to us. They may not be borrowed against or used as collateral for a loan or other obligation.

## Distribution of contracts

Equitable Distributors, Inc. ("EDI") and EQ Financial Consultants, Inc. ("EQF"), indirect, wholly owned subsidiaries of Equitable Life, are the distributors of the contracts and have responsibility for sales and marketing functions. EDI and EQF are registered with the SEC as broker-dealers and are members of the National Association of Securities Dealers, Inc. The principal business address of EDI and EQF is 1290 Avenue of the Americas, New York, New York 10104. Under a distribution agreement between Equitable Life, certain of Equitable Life's separate accounts, including the separate account that contains the fixed maturity options, and EDI, Equitable Life paid EDI distribution fees of $129,520 for 1998, $962,599 for 1997 and $202,400 for 1996, as the distributor of the contracts. Under a distribution and services agreement between EQF, Equitable Life and certain of Equitable Life's separate accounts, including the separate account that contains the fixed maturity options, Equitable Life paid EQF $325,380 for

1998, as the distributor for certain contracts including these contracts. During 1999, EQF plans to change its name to AXA Advisors, Inc.

The contracts will be sold by registered representatives of EDI and EQF as well as by affiliated and unaffiliated broker-dealers with which EDI and/or EQF has entered into selling agreements. Broker-dealer sales compensation will generally not exceed 5% of total contributions made under the contracts. EDI and EQF may also receive compensation and reimbursement for its marketing services under the terms of their distribution agreements with Equitable Life. Broker-dealers receiving sales compensation will generally pay a portion of it to their registered representatives as commissions related to sales of the contracts. The offering of the contracts is intended to be continuous.

[This page intentionally left blank]

# Appendix: Market value adjustment example

The example below shows how the market value adjustment would be determined and how it would be applied to a withdrawal, assuming that $100,000 was allocated on February 15, 2000 to a fixed maturity option with a maturity date of February 15, 2009 at a rate to maturity of 7.00% resulting in a maturity value at the maturity date of $183,846, and further assuming that a withdrawal of $50,000 was made on February 15, 2004.

|  | Assumed rate to maturity on February 15, 2004 | |
|---|---|---|
|  | 5.00% | 9.00% |
| **As of February 15, 2004 (before withdrawal)** | | |
| (1)  Market adjusted amount | $144,048 | $119,487 |
| (2)  Fixed maturity amount | $131,080 | $131,080 |
| (3)  Market value adjustment:<br>      (1) − (2) | $ 12,968 | $ (11,593) |
| **On February 15, 2004 (after withdrawal)** | | |
| (4)  Portion of the market adjusted amount associated with withdrawal:<br>      (3) x [$50,000/(1)] | $  4,501 | $  (4,851) |
| (5)  Reduction in fixed maturity amount:<br>      [$50,000 − (4)] | $ 45,499 | $ 54,851 |
| (6)  Fixed maturity amount: (2) − (5) | $ 85,581 | $ 76,229 |
| (7)  Maturity value | $120,032 | $106,915 |
| (8)  Market adjusted amount of (7) | $ 94,048 | $ 69,487 |

You should note that if a withdrawal is made when rates have increased from 7.00% to 9.00% (right column), a portion of a negative market value adjustment is realized. On the other hand, if a withdrawal is made when rates have decreased from 7.00% to 5.00% (left column), a portion of a positive market value adjustment is realized.

Copyright 1999 by The Equitable Life Assurance Society of the United States, New York, New York 10104. All rights reserved.
Income Manager is a registered service mark of The Equitable Life Assurance Society of the United States.

The Equitable Life Assurance Society of the United States
New York, NY 10104 (212) 554-1234

IM95-17 (5/99)



EXHIBIT "G"

Equitable Accumulator
P.O. Box 1547
Secaucus, NJ 07096-1547

Equitable Distributors, Inc., acts as distributor for The
Equitable Life Assurance Society of the United States in
connection with the distribution of Separate Account units
under your contract or certificate. Equitable Distributors,
Inc. and Equitable Life are affiliated companies.

December 18, 2000
No. 00353 02172
Page  1 of  2

01021011

DORINE BARRANCO
103 W BROOKWOOD CIRCLE
OZARK AL 36360

**Equitable** Accumulator (NQ)
Contract Number:       300 637 931
Contract Date:          November 16, 2000
Name of Annuitant      DORINE BARRANCO
Contract Owner:         DORINE BARRANCO
  Soc. Sec./Tax ID#:    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
Your Representative:   HOLMAN CHAPPELL
  Telephone:            (334)677-2812

If you need assistance, please call your representative at the
phone number above, or call our processing office toll free at
1-800-789-7771, or visit our website at www.equitable.com.

