IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| AXA DISTRIBUTORS, LLC and <br> AXA ADVISORS, LLC, <br> <br> Plaintiffs, <br> <br> v. <br> <br> GAYLE S. BULLARD et al., <br> <br> Defendants. | Case No. 1:08cv188 |

**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, TO COMPEL ARBITRAION**

Defendants hereby reply in support of their Motion to Dismiss or, in the Alternative, to Compel Arbitration (hereinafter "Motion to Dismiss" or "Motion"). Plaintiffs filed their opposition to Defendants' Motion to Dismiss on July 14, 2008. For the reasons set forth below, the Defendants' Motion is due to be granted.[1]

**I.  INTRODUCTION**

As a member of FINRA, AXA Distributors agreed in advance to allow the NASD Director to decide the issue of whether FINRA is the appropriate forum for the claims alleged. That agreement must be given effect, and Plaintiff's claims dismissed. Even assuming this Court should decide the issue of arbitrability, the

---

[1] In this brief, for the reasons stated in the Motion to Dismiss, Defendants will refer only to Plaintiff AXA Distributors, LLC ("Plaintiff").

1

claims are due to be arbitrated. Defendants are "customers" under the NASD Code and the clearly established law of this circuit. And, Defendants' claims arise from the sales and marketing techniques Plaintiff employed in training and supervising the sale of the Accumulator annuities. Ann Holman is an associated person of Plaintiff as defined under the NASD Code, and Plaintiff is therefore bound to arbitrate Defendants' claims relating to her business activities in the sale and marketing of the Accumulator annuities. Furthermore, all doubts regarding arbitrability must be resolved in favor of arbitration.

## II. STANDARD OF REVIEW

A motion to dismiss should be granted under Federal Rule of Civil Procedure 12(b)(6) when the Plaintiff has failed to state a claim upon which relief could be granted. A Rule 12(b)(6) motion to dismiss a complaint, or any portion thereof, should be granted when it appears that the facts alleged fail to state a plausible claim for relief. *Bell Atlantic Corp. v. Twombly,* 127 S.Ct. 1955, 1965-66 (2007); Fed.R.Civ.P. 12(b)(6). A court ruling on a motion to dismiss must accept all well-pleaded facts as true, and it must construe all reasonable inferences therefrom in the light most favorable to the plaintiff. *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1274 n.1 (11th Cir. 1999).

## III. LEGAL ARGUMENT

### A. Plaintiff Agreed to Allow the NASD Director to Determine Arbitrability.

Under Eleventh Circuit law, "the Court must interpret the [NASD] Code as it would a contract under the applicable state law." *Multi-Financial Securities Corp. v. King*, 386 F.3d 1364, 1367 (11th Cir. 2004). In doing so, the Court must give effect "to the parties' intent expressed by the ordinary meaning of the language they used." *Id.* The Alabama Supreme Court has made clear that if there is unmistakable evidence of the parties' intent to submit the issue of arbitrability to the arbitration panel, it must be submitted to the panel according to the agreement, and not determined by the Court. *Ex parte Johnson*, 2008 WL 2068077 at *6, 10 (Ala. May 16, 2008). Plaintiff does not deny that it is a member of FINRA, and as such, it is bound in arbitration by the NASD Code. Doc. 19 at p. 4 line 5, p. 8 lines 6-10. As Defendants discussed in their Motion to Dismiss, the NASD Code clearly provides for the NASD Director to determine issues of arbitrability and appropriateness of the forum for the claims alleged, under the procedure set forth in the Code. *See* NASD Code §§ 122-3, 12503(c)(1). As the U.S. Supreme Court has explained and the Eleventh Circuit has reiterated, arbitrators derive their authority to resolve disputes "because the parties have agreed in advance to submit such grievances to arbitration." *King*, 386 F.3d at 1367, *quoting AT&T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648-49, 106 S. Ct. 1415, 1418,

3

89 L. Ed. 2d 648 (1986). Here, Plaintiff, as a member of FINRA, has agreed in advance that the NASD Director shall determine the appropriateness of FINRA arbitration for any claims brought before FINRA.

