IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

AXA DISTRIBUTORS, LLC and   )
AXA ADVISORS, LLC,   )
  )
    Plaintiffs,   )
  )    **Case No. 1:08cv188**
  )
v.   )
  )
GAYLE S. BULLARD et al.,   )
  )
    Defendants.   )
  )

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Defendants hereby respond in opposition to the Plaintiffs' Motion for Preliminary Injunction filed June 27, 2008. Defendants' claims relate to the sales and marketing of the AXA Accumulator annuity. Plaintiff AXA Distributers unquestionably and indisputably had the responsibility for sales and marketing of the AXA Accumulator Annuity through third-party brokers. Here, it is undisputed that AXA Distributers provided all of the sales and marketing training and instruction to the broker that sold the product to Defendants, training and instructing her to sell and market the product on the basis of a liquidity feature and a guaranteed rate of return at the end of the annuity term. Those representations were fraudulent and Plaintiff AXA Distributers is liable to Defendants, at a

minimum, for its negligent training and supervision of the broker that sold the products to Defendants, for engaging in a device, scheme or artifice to defraud Defendants, and for engaging in a practice or course of business which operates as a fraud or deceit on Defendants. Because Plaintiff has unquestionably agreed to arbitrate claims arising out of its business activities or those of any person associated with it, Plaintiff's motion for preliminary injunction is due to be denied.[1]

## I. INTRODUCTION

Plaintiff cannot meet its burden for obtaining injunctive relief because Plaintiff agreed in advance, by joining FINRA, to arbitrate at FINRA all claims arising out of its business activities, and Defendants' claims unquestionably relate to Plaintiff's business activities. Defendants' claims of negligent training and supervision and fraud under the Alabama Securities Act arise out of Plaintiff's own actions in training and supervising Ann Holman on the sales and marketing of the Accumulator. Though Plaintiff would distract the Court with notions that AXA Equitable alone is liable to Defendants because AXA Equitable issued the policies and drafted the prospectuses, AXA Distributors is liable to Defendants because Defendants allege fraud in the sale and marketing of the product, for which

---

[1] Hereinafter, Defendants will refer only to Plaintiff AXA Distributors, LLC ("Plaintiff").

Plaintiff undeniably retained responsibility. AXA Distributors, not AXA Equitable, trained brokers to provide fraudulent misrepresentations on the Accumulator annuity and to sell the Accumulator based upon a liquidity feature and a guaranteed rate of return at the end of term. Because AXA Equitable refuses to honor the contracts as sold, Plaintiff is liable to Defendants for its own actions in negligently training and supervising the brokers selling the product, in engaging in a device, scheme or artifice to defraud and in engaging in an act, practice, or course of business which operated as a fraud or deceit upon Defendants in training, instructing, and supervising brokers to make fraudulent misrepresentations to induce sales of the Accumulator. Because Plaintiff agreed to arbitrate any claims relating to its business activities, and its business activities were undisputably to provide the training and supervision for the sales and marketing of the Accumulator through third-party brokers, Plaintiff cannot show irreparable harm or likelihood of success on the merits for the arbitration of claims relating to their activities relating to the sale and marketing of the Accumulator. Accordingly, the Motion for Preliminary Injunction is due to be denied.

Further, Plaintiff agreed in advance to arbitrate any claims arising out of the business activities of its associated persons, as that term is defined under the NASD Code. The broker here, Ann Holman, was unquestionably an associated person of Plaintiff. It is undisputed that Plaintiff trained and supervised Ann

Holman on the Accumulator product and *controlled* the way in which she sold the product. Plaintiff argues that it did not control Ann Holman, but provides no evidence or testimony to contradict the sworn statement of Ann Holman.

Contrary to Plaintiff's suggestion, Eleventh Circuit precedent is clear that a "customer" is simply a non-broker/dealer. Further, Plaintiff does not deny anything Defendants have said demonstrating that the claims arise in connection with Plaintiff's business activities.

Plaintiff does not deny that, under clearly established Alabama law, an arbitration agreement that "incorporates rules that provide for the arbitrator to decide issues of arbitrability clearly and unmistakably evidences the parties' intent to arbitrate the scope of the arbitration provision." *Citifinancial Corp., LLC v. Peoples*, 973 So. 2d 332 (Ala. 2007). Because Plaintiff, as a member of FINRA, agreed in advance that the NASD Director alone would decide issues of arbitrability and the appropriateness of the forum for the claims alleged, the issue of arbitrability in this case is for FINRA to decide.

Even assuming this Court should determine the issue of arbitrability, the Plaintiff must be compelled to arbitrate the claims because Plaintiff does not deny that it provided all of the training and supervision to Ann Holman on the product and was responsible for sales and marketing of the product. Defendants have brought claims for misrepresentation, suppression, negligent training and

supervision, and Alabama Securities Fraud, among other claims, in relation to Plaintiff's marketing and training activities in sales of the AXA products to Defendants. Plaintiff wants to list all that it did not do in relation to the contracts, but by its own literature, Plaintiff concedes it was responsible for training, marketing, and sales, and that it received a commission on *each sale* of an AXA contract, including those to Defendants.

