**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| AXA DISTRIBUTORS, | ) | |
| LLC and AXA ADVISORS, LLC., | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | **CIVIL ACTION NO.:  1:08-cv-00188** |
| | ) | |
| GAYLE S. BULLARD, et al., | ) | |
| | ) | |
| **Defendants.** | ) | |

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR PRELIMINARY INJUNCTION**

AXA Distributors, LLC ("AXA Distributors") and AXA Advisors, LLC ("AXA Advisors") (collectively, "Plaintiffs") hereby submit this Reply in Support of Their Motion for Preliminary Injunction.[1]

## I.    INTRODUCTION

Throughout their briefs in this action, Defendants mischaracterize the evidence and misstate the facts in an attempt to avoid injunctive relief.  Defendants also falsely claim that "plaintiffs do not deny" certain "undisputed" evidence which forms the crux of Defendants' arguments that (1) they were customers of AXA Distributors and (2) their claims arise in connection with AXA Distributors' business activities.  For example, Defendants cite the following allegedly "undisputed" facts in support of their allegations:

---

[1] In their Motion to Dismiss, Defendants acknowledge that they erroneously named AXA Advisors as a respondent in the arbitration, and state that they "do not intend to pursue claims against AXA Advisors, LLC." *See* Defendants' Motion to Dismiss at p, 10, n. 3.  Likewise, in Defendants' Response to Plaintiffs' Motion for Preliminary Injunction, Defendants do not dispute that AXA Advisors is entitled to preliminary injunctive relief, and do not reference AXA Advisors in connection with their opposition to injunctive relief.  Accordingly, by their own admission, Defendants' claims in arbitration against AXA Advisors are due to be enjoined.  This Reply Memorandum will therefore only address Defendants' remaining claims against AXA Distributors, which are also due to be enjoined.  As discussed in section II. A., *infra*, any question as to whether AXA Advisors is entitled to the preliminary injunctive relief requested by the Plaintiffs is properly within this Court's jurisdiction. Thus, hereafter, any reference to "Plaintiff" specifically relates to AXA Distributors.

- "[I]t is undisputed that Defendants are "customers" as plainly defined under the Code." Defendants' Response to Motion for Preliminary Injunction at p. 17.

- "Plaintiff concedes . . . that it received a commission on each sale of an AXA contract, including those to Defendants." Defendants' Response to Motion for Preliminary Injunction at pp. 5 and 23.

- Ann Holman "was unquestionably an associated person of Plaintiff." Defendants' Response to Motion for Preliminary Injunction at p. 3.

- Plaintiffs' "business activities were undisputedly to provide the training and supervision for the sales and marketing of the Accumulator through third-party brokers." Defendants' Response to Motion for Preliminary Injunction at p. 3.

- "It is undisputed that Plaintiff trained and supervised Ann Holman on the Accumulator product and controlled the way in which she sold the product." Defendants' Response to Motion for Preliminary Injunction at pp. 3, 4.

Despite Defendants' representations to the contrary, each of these "undisputed facts" are both disputed and demonstrably false. Therefore, each of Defendants' arguments in opposition to Plaintiff's motion for preliminary injunction must fail.[2]

Defendants' mischaracterizations go a step further, attempting to couch this proceeding as a "shell game" through which AXA Equitable Life Insurance Company ("AXA Equitable") is attempting to avoid "securities regulation and liability" for the claims at issue. *See* Defendants' Response to Motion for Preliminary Injunction at pp. 3-5. While AXA Equitable (which is not a party to this case), AXA Distributors and AXA Advisors deny any liability to Defendants, that

---

[2] Indeed, Defendants themselves admit that testimony which they unambiguously define as "undisputed" is, actually, disputed. *See* Defendants' Reply in Support of Motion to Dismiss at p. 10 ("Ann Holman's undisputed testimony is that she was controlled by AXA Distributors . . . While Plaintiff argues that it did not control Ann Holman . . .").

has absolutely nothing to do with the sole issue before this Court; should that liability be adjudicated in court, where Defendants can bring their claims; or in arbitration, despite the absence of any agreement to arbitrate. Because Defendants were neither customers of AXA Distributors nor any of its associated persons, and their claims do not arise in connection with AXA Distributors' business activities, their claims in this proceeding must be adjudicated in court.

## II.    ARGUMENT

### A.    BINDING SUPREME COURT PRECEDENT, AS ADOPTED BY THE ELEVENTH CIRCUIT, CLEARLY DICTATES THAT THIS COURT, AND NOT THE DIRECTOR OF ARBITRATION, MUST DECIDE THE ISSUE OF ARBITRABILITY.

As stated, there is no actual or implied agreement to arbitrate between AXA Distributors and Defendants. Even assuming that FINRA rules did supply an agreement to arbitrate between the parties, this Court, and not the FINRA Director of Arbitration, has the responsibility to determine the preliminary issue of arbitrability. In the face of binding Supreme Court and Eleventh Circuit precedent to the contrary, Defendants argue that the Director of Arbitration should decide the issue of arbitrability. However, in *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cohen*, 62 F.3d 381, 383 (11th Cir. 1995), the Eleventh Circuit held that the provisions of the FINRA Code were "insufficient to override the presumption that courts determine arbitrability." *Cohen*, 62 F.3d at 384 (citing *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938 (1995)). Basing its decision on the presumption that courts are to decide the issue of arbitrability, the Eleventh Circuit in *Cohen* reversed the lower court's dismissal of Merrill Lynch's action to enjoin the arbitration proceeding.

In addition, the Eleventh Circuit disposed of Defendants' argument that that the federal

policy favoring arbitration applies to the question of who decides arbitrability:

> The Supreme Court has held that "due regard must be given to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself resolved in favor of arbitration." Nevertheless, the Supreme Court recently reiterated that this presumption in favor of arbitration is not applicable when the question to be resolved is who decides arbitrability: The law treats silence or ambiguity about the question "who (primarily) should decide arbitrability" differently from the way it treats silence or ambiguity about the question "whether a particular merits-related dispute is arbitrable because it is within the scope of a valid arbitration agreement" - for in respect to this latter question the law reverses the presumption. Thus, courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so.

*Id.*  (citing *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995); *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944-45 (1995); *AT&T Technologies, Inc. v. Comm. Workers of Am.*,  475 U.S. 643, 649 (1986)) (internal quotations and citations omitted).

Defendants argue that FINRA Rule 12203(a) divests this Court of its authority to decide the issue of arbitrability and instead places that authority in the hands of the FINRA Director of Arbitration.   FINRA Rule 12203(a), however, is inapplicable to this dispute on its face:

> The Director may decline to permit the use of the NASD arbitration forum if the Director determines that, given the purposes of NASD and the intent of the Code, the subject matter of the dispute is inappropriate, or that accepting the matter would pose a risk to the health or safety of arbitrators, staff, or parties or their representatives. Only the Director or the President of NASD Dispute Resolution may exercise the Director's authority under this rule.

Indeed, FINRA Rule 12203(a) gives the Director of Arbitration no power to determine arbitrability; it merely provides the Director of Arbitration with permissive authority to decline to permit the parties to arbitrate where a valid arbitration agreement otherwise exists.  As stated by the Eleventh Circuit in *Cohen*, the authority provided to the Director of Arbitration under

FINRA Rule 12203(a) may only come into play after this Court determines whether or not a valid arbitration agreement already exists.[3]  FINRA Rule 12203(a) is insufficient to overcome the overriding presumption that this Court must determine the issue of arbitrability.

*CitiFinancial Corp. LLC v. Peoples*, 973 So. 2d 332 (Ala. 2007) does not support the proposition that Plaintiffs somehow intended to arbitrate the issue of arbitrability.  *See* Defendants' Response to Motion for Preliminary Injunction at p. 14.  *CitiFinancial Corp.* involved an express written agreement by the parties that "the Expedited Procedures of the Commercial Arbitration Rules of the American Arbitration Association" ("AAA") governed the dispute.  973 So.2d at 334-35.  AAA Rule 8(a) was included in that agreement, and provided that "the arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement." *CitiFinancial Corp.*, 973 So.2d at 339.  *CitiFinancial Corp.* is irrelevant here because there is no rule applicable to this dispute that provides for an arbitrator to decide the issues of arbitrability, and as Defendants recognize, the FINRA Director of Arbitration is not an arbitrator.  Moreover, under *Cohen*, FINRA Rule 12203 does <u>not</u> provide clear or unmistakable evidence of the Plaintiff's intent that the Director of Arbitration decide the issue of arbitrability.  Accordingly, this Court, and only this Court, may decide the issue of the arbitrability of this case.

---

[3] Even then, "[t]he courts are not to twist the language of the contract to achieve a result which is favored by federal policy but contrary to the interest of the parties."  *Carroll v. W.L. Petrey Wholesale Co., Inc.*, 941 So.2d 234, 237 (Ala. 2006).

**B.      DEFENDANTS WERE NEVER CUSTOMERS OF AXA DISTRIBUTORS.**

Pursuant to Rule 12200 of the FINRA Code of Arbitration Procedure, member firms must arbitrate a dispute where it arises "between a *customer* and a member or associated person of a member; <u>and</u> the dispute arises in connection with the business activities of the member or the associated person." FINRA Code of Arbitration Procedure, Rule 12200 (emphasis added). Here, Defendants' Statement of Claim involves a dispute about annuities issued by AXA Equitable and sold to Defendants by Ann Holman - an associated person of Raymond James. Defendants were not customers of Plaintiffs, they were customers of Ann Holman and Raymond James. Accordingly, Defendants cannot satisfy the first part of FINRA Rule 12200's two-part test, and Defendants must be enjoined from pursuing their claims in arbitration.

**1.      Defendants' definition of "customer" contradicts the intent of FINRA rules and goes beyond the reasonable expectations of FINRA member firms.**

Defendants were never customers of AXA Distributors and do not point to any authority that demonstrates that they were customers of AXA Distributors. While Defendants argue that a broad interpretation should be applied to the meaning of the term "customer" under FINRA Rules, Defendants' arguments stretch far beyond any reasonable application or interpretation of NASD/FINRA Rules, the federal securities laws, and industry standards and practices. *See* Affidavit of John E. Pinto at ¶ 7, attached hereto as Exhibit A (hereafter, "Pinto Aff."). Defendants' interpretation of the rules further contravenes the reasonable expectations of FINRA member firms. *See Wheat, First Securities Inc. v. Green,* 993 F.2d 814 (11th Cir. 1993) (the interpretation of FINRA rules should not be so broad as to upset the reasonable expectations of FINRA member firms). Accordingly, Defendants' arguments in favor of a virtually unlimited (and unsupportable) definition of the term "customer" should be denied. *Wheat, First Securities Inc.*, 993 F.2d 814; *see also BMA Financial Svcs., Inc. v. Guin,* 164 F. Supp. 2d 813, 819 (W.D.

La. 2001) ("In other words, simply by becoming a NASD member, the firm would be agreeing to arbitrate the claims of *any* person who purchased an investment, not just the claims of *their* customers, or the claims of *their* associated persons' customers. Such a boundless definition would surely upset the reasonable expectations of NASD members. Furthermore, this definition has been - at the very least - implicitly rejected by … major cases examining Rule 10301(a).").

The evidence makes clear that Defendants were customers of Ann Holman and Raymond James and not AXA Distributors. *See* Pinto Aff. at ¶ 8; Supplemental Affidavit of William Miller at ¶ 5, (hereafter, "Miller Aff.," attached hereto as Exhibit B. While the definition of "customer" in Rule 0120(g) of the FINRA/NASD Manual provides that a customer "shall not include a broker or dealer," that definition is not intended to imply that every person or entity in the universe that is not a broker or dealer is a customer of every FINRA member firm. *See BMA Financial Svcs., Inc. v. Guin*, 164 F. Supp. 2d 813, 819 (W.D. La. 2001). Rather, the intent of Rule 0120(g) in excluding brokers and dealers from the definition of "customer" is to differentiate FINRA disputes involving industry participants, to which one set of FINRA rules apply, from non-industry disputes involving public customers, to which a separate set of FINRA rules apply. *See* Pinto Aff. at ¶ 9. Thus, FINRA's intent in defining "customer" is for the purpose of differentiating industry vs. non-industry disputes, and is clearly not intended to subject FINRA member firms to mandatory arbitration at the demand of every person or entity which is not a broker or dealer. *Id*. Accordingly, Defendants' arguments to the contrary contradict not only the plain language of the rule, they are also contrary to the intent of the rule and the reasonable expectations of FINRA member firms and should be rejected. *Id.*; *see Wheat First*, 993 F.2d at 820.

     **2.**    **There was no business relationship between AXA Distributors and Defendants.**

Moreover, Defendants were not customers of AXA Distributors because the "customer" relationship under FINRA/NASD Rule 10101 contemplates a reasonable nexus between the person claiming to be a customer and the business of the member firm. *See* Pinto Aff. at ¶ 10. Because Defendants did not maintain any business relationship with AXA Distributors whatsoever, there is no such nexus between AXA Distributors and Defendants. *Id*. Indeed, SEC Rule 15c3-3, known as the Customer Protection Rule, defines customer to mean "….any person from whom or on whose behalf a broker or dealer has received or acquired or holds funds or securities for the account of that person." *Id*. None of Defendants had any such relationship with AXA Distributors. *Id*. Rather, each of Defendants had that very relationship with Raymond James, the broker-dealer with which Ms. Holman was associated and registered. *Id*.