## CONFIRMATION NOTICE

THIS IS YOUR NOTICE THAT THE EQUITABLE PROCESSING OFFICE:

|  | Amount | Effective Date |
|---|---|---|
| Processed an automatic monthly transfer. | $4,214.81 | December 18, 2000 |

| | Amount | Effective Date |
|---|---|---|
| Last Reported Account Balance: | $25,000.00 | on November 16, 2000 |
| Current Account Balance: | $25,288.84 | on December 18, 2000 |

## DETAIL OF ACTIVITY BY INVESTMENT OPTION

| Investment Fund | Last Reported Balance | Investment Results | Amount Transferred | Number of Units | 2000/12/18 Unit Value | Number of Units | Unit Value | Account Balance |
|---|---|---|---|---|---|---|---|---|
| | | | --- Transaction Information --- | | | Account Information as of December 18, 2000 | | |
| Alliance Small Cap Growth | | | $632.22+ | 39.4787 | $16.014188 | 39.4787 | $16.014188 | $632.22 |
| EQ/...nce Premier Growth | | | $842.96+ | 87.3527 | $9.650077 | 87.3527 | $9.650077 | $842.96 |
| EQ/...nce Technology | | | $632.22+ | 94.4071 | $6.696739 | 94.4071 | $6.696739 | $632.22 |
| FI Mid Cap | | | $1,053.71+ | 108.8724 | $9.678395 | 108.8724 | $9.678395 | $1,053.71 |
| EQ/Janus Large Cap Growth | | | $1,053.70+ | 123.6616 | $8.520837 | 123.6616 | $8.520837 | $1,053.70 |
| Sub Total | $0.00 | | $4,214.81+ | | | | | $4,214.81 |

| Special Dollar Cost Average Account | Last Reported Balance | Interest Earned | Amount Transferred | | | Account Information as of December 18, 2000 Account Balance |
|---|---|---|---|---|---|---|
| | | | --- Transaction Information --- | | | |
| Special Dollar Cost Average Account | $25,000.00 | $288.84+ | $4,214.81- | | | $21,074.03 |
| Grand Total | $25,000.00 | $288.84+ | | | | $25,288.84 |

Equitable Accumulator
P.O. Box 1547
Secaucus, NJ 07096-1547

December 8, 2000

## Equitable
Accumulator℠ (Rollover IRA)

Contract Date:          December 4, 2000
Name of Annuitant:      Dorine Barranco
Contract Owner:         Dorine Barranco
Your Representative:    Not Available
Telephone:              Not Available



0000377 01      1211 36360
Dorine Barranco
103 W Brookwood Circle
Ozark AL 36360

If you need assistance, please call our processing office toll
free at 1-800-789-7771.

## CONFIRMATION NOTICE

THIS IS YOUR NOTICE THAT THE EQUITABLE PROCESSING OFFICE          EFFECTIVE DATE
-Assigned a TOPS Personal Identification Number                   December 4, 2000

Your Personal Identification Number (PIN) assigned by the Equitable is **86489**. This PIN allows you secured access to your annuity account through the Telephone Operated Support (TOPS) system. You should protect this PIN number as confidential. For your protection, it is not written anywhere other than on this notice. When you use your PIN to access TOPS, you authorize the Equitable Life Assurance Society of the United States (Equitable) to act on instructions to make transfers and allocation changes for your account from any person furnishing the PIN.

The Accumulator℠ prospectus contains a discussion of the restrictions and limitations to which transfers are subject. Only one transfer and/or allocation change request for each VRU transaction is permitted on any one day and cannot be revoked.

3. Equitable will generally provide this telephone facility 24 hours a day, 7 days a week. Any transaction received prior to 4:00 PM Eastern Time on a business day will be effective as of the close of business that day. Requests made after 4:00 PM on business days, or on non-business days, will be effective as of the close of business on the next business day.

4. No transaction will be processed unless your PIN is furnished. This PIN will remain in effect unless revoked by you in writing or by requesting a change via TOPS.

5. After you key the details of your transaction(s), you must wait for an acknowledgment that the request has been filed before terminating the telephone connection; failure to do so may result in the total loss of the information, in which case no transaction will be processed.

6. Equitable will not be liable for loss, liability, costs or expenses arising out of transfers, and/or allocation changes authorized by telephone that Equitable reasonably believes to be genuine. Equitable reserves the right to discontinue the telephone transfer service at any time without notice. Equitable shall not be responsible for the unavailability of the telephone facility due to systems problems, scheduling requirements, power surges or failures, etc. Changes in the above terms and conditions or additional limitations will be effective upon notice from Equitable.