Plaintiff's reliance on unpublished cases outside the Eleventh Circuit regarding "reasonable expectations" are also not persuasive. Plaintiff should have reasonably anticipated being haled before FINRA by customers purchasing AXA products for its misconduct regarding the sale and marketing of those products. Plaintiff's sole business was to sell and market the products at issue in this case and to train and supervise others who sell and market the products, and Plaintiff was involved in and received compensation for each sale. Indeed, Plaintiff must be a member of FINRA in order for the Accumulator products to be sold through member firms and their brokers. *See, e.g.*, NASD Code § 2820(e) (Requiring member firms to sell variable annuities through selling agreements with other member firms if they are to sell such annuities indirectly); Section 15 of the Securities Exchange Act of 1934, 15 U.S.C. § 78o (requiring all securities to be sold through registered broker-dealers who are members of a self-regulatory organization). Accordingly, Plaintiff reasonably must have anticipated having to answer at FINRA arbitration to customers for its fraudulent and deceptive sales practices, as it indisputably was responsible for the sales and marketing of the Accumulator products. *See* Exhibit F to Motion to Dismiss, p. 38, "Distribution of

Contracts" section lines 3-5 (AXA Distributors is a distributor of the contracts and has "responsibility for sales and marketing functions"). Because, as a member of FINRA, Plaintiff agreed in advance that the NASD Director would decide the issue of arbitrability, Plaintiff's claims are due to be dismissed.

### B. Arbitration is Required Because Defendants Are "Customers" Under Clearly Established Eleventh Circuit Law.

Because it is undisputed that Defendants are neither brokers nor dealers, they qualify as "customers" under the NASD Code and according to the controlling authority. The Eleventh Circuit established in both *MONY v. Bornstein*, 390 F.3d 1340, 1345-46 (11th Cir. 2004) and *Multi-Financial Securities Corp. v. King*, 386 F.3d 1364, 1368 (11th Cir. 2004), that the NASD Code "unambiguously provide[s] that [an investor] is a customer as long as she is not a broker or dealer; **nothing in the Code directs otherwise or requires more**." *King*, 386 F.3d at 1368 (emphasis added). The Eleventh Circuit is consistent in holding that the language of the NASD Code mandates a broad reading of "customer" to include even indirect customers. *King*, 386 F.3d at 1368; *MONY v. Bornstein*, 390 F.3d at 1344 ("[W]e are bound by the plain language of the Code, which defines "customer" to include anyone who is not a broker or a dealer."). The holdings are not limited to situations involving an employee of a broker-dealer, as Plaintiff suggests. For example, in *King*, the Eleventh Circuit was not persuaded by the

member's argument that the investor "was not *its* customer." 386 F.3d at 1368 (emphasis in original). Judge Smith, writing for the Court, explained that "[e]nforcing the limitation [the member] seeks would be tantamount to reading language into the Code that is conspicuously absent." *Id.* Because other inapplicable NASD rules make a distinction between customers generally and customers of the member, the Eleventh Circuit held that the NASD made the "clear and unambiguous choice to leave the term as defined generally . . . ." *Id.* Thus, contrary to Plaintiff's argument, an investor does ***not*** have to be a "direct customer" to be included in the NASD Code's definition of "customer" eligible to bring a claim before the arbitration panel. Accordingly, all Defendants are "customers."

Plaintiff attempts to apply *Wheat, First Securities, Inc. v. Green*, 993 F.2d 814, 816 (11th Cir. 1994) to support a more narrow definition of "customers." However, the Eleventh Circuit has limited *Wheat First*, decided ten years prior to *MONY*, to situations involving an issue of timing of the customer relationship. *MONY Securities Corp. v. Bornstein*, 390 F.3d at 1345 (construing *Wheat First* as "holding only that customer status for purposes of the NASD is determined as of the time of the events providing the basis for the allegations of fraud. In other words, Wheat discussed timing for investors who were harmed by the firm's

successor in interest.") (internal quotation marks and citation omitted). Because the timing of events is not at issue here, *Wheat First* is likewise inapplicable.