The AXA companies play a shell game, attempting to avoid responsibility at the Financial Industry Regulatory Association ("FINRA") for the AXA companies' fraudulent sales of variable annuities. The AXA companies are set up in such a way that the issuer, AXA Equitable, the products' creator, is an insurance company not registered as a broker-dealer with FINRA. Plaintiff AXA Distributors, LLC (hereinafter "Plaintiff" or "AXA Distributors"), which does all of the marketing for the annuities and through which all of the annuities are sold by third-party brokers, is a member of FINRA, but it argues that it cannot be responsible to end-customers who purchase the products through third-party brokers because it does not issue the securities or broker them directly. However, AXA Distributors exists solely to facilitate the sales of AXA products, and it is involved in each and every sale of the AXA annuities. Accordingly, Plaintiff's motion for preliminary injunction is due to be denied because it cannot show irreparable harm in being compelled to arbitrate claims arising from its own

5

activities or the activities of Ann Holman in selling and marketing the Accumulator annuity or demonstrate a likelihood of success on the merits that it did not agree to arbitrate claims relating to its own activities and those of Ann Holman in selling the Accumulator.

Plaintiff wholesaler is a member of FINRA for a reason; its activities are regulated by FINRA for the protection of customers. *See, e.g.,* NASD Code 2820(e) (Requiring member firms to sell variable annuities through selling agreements with other member firms if they are to sell such annuities indirectly); Section 15 of the Securities Exchange Act of 1934, 15 U.S.C. § 78o (requiring all securities to be sold through registered broker-dealers who are members of a self-regulatory organization). Its membership also links the responsible party, where the issuer parent company is not a FINRA member, to the self-regulatory organization. Plaintiff's membership in FINRA prevents the kind of shell game whereby the originator of the securities avoids regulation and liability. Requiring Plaintiff to arbitrate this dispute will not, as Plaintiff argues, upset the reasonable expectations of FINRA members – Plaintiff exists to market and otherwise facilitate sales of AXA variable annuity products to end customers like Defendants. Plaintiff must expect to be held accountable by those end customers before FINRA for its activities regarding the sales and marketing of those products. Plaintiff's membership in FINRA requires it to arbitrate disputes brought by

6

customers involving claims in connection with Plaintiff's business, and Plaintiff must reasonably anticipate that the FINRA Director will determine, under the NASD Code, whether such claims are arbitrable and whether the forum is appropriate.

## II. STATEMENT OF FACTS

On January 30, 2008, Defendants brought claims against Plaintiff before FINRA, alleging fraud, suppression, negligent training and supervision, breach of contract, conversion, Alabama Securities Fraud, and unsuitable investment/suitability review.   Statement of Claim, Exhibit A to Doc. 13. Defendants allege they were induced to purchase the AXA Accumulator annuity based upon misrepresentations of material fact, including that the annuity provided liquidity and a guaranteed rate of return at the end of term.  See Statement of Claim p. 5 at lines 13-16, p. 6 at lines 6-9.  Defendants allege that the true nature of the investment was suppressed and that their inquiries were deflected with additional misrepresentations relating to their account statements.  Statement of Claim p. 7 lines 4-7.   Defendants allege Plaintiff negligently trained and supervised Ann Holman and failed to detect and/or deter the misrepresentations.  Statement of Claim, p. 9, lines 13-16.  They allege Plaintiff employed "a device, scheme or artifice to defraud, making untrue statements of material fact or omitting to state a material fact necessary in order to make the statements made . . . not misleading"

in engaging in sales practices aimed at fraudulently inducing the sale of the Accumulator annuity.  Statement of Claim, p. 10, lines 15-16, p. 11, lines 1-3.

It is undisputed that Ann Holman was the broker for the Accumulator contracts at issue and that Plaintiff provided all the training Ann Holman received on the Accumulator products.  Holman Aff., Exhibit B to Motion to Dismiss, ¶ 5. Plaintiff conducted all the seminars Ms. Holman attended, explained the product to her, told her how to sell it, answered her questions, and "very much controlled how [she] sold the product to [her] clients."  *Id*.  Plaintiff provided her with all the literature and prospectuses that came into her possession on the product, and instructed her how to interpret the literature and the statements.  *Id*.  Plaintiff represented to Ms. Holman that the Accumulator products "provided liquidity and a guaranteed rate of return at the end of the annuity term."  *Id*. ¶ 7.  Ms. Holman passed on to her clients the representations Plaintiff made to her.  *Id*. ¶ 5.  Ms. Holman called Plaintiff several times to confirm she was selling the product correctly.  *Id*.  Plaintiff denies none of these facts in its Opposition to the Motion to Dismiss or in its Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Injunction.  Further, as cited in the Motion to Dismiss, pp. 19-26, Plaintiff thus undertook a duty to train and supervise her, even if it had no preexisting duty to do so.

Plaintiff's own literature makes clear that it was a directly involved, responsible party in each and every contract sale and in the overall marketing and sales of the products. In addition to the literature cited in Defendants' motion to dismiss,[2] the 2006 Supplement to the prospectuses reiterates AXA Distributors' involvement and financial interest in each and every sale of an AXA annuity, including those sold by third-party brokers who had selling agreements with AXA Distributors. Exhibit A at 15-16, section 11. AXA Equitable pays AXA Distributors on each contract, and AXA Distributors receives a commission from AXA Equitable whenever a Selling broker-dealer sells a contract. *Id.* AXA Distributors, in turn, pays a commission to the broker-dealer. *Id.* In addition to its per-contract compensation, AXA Distributors can receive compensation and reimbursement from AXA Equitable for its marketing services. Exhibit A at 15, section 11, lines 24-25. AXA Distributors is authorized by AXA Equitable to provide "incentives" for those selling the contracts to promote the sale of AXA Equitable products, but must pay for those out of its assets. *Id.* at p. 16, lines 2-6.