In addition, AXA Distributors' FINRA membership, and therefore its activities in the securities industry, are limited to serving in the role of a securities wholesaler. *Id* at ¶ 12; *see also* Miller Aff. at ¶ 3. The role of a wholesaler is to act as a middleman or distributor of securities that are marketed to other broker-dealers which in turn sell to their retail customers. *See* Pinto Aff. at ¶ 12. Simply stated, wholesalers market to other professionals (such as Raymond James) as distinguished from retail customers. *Id*. As such, AXA Distributors had no retail customers.[4] *Id*.; Miller Aff. at ¶¶ 3-4. Correspondingly, AXA Distributors had no supervisory responsibilities over securities transactions involving registered representatives (such as Ann Holman) and customers of other FINRA/NASD regulated member firms (such as Raymond James). *See* Pinto Aff. at ¶ 12; Miller Aff. at ¶ 6. Likewise, FINRA did not and had

---

[4] Indeed, for AXA Distributors to conduct a retail customer business, it would have required prior approval by NASD pursuant to NASD Membership and Registration Rule 1017. *See* Pinto Aff. at ¶ 12.

no reason to conduct examinations or regulatory reviews of AXA Distributors to assure compliance with FINRA/NASD suitability or other sales practice customer protection rules regarding interaction with "customers." *See* Pinto Aff. at ¶ 12. Rather, such types of regulatory examinations would be conducted of Raymond James because it is Raymond James that maintains the customer relationship through Ann Holman, as she is registered with and an associated person of Raymond James. *Id*. Thus, AXA Distributors, in its limited role as a wholesaler, had no supervisory responsibilities, and was not subject to regulatory supervision, in connection with Ann Holman's sale of annuities to Defendants. *Id*.; Miller Aff. at ¶ 6. The lack of supervisory responsibility or oversight on the part of AXA Distributors in connection with the annuity sales at issue clearly demonstrates that Defendants were customers of Ann Holman and Raymond James - not AXA Distributors.

Moreover, each of Defendants' allegations in this regard only serve to further highlight their customer relationship with Ann Holman and Raymond James - not AXA Distributors. Defendants fail to point to a single contact between themselves and AXA Distributors. They do not reference a single phone conversation, meeting or communication between themselves and AXA Distributors. Rather, every contact they allege to have had with AXA Distributors is actually a contact between Ann Holman - Defendants' broker - and AXA Distributors, as wholesaler. Because Defendants can point to no contacts between themselves and AXA Distributors, they were not AXA Distributors' customers. The mere fact that the Defendants allege a scheme to defraud on the part of AXA Distributors in its dealings with Ann Holman does not make them customers of AXA Distributors. Likewise, the mere fact that AXA Distributors was aware that Ann Holman sold AXA Equitable annuities to her clients does not

make those clients customers of AXA Distributors.  Because there was no business relationship

between Defendants and AXA Distributors, Defendants were not AXA Distributors' customers.

### 3.    AXA Distributors did not receive compensation from Defendants' annuity purchases.

Defendants attempt to imply a customer relationship between themselves and AXA

Distributors by incorrectly alleging that AXA Distributors received direct payment from each

contract sold to the Defendants.  This allegation is false.  The documentary evidence in this case

demonstrates that AXA Distributors did not receive direct compensation from Raymond James'

sale of annuities to Defendants.    Miller Aff. at ¶ 10.  While AXA Distributors passes

compensation from AXA Equitable to Raymond James, no portion of that compensation is

retained by AXA Distributors.  *Id*.; *see* Defendants' Response to Motion for Preliminary

Injunction at Exhibit A, ¶ 11 ("AXA Distributors passes all sales compensation it receives

through to the Selling broker-dealer.").  Like its role in distributing the annuity contracts at issue,

AXA Distributors merely acts as a pass-through entity for the distribution of compensation from

AXA Equitable to Raymond James.  *Id.*  Thus, AXA Distributors does not receive monies from

customers of Raymond James or retain portions of those customers' annuity contributions.[5]

Miller Aff. at ¶ 10.

### 4.    Ann Holman was not an associated person of AXA Distributors.

Ann Holman was clearly not an "associated person" of AXA Distributors, as that term is

interpreted and enforced by FINRA, the SEC or securities industry standards and practices.

There is no dispute that Defendants were customers of Ann Holman, who was an associated

person and registered representative of Raymond James.  Pinto Aff. at ¶ 13; Miller Aff. at ¶ 6;

---

[5] AXA Distributors is, of course, compensated by AXA Equitable for its activities as a wholesaler of its various annuities.  In that regard, AXA Distributors receives an annual allowance from AXA Equitable in connection with its distribution activities. That allowance, while tied to sales volume, is not a commission from the sale of any individual annuity contract, nor is it direct compensation from any specific annuity contract.  Miller Aff. at ¶ 10.

Affidavit of Ann Holman at ¶¶ 2, 4 (attached to Defendants' Motion to Dismiss as Exhibit B). Under FINRA/NASD and SEC rules and regulations, Raymond James alone had supervisory responsibilities for Ann Holman's actions. Pinto Aff. at ¶ 13; Miller Aff. at ¶ 6. For instance, FINRA/NASD Conduct Rule 3010 requires broker dealers such as Raymond James to design and implement a supervisory system specifically tailored to its business that must address the activities of all of its registered representatives and associated persons. Pinto Aff. at ¶ 13. FINRA/NASD makes it clear that ultimate responsibility for supervision rests with the employing FINRA/NASD member firm. *Id.* In this case, that was Raymond James, and it alone had the obligation to assure that Ann Holman fulfilled responsibilities to her, and Raymond James', customers. *Id.*; Miller Aff. at ¶ 6.

To find that Ann Holman was an associated person of AXA Distributors would require a finding that AXA Distributors had the obligation to supervise Ann Holman. *See* Pinto Aff. at ¶ 14. It would also require a finding that AXA Distributors had the obligation to supervise every broker who sold AXA Equitable products. *Id.* Such a result is contrary to the very terms of AXA Distributors' FINRA membership agreement, which limits its business in the securities industry to serving as a wholesale distributor of AXA Equitable products, and does not permit AXA Distributors to supervise brokers such as Ann Holman. *See* Pinto Aff. at 12; Miller Aff. at ¶ 4. Such a finding also is contrary to FINRA's entire regulatory scheme, which requires that every registered representative (such as Ann Holman) be under the close supervision of their employer firms (here, Raymond James). Pinto Aff. at ¶ 14 In addition, such a finding is contrary to the explicit terms of the Sales Agreement between Raymond James and AXA Distributors. *See* Pinto Aff. at 15; Miller Aff. at ¶ 6. That Sales Agreement vests Raymond James, and not AXA Distributors, with the sole responsibility to train, supervise and control Ann

Holman. *Id.* (citing Sales Agreement at p. 6). With regard to the training, supervision and control of Ann Holman, the Sales Agreement states all such obligations are the responsibility of Raymond James (the "Broker-Dealer"):

> § 4.2 <u>Supervisory responsibilities of Broker-Dealer</u>. The Broker-Dealer shall be responsible for securities training, supervision and control of the Agents in connection with their solicitation activities and any incidental services with respect to the Contracts and shall supervise Agents' strict compliance with applicable federal and state securities laws and NASD requirements in connection with such solicitation activities and with the rules and procedures of the Equitable Life Companies.

*Id.* Because it was Raymond James, and not AXA Distributors, that had the sole responsibility to train, supervise and control Ann Holman, she was clearly an associated person of Raymond James and not AXA Distributors. *See* Miller Aff. at ¶ 8; Pinto Aff. at ¶ 14.

Defendants misconstrue the concept of indirect control in an effort to establish an "associated person" relationship between Ann Holman and AXA Distributors, where none exists. Pinto Aff. at ¶ 16. Defendants' interpretation of the concept of indirect control is without merit. *Id.* First, it was Raymond James that had the contractual relationship with AXA Distributors, not Ann Holman. *Id.* As an associated person and registered representative of Raymond James, Ann Holman was subject to the supervision and direction of her broker-dealer Raymond James, and only Raymond James. *Id.* It was as a result of the contractual relationship between Raymond James and AXA Distributors that Ann Holman was permitted to sell insurance-related products (securities) issued by AXA Equitable to Raymond James customers. *Id.* Considering Ann Holman an associated person of AXA Distributors based on the contractual relationship between Raymond James and AXA Distributors would equate to considering Ann Holman the associated person of every vendor, broker-dealer, and distributor of mutual funds or variable products that had a contractual relationship with Raymond James. *See id.* Such a result would also subject

every vendor, broker-dealer, and distributor of mutual funds or variable products to the regulatory obligations and responsibilities relative to each of Raymond James' associated persons by virtue of that contractual relationship. *Id*. Under such a concept, for example, the 16,000 registered representatives with Merrill Lynch would become associated persons for each and every mutual fund and variable product distributor with which Merrill Lynch had a sales agreement, and therefore be subject to the oversight and supervision by all such distributors. Pinto Aff. at ¶ 16. Such a requirement has not and never will be mandated, required or expected by regulators, nor by industry practices and standards. Pinto Aff. at ¶ 16.

Instead, the concept of "indirect control" is applied to determine responsibility of broker-dealers for the supervision of individuals who are not direct employees of the broker-dealer, such as in the case of non-registered employees of the broker-dealer's registered representatives. Pinto Aff. at ¶ 17. In these situations, regulators generally attempt to determine the functions and roles of these individuals, and depending on the circumstances, may find that the broker-dealer may still have responsibility for supervision under FINRA/NASD rules for their securities-related activities. *Id*. Thus, the concept of indirect control is commonly applied by regulators in order to attribute supervisory responsibility to broker-dealer firms where the relationship between the firm and the individual is not readily apparent or otherwise established. *See id*. Clearly, that situation is not applicable here, where the relationship between AXA Distributors and an arms-length broker-dealer, Raymond James, was contractual, and that contract clearly and unambiguously dictated that Raymond James, and not AXA Distributors, was bound to train, supervise and control Ann Holman.

In the present case, there is no evidence that Ann Holman was ever an "associated person" of AXA Distributors. Pinto Aff. at ¶ 18. If Ann Holman had ever entered into an

arrangement through which she was an associated person of AXA Distributors, then specific FINRA/NASD rules would have come into play, such as Rule 3030, requiring written disclosure of that relationship. *Id*. No such disclosure has been produced in this proceeding because none exists. Further, hypothetically, if Ann Holman had become an associated person of AXA Distributors, then Ann Holman would have undertaken responsibilities to disclose her position with AXA Distributors to Raymond James, and in addition, pursuant to FINRA/NASD rules, for promptly reporting such relationship to Raymond James. *Id*. Again, there is no evidence of such disclosure, because Ann Holman was never an associated person of AXA Distributors. *See* Miller Aff. at ¶ 9; Pinto Aff. at ¶ 13.

Defendants have argued that AXA Distributors indirectly controlled Ann Holman because it controlled the way that Ann Holman sold AXA Equitable annuities. As noted, that argument is directly contrary to the Sales Agreement between AXA Distributors and Raymond James, the terms of AXA Distributors' FINRA membership agreement, and the regulatory structure which imposes supervisory responsibilities on Ann Holman's broker-dealer, Raymond James. Moreover, to the extent that the Sales Agreement between Raymond James and AXA Distributors limits materials to be used in sales by Raymond James, it is simply in compliance with FINRA/NASD rules for use of only originator-approved advertising, sales materials, and prospectuses. Such limitations, which solely ensure compliance with applicable securities rules and regulations, can not be construed to imply a relationship of "indirect control" under FINRA/NASD rules. Pinto Aff. at ¶ 15; Miller Aff. at ¶ 7.

Furthermore, Defendants cite no legal authority for their contention that Ann Holman was controlled by AXA Distributors and was therefore its associated person. The only case cited by Defendants in purported support of this contention is *Lawrence v. Richman Group Capital*

*Corp.* However, *Lawrence* directly supports the conclusion that Ann Holman was an associated person of Raymond James, not AXA Distributors. 358 F.Supp.2d 29 (D. Conn. 2005). Defendants quote footnote 4 of the *Lawrence* opinion, stating that the "Securities and Exchange Commission 'has consistently taken the position that independent contractors . . . involved in the sale of securities on behalf of a broker-dealer are controlled by the broker-dealer, and, therefore, are associated persons of the broker-dealer.'" *See* Defendants' Motion to Dismiss at p. 18, citing *Lawrence v. Richman Group Capital Corp.*, 358 F.Supp.2d 29, 33 n. 4 (D. Conn. 2005). This quote has no relevance to Ann Holman's relationship with AXA Distributors, as Ann Holman was not (and does not allege that she was) an independent contractor of AXA Distributors. Rather, this quote directly describes Ann Holman's relationship with Raymond James, the broker-dealer of which she was an independent contractor at the time period at issue. Thus, under *Lawrence*, Ann Holman was controlled by Raymond James and was therefore an associated person of Raymond James -- not AXA Distributors.