7. If you wish to transfer the entire fund balance or a specific percentage from one or more investment options, the transfer by percentage option is available. However, if you wish to transfer a specific dollar amount from one or more investment options, the transfer by dollar amount option is also available. Fund balances in the various investment options fluctuate with daily changes in unit values. Hence, if the requested transfer amount is close to the fund balance as of the previous business day, you should consider using the transfer by percentage option. Dollar amount transfers will not be processed if the requested transfer amount is greater than the amount available for transfer.

8. Allocation change requests apply only to future contributions. Requests must specify the percentage for each Fund in whole numbers, and the total must equal 100%.

If you have any questions about TOPS, contact your Representative or call our processing office at the number above a Customer Service Consultant will be happy to help you.

*For Convenient Access To Your Accumulator Contract Use TOPS - Telephone Operated Program Support Call 1-888-909-7770*

## INTRODUCING TRANSACTION CAPABILITY

TOPS is available 24 hours a day, 7 days a week and has recently been enhanced and now allows contract owners to initiate transfers and change allocations. Now, using a touch-tone telephone, you can get up-to-date information on:

- Fund Unit Values
- Current GIRO Rates
- Annuity Contract Values
- Balances by Fund
- Current Contract Allocations

**AND**

- Transfer a Percentage Between Funds
- Transfer a Dollar Amount Between Funds
- Change Future Allocations

### TO ACCESS INFORMATION

Call us toll-free at (888)909-7770 on your touch-tone telephone. You will be directed to enter your contract number and your contract access code. Your access code is the last four digits of the annuitant's social security number. You will then be prompted to choose one of the menu selections listed to the right.

If you have a rotary telephone, please call our customer service department at (800)789-7771 between 8:30am and 5:30pm Eastern Time on any business day.

As you become familiar with Equitable Accumulator's telephone access system, you can bypass the voice prompts and obtain information faster by entering the appropriate codes.

## MAIN MENU SELECTIONS

### Unit Values and GIRO Rates Press 1

This option allows you to obtain the previous day's values.

- For a listing of all contract unit values Press 1
- For a specific fund unit value Press 2
- For a listing of all GIRO values Press 3
- For a specific GIRO Maturity Press 4

### Contract Inquiries Press 2

This option allows you to obtain the current annuity contract value* as of the close of the previous business day. Also available under this option are:

- For a listing of the existing fund balances for the contract Press 1
- For a listing of the available fund investment options for the contract Press 2
- For a listing of the current contract fund allocation percentages Press 3

### Transaction Menu Press 3

This option will first prompt you to enter your PIN number. After proper verification has been attained you can perform transactions and/or change your PIN number. Available under this option are:

- To initiate fund transfers (dollar amount or percentage) Press 1
- To change the allocation for future contributions Press 2
- To change your PIN number Press 3

### To Enter Another Contract Number Press 4

### To Request the Assignment of a New Pin Number Press 5

This option is only if you have lost or can't remember your PIN and allows you to receive a new PIN via mail in 5-7 business days.

### To Return to Main Menu Press 0 at any time during the call.

*\* Does not include surrender charges or taxes if applicable*

EXHIBIT "H"



**EQUITABLE
DISTRIBUTORS, INC.**

March 2, 2000

Ann S. Holman
Raymond James Financial
2431 W. Main
Westwood Park     Suite 603
Dothan, AL  36301

Dear Ann S. Holman:

I would like to take this opportunity to thank you for recently placing an Equitable Accumulator$^{SM}$ Certificate for Floyd Starling with The Equitable Life Assurance Society of the United States (Equitable).  At Equitable Distributors, Inc., we are committed to providing you with the support you and your clients deserve, and look forward to building a longstanding relationship with you.

Enclosed please find a package of information for Floyd Starling.  Included is a welcome letter, your client's Accumulator Certificate and a personalized summary that highlights important information. Please review this package with your client and provide the kit to them for record keeping purposes.

We have also included a summary sheet for your files. This summary contains important information regarding this particular client and Certificate.

We at Equitable Distributors appreciate your continued support and look forward to working with you in the future. We're always ready to answer your questions . . . give you a quote or a hypothetical illustration . . . provide you with marketing materials . . . help you in any way we can. When you need us, just contact your Equitable Distributors' Regional Vice President or call our Sales Desk at 1-888-517-9900.

Again, thank you for the business.

Sincerely,

Greg Brakovich
Managing Director

EDIU-97-76 (rev. 9/99)