Plaintiff's reliance on Eighth Circuit jurisprudence regarding the definition of "customer" is also misplaced; the Eleventh Circuit holds that an investor does not have to be a "direct customer" to bring claims under the NASD Code and that the plain language of the Code is controlling, directly contradicting the Eighth Circuit's "brokerage or investment relationship" standard. *Cf. Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc.*, 264 F.3d 770, 772-72 (8th Cir. 2001) *with Multi-Financial Securities Corp. v. King*, 386 F.3d at 1368, *and MONY v. Bornstein*, 390 F.3d at 1344.

### C. Arbitration is Required Because Defendants' Claims Arise Out of Plaintiff's Business Activities.

As Defendants have shown in their Motion to Dismiss, Plaintiff was involved in every transaction and in sales and marketing generally for the products at issue, and Plaintiff profited directly from each sale of AXA annuities.[2] Plaintiff

---

[2] *See* Motion to Dismiss at 19-26. In addition to the literature cited in the Motion to Dismiss, the 2006 Supplement to the prospectuses reiterates AXA Distributors' involvement and financial interest in each and every sale of an AXA annuity, including those sold by third-party brokers who had selling agreements with AXA Distributors. "Accumulator Series" prospectus, attached as Exhibit A, pp. 15-16. All commissions on the contracts at issue flowed through the Plaintiff. AXA Distributors receives a commission from AXA Equitable whenever a Selling broker-dealer sells a contract, and AXA Distributors, in turn, pays the commission to the broker-dealer. Exhibit A at p. 15, "Distribution of the contracts" section ¶ 1,

7

had selling agreements with each and every non-AXA broker selling its product. *See* Exhibit A at 15, section 11, lines 9-14, 20-30. Defendants are "customers" who were deceived by the fraudulent sales and marketing practices employed by Plaintiff and its associated persons and are entitled to bring claims against Plaintiff in connection with these sales and the representations leading to the sales.

### 1. Defendants' Claims Relate to Plaintiff's Business Activities.

It must be undisputed that Defendants' claims relate to the business activities of Plaintiff. Plaintiff concedes it provided all of the training to Ann Holman, and does not dispute her testimony on that subject. Defendants have alleged a claim against Plaintiff for negligent training. And even assuming for the sake of argument that the Court accepts Plaintiff's attempts to distance itself from the actions of Ann Holman and assumes Plaintiffs had no duty to train her on the product, it is well established that once it undertook to do so, Plaintiff assumed a duty and became liable to third parties for damages resulting from their negligence in training her. *Fireman's Fund American Ins. Co. v. Coleman*, 394 So. 2d 334,

---

lines 12-14, 20-25. In addition to its per-contract compensation, "AXA Distributors also receives compensation and reimbursement for its marketing services under the terms of its distribution agreement with AXA Equitable." Exhibit A at p. 15, section 11, lines 24-25. AXA Distributors may also make payments to Selling broker-dealers as "incentive[s] . . . to promote the sale of AXA Equitable products . . . ." Those incentives are paid by AXA Distributors out of its assets. *Id* at p. 16 lines 2-6.

350 (Ala.) (on reh'g, 1981) (J. Jones, concurring); *see also* Michael L. Roberts and Gregory S. Cusimano, Alabama Tort Law (2d ed. 1996) at 30.  Likewise for supervision, it is the undisputed testimony of Ann Holman that AXA Distributors "provided all the training that [she] received on the product," conducted all the seminars she attended on the Accumulator annuities, taught her how to sell the product, and "very much controlled how [she] sold the product to [her] clients." Holman Aff. at ¶ 5, Exhibit B to Motion to Dismiss.  Whether those actions are sufficient for Defendants to ultimately prevail on those claims against Plaintiff is for the arbitration panel to determine.  What is clear is that Defendants' claims of negligent training and supervision relate to Plaintiff's business activities.