---

[2] *See* Equitable Income Manager Prospectus, Exhibit F to Motion to Dismiss; Letter dated March 2, 2000 from Greg Brakovich, Managing Director of Equitable Distributors, Inc. (now AXA Distributors, LLC) to Ann S. Holman, attached as Exhibit H to Motion to Dismiss (letter sent with each new account, thanking the representative for the business and offering support, an information package, and marketing materials and assistance).

All of the AXA variable annuity contracts (not sold directly by AXA Distributors or AXA Advisors) were sold by third party brokers pursuant to a selling agreement between AXA Distributors and the brokerage firms. *See* "Accumulator Series Combination variable and fixed annuity," May 1, 2006, at p. 15, section 11, lines 9-11, attached hereto as Exhibit A ("The contracts are sold by . . . financial professionals of both affiliated and unaffiliated broker-dealers that have entered into selling agreements with the Distributors ("Selling broker-dealers").").

## III.    LEGAL BACKGROUND

The present action is before this federal Court under its diversity jurisdiction; thus, Alabama state law governs the substantive law of the case. *Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc.*, 420 F.3d 1317, 1326 n.5 (11th Cir. 2005) (noting state law governs in diversity cases).

Whether there is an agreement to arbitrate a given matter is an issue to be determined under state contract law, *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995), and all doubts must be resolved in favor of arbitration, *see Carroll v. W.L. Petrey Wholesale Co., Inc.*, 941 So. 2d 234, 236-37 (Ala. 2006). Similarly, the issue of whether the parties have agreed, in an arbitration agreement, to arbitrate the issue of arbitrability, is determined as a matter of state contract law upon a showing of clear and unmistakable evidence of intention to arbitrate the issue of arbitrability. *See Kaplan*, 514 U.S. at 944. Thus, it is true there is a

different standard for the question of *who* decides the issue of whether the parties agreed to arbitrate than for the broader question of *whether* the parties have agreed to arbitrate given matters in dispute. However, as Defendants have argued in their Motion to Dismiss, the NASD Code, which constitutes the arbitration agreement here, clearly and unmistakably provides for the parties to submit arbitrability disputes to the NASD Director.

If the Court determines that it and not the FINRA Director, is the proper determiner of arbitrability and moves on to the issue of whether the parties agreed to arbitrate these claims, it must, as with the issue of arbitrability, interpret the NASD Code as it would a contract under applicable law. *See Multi-Financial Securities Corp. v. King*, 386 F.3d 1364, 1387 (11th Cir. 2004) (citing *Terry v. Thomas*, 482 U.S. 483, 492 n.9 (1987). On this issue the Federal Arbitration Act ("FAA") creates a strong presumption in favor of arbitrability so that parties must clearly express their intent to exclude categories of claims from their arbitration agreement.[3] *See Ivax Corp. v. B. Braun of America, Inc.*, 286 F.3d 1309, 1320 (11th Cir. 2002); *Paladino v. Avnet Computer Techs, Inc.*, 734 F.3d 1054, 1057 (11th cir. 1998); *Brown v. ITT Consumer Financial Corp.*, 211 F.3d 1217, 1222

---

[3] The FAA applies to disputes such as this one involving sales of securities because they relate to interstate commerce. *Prudential Securities Inc. v. Hornsby*, 865 F. Supp. 447, 449 (N.D. Ill. 1994) ("It is axiomatic that the purchase and sale of securities relates to interstate commerce.") (citing *Austin Municipal Secur., Inc. v. NASD*, 757 F.2d 676, 697 (5th Cir.1985)).

(11th Cir. 2000) (reh'g denied); *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration . . . ."). Under the FAA, there is such a strong presumption in favor of arbitration that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Carroll v. W.L. Petrey Wholesale Co., Inc.*, 941 So. 2d 234, 236-37 (Ala. 2006) (internal quotations omitted). *See also Blue Cross Blue Shield of Alabama v. Rigas*, 923 So. 2d 1077, 1085-86 (Ala. 2005).

## IV.   STANDARDS OF REVIEW

A motion for preliminary injunction should only be granted when the moving party demonstrates "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction were not granted, (3) that the threatened injury to the plaintiff outweighs the harm an injunction may cause the defendant, and (4) that granting the injunction would not disserve the public interest." *Am. Red Cross v. Palm Beach Blood Bank, Inc.*, 143 F.3d 1407, 1410 (11th Cir. 1998). All four factors must be satisfied because a "preliminary injunction is an ***extraordinary*** and ***drastic*** remedy not to be granted unless the movant clearly carries the burden of persuasion as to the four prerequisites."

*United States v. Jefferson County,* 720 F.2d 1511, 1519 (11th Cir. 1983) (emphasis added). In balancing the likelihood of success on the merits against the injury to the party seeking the injunction, "a sliding scale can be employed, balancing the hardships associated with the issuance or denial of a preliminary injunction with the degree of likelihood of success on the merits." *Fla. Medical Ass'n, Inc. v. U.S. Dept. of Health, Education, & Welfare,* 601 F.2d 199, 203 n.2 (5th Cir. 1979). Here, Plaintiff cannot demonstrate that it has a substantial likelihood of success on the merits, as set forth below, and the Motion for Preliminary Injunction is due to be denied.

## V. LEGAL ARGUMENT

### A. Plaintiff Cannot Demonstrate Irreparable Harm or Likely Success on the Merits Because it Agreed in Advance that the NASD Director Shall Determine the Issue of Arbitrability.