Likewise, other cases discussing whether an individual such as Ann Holman was controlled by a member firm draw the same conclusion, finding that control rests with the member firm of which the individual was an employee or an independent contractor. *See, e.g.*, *First Liberty Investment Group v. Nicholsberg*, 145 F.3d 647 (3rd Cir. 1998) (finding that member firm had indirect control over its registered representative, who was an independent contractor); *Edelman v. Marek*, 1992 WL 321715, *1 (S.D.N.Y. Oct. 23, 1992) (holding that Prudential Securities Inc.'s in-house counsel was an employee and therefore an associated person of Prudential Securities Inc.). Because Ann Holman was not an employee, registered representative or independent contractor of AXA Distributors, AXA Distributors did not control Ann Holman, directly or indirectly, and Ann Holman was not AXA Distributors' associated

person. Rather, Ann Holman was clearly and unmistakably the associated person of Raymond James at all times relevant to this action.

5.    **All of the case law cited by Defendants in purported support of their alleged customer relationship with AXA Distributors is distinguishable because none of Defendants dealt with an associated person of AXA Distributors.**

In every case cited by the Defendants in which the court found that the complaining parties were customers of a FINRA member firm, it was undisputed that the complaining parties were customers of the member firm's associated person. Those cases are completely irrelevant to the issue before this Court because, as set forth above, Ann Holman was never an associated person of AXA Distributors. Ann Holman was an associated person of Raymond James, and Defendants were customers of Ann Holman. Thus, every case cited by Defendants for the proposition that they were customers of AXA Distributors is distinguishable on that basis.

For example, in both *MONY Securities* and *King,* the critical factor in the court's inquiry was the undisputed evidence that the investors purchased investments from an associated person of the member firm. *See MONY Securities Corp.*, 390 F.3d at 1344 ("We thus hold that the Bornsteins are customers under the applicable NASD rules because it is undisputed that they are customers of Keller, and that Keller was an associated person with MONY."); *King*, 386 F.3d at 1370 ("The parties agree that King dealt with [IFG's associated person, who was a registered representative of IFG], so King, in turn, dealt with IFG. The Court, therefore, holds that King has satisfied the first requirement of [NASD] Rules 10101(c) and 10301(a) by demonstrating that she is a customer and IFG is a member."). In addition, in *California Fina Group, Inc. v. Herrin*, the Fifth Circuit rested its narrow holding on the ground that the member firm did not dispute that the registered representative was its associated person, finding that the dispute arose between a customer and an associated person of the member firm. 379 F.3d 311, 318 (5th Cir. 2004)

(citing *John Hancock Life Ins. Co. v. Wilson,* 254 F.3d 48 (2d Cir. 2001).

Similarly, the other cases cited by Defendants address the narrow question of whether a member firm must arbitrate disputes with investors who were customers of the member firm's "associated person." *See MONY Securities Corp.,* 390 F.3d at 1340 (investors were "customers" of the member firm by virtue of being "customers" of an "associated person" of the member firm); *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48, 58 (2d Cir. 2001) (NASD rule required arbitration with investors who dealt directly with a member firm's registered representative); *O.N. Equity Sales Co. v. Cattan*, 2008 WL 361549, at *3 (S.D. Tex. Feb. 8, 2008) (investor was a "customer" of the member because the investor had a direct business relationship with the member's "associated person"); *Multi-Financial Securities Corp. v. King*, 386 F.3d 1364, 1370 (11th Cir. 2004) ("When an investor deals with a member's agent or representative, the investor deals with the member.").

Significantly, no Defendant ever dealt with a registered representative or associated person of AXA Distributors; nor do any of the cases cited by Defendants broaden the definition of "customers" to include investors who never engaged in a business transaction with the member's registered representative.  In each case cited by Defendants, it was undisputed that the registered representatives who sold the securities were associated persons of their FINRA member, broker-dealer firms.  On that basis, the courts found that that the investors were customers of the member firms pursuant to FINRA/NASD rules.  These cases only serve to highlight the fact that Ann Holman was a registered representative and associated person of Raymond James, not AXA Distributors.  Accordingly, Defendants are not customers of AXA Distributors – they are customers of Ann Holman and Raymond James.

## C.    DEFENDANTS' CLAIMS DO NOT ARISE IN CONNECTION WITH AXA DISTRIBUTORS' BUSINESS ACTIVITIES.

For the same reasons that Defendants were not customers of AXA Distributors, this dispute does not arise in connection with AXA Distributors' business activities. First and foremost, AXA Distributors' business activities did not include a business relationship with the Defendants.  As set forth above, Defendants point to no business contacts between themselves and AXA Distributors.  Rather, the Defendants only point to business contacts between themselves and Ann Holman (who was Raymond James' registered representative).  In fact, AXA Distributors' business activities as a wholesaler prevent it from having a business relationship with retail customers such as the Defendants.  Miller Aff. at ¶ 4; Pinto Aff. at ¶ 12. Moreover, AXA Distributors did not receive any compensation from the Defendants or retain portions of the Defendants' annuity contributions. Miller Aff. at ¶ 10.  In addition, AXA Distributors had no responsibility to train or supervise Ann Holman in connection with her sale of the annuities at issue to the Defendants.  Miller Aff. at ¶ 8; Pinto Aff. at ¶ 15.  By contract and under FINRA rules and regulations, that responsibility conclusively resided with Raymond James, the broker-dealer through which the Defendants opened brokerage accounts and invested in the securities at issue. *Id*.  At all times relevant hereto, Ann Holman was the associated person of Raymond James, the entity that controlled her activities in connection with the sale of the annuities at issue to the Defendants.  Accordingly, Defendants' claims arise directly from the business activities of Ann Holman and Raymond James - not AXA Distributors.

### III.    <u>CONCLUSION</u>

Based on the authority cited herein, and in accordance with Plaintiffs' Motion for Preliminary Injunction and Opposition to Defendants' Motion to Dismiss, the entry of a preliminary injunction in this case is necessary and appropriate.  Plaintiffs have demonstrated that there is a substantial likelihood of success on the merits of their claims because Defendants were not customers of Plaintiffs or their associated persons, and Defendants' arbitration proceeding does not arise in connection with Plaintiffs' business activities.  As such, this dispute is not arbitrable.  Plaintiffs therefore respectfully request that this Court enter a preliminary injunction restraining and enjoining Defendants, their agents, attorneys, and all persons acting in concert or participation with them, or similarly situated with them, from proceeding with their claims pending against Plaintiffs in the arbitration styled *Gayle S. Bullard, et al., v. AXA Equitable Life Insurance Company, et al*., FINRA Arbitration No. 08-00280.

Respectfully Submitted,


/s/ Andrea Morgan Greene
A. Inge Selden III (SEL003)
John N. Bolus (BOL022)
Andrea Morgan Greene (GRE102)

Attorneys for Plaintiffs
AXA Distributors, LLC and AXA Advisors, LLC

OF COUNSEL:

MAYNARD, COOPER & GALE, P.C.
2400 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203-2602
(205) 254-1000

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Andrew P. Campbell
Caroline Smith Gidiere
Campbell, Gidiere, Lee, Sinclair & Williams, PC
2100-A SouthBridge Parkway, Suite 450
Birmingham, Alabama 35209


on this the 30th day of June, 2008.


/s/ Andrea Morgan Greene
OF COUNSEL

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| AXA DISTRIBUTORS,<br>LLC and AXA ADVISORS, LLC., | ) | |
| | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: 1:08-cv-00188 |
| | ) | |
| GAYLE S. BULLARD, et al., | ) | |
| | ) | |
| **Defendants.** | ) | |

| | |
|---|---|
| STATE OF MARYLAND | ) |
| | ) |
| COUNTY OF MONTGOMERY | ) |

## AFFIDAVIT OF JOHN E. PINTO

John E. Pinto, being duly sworn, does depose and say as follows:

1.       My name is John E. Pinto.  I am competent to make this affidavit, and I have stated below, in summary form, the bases for opinions set forth in this affidavit.

2.       I currently head the Washington, D.C. office of Renaissance Regulatory Services as Managing Director and provide consulting and support to all segments of the financial services industry, including major broker-dealers across the country.  Prior to October 1997 I had spent nearly thirty years with the National Association of Securities Dealers, Inc. ("NASD"), which has recently merged with the regulatory arm of the New York Stock Exchange to become the Financial Industry Regulatory Authority ("FINRA").[1]  Beginning as an entry level examiner trainee in 1969, I received promotions and greater responsibility during my tenure in the NASD New York District Office.  I was promoted to the NASD Executive Office in

---

[1] The NASD-NYSE regulatory merger was effective in July 2007, resulting in the formation of FINRA.  Because many of the rules administered by FINRA are still referred to by the NASD designation, and because of the timing of the sales at issue,  the NASD designation frequently is retained in this affidavit.

246551

Washington, DC in 1975, and I served for the last ten years of my employment with the NASD as Executive Vice President for regulation, the top level executive in charge of all examination and enforcement functions of the NASD.

3.     In my role as Executive Vice President for regulation with the NASD, I reported directly to the President of NASD, and I was responsible for more than half of the approximately 1,800 NASD employees, and for establishing policies, practices and procedures for NASD examination, surveillance and enforcement activities.     Specifically, my responsibilities included the operation and management of the 14 NASD District Offices, which conducted field examinations of the 5,500 NASD members, performed financial and operational surveillance, investigated customer complaints, and initiated disciplinary actions as appropriate. I was responsible for the regulatory aspects in the creation and development of the NASD's Central Registration Depository (CRD), and remained involved thereafter in the policy making and regulation of the registration and termination processes for registered representatives. All customer complaint and registered representative "termination for cause" investigations fell under my area of responsibility. I also directed regulation of the NASDAQ Stock Market, OTC Bulletin Board, and other OTC markets under the *Market Surveillance Department*; the *Enforcement Department* for major fraud and manipulation cases; *Corporate Financing* for review of underwriting materials; *Advertising Regulation* for overseeing NASD member compliance with Association rules regarding advertising and sales literature; and the *Compliance Department* for support of district operations and establishing examination policies and procedures.

4.     Among my other activities and contributions as a senior executive of the NASD, I have testified before Congress on behalf of the Association, having appeared before the

Committee on Energy and Commerce, Subcommittee on Telecommunications and Finance of the House of Representatives regarding international securities enforcement, the municipal securities market, penny stock market fraud, short-selling activity in the stock markets and sales practice abuses in the securities industry, which included issues relating to suitability, fraud and misrepresentation.

5.      I have been retained by AXA Distributors, LLC ("AXA Distributors") in this action to evaluate and express opinions regarding its position that the Defendants in this action were neither "customers" of AXA Distributors nor customers of an "associated person" of AXA Distributors, according to the definitions and usages of those terms by FINRA/NASD under the NASD Manual and interpretive materials.[2] I was also retained to provide an opinion as to whether Ms. Holman was an associated person of AXA Distributors.

6.      The bases for my opinions include my knowledge of FINRA/NASD rules as a result of with my intimate familiarity with the NASD Manual and interpretive materials, including my knowledge in interpreting and enforcing the rules of the NASD, my knowledge and experience concerning the business activities of a broker-dealer, including their disclosure of their business activities on the Form BDs they file, and my experience and knowledge concerning the scope of the regulatory authority of FINRA/NASD. My opinions also are based on the facts provided to the Court in AXA Distributors' Verified Complaint for Preliminary and Permanent Injunction, and Declaratory Judgment, Plaintiffs' Motion For Preliminary Injunction and memorandum of law in support thereof, and the materials submitted in opposition to those pleadings and motions, including the Motion to Dismiss and to Compel Arbitration, and

---

[2] It is my understanding that Defendants have acknowledged that they have no relationship with the other plaintiff, AXA Advisors, LLC. Therefore I have not undertaken to provide an opinion about the lack of a customer relationship and the fact that Ann Holman is not an associated person with that entity, which is obvious from the admission by Defendants.

Defendants' Response in Opposition to Motion for Preliminary Injunction, including the affidavits and documents filed with those pleadings.

7.      In particular, I have evaluated Defendants' claims that they are customers of AXA Distributors or are customers of an associated person of AXA Distributors. Neither argument has any basis in the FINRA/NASD rules, and frankly, the arguments stretch far beyond any reasonable application or interpretation of FINRA/NASD Rules, the federal securities laws, and industry standards and practices.

8.      First, Defendants are not customers of AXA Distributors. It is clear from the allegations of the Defendants in their Statement of Claim in the Bullard arbitration action and the documents I have reviewed that the Defendants were never customers of AXA Distributors but instead were customers of Ann Holman and Raymond James Financial Services ("RJFS"), which is an SEC registered broker-dealer and FINRA member totally unaffiliated with AXA Distributors.

9.      The definition of "customer" that is found in Rule 0120(g) of the NASD Manual is an "exclusionary" definition. Rule 0120(g) simply provides that the term customer "shall not include a broker or dealer." The NASD Manual has a different set of rules for disputes between member firms and customers, and disputes between member firms and other member firms. The latter, disputes between member firms, are considered to be industry disputes, and are thus subject to a different set of rules and standards than disputes between member firms and customers. See, for example, NASD Rules 10200 through 10205, which are separate rules governing the arbitration of "Industry and Clearing Controversies." The intent of Rule 0120(g) in excluding brokers and dealers from the definition of "customer" is to differentiate industry participants in FINRA proceedings, including arbitration, from public customers for the purposes

of application of the different set of NASD rules to "industry" disputes vs. non-industry disputes.