Furthermore, Defendants' claims of fraud under the Alabama Securities Act also undisputedly arise out of Plaintiff's business activities.  Defendants claim they were fraudulently induced to purchase a variable annuity that has not worked as it was marketed and sold to them.  Ann Holman's testimony is ***undisputed*** that AXA Distributors trained her on the product and that she sold the product exactly as she was trained by AXA Distributors.  Ann Holman Aff. at ¶ 5, Exhibit B to Motion to Dismiss.  Plaintiff, in training brokers that the Accumulator annuity provided liquidity and a guaranteed rate of return at the end of the annuity term, engaged either directly ***or indirectly*** in a device, scheme, or artifice to defraud or engaged in an ***act, practice, or course of business*** which operated as a fraud on Defendants.

9

Under the Alabama Securities Act, Plaintiff is liable to Defendants for its actions. Plaintiff is bound to arbitrate those claims because they arise out of their own business activities and all doubts must be resolved in favor of arbitration.

### 2. Ann Holman is an "Associated Person" as Defined Under the NASD Code.

There is no question that, because Ann Holman was the broker who sold the contracts that form the basis of Defendants' claims, the claims are also in connection with the business activities of Ann Holman. Plaintiff does not dispute that it provided all of Ann Holman's training on the product. It does not dispute her testimony regarding its supervision of her sales and marketing of the products. Plaintiff's literature shows that it received a commission on all of her sales. Exhibit A at 16-17. The NASD Code specifically defines "Associated Person" and "Person associated with a member" as one who is directly or indirectly controlled by a member. NASD Rules 2100(a), (r). Ann Holman's undisputed testimony is that she was controlled by AXA Distributors in the sale and marketing of the Accumulator products. Holman Aff. at ¶ 5, Exhibit B to Defendants' Motion to Dismiss. While Plaintiff argues that it did not control Ms. Holman, it has proffered no evidence or testimony to refute Ms. Holman's testimony that AXA Distributors controlled "how she sold the product to her clients," that she sold the product "exactly as she was trained by AXA Distributors," and that she passed on to her

clients "the representations that were made to [her] by AXA Distributors." Holman Aff. at ¶ 5, Exhibit B to Defendants' Motion to Dismiss. Ann Holman fulfills the plain definition of "person associated with a member" in the NASD Code as to Plaintiff. Because Ann Holman is unquestionably a "person associated with" Plaintiff for the purpose of the sale and marketing of the Accumulator, Plaintiff is bound to arbitrate any claims relating to her business activities in selling and marketing of the Accumulator annuity.

Plaintiff attempts, on page 18 of its Opposition to the Motion to Dismiss, to argue that "associated person" is a term of art in the NASD, citing no authority.[3] Plaintiff would do better to have the NASD Director determine arbitrability if it wishes a person with knowledge of the unwritten connotations of the NASD

---

[3] A "term of art" is defined in Black's Law Dictionary as "[a] word or phrase having a specific, precise meaning in a given specialty, apart from its general meaning in ordinary contexts." Black's Law Dictionary, Abridged Seventh Ed. (2000). Courts look to the express definitions of "terms of art" in the contract or statute in which they are defined. *See Hanley v. Roy*, 485 F.3d 641, 646 (11th Cir. 2007); *Home Guaranty Ins. Corp. v. Numerica Financial Services, Inc.*, 835 F.2d 1354, 1357 (11th Cir. 1988); *Hatcher v. Dept. of the Air Force*, 705 F.2d 1309, 1312 (11th Cir. 1983) (reh'g den.). As Defendants have demonstrated in their Motion to Dismiss, p. 17-22, section IV.B.2.b.(2), Ann Holman is an "associated person" as defined by the Code. While Plaintiff may dislike or disagree with the definition of "person associated with a member" provided in the NASD Code, it is to the express definition that the Court must look, and not to any unsubstantiated alternate meanings put forth by the Plaintiff.