Plaintiff cannot meet its burden for a preliminary injunction because Plaintiff will not be harmed by arbitrating a matter it agreed in advance to arbitrate and it is unlikely it could succeed on the merits.

Plaintiff bases its "irreparable harm" claim on the assertion that there is no "express" signed arbitration agreement between the parties, but it admits that it is a member of FINRA, and as such, as set forth in Defendants' Motion to Dismiss, it has agreed in a broad and open-ended manner to arbitrate all disputes with customers that relate to its business activities under the FINRA Code of

13

Arbitration. *See MONY Securities Corp. v. Bornstein*, 390 F.3d 1340, 1342 (11th Cir. 2004) (holding that even if there is no direct written agreement to arbitrate, the NASD Code itself serves as a sufficient agreement to arbitrate, binding its members to arbitrate a variety of claims with customers and third parties, and quoting *Multi-Financial Sec. Corp. v. King*, 386 F.3d 1364, 1366 (11th Cir. 2004)). Part of the agreement to which Plaintiff agreed in advance provided that the NASD Director should determine issues of arbitrability and appropriateness of the forum, and the Court must honor that agreement.

The Alabama Supreme Court has made clear that an arbitration agreement that "***incorporates rules*** that ***provide for the arbitrator to decide issues of arbitrability*** clearly and unmistakably evidences the parties' intent to arbitrate the scope of the arbitration provision." *Citifinancial Corp., LLC v. Peoples*, 973 So. 2d 332 (Ala. 2007) (emphasis added). The Plaintiff has agreed to be bound by the NASD Code, which clearly provides for the Director of NASD to determine the issue of appropriateness of the FINRA forum. Under the NASD Code as adopted for cases filed on or after April 16, 2007, upon motion, the Director of NASD Dispute Resolution (the "Director") may "decline to permit the use of the arbitration forum if the Director determines that, given the purposes of NASD and the intent of the Code, the subject matter of the dispute is inappropriate . . . ." Rule 12203; *see also* Rule 12503(c)(1). Further, "[*o]nly* the Director or the President of

14

the NASD Dispute Resolution may exercise the Director's authority under [Rule 12203]." *See id* (emphasis added). Thus, the NASD Code specifically provides for the Director, and only the Director, to decide whether or not the subject matter of the dispute falls within the parameters of the NASD Code and is properly before FINRA.

Defendant customers have voluntarily put themselves under that same NASD Code of Arbitration by virtue of filing their claims before FINRA, and thus the NASD Code is the valid arbitration agreement between the parties for purposes of the Defendants' claim. *See* NASD Code § 12200. The Code provides, in pertinent part:

> Parties must arbitrate a dispute under the Code if:
> · Arbitration under the Code is either:
>> (1) Required by a written agreement, or
>> (2) ***Requested by the customer***;
> • The dispute is between a customer and a member or associated person of a member; and
> • The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

NASD Code § 12200 (Emphasis added). As discussed above, the NASD Code specifically provides for the Director of NASD to determine the issue of arbitrability and the appropriateness of the forum. Thus, Plaintiff would suffer no

irreparable harm because it has a venue, to which it has agreed in advance, in which to challenge the appropriateness of the FINRA forum for this arbitration.

**B. Plaintiff Cannot Prove Likely Success on the Merits or Irreparable Harm Because Defendants' Claims are Appropriate for Arbitration Before FINRA.**

It is for the FINRA Director to determine arbitrability and the appropriateness of the FINRA arbitration forum under the NASD Code. However, should the Court determine it is to decide the issue of arbitrability, the only unresolved issues here are (1) whether the arbitration agreement applies between these parties (specifically, whether Defendants are "customers" under the Code and can form the other party to the agreement) and (2) whether the Defendants' FINRA claims arise in connection with the business activities of Plaintiff or its associated person (and, thus, whether Ann Holman meets the definition of "Associated Person" in the Code).    And, any doubts concerning arbitrability of the issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or any other defense to arbitrability. *See Carroll v. W.L. Petrey Wholesale Co., Inc.*, 941 So. 2d 234, 236-37 (Ala. 2006) (internal quotations omitted). *See also Blue Cross Blue Shield of Alabama v. Rigas*, 923 So. 2d 1077, 1085-86 (Ala. 2005).

16

### 1. Defendants are Customers Under the NASD Code and Entitled to Arbitrate.

Plaintiff contends it will be irreparably harmed by being required to arbitrate Defendants' claims because Defendants are not in privity of contract with Plaintiff, and, therefore, Defendants are not its "customers." However, nothing in the Code or the Eleventh Circuit case law requires privity of contract rather than a situation like this one in which the claimants are end-customers damaged by the FINRA member's fraudulent marketing and training activities. And the Code definition, and its interpretation by the Eleventh Circuit, is broad. Thus, as demonstrated below and in Defendants' Motion to Dismiss, Plaintiff cannot succeed on a theory that Defendants are not "customers" under the Code. Its success on the merits of this issue is unlikely at best, and a preliminary injunction should not issue.

As Defendants stated previously in their Motion to Dismiss, the NASD Code defines "customer" simply and broadly: "A customer shall not include a broker or a dealer." *See* NASD Code 12100(i). Plaintiffs do not allege that Defendants are either brokers or dealers. Thus, it is undisputed that Defendants are "customers" as plainly defined under the Code. Defendants purchased the products that Plaintiff marketed and sold wholesale and were damaged as a result of Plaintiff's sales and marketing tactics, including training and supervising brokers in providing fraudulent misrepresentations. Nothing in the Code requires Plaintiff to be a

17

signatory to the contract with the end-customer in order to be liable for the damages it has caused in that very transaction, for which it received a commission and which it marketed.