10.     In addition, the Defendants were not customers of AXA Distributors because the "customer" relationship under NASD Rule 10101 contemplates a reasonable nexus between the person claiming to be a customer and the business of the member firm. Because the Defendants did not maintain any formal or informal business relationship with AXA Distributors, or for that matter any relationship whatsoever, there is no such nexus between AXA Distributors and the Defendants.

11.     To get a clearer understanding of how the term "customer" is more universally applied in the securities industry, SEC Rule 15c3-3, known as the Customer Protection Rule, defines customer to mean "….any person from whom or on whose behalf a broker or dealer has received or acquired or holds funds or securities for the account of that person". None of the customers involved in the instant matter had any such relationship with AXA Distributors. Rather, they had that relationship with another broker-dealer with which Holman was associated and registered, RJFS.

12.     I have reviewed the March 21, 1996 Membership Agreement of AXA Distributors' predecessor, Equitable Distributors, Inc. with the NASD that I understand was in effect at the time of the sales that are alleged in the Bullard arbitration action. That agreement is attached as Exhibit A. The Membership Agreement specifically limits Equitable Distributors, Inc.'s activities in the securities industry to that of a wholesaler. The role of a wholesaler is to act as a middleman or distributor of securities which are marketed to other broker-dealers, which in turn sell to their customers. Simply stated, wholesalers market to other professionals as distinguished from customers. As such, Equitable (now AXA) Distributors had no retail customers, and correspondingly, would not have supervisory responsibilities over securities

246551

transactions involving registered representatives and customers of other FINRA/NASD regulated broker-dealers. FINRA would not conduct examinations or regulatory reviews of AXA Distributors to assure compliance with FINRA/NASD suitability or other sales practice customer protection rules regarding interaction with "customers." Rather, such types of regulatory examinations would be conducted of RJFS because it is RJFS that maintains the customer relationship, and it is RJFS with which Holman is registered and is an associated person. For AXA Distributors to conduct a retail customer business, it would have required prior approval by FINRA/NASD pursuant to NASD Membership and Registration Rule 1017.

13.     My second opinion is that Ann Holman was clearly not an "associated person" of AXA Distributors, as that term is interpreted and enforced by FINRA/NASD, the SEC or securities industry standards and practices. There is no dispute that the Defendants were customers of Ann Holman, who was an associated person and registered representative of RJFS. As an associated person of RJFS, under FINRA/NASD and SEC rules and regulations, it was RJFS alone that had supervisory responsibilities for Holman's actions. For instance, NASD Conduct Rule 3010 requires broker dealers such as RJFS to design and implement a supervisory system specifically tailored to its business that must address the activities of all of its registered representatives and associated persons. FINRA makes it abundantly clear that ultimate responsibility for supervision rests with the employer FINRA member firm. In this case, that was RJFS, and it alone had the obligation to assure that Holman fulfilled responsibilities to her, and RJFS's, customers.

14.     Frankly, I have been involved with securities regulation at a senior level for almost forty (40) years, and I have never been involved with or heard of a single instance where a claim was made like that which Defendants are making that Holman was an associated

person of AXA Distributors. I will attempt to demonstrate by way of example why I believe such a claim is utterly preposterous. Assume that there is an FINRA member located in Columbus, Ohio that functions as a distributor for insurance related securities products. This distributor has sales agreements with several hundred, maybe more, broker-dealer FINRA members across the country that employ several hundred thousand associated persons/registered representatives who sell these products. The idea that this Columbus based broker-dealer, approved by FINRA/NASD to conduct only a limited business as a wholesale distributor, would then somehow be responsible to supervise these several hundred thousand registered representatives, all of whom are already subject to the close supervision by their employer firms, is simply absurd. I speak from personal experience to say that no regulator has such expectations.

15.    I have reviewed what I understand to be the operative sales agreement between RJFS's predecessor, Investment Management & Research, Inc. and Equitable Distributors, Inc., dated March 27, 1996, attached as Exhibit B.  That agreement confirms the responsibilities of Ann Holman's broker dealer, not AXA Distributors, to supervise her.  See section 4.2 of Exhibit B.  The agreement is typical of those entered into by a wholesaler or product issuer with an independent broker dealer, in my experience.  Investment Management & Research, Inc. retained all supervisory responsibilities for its registered representatives who would be offering products under the agreement.  Equitable Distributors, Inc. did not assume control, either directly or indirectly, of those representatives such as Ann Holman under the agreement.  Instead, the agreement confirms the supervisory responsibilities of Ann Holman's broker dealer rather than Equitable Distributors, Inc.  To the extent that the agreement limits materials to be used in sales by RJFS representatives, it is simply in compliance with FINRA/NASD rules for use of only approved advertising, sales materials, and prospectuses.

16.     The Defendants misconstrue the concept of indirect control in an effort to establish an "associated person" relationship between Holman and AXA Distributors, where none exists.    This concept, as set forth by Defendants, is in my opinion, misguided, inconceivable, and wholly without merit.  First, it was RJFS that had the contractual relationship with AXA Distributors, not Holman.  As described in previous paragraphs, as an associated person and registered representative of RJFS, Holman was subject to the supervision and direction of her broker-dealer RJFS, and only RJFS.  It was as a result of the contractual relationship between RJFS and AXA Distributors that Holman was permitted to sell insurance-related products issued by AXA Equitable Life Insurance Company to RJFS customers.  To consider Holman to be an associated person, direct or indirect, of AXA Distributors based on the contractual relationship between RJFS and AXA Distributors, would mean that every vendor, every broker-dealer, and every distributor of mutual funds or variable products that had a contractual relationship with RJFS would be subject to the panoply of regulatory obligations and responsibilities relative to each of RJFS's associated persons by virtue of that contractual relationship.  This is ludicrous.  Under such a concept, for example, the 16,000 registered representatives with Merrill Lynch would become associated persons for each and every mutual fund and variable product distributor with which Merrill Lynch had a sales agreement, and therefore be subject to the oversight and supervision by all such distributors.  Based on my almost 40 years of experience with NASD and as provider of regulatory and compliance consulting services, and in my dealings over the years with federal and state regulators, I can state unequivocally that such a requirement has not and never will be mandated, required or expected by regulators, nor by industry practices and standards.

246551

17.    In my experience and judgment, the term "indirect control" could be applied, for example, in determining responsibility of broker-dealers for the supervision of individuals who are hired and paid by certain of the broker-dealer's registered representatives who because of tax and compensation arrangements are classified as independent contractors rather than as employees. FINRA/NASD has made it abundantly clear that such independent contractors/registered representatives under the control of the broker-dealer are considered associated persons for purposes of NASD By-Laws and Rules. However, perhaps less clear is what level of supervision is required of those individuals who may be hired and compensated by the independent contractor, not the broker-dealer. That is, even in those situations where a broker-dealer does not directly employ staff persons hired by those independent contractors/registered representatives, the regulators generally attempt to determine the functions and roles of these individuals, and depending on the circumstances, may find that the broker-dealer may still have responsibility for supervision under FINRA/NASD rules for their securities- related activities.

18.    In sum, I have seen no evidence that Ann Holman was ever an "associated person" of AXA Distributors or its predecessor. If an associated person of RJFS had entered into or had been considered to be in such an arrangement, then specific FINRA/NASD rules would have come into play, such as Rule 3030, requiring written disclosure of that relationship. Further, hypothetically, if Ann Holman had become an associated person with AXA Distributors or its predecessor, then Holman would have undertaken responsibilities to disclose her position with RJFS to AXA Distributors, and in addition pursuant to FINRA/NASD rules, for promptly reporting such relationship to RJFS. I am totally confident, based upon the information I have

246551

reviewed, that such an arrangement never existed, because Ann Holman was never an associated person of AXA Distributors.

FURTHER AFFIANT SAITH NOT.

Executed on this the _29_ day of July, 2008.

_____
John E. Pinto

Sworn to before me this the _29_ day of July 2008.

Notary Public
My commission expires:

HOWARD A. WALTON
NOTARY PUBLIC
Montgomery County, Maryland
My Commission Expires February 1, 2011

246551

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| AXA DISTRIBUTORS, | ) | |
| LLC and AXA ADVISORS, LLC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO.: 1:08-cv-00188 |
| | ) | |
| GAYLE S. BULLARD, et al., | ) | |
| | ) | |
| Defendants. | ) | |

| | |
|---|---|
| STATE OF NEW YORK | ) |
| | ) |
| COUNTY OF NEW YORK | ) |

## SUPPLEMENTAL AFFIDAVIT OF WILLIAM C. MILLER

Comes now William C. Miller, who, upon being duly sworn, does depose and say as follows:

1.      My name is William C. Miller.  I am competent to make this affidavit, and I have personal knowledge of the facts stated below.

2.      I am a Senior Vice President of and am currently employed by AXA Distributors, LLC ("AXA Distributors") as Chief Sales Officer, and have been employed by AXA Distributors since 2006.  As Senior Vice President, I have access to and have reviewed business records disclosing the information herein.

3.      As stated in my initial Affidavit in this case, AXA Distributors markets AXA Equitable Life Insurance Company annuities at a wholesale level.  AXA Distributors does not engage in retail sales of AXA Equitable Life Insurance Company products.    AXA

246551

Distributors does not issue any investments.  AXA Distributors does not provide order execution for retail clients.

4.     I have attached as Exhibit A a true and correct copy of AXA Distributors' membership agreement with the NASD effective March 21, 1996 (in the name of its predecessor, Equitable Distributors, Inc.).  That membership agreement, which governed AXA Distributors' predecessor's membership with the NASD at the time of the sales at issue in this case, verifies the limited nature of the business of AXA Distributors, and specifically, the fact that it had, and has, no retail customers.  That limited activity membership continues today.

5.     As verified in my initial affidavit and as a matter of AXA Distributors' business model and restrictions, Gayle S. Bullard, Peggy J. Cole, Beverly L. Davis, Jesse D. Dean, Jacqueline P. Draughon, Hans D. Erbskorn, Charlene B. Erbskorn, Rabon W. Harrison, Ruth K. Harrison, James H. Hausman, Donald W. Hendley, Edward L. Hinson, Jeanette C. Hinson, Gayle O. Hudson, Kenneth W. Joyner, James R. Little, Linda D. Little, Sarah A. Martin, Sarah McCord, Jerry Mims, Nina Sue New, Hazel J. Odom, Mary Harriett Patton, Jack R. Perry, Freddy Quattlebaum, Carolyn H. Saunders, Roy W. Saunders, Earl T. Senn, Edna Senn, Reuben S. Shelley, June K. Shelley, Anita Carol Shirah, Danny L. Snell, Floyd Starling, Virginia Starling, Willa C. Storey, Jeanette S. Sutherland, Mary E. Todd, Betty M. Vann, F. Terry Walden, Shirley J. Walker, Helen S. Hall Walworth, Debra Rebecca White, Pheobie D. Wilson and Charles H. Woodham (collectively, the "Claimants") have never been customers of AXA Distributors, its agents or representatives.  I have reviewed once more paragraphs 5 through 7 of my initial affidavit, and those facts set forth at the time of the affidavit remain true and correct.

6.     A former registered representative of Raymond James Financial Services, Inc. ("RJFS") was the broker of record on the sales of variable annuities issued by AXA

246551

Equitable Life Insurance Company ("AXA Equitable") to the Claimants.    The RJFS representative sold those AXA Equitable annuities pursuant to a sales agreement entered into between AXA Distributors and RJFS.  I have attached a true and correct copy of the applicable Broker-Dealer and General Agent Sales Agreement (the "Sales Agreement"), entered into on March 27, 1996 between predecessors of AXA Distributors and RJFS as Exhibit B.[1]  Pursuant to that agreements, RJFS, through its predecessor Investment Management & Research, Inc., verified its responsibility for "training, supervision and control" of its registered representatives that it might allow to sell AXA Equitable products.  See paragraph 4.2 of the Sales Agreement.  AXA Distributors assumed no control, direct or indirect, over those representatives of RJFS.

7.    I understand that Claimants' counsel have argued that because RJFS representatives were limited to the use of approved sales materials, AXA Distributors had some level of control over them.  That is not true.  FINRA/NASD rules require submission of advertising and sales materials after approval by Series 24 principals of the originator of those materials.  To the extent that a third party broker-dealer such as RJFS intends to originate its own advertising and sales materials regarding an AXA Equitable product, AXA Equitable has required that any such materials be reviewed by AXA Distributors.  My understanding, and the practical effect of paragraphs such as 4.8 and 4.10 of the Sales Agreement, is that RJFS agreed that it would assure compliance with FINRA/NASD rules as well as comply with AXA Equitable's requirement that AXA Distributors review any materials that RJFS intends to originate.    The agreement does not impose any control by AXA Distributors on RJFS representatives.

---

[1] RJFS's insurance affiliate, Planning Corporation of America, also is a party to that agreement as a general agent for insurance sales.