11

definitions to determine this issue. A court, however, must take the NASD Code on its face. *See H & S Homes, L.L.C. v. Shaner*, 940 So. 2d 981, 988 (Ala. 2006) ("When a court construes a contract, the clear and plain meaning of the terms of the contract are to be given effect, and the parties are presumed to have intended what the terms clearly state."). Under the NASD Code, a member need only indirectly control the activities of a broker. Here, it is undisputed that for the sales and marketing of the Accumulator, Plaintiff at a minimum indirectly controlled the actions of Ann Holman. And all doubts must be construed in favor of arbitration. Therefore, Plaintiff is bound to arbitrate any claims arising out of or relating to the activities of Ann Holman in selling and marketing the Accumulator.

**CONCLUSION**

For the above reasons and the reasons set forth in Defendants' Motion to Dismiss or, In the Alternative, to Compel Arbitration, Defendants' Motion should be granted, the Plaintiff's Complaint should be dismissed, or the Plaintiff should be compelled to arbitrate the Defendants' dispute before FINRA.

Respectfully Submitted,

/s/ Caroline Smith Gidiere
One of the Attorneys for Defendants

Andrew P. Campbell
Caroline Smith Gidiere
Campbell, Gidiere, Lee, Sinclair
    and Williams, PC
2100A SouthBridge Parkway, Suite 450
Birmingham, Alabama  35209
(205) 803-0051
Fax: (205) 803-0053
acampbell@cgl-law.com
cgidiere@cgl-law.com


M. Dale Marsh
Mash, Cotter & Stewart, LLP
P. O. Box 310910
Enterprise, Alabama 36331
334-347-2626
Fax:  334-393-1396
mdm@enterpriselawyers.com

## CERTIFICATE OF SERVICE

I hereby certify that on July 21, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Andrea Morgan Greene, Esq.
Armistead Inge Selden, III, Esq.
John Norman Bolus, Esq.
**MAYNARD, COOPER, & GALE, P.C.**
1901 Sixth Avenue North
2400 AmSouth/Harbert Plaza
Birmingham, AL  35203

/s/ Caroline Smith Gidiere
Of Counsel

# EXHIBIT A



May 1, 2006

# ACCUMULATOR® SERIES
*Combination variable and fixed annuity*

*This booklet contains our privacy policy, product prospectus supplement, EQ Advisors Trust and AXA Premier VIP Trust prospectuses and other important information regarding your insurance contract.*

Issued by AXA Equitable Life Insurance Company



Be Life Confident

After your contract has been issued, additional contributions may be transmitted by wire.

### 9) Certain information about our business day

Our business day, generally, is any day on which the New York Stock Exchange is open for trading. A business day does not include any day we close not to open due to emergency conditions. We may also close early due to emergency conditions. Our business day generally ends at 4:00 p.m. Eastern Time for purposes of determining the date when contributions are applied and any other transaction requests are processed. Contributions will be applied and any other transaction requests will be processed when they are received along with all the required information.

If we have entered into an agreement with your broker-dealer for automated processing of contributions upon receipt of customer order, your contribution will be considered received at the time your broker-dealer receives your contribution and all information needed to process your application, along with any required documents, and transmits your order to us in accordance with our processing procedures. Such arrangements may apply to initial contributions, subsequent contributions, or both, and may be commenced or terminated at any time without prior notice. If required by law, the "closing time" for such orders will be earlier than 4 p.m., Eastern Time.

For more information, including additional instances when a different date may apply to your contributions, please see "More Information" in your prospectus.

### 10) Legal proceedings

AXA Equitable and its affiliates are parties to various legal proceedings. In our view, none of these proceedings would be considered material with respect to a contract owner's interest in Separate Account Nos. 45 and 49, respectively, nor would any of these proceedings be likely to have a material adverse effect upon either Separate Account, our ability to meet our obligations under the contracts, or the distribution of the contracts.

### 11) Distribution of the contracts

The contracts are distributed by both AXA Advisors, LLC ("AXA Advisors") and AXA Distributors, LLC ("AXA Distributors") (together, the "Distributors"), which serve as principal underwriters of Separate Account Nos. 45 and 49, respectively. The offering of the contracts is intended to be continuous.