Eleventh Circuit jurisprudence is in accord, recognizing that the NASD Code does *not* define "customer" as a party that has engaged in direct transactions with a member or state that the party must be a customer *of* a member and holding that it is bound by the broad language of the Code. *See Multi-Financial Securities Corp. v. King*, 386 F.3d 1364, 1368 (11th Cir. 2004) (noting, after a review of all other NASD Rules defining "customer," that it is the NASD's "clear and unambiguous choice to leave the term as defined generally" and holding a party satisfied the "customer" requirement under the NASD Code because she was not a broker or a dealer, "even though she may not have been a direct customer of" the member); *MONY*, 390 F.3d 1340, 1344 ("[W]e are bound by the plain language of the Code, which defines 'customer' to include anyone who is not a broker or a dealer"); *see also California Fina Group, Inc. v. Herrin*, 379 F.3d 311 (5th Cir. 2004); *O.N. Equity Sales Co. v. Cattan*, 2008 WL 361549 (S.D. Tex. Feb. 8, 2008); *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 59 (2d Cir. 2001) (rejecting the plaintiff's argument that the defendants must be customers *of* the firm directly rather than of an associated person, and stating that it would be compelled to find in favor of arbitration even if the plaintiff created an ambiguity as to the

18

definition).   Thus, Plaintiff's argument that Defendants are not "customers of" Plaintiff is irrelevant under the NASD Code and prevailing Eleventh Circuit jurisprudence.  *Cf.* Pls. Br. at ¶25 *with* NASD Code 12100(i).

Contrary to Plaintiff's suggestion, both *MONY v. Bornstein* and *Multi-Financial Securities Corp. v. King* support Defendants' position that a direct privity relationship is not necessary in order for a claimant to be a customer under the FINRA rules.   In *King*, the plaintiff argued that the investor "was not *its* customer."  386 F.3d at 1368 (emphasis in original).   The Eleventh Circuit flatly rejected that argument, holding that the Rules "unambiguously provide that [the investor] is a customer as long as she is not a broker or dealer; ***nothing in the Code directs otherwise or requires more***."  *Id.*  (Emphasis added).   The Eleventh Circuit went further, explaining that "[e]nforcing the limitation [the plaintiff] seeks would be tantamount to reading language into the Code that is conspicuously absent. Other inapplicable NASD rules do make a distinction between customers generally and customers of the member," demonstrating the obvious intention to keep the definition broad.  *Id.*  In *MONY*, the Court reiterated its conclusion in *King*, stating that it is "bound by the plain language of the Code, which defines 'customer' to include anyone who is not a broker or a dealer."  390 F.3d at 1344.    Thus, an investor does not have to be a "direct customer" to be included in the NASD

19

Code's definition of "customer" eligible to bring a claim before the arbitration panel.

The fact that the Plaintiff is a distributor/wholesaler and thus one more step up from the brokerage firm is immaterial to the definition of "customer" under the Code and certainly here, where it was Plaintiff's own actions that damaged the end-customers. The facts set forth in the Statement of Facts above, as well as those discussed throughout Defendants' Motion to Dismiss, demonstrate that Defendants are "customers" of Plaintiff because of Plaintiff's direct involvement and financial interest, indeed direct payment, in each contract sale to Defendants. Plaintiff's involvement with and awareness of each customer and sale was much greater than in *MONY* or *John Hancock*, in which the plaintiff was not even aware of the existence of the customer or the transaction. Here, Plaintiff trained the selling brokers, provided them with sales and marketing materials, received a commission on their sales, a portion of which it passed to the selling brokers, sent the brokers each customer's account certificate and information package, and provided post-sale support. Plaintiff was aware of and involved with each sale and each customer. *See* Section II, *supra*, and Motion to Dismiss, section IV.B.2.c.

Plaintiff attempts to apply *Wheat, First Securities, Inc. v. Green*, 993 F.2d 814, 816 (11th Cir. 1994) to support a more narrow definition of "customers." However, the Eleventh Circuit has limited *Wheat First*, decided ten years prior to

20

*MONY*, to situations involving an issue of timing of the customer relationship. *MONY Securities Corp. v. Bornstein*, 390 F.3d at 1345 (construing *Wheat First* as "holding only that customer status for purposes of the NASD is determined as of the time of the events providing the basis for the allegations of fraud. In other words, Wheat discussed timing for investors who were harmed by the firm's successor in interest.") (internal quotation marks and citation omitted). Because the timing of events is not at issue here, *Wheat First* is likewise inapplicable.

### 2. Defendants Are Entitled to Arbitrate Their Claims Because They Arise in Connection with Plaintiff's Business Activities.

Defendants cannot demonstrate irreparable harm in being required to arbitrate where Plaintiff's own business activities led directly to the claims Defendants have brought before FINRA. AXA Distributors was AXA Equitable's responsible NASD member, enabling the sale of the products through third-party brokers to the end customers. *See, e.g.,* Accumulator Certificate Summary, Exhibit C to Motion to Dismiss ("Accumulator is issued by the Equitable Life Assurance Society of the United States and distributed by Equitable Distributors, Inc. (member NASD)."); *see also* BrokerCheck Report, Exhibit A to Motion to Dismiss. As Defendants discuss in greater detail in their Motion to Dismiss, Section IV.B.2., it is undisputed that Plaintiff had the responsibility for marketing and sales for AXA Equitable contracts through non-affiliated, third-party brokers.