246551

8.    AXA Distributors exercised no control, direct or indirect, over registered representatives of RJFS in connection with their sales under the Sales Agreement.  Instead, the Sales Agreement verifies the responsibility of RJFS to train, supervise and control its own registered representatives.

9.    Ann Holman was never an "associated person" of AXA Distributors and was never the subject of any compliance oversight requirements by it.

10.    AXA Distributors does not receive compensation in the form of "commissions" on the sale of variable annuities by RJFS.  AXA Distributors receives an annual allowance from the issuer for its distribution activity and acts as a pass-through for compensation to broker-dealers such as RJFS.  RJFS then pays whatever commissions are due to its brokers and retains that portion to which it is entitled.  The annual allowance to AXA Distributors is in part based upon volume, but AXA Distributors does not receive monies from customers of RJFS or retain portions of contributions from those customers.

FURTHER AFFIANT SAITH NOT.

Executed on this the _30_ day of July, 2008.

_____
William C. Miller

Sworn to before me this the _30_ day of July 2008.

_____
Notary Public
My commission expires:

RUTH A. SHORTER
Notary Public, State of New York
No. 01SH6013638
Qualified in New York County
Commission Expires September 27, 2010

246551

# Exhibit A

# AGREEMENT BETWEEN
## EQUITABLE DISTRIBUTORS, INC.
### AND THE
## DISTRICT COMMITTEE FOR DISTRICT NO. 10
### OF THE
## NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC. ("NASD")
### (Amended March 21, 1996)

Equitable Distributors, Inc., the ("Firm"), through        Mr. Jerome Golden, agrees that membership in the National Association of Securities Dealers, Inc. ("NASD") is conditioned upon the following restrictions to its operations:

1.    the Firm shall not permit its aggregate indebtedness to all other persons to exceed fifteen hundred percent (1500%) to maintain a minimum net capital in accordance with SEC Rule 15c3-1, paragraph (a)(2)(v). The Firm also agrees to maintain one hundred and twenty (120%) of its minimum net capital requirement in accordance with SEC Rule 17a-11(b)(1);

2.    the Firm will limit its business activity only to the following:

      a)    wholesaling variable and fixed contracts, including market value adjusted contracts, through other broker/dealers and banks, and

      b)    distributing investment company securities on a wholesale basis only;

3.    the Firm will operate pursuant to the (k)(1) exemptive provisions of SEC Rule 15c3-3;

4.    the Firm will notify the Association prior to changing its clearing agent and shall notify and obtain the Association's approval prior to changing its:

      a)    method of clearance, and
      b)    method of bookkeeping, e.g., manual to computer or utilizing an outside computer service;

5.    the Firm will provide written notice to the District No. 10 Office prior to opening additional branch offices; and

6.    if a decision is made to change the controlling interest, management and/or organizational structure of the Firm, the District No. 10 Office must be promptly notified, in writing, and approval of the District No. 10 Office must be obtained before the initiation of the change;

      As a member of the Association, Equitable Distributors, Inc. agrees to comply with the above restrictions and/or limitations and further agrees to promptly notify the District No. 10 office in writing, of its intention to change or modify any of the above restrictions and/or limitations, and further agrees to refrain from implementing such changes or modifications until it has received written approval from the District Committee for District No. 10.

Equitable Capital Securities Corp.
(Amended March 21, 1996)
Page Two

This restriction agreement is governed by the Schedule C of the NASD By-Laws and under the terms of Schedule C requires the approval of the District Committee for any removal and/or modification of restriction/limitations set forth herein.

Any activity of the member which does not conform to the restrictions and/or limitations set forth herein could be a basis for disciplinary action against the Firm by the District Business Conduct Committee.

This restriction agreement will remain in effect until such time as the Firm is notified by the District No. 10 Office, in writing, that the restriction agreement is rescinded by the District Committee.

## EQUITABLE DISTRIBUTORS, INC.

By: _Jerome Golden_
      Jerome Golden

Title _Chairman and Chief Executive Officer_

Date: _May 8, 1996_

**Exhibit B**

# BROKER-DEALER AND GENERAL AGENT

## SALES AGREEMENT

AGREEMENT, by and among Equitable Distributors, Inc. ("Distributor"), Investment Management & Research, Inc. ("Broker-Dealer") and Planning Corporation of America ("General Agent").

## WITNESSETH:

WHEREAS, the Distributor and the Broker-Dealer are both broker-dealers registered with the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended ("1934 Act"), and members of the National Association of Securities Dealers, Inc.;

WHEREAS, the General Agent, whose licensed agents are also registered representatives of the Broker-Dealer, is an insurance agency duly licensed to sell variable life insurance and variable annuities in any state or other jurisdiction in which the General Agent intends to perform hereunder;

WHEREAS, The Equitable Life Assurance Society of the United States ("Equitable") has appointed the Distributor as principal underwriter or distributor of the Variable Accounts and the MVA Interests and as distributor of the Contracts and has authorized the Distributor to recommend persons for appointment as agents of Equitable to solicit applications for the sale of the Contracts;

WHEREAS, it is intended that the General Agent shall be authorized to offer and sell the Contracts to the general public subject to the terms and conditions set forth more fully herein;

WHEREAS, Equitable has authorized the Distributor to enter into separate written agreements with broker-dealers registered under the 1934 Act which agree to participate in the distribution of the Contracts, and the parties hereto desire that the Broker-Dealer be authorized to solicit applications for the sale of the Contracts;

WHEREAS, in the future, Contracts may be issued by an insurance company which is an Affiliate of Equitable and the Distributor may be authorized to promote the offer and sale of such Contracts in the same manner that Equitable has authorized the Distributor to act, as described above.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and promises herein contained, the parties hereto agree as follows:

## ARTICLE I
### Definitions

§1.1    Defined Terms.  In addition to any terms defined elsewhere in this Agreement, the terms defined in this Section 1.1, whenever used in this Agreement (including in the Schedules and Exhibits), shall have the respective meanings indicated.

    a.    *Affiliated Person or Affiliate* -- With respect to a person, any other person controlling, controlled by, or under common control with, such person.

    b.     *Agent* -- An individual associated with the General Agent and registered with the NASD as a representative of the Broker-Dealer who is appointed by an Equitable Life Company as an insurance agent for the purpose of soliciting applications for the Contracts.

    c.     *Broker-of-Record* -- The party designated in the Equitable Life Companies records as the person, with respect to a Contract, who is entitled to receive compensation payable with respect to such Contract and who is authorized to contact directly the owner of such Contract. In the case of compensation payable with respect to a Premium, the Broker-of-Record shall be the party designated as such in the records of an Equitable Life Company, at the time such Premium is accepted by such Equitable Life Company. In the case of any payment of compensation payable with respect to Contract value or client services, the Broker-of-Record shall be the party designated as such in the records of an Equitable Life Company, in accordance with the rules and procedures of the Equitable Life Companies at the time any such payment is payable. In the case of compensation payable on annuitization of a Contract, the Broker-of-Record shall be the party designated as such in the records of an Equitable Life Company on the annuity commencement date specified in such Contract.

    d.     *Contract Prospectus* -- The prospectus for the interests under the Contracts included within a Contract Registration Statement and including any Contract prospectus or supplement separately filed under the 1933 Act. The Contract Prospectus also shall include the statement of additional information which is part of the Contract Registration Statement, unless the context otherwise requires.

    e.     *Contract Registration Statements* -- The most recent effective registration statements, or most recent effective post-effective amendments thereto, relating to interests under the Contracts and in the Variable Accounts, as required by the 1933 Act and the 1940 Act, including financial statements therein and all exhibits thereto.

    f.     *Contracts* -- The classes of life insurance policies and annuity contracts, including certificates, issued by Equitable or by an Affiliate of Equitable which are identified in Schedule I. Schedule I may be modified from time to time, as provided in Section 2.6.

    g.     *Effective Date* -- April 24, 1995.

    h.     *Equitable Life Companies or, individually, an Equitable Life Company* -- Equitable and any Affiliate of Equitable which is an insurance company.

    i.     *MVA Interests* -- The market value adjustment interests under the Contracts.

    j.     *NASD* -- National Association of Securities Dealers, Inc.

    k.     *1940 Act* -- Investment Company Act of 1940, as amended.

    l.     *1934 Act* -- Securities Exchange Act of 1934, as amended.

    m.     *1933 Act* -- Securities Act of 1933, as amended.

    n.     *Premium* -- Any premium, contribution or other consideration relating to the Contracts.

    o.     *SEC or Commission* -- Securities and Exchange Commission.

p.      *Trust* -- The Hudson River Trust and any other entity available for investment through the Variable Accounts under the Contracts.

q.      *Trust Prospectus* -- The prospectus for the Trust included within the Trust Registration Statement and including any Trust prospectus or supplement separately filed under the 1933 Act. The Trust Prospectus also shall include the statement of additional information which is part of the Trust Registration Statement, unless the context otherwise requires.

r.      *Trust Registration Statement* -- The most recent effective registration statement or most recent effective post-effective amendment thereto relating to the Trust as required by the 1933 Act and the 1940 Act, including financial statements therein and all exhibits thereto.

s.      *Variable Accounts* -- Segregated asset accounts identified in Exhibit A, each of which has been established by an Equitable Life Company pursuant to state law as a funding vehicle for the Contracts. The Variable Accounts are divided into divisions that invest in shares of the Trust.

§1.2    Cross-References. All references in this Agreement to a Section, Article, Schedule or Exhibit are to a section, article, schedule or exhibit of this Agreement, unless otherwise indicated.

## ARTICLE II
## Authorization of Broker-Dealer and General Agent

§2.1    Authority to Distribute Contracts. Pursuant to the authority granted to it by Equitable, the Distributor hereby authorizes the Broker-Dealer, under the securities laws, and General Agent, under the insurance laws, each in a non-exclusive capacity, to distribute the Contracts. The Broker-Dealer and the General Agent accept such authorization and agree to use their best efforts to find purchasers for the Contracts in each case acceptable to the Equitable Life Company issuing such Contracts. The Broker-Dealer and the General Agent understand that the public offering of and solicitation for interests under the Contracts are not permitted to commence, or to continue, unless the Contract Registration Statements have become effective and, with respect to each state or other jurisdiction in which Contract applications are to be solicited, the Contracts are qualified for sale under all applicable securities and insurance laws. The Broker-Dealer and the General Agent agree that the solicitation of applications for the sale of the Contracts will commence as soon as practicable after the Contract Registration Statements have become effective.

§2.2    Notification by Distributor. The Distributor shall notify the Broker-Dealer and the General Agent:

a.      If there are no effective Contract Registration Statements, when the Contract Registration Statements have become effective;

b.      Of all states and other jurisdictions in which the Contracts are qualified for sale and of the states and other jurisdictions in which the Contracts may not be lawfully sold;

c.      Of any request by the SEC for any amendments or supplements to a Contract Registration Statement or of any request for additional information that must be provided by the Broker-Dealer or the General Agent or any Affiliate of the Broker-Dealer or the General Agent;

d.      Of the issuance by the SEC of any stop order with respect to a Contract Registration Statement or the initiation of any proceedings for that purpose or for any other purpose relating to the registration and/or offering of the Contracts;

e.    If any event occurs as a result of which the Contract Prospectus(es) or any sales literature for the Contracts would include any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein not misleading.

The Distributor will provide the Broker-Dealer and the General Agent with notification of these matters immediately by telephone, with notification in writing promptly thereafter.

§2.3    Authority to Recommend Agent Appointments.  The General Agent is vested under this Agreement with power and authority to select and recommend individuals who are associated with the General Agent and are registered representatives of the Broker-Dealer for appointment as agents of Equitable, and only individuals so recommended by the General Agent to the Distributor shall become Agents, provided that Equitable reserves the right in its sole discretion to refuse to appoint any proposed agent or, once appointed, to terminate the same at any time with or without cause.

§2.4    Limitations on Authority.  Neither the Broker-Dealer nor the General Agent shall possess or exercise any authority on behalf of the Distributor or the Equitable Life Companies other than that expressly conferred on the Broker-Dealer or the General Agent by this Agreement.  In particular, and without limiting the foregoing, neither the Broker-Dealer nor the General Agent shall have any authority, nor shall either grant such authority to any Agent, on behalf of the Distributor (i) to make, alter or discharge any Contract or other contract entered into pursuant to a Contract; (ii) to waive any Contract provision; (iii) to extend the time for payment of any Premiums; or (iv) to receive any monies or Premiums from applicants for or purchasers of the Contracts (except for the purpose of forwarding monies or Premiums to an Equitable Life Company and except as provided in Section 2.5).

§2.5    Insurer's Right to Reject Applications.  The Broker-Dealer and the General Agent acknowledge that each Equitable Life Company has the right in its sole discretion to reject any applications or Premiums received by it and to return or refund to an applicant such applicant's Premium.  In the event that an Equitable Life Company rejects an application solicited by an Agent, such Equitable Life Company will return any Premium paid by the applicant to such applicant and will promptly notify the General Agent of such action.  In the event that a purchaser exercises his or her free look right under a Contract, any amount to be refunded as provided in such Contract will be returned to the General Agent for refund to the purchaser on behalf of the Equitable Life Company that issued such Contract.