AXA Advisors (the successor to EQ Financial Consultants, Inc.), an affiliate of AXA Equitable, and AXA Distributors, an indirect wholly owned subsidiary of AXA Equitable, are registered with the SEC as broker-dealers and are members of the National Association of Securities Dealers, Inc. ("NASD"). Their principal business address is 1290 Avenue of the Americas, New York, NY 10104. Both broker-dealers also act as distributors for other AXA Equitable annuity products. AXA Distributors is a successor by merger to all of the functions, rights and obligations of Equitable Distributors, Inc. ("EDI"). Like AXA Distributors, EDI was owned by Equitable Holdings, LLC.

The contracts are sold by financial professionals of AXA Advisors and its affiliates and by financial professionals of both affiliated and unaffiliated broker-dealers that have entered into selling agreements with the Distributors ("Selling broker-dealers"). The Distributors are under the common control of AXA Financial, Inc.

AXA Equitable pays sales compensation to both Distributors. In general, the Distributors will pay all or a portion of the sales compensation they receive from AXA Equitable to individual financial representatives or Selling broker-dealers. Selling broker-dealers will, in turn, pay all or a portion of the compensation they receive from the Distributors to individual financial representatives as commissions related to the sale of the contracts.

Sales compensation paid to AXA Advisors will generally not exceed 8.50% of the total contributions made under the contracts. AXA Advisors, in turn, may pay its financial professionals (or Selling broker-dealers) either a portion of the contribution-based compensation or a reduced portion of the contribution-based compensation in combination with ongoing annual compensation ("asset-based compensation") up to 1.20% of the account value of the contract sold, based on the financial professional's choice. Contribution-based compensation, when combined with asset-based compensation, could exceed 8.50% of the total contributions made under the contracts.

Sales compensation paid to AXA Distributors will generally not exceed 7.50% of the total contributions made under the contracts. AXA Distributors passes all sales compensation it receives through to the Selling broker-dealer. The Selling broker-dealer may elect to receive reduced contribution-based compensation in combination with asset-based compensation of up to 1.25% of the account value of all or a portion of the contracts sold through the broker-dealer. Contribution-based compensation, when combined with asset-based compensation, could exceed 7.50% of the total contributions made under the contracts. The sales compensation paid by AXA Distributors varies among Selling broker-dealers. AXA Distributors may also receive compensation and reimbursement for its marketing services under the terms of its distribution agreement with AXA Equitable.

The Distributors may also pay certain affiliated and/or unaffiliated Selling broker-dealers and other financial intermediaries additional compensation for certain services and/or in recognition of certain expenses that may be incurred by them or on their behalf (commonly referred to as "marketing allowances"). Services for which such payments are made may include, but are not limited to, the preferred placement of AXA Equitable and/or Accumulator® products on a company product list; sales personnel training; due diligence and related costs; marketing and related services; conferences; and/or other support services, including some that may benefit the contract owner. Payments may be based on the amount of assets or

purchase payments attributable to contracts sold through a Selling broker-dealer or, in the case of conference support, such payments may be a fixed amount. The Distributors may also make fixed payments to Selling broker-dealers in connection with the initiation of a new relationship or the introduction of a new product. These payments may serve as an incentive for Selling broker-dealers to promote the sale of particular products. Additionally, as an incentive for financial professionals of Selling broker-dealers to promote the sale of AXA Equitable products, the Distributors may increase the sales compensation paid to the Selling broker-dealer for a period of time (commonly referred to as "compensation enhancements"). Marketing allowances and sales incentives are made out of the Distributors' assets. Not all Selling broker-dealers receive these kinds of payments. For more information about any such arrangements, ask your financial professional.

The Distributors receive 12b-1 fees from certain portfolios for providing certain distribution and/or shareholder support services. The Distributors or their affiliates may also receive payments from the advisers of the portfolios or their affiliates to help defray expenses for sales meetings or seminar sponsorships that may relate to the contracts and/or the advisers' respective portfolios. In connection with portfolios offered through unaffiliated insurance trusts, the Distributors or their affiliates may also receive other payments from the advisers of the portfolios or their affiliates for providing distribution, administrative and/or shareholder support services.