21

*See* Exhibit A at 15-16, section 11.  It is undisputed that Plaintiff provided the training on the product and on how to sell the product at issue, which sales techniques give rise to the dispute in the *Bullard* arbitration.  Holman Affidavit, Exhibit B to Motion to Dismiss, § 5.  Thus, the business that gave rise to Defendants' claims against Plaintiff was Plaintiff's primary business.  And, it is undisputed that Plaintiff received compensation from AXA Equitable, the issuer, for each sale, whether direct or through a broker like Ann Holman.  See Statement of Facts, *supra*; Exhibit A at 15-16, section 11.

Each of the claims in Defendants' Statement of Claim is in connection with the business activities of Plaintiff.  *See* Statement of Claim, Exhibit A to Doc. 13. The Alabama Securities Act imposes liability for indirect practices, and here, the misleading and deceptive way in which Plaintiff trained people resulted in fraud on the Defendants.  Defendants have also alleged negligent training and supervision; having undertaken a duty to act, Plaintiff had a duty to do so responsibly, and Plaintiff does not deny that it trained Ann Holman on the product, as she asserts in her affidavit.  Holman Affidavit, Exhibit B to Motion to Dismiss, ¶¶ 5, 7. Accordingly, Plaintiff fails to meet its burden of demonstrating irreparable harm, because the Defendants' claims arise out of Plaintiff's business activities.

22

### 3. Defendants are Entitled to Arbitrate Their Claims Because They Arise In Connection With the Business of AXA Distributors' Associated Person, Ann Holman.

Defendants cannot demonstrate any harm in being required to arbitrate claims relating to the business of Ann Holman in selling and marketing the Accumulator annuity, because, as demonstrated in Defendants' Motion to Dismiss and Reply, Ms. Holman was unquestionably an "associated person" of Plaintiff as defined under the Code. And, Plaintiff agreed, upon joining FINRA, to arbitrate any claims arising from the business activities of its associated persons. Thus, it is unlikely Plaintiff could succeed on the merits or would suffer irreparable harm.

While it is clear that the claims arise in connection with Plaintiff's business activities, they also arise in connection with the business activities of Plaintiff's associated person, as that term is defined in the NASD Code. That connection is discussed in detail in Defendants' Motion to Dismiss, section IV.B.2.b.(2), pp. 17-22, as well as in section III.C.2, pp. 10-13, of their Reply in support of the Motion to Dismiss. Defendants hereby incorporate those sections by reference as if fully set out herein.

As set forth in those filings, because Ann Holman was indisputably controlled by Plaintiff for the purposes of the sale and marketing of the Accumulator product, she was the associated person of Plaintiff for the purposes of the sale and marketing of the Accumulator. As Ms. Holman has testified, she was

23

controlled by AXA Distributors in the sale and marketing of the Accumulator products. Holman Aff. at ¶ 5, Exhibit B to Defendants' Motion to Dismiss. While Plaintiff argues that it did not control Ms. Holman, it has proffered no evidence or testimony to refute Ms. Holman's testimony that AXA Distributors controlled "how she sold the product to her clients," that she sold the product "exactly as she was trained by AXA Distributors," and that she passed on to her clients "the representations that were made to [her] by AXA Distributors." Holman Aff. at ¶ 5, Exhibit B to Defendants' Motion to Dismiss. Ann Holman fulfills the plain definition of "person associated with a member" in the NASD Code as to Plaintiff. Because Ann Holman is unquestionably a "person associated with" Plaintiff for the purpose of the sale and marketing of the Accumulator, Plaintiff is bound to arbitrate any claims relating to her business activities in selling and marketing of the Accumulator annuity. Thus, the Plaintiff's likelihood of success on the merits is doubtful, at best, and a preliminary injunction should not issue in this case.

## VI.    CONCLUSION

For the reasons set forth above and for the reasons set forth in Defendants' Motion to Dismiss, Defendants' claims against Plaintiff are arbitrable before FINRA and Plaintiff's Motion for Preliminary Injunction must be denied. Plaintiff is therefore unlikely to succeed on the merits of its case, and it would suffer no irreparable harm in being compelled to arbitrate Defendants' claims.

Respectfully Submitted,


/s/ Caroline Smith Gidiere
One of the Attorneys for Defendants

Andrew P. Campbell
Caroline Smith Gidiere
Campbell, Gidiere, Lee, Sinclair
    and Williams, PC
2100A SouthBridge Parkway, Suite 450
Birmingham, Alabama  35209
(205) 803-0051
Fax: (205) 803-0053
acampbell@cgl-law.com
cgidiere@cgl-law.com

M. Dale Marsh
Mash, Cotter & Stewart, LLP
P. O. Box 310910
Enterprise, Alabama 36331
334-347-2626
Fax:  334-393-1396
mdm@enterpriselawyers.com

25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 23, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Andrea Morgan Greene, Esq.
Armistead Inge Selden, III, Esq.
John Norman Bolus, Esq.
**MAYNARD, COOPER, & GALE, P.C.**
1901 Sixth Avenue North
2400 AmSouth/Harbert Plaza
Birmingham, AL  35203

<u>/s/ Caroline Smith Gidiere</u>
Of Counsel

26

# EXHIBIT A



**AXA EQUITABLE**

*May 1, 2006*

# ACCUMULATOR® SERIES

*Combination variable and fixed annuity*

This booklet contains our privacy
policy, product prospectus
supplement, EQ Advisors Trust and
AXA Premier VIP Trust prospectuses
and other important information
regarding your insurance contract.