§2.6    Contracts Included Under Agreement.  Schedule I to this Agreement describes the life insurance and annuity contracts which are included as Contracts under this Agreement.  Schedule I may be amended from time to time by the Distributor, with the consent of the General Agent, to include other classes of annuity contracts or life insurance contracts issued by an Equitable Life Company and distributed by the Distributor pursuant to any distribution agreement with an Equitable Life Company which relates to the Contracts.  If the consent of the General Agent to an amendment to Schedule I is not given within 60 days following receipt of notice from the Distributor, the Distributor shall be entitled to conclude that such consent has been withheld.  The provisions of this Agreement shall apply with equal force to any additional Contracts unless the context otherwise requires.  Schedule I may be amended by the Distributor in its sole discretion from time to time to delete classes of annuity contracts or life insurance contracts.

§2.7    Independent Contractor Status.  The Distributor acknowledges that the Broker-Dealer and the General Agent are each independent contractors.  Accordingly, while the Broker-Dealer and the General Agent agree to use their best efforts to solicit applications for the Contracts, the Broker-Dealer and the General Agent are not obliged or expected to give full time and energies to the performance of their obligations hereunder or to sell or solicit a specified number of Contracts, nor are the Broker-Dealer and the General Agent obliged or expected to represent the Distributor or any Equitable Life Company

exclusively. Nothing herein contained shall constitute the Broker-Dealer, the General Agent, or any agents or representatives of the Broker-Dealer or the General Agent as employees of an Equitable Life Company or the Distributor.

## ARTICLE III
### Licensing and Registration of Broker-Dealer, General Agent and Agents

§3.1   Broker-Dealer Qualifications.   The Broker-Dealer represents that it is a broker-dealer registered with the SEC under the 1934 Act, and is a member of the NASD. The Broker-Dealer must, at all times when performing its functions and fulfilling its obligations under this Agreement, be duly registered as a broker-dealer under the 1934 Act and in each state or other jurisdiction in which Broker-Dealer intends to perform its functions and fulfill its obligations hereunder and in which such registration is required, and be a member in good standing of the NASD.

§3.2   General Agent Qualifications.   The General Agent represents that it is a licensed life insurance agent where required to solicit applications. The General Agent must, at all times when performing its functions and fulfilling its obligations under this Agreement, be duly licensed to sell the Contracts in each state or other jurisdiction in which the General Agent intends to perform its functions and fulfill its obligations hereunder.

§3.3   Qualifications of Broker-Dealer Representatives.   The Broker-Dealer represents and warrants that it shall take all necessary action to ensure that no individual shall offer or sell the Contracts on behalf of Broker-Dealer in any state or other jurisdiction in which the Contracts may lawfully be sold unless such individual is an associated person of Broker-Dealer (as that term is defined in Section 3(a)(18) of the 1934 Act), is not subject to a statutory disqualification (as that term is defined in the 1934 Act) and is duly registered with the NASD and any applicable state securities regulatory authority as a registered person of Broker-Dealer qualified to distribute the Contracts in such state or other jurisdiction.

§3.4   Qualifications of General Agent's Agents and Appointment of Agents.   The General Agent represents and warrants that it shall take all necessary action to ensure that no individual shall offer or sell the Contracts on behalf of the General Agent in any state or other jurisdiction unless such individual is duly appointed as an agent of the General Agent, duly licensed and appointed as an agent of the appropriate Equitable Life Company and appropriately licensed, registered or otherwise qualified to offer and sell the Contracts to be offered and sold by such individual under the insurance laws of such state or jurisdiction. The General Agent understands that certain states may require that a special variable contracts examination be passed by agent before he or she can solicit applications for the Contracts. Nothing in this Agreement is to be construed as requiring an Equitable Life Company to obtain a license or issue a consent or appointment to enable any particular agent to sell Contracts. Moreover, without limiting the generality of the foregoing, an Equitable Life Company shall not consider for appointment any individual who was a member of Equitable's career agency force within the preceding 12 months. All matters concerning the licensing of any individuals recommended for appointment by the General Agent under any applicable state insurance law shall be a matter directly between the General Agent and such individual. The General Agent shall furnish the Equitable Life Companies with proof of proper licensing of such individual or other proof, reasonably acceptable to the Equitable Life Companies, of satisfaction by such individual of licensing requirements prior to the appointment of any such individual as an agent of any Equitable Life Company. In conjunction with the submission of appointment papers for all such individuals as insurance agents of an Equitable Life Company, the General Agent shall be deemed to represent that each individual is competent and qualified to act as an agent for the Equitable Life Companies and to hold himself or herself out in good faith to the general public.

## ARTICLE IV
### Broker-Dealer and General Agent Compliance

§4.1   Supervisory Responsibilities of General Agent.  The General Agent shall train, supervise and be solely responsible for the conduct of the Agents in their solicitation activities in connection with the Contracts, and shall supervise Agents' strict compliance with applicable rules and regulations of any governmental or other insurance authorities that have jurisdiction over insurance contract activities, as well as the rules and procedures of the Equitable Life Companies pertaining to the solicitation, sale and submission of applications for the Contracts and the provision of services relating to the Contracts.  The General Agent shall be solely responsible for background investigations of the proposed agents to determine their qualifications, good character and moral fitness to sell the Contracts; in discharging this responsibility, the General Agent shall be permitted to rely upon information furnished by the Broker-Dealer.

§4.2   Supervisory Responsibilities of Broker-Dealer.  The Broker-Dealer shall be responsible for securities training, supervision and control of the Agents in connection with their solicitation activities and any incidental services with respect to the Contracts and shall supervise Agents' strict compliance with applicable federal and state securities laws and NASD requirements in connection with such solicitation activities and with the rules and procedures of the Equitable Life Companies.

§4.3   Compliance With Applicable Laws.  The Broker-Dealer and the General Agent hereby represent and warrant that they are in compliance with all applicable federal and state securities laws and regulations and all applicable insurance laws and regulations, including, without limitation, state insurance laws and regulations imposing insurance licensing requirements. The Broker-Dealer and the General Agent each agree to carry out their respective sales and administrative activities and obligations under this Agreement in continued compliance with federal and state laws and regulations, including those governing securities and insurance-related activities or transactions, as applicable.  The Broker-Dealer and the General Agent shall notify the Distributor and the Equitable Life Companies immediately in writing if Broker-Dealer and/or the General Agent fail to comply with any of the laws and regulations applicable to either of them.

§4.4   Restrictions on Sales Activity.  The Broker-Dealer and the General Agent and Agents shall not offer or attempt to offer the Contracts, nor solicit applications for the Contracts, nor deliver Contracts, in any state or other jurisdiction in which the Contracts may not lawfully be sold or offered for sale.  For purposes of determining where the Contracts may be offered and applications solicited, the Broker-Dealer and the General Agent may rely on written notification, as revised from time to time, received from the Distributor.

§4.5   Premiums and Other Payments.   All Premiums and loan repayments shall be sent immediately to the appropriate Equitable Life Company at the address indicated in the rules and procedures of the Equitable Life Companies, or at such other address as the Equitable Life Companies or the Distributor may subsequently specify in writing. Each initial Premium shall be accompanied by a properly completed application for a Contract, unless such Premium is submitted in accordance with the procedures set forth in Exhibit C, which have been accepted and agreed to by the Broker-Dealer and the General Agent, as provided in Exhibit C.  Checks in payment of Premiums or outstanding loans shall be drawn to the order of the appropriate Equitable Life Company.

§4.6   Misdirected Payments.  In the event that Premiums or loan repayments are sent to the General Agent or Broker-Dealer, rather than to the appropriate Equitable Life Company, the General Agent and Broker-Dealer shall immediately remit such Premiums to the appropriate Equitable Life Company at

the address indicated in the rules and procedures of the Equitable Life Companies. The General Agent and Broker-Dealer acknowledge that if any Premium or other payment is held at any time by either of them, such Premium or other payment shall be held on behalf of the client, and the General Agent or Broker-Dealer shall segregate such Premium or other payment from their own funds and immediately remit such Premium or other payment to the Equitable Life Company issuing the Contract pursuant to which such amounts have been paid.

§4.7    Delivery of Contracts.  Upon issuance of a Contract by an Equitable Life Company and delivery of such Contract to the General Agent, the General Agent shall promptly deliver such Contract to its purchaser.  For purposes of this provision, "promptly" shall be deemed to mean not later than five calendar days.  Consistent with its administrative procedures, each Equitable Life Company will assume that a Contract issued by it will be delivered by the General Agent to the purchaser of such Contract within five calendar days.  As a result, if a purchaser exercises the free look rights under a Contract, the Broker-Dealer and the General Agent shall indemnify the Equitable Life Company issuing a Contract for any market loss incurred by such Equitable Life Company that results from the General Agent's failure to deliver such Contract to its purchaser within a ten-calendar-day period.

§4.8    Restrictions on Communications.  Neither the Broker-Dealer nor the General Agent, nor any of their directors, partners, officers, employees, registered persons, associated persons, agents or affiliated persons, in connection with the offer or sale of the Contracts, shall give any information or make any representations or statements, written or oral, concerning the Contracts, the Variable Accounts or the Trust other than information or representations contained in the Contract and Trust Prospectuses, statements of additional information and Registration Statements, or in reports or proxy statements therefor, or in promotional, sales or advertising material or other information supplied and approved in writing by the Distributor.

§4.9    Directions Given on Behalf of Contract Owners.  The Broker-Dealer and the General Agent shall be solely responsible for the accuracy and propriety of any instruction given or action taken by an Agent on behalf of an owner or prospective owner of a Contract, including any instruction or action pursuant to Exhibit B.  Neither the Distributor nor the Equitable Life Companies shall have any responsibility or liability for any action taken or omitted by it or by them in good faith in reliance on or by acceptance of such an instruction or action.

§4.10    Restrictions on Sales Material and Name Usage.  The Broker-Dealer and the General Agent shall neither use nor authorize the use of any promotional, sales or advertising material relating to the Contracts, the Equitable Life Companies, the Variable Accounts, the MVA Interests or the Trust without the prior written approval of the Distributor.  Furthermore, the Broker-Dealer and the General Agent shall neither use nor authorize the use of the name of Equitable or of an Affiliate of Equitable, or any other name, trademark, service mark, symbol or trade style that is now or may hereafter be owned by Equitable or by an Affiliate of Equitable, except in the manner and to the extent that such use may be specifically authorized in writing by Equitable or the Distributor.

§4.11    Market Timing and Other Prohibitions.  The Broker-Dealer and the General Agent understand and acknowledge that the Distributor, in its sole discretion and at any time during the term of this Agreement, may restrict or prohibit the solicitation, offer or sale of Contracts and Premiums thereunder in connection with any so-called "market timing" or "asset allocation" program, plan, arrangement or service.  Should the Distributor determine in its sole discretion that the Broker-Dealer or the General Agent is soliciting, offering or selling, or has solicited, offered or sold, Contracts or Premiums subject to any so-called "market timing" or "asset allocation" program, plan, arrangement or service which is not permitted under this Agreement (an "unapproved program"), the Distributor may take such action which is necessary, in its sole discretion, to halt such solicitations, offers or sales.  Furthermore, in addition to any

indemnification provided in Article XI and any other liability that the Broker-Dealer and the General Agent might have, the Distributor may hold the Broker-Dealer and the General Agent liable for any damages or losses, actual or consequential, sustained by the Distributor or any of its Affiliates, or the Trust or any Equitable Life Company, as a result of any unapproved program which causes such losses or damages following solicitation, offer or sale of a Contract or Premium subject to any unapproved program or similar service made available by or through the Broker-Dealer or the General Agent. Notwithstanding any prohibitions which may be imposed pursuant to this Section 4.11, the Broker-Dealer and its registered representatives who are Agents may provide incidental services in the form of guidance to applicants and owners of Contracts regarding the allocation of Premiums and Contract value, provided that such services are (i) solely incidental to the Broker-Dealer's activities in connection with the sales of the Contracts, (ii) subject to the supervision and control of the Broker-Dealer, and (iii) furnished in accordance with rules and procedures prescribed by Equitable.

§4.12  Tax Reporting Responsibility.  The Broker-Dealer and the General Agent shall be solely responsible under applicable tax laws for the reporting of compensation paid to Agents and for any withholding of taxes from compensation paid to Agents, including, without limitation, FICA, FUTA, and federal, state and local income taxes.

§4.13  Maintenance of Books and Records.  The General Agent represents that it maintains and shall maintain such books and records concerning the activities of the Agents as may be required by the appropriate insurance regulatory agencies that have jurisdiction and that may be reasonably required by the Distributor to reflect adequately the Contracts processed through the General Agent. The General Agent shall make such books and records available to the Distributor and/or an Equitable Life Company at any reasonable time upon written request by the Distributor. The Broker-Dealer represents that it maintains and shall maintain appropriate books and records concerning the activities of the Agents as are required by the SEC, the NASD and other agencies having jurisdiction and that may be reasonably required by the Distributor to reflect adequately the Contracts processed through the General Agent. Broker-Dealer shall make such books and records available to the Distributor and/or an Equitable Life Company at any reasonable time upon written request by the Distributor or an Equitable Life Company.