In an effort to promote the sale of our products, AXA Advisors may provide its financial professionals and managerial personnel with a higher percentage of sales commissions and/or compensation for the sale of an affiliated variable product than it would the sale of an unaffiliated product. Such practice is known as providing "differential compensation." AXA Advisors may provide other forms of compensation to its financial professionals, including health and retirement benefits. In addition, managerial personnel may receive expense reimbursements, marketing allowances and commission-based payments known as "overrides." For tax reasons, AXA Advisors financial professionals qualify for health and retirement benefits based solely on their sales of our affiliated products.

These payments and differential compensation (together, the "payments") can vary in amount based on the applicable product and/or entity or individual involved. As with any incentive, such payments may cause the financial professional to show preference in recommending the purchase or sale of AXA Equitable products. However, under applicable rules of the NASD, AXA Advisors may only recommend to you products that they reasonably believe are suitable for you based on facts that you have disclosed as to your other security holdings, financial situation and needs. In making any recommendation, financial professionals of AXA Advisors may nonetheless face conflicts of interest because of the differences in compensation from one product category to another, and because of differences in compensation between products in the same category.

In addition, AXA Advisors may offer sales incentive programs to financial professionals who meet specified production levels for the sale of both affiliated and unaffiliated products which provide non-cash compensation such as stock options awards and/or stock appreciation rights, expense-paid trips, expense-paid educational seminars and merchandise.

Although AXA Equitable takes all of its costs into account in establishing the level of fees and expenses in its products, any compensation paid will not result in any separate charge to you under your contract. All payments made will be in compliance with all applicable NASD rules and other laws and regulations.

## (12) Incorporation of certain documents by reference

This section only applies if your contract offers fixed maturity options.

AXA Equitable's Annual Report on Form 10-K for the period ended December 31, 2005 (the "Annual Report") is considered to be part of this Supplement because it is incorporated by reference.

The Annual Report includes the audited consolidated financial statements of AXA Equitable at December 31, 2005 and 2004 and for each of the three years in the period ended December 31, 2005 (the "AXA Equitable Financial Statements"). The AXA Equitable Financial Statements are included in the Annual Report and incorporated by reference into this Supplement in reliance on the report of PricewaterhouseCoopers LLP, an independent registered public accounting firm. The AXA Equitable Financial Statements are also included in the Annual Report and incorporated by reference into this Supplement in reliance on the reports of KPMG LLP, an independent registered public accounting firm, on the consolidated financial statements of AllianceBernstein L.P. and on the financial statements of AllianceBernstein Holding L.P. (together, "Alliance") as of December 31, 2005 and 2004 and for each of the years in the three year period ended December 31, 2005, and on the reports of KPMG LLP on Alliance management's assessment of the effectiveness of internal control over financial reporting as of December 31, 2005.

KPMG LLP was Alliance's independent registered public accounting firm for each of the years in the three year period ended December 31, 2005. On March 8, 2006, KPMG LLP was terminated, and PricewaterhouseCoopers LLP was appointed as Alliance's independent registered public accounting firm, as disclosed on AXA Equitable's Report on Form 8-K filed on March 13, 2006. AllianceBernstein Corporation, an indirect wholly owned subsidiary of AXA Equitable, is the general partner of both AllianceBernstein L.P. and AllianceBernstein Holding L.P.

After the date of this Supplement and before we terminate the offering of the securities under this Supplement, all documents or reports we file with the SEC under the Securities Exchange Act of 1934 ("Exchange Act"), will be considered to become part of this Supplement because they are incorporated by reference.

Any statement contained in a document that is, or becomes part of this Supplement, will be considered changed or replaced for purposes of this Supplement if a statement contained in this Supplement changes or is replaced. Any statement that is considered to be a part of this Supplement

16