Issued by AXA Equitable Life Insurance Company

After your contract has been issued, additional contributions may be transmitted by wire.

## (9) Certain information about our business day

A business day, generally, is any day on which the New York Stock Exchange is open for trading. A business day does not include any day we close not to open due to emergency conditions. We may also close early due to emergency conditions. Our business day generally ends at 4:00 p.m. Eastern Time for purposes of determining the date when contributions are applied and any other transaction requests are processed. Contributions will be applied and any other transaction requests will be processed when they are received along with all the required information.

If we have entered into an agreement with your broker-dealer for automated processing of contributions upon receipt of customer order, your contribution will be considered received at the time your broker-dealer receives your contribution and all information needed to process your application, along with any required documents, and transmits your order to us in accordance with our processing procedures. Such arrangements may apply to initial contributions, subsequent contributions, or both, and may be commenced or terminated at any time without prior notice. If required by law, the "closing time" for such orders will be earlier than 4 p.m., Eastern Time.

For more information, including additional instances when a different date may apply to your contributions, please see "More Information" in your prospectus.

## (10) Legal proceedings

AXA Equitable and its affiliates are parties to various legal proceedings. In our view, none of these proceedings would be considered material with respect to a contract owner's interest in Separate Account Nos. 45 and 49, respectively, nor would any of these proceedings be likely to have a material adverse effect upon either Separate Account, our ability to meet our obligations under the contracts, or the distribution of the contracts.

## (11) Distribution of the contracts

The contracts are distributed by both AXA Advisors, LLC ("AXA Advisors") and AXA Distributors, LLC ("AXA Distributors") (together, the "Distributors"), which serve as principal underwriters of Separate Account Nos. 45 and 49, respectively. The offering of the contracts is intended to be continuous.

AXA Advisors (the successor to EQ Financial Consultants, Inc.), an affiliate of AXA Equitable, and AXA Distributors, an indirect wholly owned subsidiary of AXA Equitable, are registered with the SEC as broker-dealers and are members of the National Association of Securities Dealers, Inc. ("NASD"). Their principal business address is 1290 Avenue of the Americas, New York, NY 10104. Both broker-dealers also act as distributors for other AXA Equitable annuity products. AXA Distributors is a successor by merger to all of the functions, rights and obligations of Equitable Distributors, Inc. ("EDI"). Like AXA Distributors, EDI was owned by Equitable Holdings, LLC.

The contracts are sold by financial professionals of AXA Advisors and its affiliates and by financial professionals of both affiliated and unaffiliated broker-dealers that have entered into selling agreements with the Distributors ("Selling broker-dealers"). The Distributors are under the common control of AXA Financial, Inc.

AXA Equitable pays sales compensation to both Distributors. In general, the Distributors will pay all or a portion of the sales compensation they receive from AXA Equitable to individual financial representatives or Selling broker-dealers. Selling broker-dealers will, in turn, pay all or a portion of the compensation they receive from the Distributors to individual financial representatives as commissions related to the sale of the contracts.

Sales compensation paid to AXA Advisors will generally not exceed 8.50% of the total contributions made under the contracts. AXA Advisors, in turn, may pay its financial professionals (or Selling broker-dealers) either a portion of the contribution-based compensation or a reduced portion of the contribution-based compensation in combination with ongoing annual compensation ("asset-based compensation") up to 1.20% of the account value of the contract sold, based on the financial professional's choice. Contribution-based compensation, when combined with asset-based compensation, could exceed 8.50% of the total contributions made under the contracts.

Sales compensation paid to AXA Distributors will generally not exceed 7.50% of the total contributions made under the contracts. AXA Distributors passes all sales compensation it receives through to the Selling broker-dealer. The Selling broker-dealer may elect to receive reduced contribution-based compensation in combination with asset-based compensation of up to 1.25% of the account value of all or a portion of the contracts sold through the broker-dealer. Contribution-based compensation, when combined with asset-based compensation, could exceed 7.50% of the total contributions made under the contracts. The sales compensation paid by AXA Distributors varies among Selling broker-dealers. AXA Distributors may also receive compensation and reimbursement for its marketing services under the terms of its distribution agreement with AXA Equitable.

The Distributors may also pay certain affiliated and/or unaffiliated Selling broker-dealers and other financial intermediaries additional compensation for certain services and/or in recognition of certain expenses that may be incurred by them or on their behalf (commonly referred to as "marketing allowances"). Services for which such payments are made may include, but are not limited to, the preferred placement of AXA Equitable and/or Accumulator® products on a company product list; sales personnel training; due diligence and related costs; marketing and related services; conferences; and/or other support services, including some that may benefit the contract owner. Payments may be based on the amount of assets or

purchase payments attributable to contracts sold through a Selling broker-dealer or, in the case of conference support, such payments may be a fixed amount. The Distributors may also make fixed payments to Selling broker-dealers in connection with the initiation of a new relationship or the intro-duction of a new product. These payments may serve as an incentive for Selling broker-dealers to promote the sale of particular products. Additionally, as an incentive for financial professionals of Selling broker-dealers to promote the sale of AXA Equitable products, the Distributors may increase the sales compensation paid to the Selling broker-dealer for a period of time (commonly referred to as "compensation enhancements"). Marketing allowances and sales incentives are made out of the Distributors' assets. Not all Selling broker-dealers receive these kinds of payments. For more information about any such arrangements, ask your financial professional.