§4.14  Bonding of Agents and Others.  The Broker-Dealer represents that all directors, officers, employees, and registered representatives of the Broker-Dealer who are appointed pursuant to this Agreement as Agents for state insurance law purposes or who have access to funds of the Equitable Life Companies, including but not limited to funds submitted with applications for the Contracts or funds being returned to purchasers of Contracts, are and shall be covered by a blanket fidelity bond, including coverage for larceny and embezzlement, issued by a reputable bonding company. This bond shall be maintained by the Broker-Dealer at the Broker-Dealer's expense. Such bond shall be, at least, of the form, type and amount required under the NASD Rules of Fair Practice. The Distributor may require evidence, satisfactory to it, that such coverage is in force, and the Broker-Dealer shall give prompt written notice to the Distributor of any cancellation or change of coverage. The Broker-Dealer assigns any proceeds received from the fidelity bonding company to the Equitable Life Companies to the extent of each Equitable Life Company's loss due to activities covered by the bond. If there is any deficiency amount, as a result of a deductible provision or otherwise, the Broker-Dealer shall promptly pay the affected Equitable Life Company such amount on demand, and the Broker-Dealer hereby indemnifies and holds harmless such Equitable Life Company from any such deficiency and from the costs of collection thereof (including reasonable attorneys' fees).

§4.15  Reports to Insurers.  The Broker-Dealer and the General Agent shall promptly furnish to each Equitable Life Company or its authorized agent any reports and information that such Equitable Life Company may reasonably request for the purpose of meeting such Equitable Life Company's reporting and

recordkeeping requirements under the insurance laws of any state, under any applicable federal or state securities laws, rules or regulations, or the rules of the NASD.

## ARTICLE V
### Standard of Conduct for Agents

§5.1    Basic Rules of Conduct.  The Broker-Dealer and the General Agent shall ensure that each Agent shall comply with a standard of conduct including, but not limited to, the following:

a.    An Agent shall be duly qualified, licensed and registered to solicit and participate in the sale of Contracts as provided in Article III.

b.    An Agent shall not solicit applications for the Contracts without delivering the appropriate Contract Prospectus(es) the Trust Prospectus and, where required by state insurance law (as set forth in a notice to be supplied by the Equitable Life Companies), the then currently effective statement of additional information for the Contracts, and any other information whose delivery is specifically required.  In soliciting applications for the Contracts, an Agent shall only make statements, oral or written, which are in accordance with the Contract Prospectus, the Trust Prospectus and written sales literature regarding the Contracts authorized by the Distributor.  An Agent shall utilize only those applications for the Contracts provided to the General Agent by the Distributor.

c.    An Agent shall recommend the purchase of a Contract to an applicant only if he or she has reasonable grounds to believe that such purchase is suitable for the applicant in accordance with, among other things, applicable regulations of any state regulatory authority, the SEC and the NASD.  While not limited to the following, a determination of suitability shall be based on information supplied to an Agent after a reasonable inquiry concerning the applicant's insurance and investment objectives and financial situation and needs.

d.    An Agent shall require that any payment of an initial Premium, whether in the form of a check or otherwise, shall be drawn in U.S. dollars on a bank located in the United States and made payable to the appropriate Equitable Life Company and, if in the form of a check, signed by the applicant for the Contract or by a duly authorized representative of the applicant who is acceptable to the Equitable Life Companies.  An Agent shall not accept third-party checks or cash for Premiums.

e.    All checks and applications for the Contracts received by an Agent shall be forwarded immediately to the processing office designated by the Equitable Life Companies.

f.    An Agent shall have no authority to endorse checks to an Equitable Life Company, except to the extent provided in Exhibit B.

g.    An Agent shall have no authority to alter, modify, waive or change any of the terms, rates, charges or conditions of the Contracts.

h.    An Agent shall make no representations concerning the continuation of non-guaranteed terms or provisions of the Contracts.

i.    An Agent shall have no authority to advertise for, on behalf of, or with respect to an Equitable Life Company, the Distributor, the Variable Accounts, the MVA Interests, the Contracts or the Trust without prior written approval and authorization from the Distributor.

j.     An Agent shall have no authority to solicit applications for Contracts or Premiums thereunder which will be subject to or in connection with any so-called "market timing" or "asset allocation" program, plan, arrangement or service which is an unapproved program.

k.     An Agent shall not furnish any transfer or other instructions by telephone to an Equitable Life Company on behalf of an owner of a Contract without having first obtained from such owner a written authorization in a form acceptable to the Equitable Life Companies.

l.     An Agent shall not encourage a prospective purchaser to surrender or exchange an insurance policy or contract issued by an Equitable Life Company in order to purchase a Contract or, conversely, to surrender or exchange a Contract in order to purchase another insurance policy or contract issued by an Equitable Life Company, except to the extent such surrenders or exchanges have been authorized by the Distributor. In the event that an insurance policy or contract issued by an Equitable Life Company is surrendered or exchanged in order to purchase a Contract, no compensation shall be paid under this Agreement.

m.     An Agent shall act in accordance with the rules and procedures of the Equitable Life Companies in connection with any solicitation activities relating to the Contracts.

## ARTICLE VI
### Responsibilities of Distributor for Marketing Materials and Reports

§6.1     Prospectuses and Applications Provided by Distributor.    During the term of this Agreement, the Distributor will provide the Broker-Dealer and the General Agent, without charge, with as many copies of the Contract Prospectus(es), Trust Prospectus and applications for the Contracts, as the Broker-Dealer or the General Agent may reasonably request. Upon receipt from the Distributor of updated copies of the Contract Prospectus(es), Trust Prospectus and applications for the Contracts, the Broker-Dealer and the General Agent will promptly discard or destroy all copies of such documents previously provided to them, except such copies as are needed for purposes of maintaining proper records. Upon termination of this Agreement, the Broker-Dealer and the General Agent will promptly return, to the Distributor, all Contract and Trust Prospectuses, Contract applications, and other materials and supplies furnished by the Distributor to the Broker-Dealer or the General Agent or to the Agents.

§6.2     Sales Material Provided by Distributor.    During the term of this Agreement, the Distributor will be responsible for providing and approving all promotional, sales and advertising material to be used by the Broker-Dealer and the General Agent. The Distributor will file such materials or will cause such materials to be filed with the SEC and the NASD, and with any state securities regulatory authorities, as required.

§6.3     Information Provided by Distributor.    The Distributor will compile periodic marketing reports summarizing sales results to the extent reasonably requested by the Broker-Dealer or the General Agent.

## ARTICLE VII
### Commissions, Fees and Expenses

§7.1     Compensation Schedule.    During the term of this Agreement, the Distributor shall pay to the General Agent (or to the Broker-Dealer, at the request of the General Agent) as compensation for Contracts for which it is the Broker-of-Record, the amounts set forth in Schedule II, as such Schedule II may be amended or modified at any time, in any manner and without prior notice by the Distributor, and subject to the other provisions of this Agreement. Any amendment to Schedule II will be applicable to any

Contract for which an application or initial Premium is received by an Equitable Life Company on or after the effective date of such amendment, in accordance with procedures established by the Distributor. Compensation with respect to any Contract shall be paid to the General Agent only for so long as the General Agent is the Broker-of-Record for such Contract.

§7.2    Limitations on Compensation. No compensation or reimbursement of any kind other than that described in this Agreement is payable to the General Agent or the Broker-Dealer. In addition, the Broker-Dealer and the General Agent recognize that, unless the provisions of Exhibit B apply to the receipt of an initial Premium, all compensation payable to the General Agent hereunder will be disbursed by or on behalf of the Distributor after each Premium is received and accepted by the appropriate Equitable Life Company.

§7.3    Expenses Paid by Broker-Dealer and General Agent. Neither the Broker-Dealer nor the General Agent shall, directly or indirectly, expend or contract for the expenditure of any funds of the Distributor or any Equitable Life Company. The Broker-Dealer and the General Agent shall each pay all expenses incurred by each of them in the performance of this Agreement, unless otherwise specifically provided for in this Agreement or unless the Distributor shall have agreed in advance in writing to share the cost of certain expenses. Initial state appointment fees for agents of an Equitable Life Company who are associated with the General Agent will be paid by such Equitable Life Company unless otherwise paid by the General Agent or Broker-Dealer. Renewal state appointment fees for any Agent shall be paid by such Equitable Life Company if, in the sole discretion of such Equitable Life Company, its minimum production and activity requirements for the payment of renewal appointment fees have been met by such Agent. Each Equitable Life Company shall establish reasonable minimum production and activity requirements for the payment of renewal state appointment fees, which may be changed by such Equitable Life Company in its sole discretion at any time without notice. Except as otherwise provided herein, the Broker-Dealer will be obligated to pay all state appointment fees, including, but not limited to, renewal appointment fees not paid for by an Equitable Life Company, transfer fees and termination fees, and any other fees required to be paid to obtain state insurance licenses for Agents.

§7.4    Offsets of Compensation Under Other Agreements. With respect to commissions, compensation or any other amounts owed by the Distributor or any Affiliate of the Distributor to the Broker-Dealer or the General Agent under any other agreement, the Distributor shall have a right to set off against such amounts any monies payable by the General Agent under this Agreement, including Schedule II, to the Distributor, to the extent permitted by applicable law. This right on the part of the Distributor shall not prevent both of them or either of them from pursuing any other means or remedies available to them to recover such monies payable by the General Agent.

§7.5    No Rights of Agents to Compensation Paid by Distributor. Agents shall have no interest in this Agreement or right to any commissions to be paid by the Distributor to the General Agent. The General Agent shall be solely responsible for the payment of any commission or consideration of any kind to Agents. The General Agent shall have no interest in any compensation paid by an Equitable Life Company to the Distributor, now or hereafter, in connection with the sale of any Contracts under this Agreement.

ARTICLE VIII
**Term and Exclusivity of Agreement**

§8.1    Limited Classes of Contracts. This Agreement relates solely to the Contracts identified in Schedule I.

§8.2    Term.  This Agreement shall remain in effect for a period of one year from the Effective Date, and, unless terminated earlier pursuant to Sections 8.3 or 8.4, shall automatically continue in effect for one-year periods thereafter; provided, however, that it shall automatically terminate upon termination of any distribution agreement between the Distributor and an Equitable Life Company relating to the Contracts.

§8.3    Early Termination by Notice.  This Agreement may be terminated by any party hereto by giving notice to the other parties at least sixty (60) days prior to an anniversary of the Effective Date.

§8.4    Termination for Cause.  If Broker-Dealer or the General Agent shall default in their respective obligations under this Agreement, or breach any of their respective representations or warranties made in this Agreement, the Distributor may, at its option, cancel and terminate this Agreement without notice.

§8.5    Surviving Provisions.  Upon termination of this Agreement, all authorizations, rights, and obligations hereunder shall cease except:

a.    the obligation to settle accounts hereunder, including the payment of compensation with respect to Contracts in effect at the time of termination or issued pursuant to applications received by an Equitable Life Company prior to termination or Premiums received under such Contracts subsequent to termination of this Agreement;

b.    the provisions with respect to indemnification set forth in Article XI;

c.    the provisions of Section 4.13 that require the General Agent and the Broker-Dealer to maintain certain books and records;

d.    the confidentiality provisions contained in Section 10.3; and

e.    the provisions of subparagraph 1. of Section 5.1 with respect to the surrender or exchange of a Contract.

In addition, after the termination of this Agreement, the General Agent shall continue to receive Contract information relating to each Contract issued pursuant to this Agreement, unless a Contract owner shall direct that such information not be so provided.

ARTICLE IX
Complaints and Investigations

§9.1    Cooperation in Investigations and Proceedings.  The Distributor, the Broker-Dealer and the General Agent shall each cooperate fully in any insurance regulatory investigation, proceeding or inquiry or in any judicial proceeding arising in connection with the Contracts marketed under this Agreement.  In addition, the Distributor, the Broker-Dealer and the General Agent shall cooperate fully in any securities regulatory investigation, proceeding or inquiry or in any judicial proceeding with respect to the Distributor, the Broker-Dealer, their Affiliates or their agents, to the extent that such investigation or proceeding is in connection with the Contracts marketed under this Agreement.  Copies of documents received by any party to this Agreement in connection with any judicial proceeding shall be furnished promptly to all of the other parties.

§9.2.   Notification and Related Requirements.  Without limiting the provisions of Section 9.1:

a.      The Broker-Dealer and the General Agent will be notified promptly of any customer complaint or notice of any regulatory investigation, proceeding or inquiry or any judicial proceeding received by the Distributor or an Equitable Life Company with respect to the Broker-Dealer, General Agent or any Agent.

b.      The Broker-Dealer and the General Agent will promptly notify the Distributor and the appropriate Equitable Life Company of any customer complaint or notice of any regulatory investigation, proceeding or inquiry or any judicial proceeding received by the Broker-Dealer, the General Agent or their Affiliates with respect to themselves, their Affiliates or any Agent in connection with any Contract marketed under this Agreement or any activity relating to any such Contract and, upon request by the Distributor, will promptly provide copies of all relevant materials to the Distributor.

c.      In the case of a customer complaint, the Distributor, the Broker-Dealer and the General Agent will cooperate in investigating such complaint, and any response by the Broker-Dealer or the General Agent to such complaint will be sent to the Distributor for written approval not less than five business days prior to its being sent to the customer or regulatory authority, except that if a more prompt response is required, the proposed response shall be communicated by telephone or facsimile.  The Distributor shall have final authority to determine the content of each such response.