The Distributors receive 12b-1 fees from certain portfolios for providing certain distribution and/or shareholder support services. The Distributors or their affiliates may also receive payments from the advisers of the portfolios or their affiliates to help defray expenses for sales meetings or seminar sponsorships that may relate to the contracts and/or the advisers' respective portfolios. In connection with portfolios offered through unaffiliated insurance trusts, the Distributors or their affiliates may also receive other payments from the advisers of the portfolios or their affiliates for provid-ing distribution, administrative and/or shareholder support services.

In an effort to promote the sale of our products, AXA Advisors may provide its financial professionals and managerial personnel with a higher per-centage of sales commissions and/or compensation for the sale of an affiliated variable product than it would the sale of an unaffiliated product. Such practice is known as providing "differential compensation." AXA Advisors may provide other forms of compensation to its financial profes-sionals, including health and retirement benefits. In addition, managerial personnel may receive expense reimbursements, marketing allowances and commission-based payments known as "overrides." For tax reasons, AXA Advisors financial professionals qualify for health and retirement benefits based solely on their sales of our affiliated products.

These payments and differential compensation (together, the "payments") can vary in amount based on the applicable product and/or entity or indi-vidual involved. As with any incentive, such payments may cause the financial professional to show preference in recommending the purchase or sale of AXA Equitable products. However, under applicable rules of the NASD, AXA Advisors may only recommend to you products that they rea-sonably believe are suitable for you based on facts that you have disclosed as to your other security holdings, financial situation and needs. In making any recommendation, financial professionals of AXA Advisors may nonetheless face conflicts of interest because of the differences in com-pensation from one product category to another, and because of differences in compensation between products in the same category.

In addition, AXA Advisors may offer sales incentive programs to financial professionals who meet specified production levels for the sale of both affiliated and unaffiliated products which provide non-cash compensation such as stock options awards and/or stock appreciation rights, expense-paid trips, expense-paid educational seminars and merchandise.

Although AXA Equitable takes all of its costs into account in establishing the level of fees and expenses in its products, any compensation paid will not result in any separate charge to you under your contract. All payments made will be in compliance with all applicable NASD rules and other laws and regulations.

## (12) Incorporation of certain documents by reference

This section only applies if your contract offers fixed maturity options.

AXA Equitable's Annual Report on Form 10-K for the period ended December 31, 2005 (the "Annual Report") is considered to be part of this Supplement because it is incorporated by reference.

The Annual Report includes the audited consolidated financial statements of AXA Equitable at December 31, 2005 and 2004 and for each of the three years in the period ended December 31, 2005 (the "AXA Equitable Financial Statements"). The AXA Equitable Financial Statements are included in the Annual Report and incorporated by reference into this Supplement in reliance on the report of PricewaterhouseCoopers LLP, an inde-pendent registered public accounting firm. The AXA Equitable Financial Statements are also included in the Annual Report and incorporated by reference into this Supplement in reliance on the reports of KPMG LLP, an independent registered public accounting firm, on the consolidated finan-cial statements of AllianceBernstein L.P. and on the financial statements of AllianceBernstein Holding L.P. (together, "Alliance") as of December 31, 2005 and 2004 and for each of the years in the three year period ended December 31, 2005, and on the reports of KPMG LLP on Alliance man-agement's assessment of the effectiveness of internal control over financial reporting as of December 31, 2005.

KPMG LLP was Alliance's independent registered public accounting firm for each of the years in the three year period ended December 31, 2005. On March 8, 2006, KPMG LLP was terminated, and PricewaterhouseCoopers LLP was appointed as Alliance's independent registered public accounting firm, as disclosed on AXA Equitable's Report on Form 8-K filed on March 13, 2006. AllianceBernstein Corporation, an indirect wholly owned subsidiary of AXA Equitable, is the general partner of both AllianceBernstein L.P. and AllianceBernstein Holding L.P.

After the date of this Supplement and before we terminate the offering of the securities under this Supplement, all documents or reports we file with the SEC under the Securities Exchange Act of 1934 ("Exchange Act"), will be considered to become part of this Supplement because they are incorporated by reference.

Any statement contained in a document that is, or becomes part of this Supplement, will be considered changed or replaced for purposes of this Supplement if a statement contained in this Supplement changes or is replaced. Any statement that is considered to be a part of this Supplement

AXA Equitable
Life Insurance Company

Mailing Address:
1290 Avenue of the Americas
New York, NY 10104

PRSRT BPM
U.S. POSTAGE
PAID
AXA EQUITABLE



# *S*TOP *Receiving This Document by Mail!*

## *Reduce Paper!*

Sign up for electronic delivery of documents online. Access and file documents online.
- *Go to www.axa-equitable.com*
- *Under the Your Documents Tab – Click "Enroll in Electronic Delivery" listed on the left side of screen*
- *Then follow the instructions that appear on screen*

**Enroll and log in to...**

➤ *Check Account Details*                    ➤ *Review Investment Performance*
➤ *Make Transfers among Investment Options*   ➤ *Change Your Address...and Much More*

```
****************************3-DIGIT 363
Pros-05-03A (5/06)
FLOYD STARLING
11485 COUNTY ROAD 65
ABBEVILLE AL 36310-6547
```

Pros-05-03A (5/06)                                                    ACCADLIF (Post)