## ARTICLE X
### Assignment, Amendment, Confidentiality

§10.1.  Non-Assignable Except to Certain Affiliates.  This Agreement shall be non-assignable by the parties hereto, except that a party may assign its rights and obligations to any subsidiary of, or any company under common control with, such party, provided that:

a.      the assignee is duly licensed to perform all functions required of that party under this Agreement;

b.      the assignee undertakes to perform such party's functions hereunder; and

c.      in the event that the Broker-Dealer or the General Agent determines to assign its rights and obligations under this Agreement:

i.      such proposed assignment is approved in advance by the Distributor; and

ii.     the Broker-Dealer or the General Agent or assignee pays any state insurance agent appointment fees and any other charges or fees, including taxes, that become due and payable as a result of the assignment.

10.2.   Prior Agreements and Amendments.  This Agreement constitutes the entire agreement between the parties hereto and supersedes all prior agreements, either oral or written, between the parties relating to the Contracts and, except for any amendment of Schedule I, pursuant to the terms of Section 2.6, or Schedule II, pursuant to the terms of Section 7.1, may not be modified in any way unless by written agreement.

§10.3.  Confidentiality.  Each party to this Agreement shall maintain the confidentiality of any client list or any other proprietary information that it may acquire in the performance of this Agreement and

shall not use such information for any purpose unrelated to the administration of the Contracts without the prior written consent of the other parties.

## ARTICLE XI
### Indemnification

§11.1    Indemnification of Distributor.    The Broker-Dealer and the General Agent, jointly and severally, shall indemnify and hold harmless each Equitable Life Company, the Distributor and each person who controls or is associated with an Equitable Life Company or the Distributor within the meaning of such terms under the federal securities laws, and any officer, director, employee or agent of the foregoing, against any and all losses, claims, damages or liabilities, joint or several (including any investigative, legal and other expenses reasonably incurred in connection with, and any amounts paid in settlement of, any action, suit or proceeding or any claim asserted), insofar as such losses, claims, damages or liabilities arise out of or are based upon:

a.    violation(s) by the Broker-Dealer, the General Agent or an Agent of federal or state securities laws or regulations, insurance laws or regulations, or any rule or requirement of the NASD;

b.    any unauthorized use of sales or advertising material, any oral or written misrepresentations, or any unlawful sales practices concerning the Contracts, the Equitable Life Companies, the Variable Accounts, the MVA Interests or the Trust, by the Broker-Dealer, the General Agent or an Agent;

c.    claims by the Agents or other agents or representatives of the General Agent or the Broker-Dealer for commissions or other compensation or remuneration of any type;

d.    any action or inaction by any clearing broker or broker furnishing similar services through which the Broker-Dealer or the General Agent processes any transaction pursuant to this Agreement;

e.    any failure on the part of the Broker-Dealer, the General Agent or an Agent to submit Premiums or applications for Contracts or accurate and proper instructions of a Contract owner or prospective owner to the Equitable Life Companies, or to submit the correct amount of a Premium, on a timely basis and in accordance with Sections 4.5 and 4.6 and the rules and procedures of the Equitable Life Companies.

f.    any failure on the part of the Broker-Dealer, the General Agent, or an Agent to deliver Contracts to purchasers thereof on a timely basis in accordance with Section 4.7 and in accordance with the rules and procedures of the Equitable Life Companies; or

g.    any other breach by the Broker-Dealer or the General Agent of any provision of this Agreement, including, without limitation, Section 5.1.

This indemnification will be in addition to any liability which the Broker-Dealer and the General Agent may otherwise have.

§11.2    Indemnification of Broker-Dealer and General Agent.    The Distributor shall indemnify and hold harmless the Broker-Dealer and the General Agent and each person who controls or is associated with the Broker-Dealer or the General Agent within the meaning of such terms under the federal securities laws, and any officer, director, employee or agent of the foregoing, against any and all losses, claims, damages or liabilities, joint or several (including any investigative, legal and other expenses reasonably incurred in

connection with, and any amounts paid in settlement of, any action, suit or proceeding or any claim asserted), to which they or any of them may become subject under any statute or regulation, at common law or otherwise, insofar as such losses, claims, damages or liabilities arise out of or are based upon a breach by the Distributor of any provision of this Agreement. This indemnification will be in addition to any liability which the Distributor may otherwise have.

§11.3  Notification and Procedures.  After receipt by a party entitled to indemnification ("Indemnified Party") under this Article XI of notice of the commencement of any action or threat of such action, if a claim in respect thereof is to be made against any person obligated to provide indemnification under this Article XI ("Indemnifying Party"), such Indemnified Party will notify the Indemnifying Party in writing of the commencement thereof as soon as practicable thereafter, provided that the omission so to notify the Indemnifying Party will not relieve it from any liability under this Article XI, except to the extent that the omission results in a failure of actual notice to the Indemnifying Party and such Indemnifying Party is damaged solely as a result of the failure to give such notice. The Indemnifying Party, upon the request of the Indemnified Party, shall retain counsel reasonably satisfactory to the Indemnified Party to represent the Indemnified Party and any others the Indemnifying Party may designate in such proceeding and shall pay the fees and disbursements of such counsel related to such proceeding. In any such proceeding, any Indemnified Party shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party, unless (i) the Indemnifying Party and the Indemnified Party shall have mutually agreed to the retention of such counsel or (ii) the named parties to any such proceeding (including any impleaded parties) include both the Indemnifying Party and the Indemnified Party and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them. The Indemnifying Party shall not be liable for any settlement of any proceeding effected without its written consent, but if such proceeding is settled with such consent or if final judgment is entered in such proceeding for the plaintiff, the Indemnifying Party shall indemnify the Indemnified Party from and against any loss or liability by reason of such settlement or judgment.

## ARTICLE XII
## Miscellaneous

§12.1  Headings.  The headings in this Agreement are included for convenience of reference only and in no way define or delineate any of the provisions hereof or otherwise affect their construction or effect.

§12.2  Counterparts.  This Agreement may be executed in two or more counterparts, each of which taken together shall constitute one and the same instrument.

§12.3  Severability.  If any provision of this Agreement shall be held or made invalid by a court decision, statute, rule or otherwise, the remainder of this Agreement shall not be affected thereby.

§12.4  Notices.  All notices under this Agreement shall be given in writing and addressed as follows:

if to the Distributor, to:

Equitable Distributors, Inc.
787 Seventh Avenue
New York, New York 10019
Attention: President

SA4.                                                     -15-

if to the Broker-Dealer or the General Agent, to:

> Planning Corporation of America
> 880 Carillon Parkway
> St. Petersburg, FL  33716
> Attention:  James Sipe

or to such other address as such party may hereafter specify in writing.  Each such notice shall be either hand delivered or transmitted by certified United States mail, return receipt requested, and shall be effective upon delivery.

§12.5   Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, excluding its conflict of laws provisions.

§12.6   Scope of Sales Material References.  For purposes of this Agreement, all references to sales, promotional, marketing or advertising material shall include, without limitation, advertisements (such as material published, or designed for use in, a newspaper, magazine or other periodical, radio, television, telephone or tape recording, videotape display, signs or billboards, motion pictures or other public media), sales literature (i.e., any written communication distributed or made generally available to customers or the public, including brochures, circulars, research reports, market letters, form letters, seminar texts, reprints or excerpts of any other advertisement, sales literature or published article), and educational or training materials or other communications distributed or made generally available to some or all Agents or employees of the Broker-Dealer or the General Agent.

§12.7   No Waiver of Rights.  The rights, remedies and obligations contained in this Agreement are cumulative and are in addition to any and all rights, remedies and obligations, at law or in equity, which the parties hereto are entitled to under state and federal laws.  Failure of any party to insist upon strict compliance with any of the conditions of this Agreement shall not be construed as a waiver of any of the conditions, but the same shall remain in full force and effect.  No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver.

§12.8   Scope of Agreement.  All Schedules and Exhibits to this Agreement are part of the Agreement.

ARTICLE XIII
**Sales By or Through Banks**

§13.1   Applicability of Article; Supplemental Definitions.  This Article XIII applies only if the Broker-Dealer or the General Agent distributes Contracts in one or more of the following circumstances (collectively referred to as "Bank-Related Sales"): (i) on the premises of a bank, trust company, savings bank, savings and loan association, or other institution (a) the deposits of which are insured by the Federal Deposit Insurance Corporation ("FDIC") or (b) which is chartered, organized, regulated or supervised under the authority of any federal or state bank or similar financial institution regulatory agency or authority (collectively, "Banks"); (ii) by means of personal, telephone, mail or other oral or written contacts originating from the premises of a Bank; or (iii) to persons which are referred to the Broker-Dealer or General Agent by a Bank.  For purposes of this Article XIII, the term "Bank Regulatory Requirements" shall include (i) the *Interagency Statement on Retail Sales of Nondeposit Products* (February 15, 1994), published by the U.S. Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the FDIC and the U.S. Office of Thrift Supervision, as supplemented or amended from

time to time, and (ii) any federal or state laws, regulations, orders, directives, circulars, agreements in writing, memoranda, commitments in writing or other legal or supervisory requirements which may be administered, adopted, promulgated, enforced or applied with respect to any Bank-Related Sales under this Agreement (regardless of whether any such requirement is of general or specific applicability) by any federal or state bank or financial institution regulatory agency or authority.

§13.2   Written Agreements for Bank-Related Sales.   The authorization to distribute Contracts which is conferred on the Broker-Dealer and the General Agent under Article II shall not include Bank-Related Sales unless such activities are conducted under the terms of a written agreement with each and any Bank where such Bank-Related Sales will take place which complies in all respects with applicable Bank Regulatory Requirements.  The Broker-Dealer or General Agent shall, upon request of the Distributor, provide the Distributor with a copy of each such written agreement.  The Broker-Dealer and the General Agent shall have exclusive responsibility for ensuring strict compliance with the terms and conditions of any such written agreement.

§13.3   Compliance with Bank Regulatory Requirements.   The Broker-Dealer and the General Agent each represent and warrant, on behalf of itself and the Agents, that it is in compliance with all Bank Regulatory Requirements applicable to third parties engaged in Bank-Related Sales.  The Broker-Dealer and the General Agent shall have exclusive responsibility for ensuring strict compliance with all Bank Regulatory Requirements with respect to any Bank-Related Sales under this Agreement.  The Broker-Dealer and the General Agent each undertake to keep the Distributor promptly informed of any amendments, supplements or changes to applicable Bank Regulatory Requirements which may affect this Agreement.

§13.4   Production by Distributor of Certain Books and Records.   The Distributor agrees to provide to the Broker-Dealer or the General Agent, upon request, any books and records relating to Contracts distributed through Bank-Related Sales for purposes of making such records available for inspection by any federal or state bank or financial institution regulatory agency with jurisdiction over such Bank-Related Sales, or over a Bank through which such sales are conducted.  The Distributor's agreement under this Section 13.4 shall not constitute or represent in any respect an admission or acknowledgment by Distributor that such federal or state bank or financial institution regulatory authority has any jurisdiction over Distributor or the activities of the Distributor, and the Distributor expressly disclaims any such jurisdiction.

§13.5   Prospectuses and Applications Provided by Distributor; Sales Materials.   During the term of this Agreement, the Distributor will provide the Broker-Dealer and the General Agent, without charge, with as many copies of the Contract Prospectus(es), Trust Prospectus and applications for the Contracts, containing those disclosures specifically required by any applicable Bank Regulatory Requirements with respect to products not insured by the FDIC and similar matters, as the Broker-Dealer or the General Agent reasonably may request.  The Broker-Dealer and the General Agent shall have exclusive responsibility for ensuring the use and delivery of such materials, and any sales materials described in Article VI, in compliance with applicable Bank Regulatory Requirements.  The terms of Article VI otherwise shall govern the furnishing, use and return of such documents and materials.

§13.6   Supplemental Indemnification of Distributor.   In addition to the indemnifications provided to the Distributor under Section 11.1, the Broker-Dealer and the General Agent, jointly and severally, shall indemnify each person entitled to indemnification under Section 11.1 for any losses, claims, damages or liabilities (as described in Section 11.1) arising out of or based on violations or failures to comply with any Bank Regulatory Requirements.  The provisions of Article VI otherwise shall govern the terms and procedures with respect to any indemnifications provided under this Section 13.6.

§13.7  <u>Construction With Other Provisions</u>.  The provisions of this Article XIII are in addition to the other terms and conditions of this Agreement.  In the event of any inconsistency between the provisions of this Article XIII and any other term or condition of this Agreement, the requirements of this Article XIII and not such other term or condition, shall govern.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers.

INVESTMENT MANAGEMENT & RESEARCH, INC.

By: _____

Title:   Vice President

PLANNING CORPORATION OF AMERICA

By: _____

Title: President

Agreed to and accepted as of the *27* day of *March*, 199*6* in New York, New York

EQUITABLE DISTRIBUTORS, INC.

By: _____

Title: _____

NNG_1.DOC/30652
38635
38637
3/1/96