**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **AXA DISTRIBUTORS,** ) | |
| **LLC and AXA ADVISORS, LLC.,** ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **CIVIL ACTION NO.:  1:08-cv-00188** |
| ) | |
| **GAYLE S. BULLARD, et al.,** ) | |
| ) | |
| **Defendants.** ) | |

**PLAINTIFFS' SUPPLEMENTAL REPLY MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR PRELIMINARY INJUNCTION**

In accordance with this Court's August 4, 2008 Order, AXA Distributors, LLC ("AXA Distributors") and AXA Advisors, LLC ("AXA Advisors") (collectively, "Plaintiffs") hereby submit this Supplemental Reply in Support of Their Motion for Preliminary  Injunction.[1]

## I.    INTRODUCTION

Defendants were neither customers of AXA Distributors nor any registered representative or associated person of AXA Distributors, and their claims do not arise in connection with AXA Distributors' business activities.   Accordingly, FINRA Rule 12200 does not constitute an agreement to arbitrate between AXA Distributors and Defendants, and Defendants' arbitration proceeding is due to be enjoined.[2]

---

[1] As Defendants do not dispute, AXA Advisors is entitled to preliminary injunctive relief. This Supplemental Memorandum will therefore only address Defendants' remaining claims against AXA Distributors, which are also due to be enjoined. Hereafter, any reference to "Plaintiff" specifically relates to AXA Distributors.

[2] *See* FINRA Code of Arbitration Procedure, Rule 12200 (member firms must arbitrate a dispute where it arises "between a *customer* and a member or associated person of a member; and the dispute arises in connection with the business activities of the member or the associated person" (emphasis added)).

## II.    ARGUMENT

**A.    DEFENDANTS WERE NEVER CUSTOMERS OF AXA DISTRIBUTORS.**

> **1.    Defendants were never customers of AXA Distributors because they never had an investment relationship with AXA Distributors.**

Defendants' arguments in favor of a broad definition of "customer" are contradicted by the controlling authority in this case. While Defendants argue that any person not a broker or a dealer is a customer of AXA Distributors, controlling Eleventh Circuit authority in *Wheat, First* dictates that there must be an investment relationship between the parties in order for the Defendants to qualify as AXA Distributors' customers. *See Wheat, First Securities Inc. v. Green,* 993 F.2d 814, 818 (11th Cir. 1993). While the Eleventh Circuit's opinion in *Wheat, First* has later been harmonized by another Eleventh Circuit panel as focusing on the timing of the investment relationship at issue, it is beyond dispute that the *Wheat, First* Court found the *existence* of an investment relationship to be a necessary element to the determination of whether a party is a customer, or else the *timing* of the relationship would make no difference. In other words, the Eleventh Circuit would not have reached its decision about the timing of the investment relationship if the relationship was not essential in the first place.[3] Here, because there was no investment relationship *at any time* between AXA Distributors and the Defendants, they were not AXA Distributors' customers. *See id; see also Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc.,* 264 F.3d 770, 772-73 (8th Cir. 2001) (to establish a customer relationship, there must be "some brokerage or investment relationship between the parties").

AXA Distributors presented evidence prior to this Court's hearing on August 1, 2008 that Defendants were not customers of AXA Distributors because they had no such investment

---

[3] In contrast, each case cited by Defendants as contra authority involves a customer of a broker who is not disputed to be an associated person of the broker-dealer. Only *Wheat, First* involves the facts present here, where purchasers are not customers of an acknowledged associated person.

relationship.  In accordance with the Court's August 4, 2008 Order, AXA Distributors also submits the Affidavit of Richard Lee, attached hereto as Exhibit A (hereafter "Lee Aff."), which addresses the fact that AXA Distributors did not receive or accept premiums in connection with variable annuity sales, and the contracts were issued by AXA Equitable to the Defendants after Defendants' retail brokers submitted applications with those premiums.  AXA Distributors certainly was not part of any "chain of title" with respect to the contracts, as AXA Distributors understands the term used by the Court.

> **2.    Defendants were never customers of AXA Distributors because they never had an investment relationship with an associated person of AXA Distributors.**

Not only were Defendants never involved in an investment relationship with AXA Distributors, they also were never involved an investment relationship with an associated person of AXA Distributors.  Defendants attempt to argue that Ann Holman was an associated person of AXA Distributors, and through their relationship with Ms. Holman, they were customers of AXA Distributors.  This argument, however, has no basis in law or fact.  Ann Holman was an associated person of Raymond James, and only Raymond James, during the time period at issue. Defendants have provided this Court with no authority to the contrary.

FINRA Rule 12100(r) defines an associated person as follows:

> (1) A natural person registered under the Rules of NASD; or
> (2) A sole proprietor, partner, officer, director, or branch manager of a member, or a natural person occupying a similar status or performing similar functions, or a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member, whether or not any such person is registered or exempt from registration with NASD under the By-Laws or the Rules of NASD.
> For purposes of the Code, a person formerly associated with a member is a person associated with a member.

Defendants do not dispute that Ann Holman was never registered under the NASD rules as AXA Distributors' associated person. Defendants instead argue that Ann Holman was directly or indirectly controlled by AXA Distributors, and was therefore its associated person. Accordingly, to determine whether the FINRA/NASD Rules imply a contractual basis to impose arbitration on a member, this Court must interpret the definition of direct or indirect control under FINRA Rule 12100(r) as it applies to Ms. Holman's relationship with AXA Distributors.

In interpreting FINRA Rule 12100(r), this Court must defer to the interpretation that FINRA applies to its own rule. It is a well-settled principle of law that administrative agencies' interpretations of their own regulations must be given "controlling weight" where such interpretations do not violate the United States Constitution or a federal statute. *Stinson v. U.S.*, 508 U.S. 36, 45 (1993) ("As we have often stated, provided an agency's interpretation of its own regulations does not violate the Constitution or a federal statute, it must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation."); *see State Farm Mut. Auto. Ins. Co. v. Mundorf*, 659 A.2d 215, 220 (Del. 1995) ("substantial weight and deference is accorded to the construction of a regulation enacted by an agency which is also charged with its enforcement"); *Texaco Inc. v. Fed. Energy Reg. Comm'n.*, 148 F.3d 1091, 1095 (C.A.D.C. 1998) (deferring to an "agency's reasonable interpretation both of its own regulations and of contracts that are subject to its rules"); *Coats-Sellers v. State ex rel. Dept. of Transp.*, 147 P.3d 946, 949 (Or. App. 2006). This principle has been applied to self-regulatory organizations, including the NASD. *F.N. Wolf & Co. v. Bowles*, 610 N.Y.S2d 757, 760-61 (N.Y. Sup. Ct. 1994) (interpreting NASD rules in accordance with views expressed by the NASD). The NASD Rules, By-Laws

and records of NASD disciplinary proceedings in which the NASD interprets the definition of control therefore provide necessary guidance about the meaning of "associated person."[4]

The NASD By-Laws contain the same definition of "associated person" that is found in FINRA Rule 12100(r).[5, 6] In interpreting the NASD By-Laws' definition of associated person where the person at issue was not registered under NASD Rules, the NASD National Adjudicatory Council has stated that "[a] person may be an associated person if he performs the usual and customary functions of an employee of a broker-dealer." *Dep't. of Enforcement v. Respondent 1*, No CAF000029, 2002 WL 970381 at *4 (N.A.S.D.R. March 21, 2002). The NASD National Adjudicatory Council has also stated that broker-dealer firms exercise "control" over their registered representatives and other associated persons through their duty to supervise under NASD Conduct Rule 3010. *Dep't. of Market Regulation v. Yankee Financial Group, et al.*, No. CMS030182, 2006 WL 2587617 at *17 (N.A.S.D.R. August 4, 2006). Although referring to registered representatives, the NASD National Adjudicatory Council has further defined "control" in the context of an employer-employee relationship: "Irrespective of an individual's location or compensation arrangements, all associated persons are considered to be

---

[4] NASD disciplinary proceedings may arise from NASD Rule 9211, which authorizes the NASD Regulation Department of Enforcement and the NASD Department of Market Regulation to initiate complaints when either department believes that any NASD member or associated person has violated any rule, regulation, or statutory provision, including the federal securities laws and regulations. Pursuant to the rules, such complaints will be heard by a NASD Hearing Panel. NASD Rule 9311 provides that the NASD Department of Enforcement or Department of Market Regulation may appeal a NASD Hearing Panel decision to the NASD National Adjudicatory Council.

[5] Article 1, section (rr) of the NASD By-Laws provides as follows: "person associated with a member" or "associated person of a member" means: (1) a natural person who is registered or has applied for registration under the Rules of the Corporation; (2) a sole proprietor, partner, officer, director, or branch manager of a member, or other natural person occupying a similar status or performing similar functions, or a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member, whether or not any such person is registered or exempt from registration with the Corporation under these By-Laws or the Rules of the Corporation . . ." The NASD By-Laws can be found at www.finra.org under the "Rules and Regulations" tab.

[6] NASD Rule 0121 states as follows: "Unless the context otherwise requires, or unless otherwise defined in these Rules, terms used in the Rules and interpretive material, if defined in the NASD By-Laws, shall have the meaning as defined in the NASD By-Laws."

*employees* of the firm with which they are registered . . ." *Id.* at n. 38 (quoting NASD Notice to Members 86-85, 1986 NASD Lexis 386 at *2 (emphasis added)). Indeed, in interpreting the definition of associated person, the NASD District Business Conduct Committee has noted that the SEC has also defined "control" in the same manner: "a person may be a controlled person, without being an employee, if the person performs the usual and customary functions of persons in the firm's employ and, in effect, could be considered one of the broker-dealer's employees." *See District Bus. Conduct Comm. v. Deltavest Financial Inc.*, et al., No. C02930042, 1994 WL 1067222 at *9 (N.A.S.D.R. June 27, 1994). Thus, in interpreting its definition of control under its own rules, the NASD has consistently demonstrated that control is found where an employer-employee relationship exists on a direct or indirect basis, and such control is evidenced by a responsibility on the part of the member firm to supervise the associated person.

In the context of a FINRA member firm, supervision and control of an associated person is demonstrated by the specific business activities that evolve from the unique requirements of FINRA member firms and their registered representatives. These activities demonstrate the member firms' power to direct the management and policies of their associated persons. *See* NASD By-Laws Article 1, section (h) ("'controlling' shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting stock, by contract or otherwise."). FINRA Rules mandate that member firms "must supervise all of their associated persons - regardless of location, compensation or employment arrangement, or registration status - in accordance with the NASD By-Laws and Rules." NASD Notice to Members 98-38. Likewise, FINRA rules impose specific obligations on associated persons of member firms in connection with those supervisory requirements, including the following:

- Associated persons "must get clearance from [their] member firm for certain personal financial activities," and must disclose to their member firms any financial accounts that the associated person or their immediate family members have with other securities firms, relationships with other businesses, and forms of compensation received from sources other than the member firm.

- Associated persons must provide their member firms with access to their "work-related documents, such as correspondence with customers, new account forms and copies of customer statements," which are considered the property of the firm, so that the firm may review and retain those documents "according to rules applicable to securities industry participants."

- During their training period, associated persons are subject to the member firm's conditions under which they may communicate with customers.

- Associated persons must be supervised by a registered principal of the member firm, and must meet with their "supervisor at least annually to formally discuss regulatory and compliance matters."

- After becoming registered, associated persons "may conduct a securities business as an agent only while under the direct supervision of [their] member firm."

Registered Representative & Other Securities Industry Professionals, Testing/Training – Roles & Responsibilities, attached hereto as Exhibit B, and available at http://www.finra.org/RegistrationQualifications/BrokerGuidanceResponsibility/RegisteredRepresentatives/EntireDocument/index.htm (last visited Aug. 8, 2008). Thus, "control" as mandated by FINRA rules and applied in the everyday activities of associated persons, is evidenced by specific business activities of both member firms and associated persons -- activities which were

never a part of Ms. Holman's relationship with AXA Distributors.

Absent from FINRA's interpretation of "control" is the unsubstantiated definition attributed to the term by the Defendants in this case. Defendants allege that AXA Distributors "controlled" Ms. Holman by controlling how she sold AXA Equitable products to her clients. Defendants, however, have presented no evidence that Ms. Holman had a direct or indirect employer-employee relationship with AXA Distributors. Nor have they presented any evidence that AXA Distributors directed, managed or supervised her actions in connection with her sale of the products at issue.

Rather, the evidence in this case demonstrates the exact opposite. *See generally* Affidavit of Tim McCabe, attached hereto as Exhibit C (hereafter "McCabe Aff.") , and Affidavit of Bron Urbanick, attached hereto as Exhibit D. Ms. Holman's arms-length relationship with AXA Distributors solely consisted of AXA Distributors' provision of product information, educational programs and post-sale support related to various AXA Equitable products. *See* McCabe Aff. at ¶ 4. Notably, these activities did not include any involvement in the acceptance of premiums paid to AXA Equitable in connection with the purchase of Accumulator annuities. *See* Lee Aff. at ¶ 3. AXA Distributors' activities do not come close to establishing the relationship required of member firms and their associated persons under FINRA rules.

Moreover, AXA Distributors had no direction or control over the manner in which Ms. Holman sold AXA Equitable products to her clients. Indeed, Ms. Holman's own allegations that she represented that the AXA Accumulator provided a guarantee of principal, return, account value or a certain lump sum at maturity illustrate the fallacy of her argument that she was controlled by AXA Distributors. All of the written materials provided to Ms. Holman in connection with the product demonstrate that these representations were untrue. *See* McCabe

Aff. at ¶ 6. Likewise, the oral information provided to Ms. Holman by AXA Distributors during the time period at issue demonstrates that these representations were untrue. *Id.* The plain fact that Ms. Holman did not present the product in a manner consistent with the materials and information provided to her by AXA Distributors provides evidence that AXA Distributors did not control the manner in which Ms. Holman sold the product.

Further demonstrating AXA Distributors' lack of control over the manner in which Ms. Holman sold the investment is the fact that AXA Distributors did not play any role in the investment recommendations made by Ms. Holman to her clients, nor did it evaluate whether any particular investment recommendation was suitable any of her clients. *See* McCabe Aff. at ¶ 5. Instead, it was Ms. Holman who had complete discretion to recommend which features of the AXA Accumulator, including its living benefit, death benefit and array of mutual find sub-accounts, were appropriate for her clients. Ms. Holman further had complete discretion to recommend the amount and timing of each of her clients' investments in the AXA Accumulator. Moreover, AXA Distributors had no duty to supervise Ms. Holman in connection with any of the investment recommendations she made. *See* McCabe Aff. at ¶ 5. Thus, the evidence in this case overwhelmingly demonstrates that AXA Distributors never directed, managed or supervised Ms. Holman's actions in connection with her sale of the products at issue.

The meaning attributed to "control" by the Defendants is therefore clearly contrary to the NASD By-Laws and FINRA Rules, is "antithetical to the whole purpose of the broker-dealer registration and supervision requirements," and upsets FINRA's complex regulatory framework. *See Dep't. of Market Regulation v. Yankee Financial Group, et al.*, No. CMS030182, 2006 WL 2587617 at *17 (N.A.S.D.R. August 4, 2006); *see generally* NASD Rule 3010 (attached hereto as Exhibit E). Plaintiffs previously have submitted the Affidavit of John Pinto, formerly the top

level executive with the NASD in charge of examination and enforcement of that organization, who certainly supports that conclusion. *See* Affidavit of John Pinto, attached as Exhibit A to Plaintiff's Reply Memorandum in Support of Their Motion for Preliminary Injunction. Accordingly, Defendants have failed to establish that AXA Distributors controlled Ms. Holman, directly or indirectly, and their baseless allegation that Ms. Holman was AXA Distributors' associated person should be rejected.

> **3.     Alabama law does not imply an agency relationship between Ms. Holman and AXA Distributors.**

The NASD Rules, By-Laws and records of NASD disciplinary proceedings in which the NASD interprets the definition of associated person must be given controlling weight in this Court's interpretation of NASD Rules. *See* discussion in section 2, *supra*. General principles of Alabama agency law therefore do not apply to the issues currently before this Court. Even assuming, however, that Alabama agency law was instructive in this manner, it would not precipitate a finding that Ms. Holman was an agent of AXA Distributors.

*Broadus v. Essex Ins. Co.,* 621 So. 2d 258, (Ala. 1993), establishes that a wholesaler of insurance products cannot be held liable for the acts of an independent retail broker in connection with the broker's sale of products to retail clients. In *Broadus*, the plaintiff alleged fraud in connection with an alleged bad faith failure to pay a property claim, joining as defendants his insurer, an independent retail insurance agency, and a wholesale insurance broker. *Broadus*, 621 So.2d at 259. The court found that the wholesale insurance broker, "The Insurance House," served as an intermediary between the retail insurance agency and the insurer by passing information back and forth between the two and performing certain administrative duties in connection with the policy on behalf of the insurer. *Id*. at 260. The Insurance House received a commission from the retail agent in connection with the sale of the policy at issue and passed the

client's premium on to the insurer. *Id.* at 259-60. The Insurance House, however, did not employ the retail agent, was not an insurance company, and did not have direct contact with the insured. *Id.* at 260. The Alabama Supreme Court held that the extent of The Insurance House's control over the retail agent was determinative of whether an agency relationship existed between The Insurance House and the retail agent. *Id.*[7] The court found that because The Insurance House acted independently of the retail agent as an intermediary, and because it had no right to control the retail agent, an agency relationship did not exist between the two and The Insurance House could not be vicariously liable for the retail agent's fraud. *Id.* at 261.

The facts of the instant case are strikingly similar to those in *Broadus* and would require the same conclusion reached by the Alabama Supreme Court in *Broadus* if agency principles were applied here. For example, like Ms. Holman, the retail agent in *Broadus* did business with many insurance companies. *See id.* at 259. In addition, like The Insurance House, AXA Distributors passed information back and forth between Ms. Holman and AXA Equitable and performed administrative duties such as distributing AXA Accumulator prospectuses and contracts to Ms. Holman on behalf of AXA Equitable. *See id.* at 259-60.[8] AXA Distributors, like The Insurance House, did not directly or indirectly employ Ms. Holman, was not an insurance company, and did not sell the products to the retail clients. *See id.* at 260. Moreover, like the relationship between Ms. Holman and AXA Distributors, the retail agent in *Broadus* acted independently of The Insurance House in selling products to his clients. *Id.* at 260.

---

[7] Alabama agency law provides that control sufficient to establish an agency relationship is not evidenced by the provision of guidelines in connection with the sale of an insurance company's products. *See Wofford v. Safeway Ins. Co. of Ala.*, 624 So.2d 555, 559 (Ala. 1993) ("the mere presence of [the insurer's] guidelines in [the retail agent's] office is not sufficient evidence of control" to establish an agency relationship).

[8] Unlike The Insurance House, AXA Distributors did not deduct and retain a portion of the premium Ms. Holman collected in connection with the sale of the contracts at issue. *Broadus,* 621 So.2d at 259-60.

Accordingly, as with The Insurance House and the retail broker in *Broadus*, AXA Distributors did not have an agency relationship with Ms. Holman. *Id*. at 261.

**B.    DEFENDANTS' CLAIMS DO NOT ARISE IN CONNECTION WITH AXA DISTRIBUTORS' BUSINESS ACTIVITIES.**

For the same reasons that Defendants were not customers of AXA Distributors, this dispute does not arise in connection with the business activities of AXA Distributors or its associated persons. In addition, AXA Distributors did not play a role in the Defendants' annuity purchase transactions, from which their claims in this case arise. Each of the Defendants' annuity contracts were issued by AXA Equitable. *See* Lee Aff. at ¶ 2. AXA Distributors did not receive and was not authorized to accept premiums from the Defendants in connection with their purchase of AXA Equitable annuities. *See id*. at ¶ 3. Rather, all of the Defendants' premiums were paid to AXA Equitable. *Id*. Moreover, AXA Distributors was not a party to any of the Defendants' annuity contracts. *See id*. at ¶ 4. AXA Distributors thus did not play a role in the Defendants' annuity purchase transactions. Accordingly, Defendants' claims against AXA Distributors do not arise in connection with its business activities.

**III.    CONCLUSION**

Based on the authority cited herein and presented at the hearing before this honorable Court on August 1, 2008, and in accordance with Plaintiffs' Motion for Preliminary Injunction and Opposition to Defendants' Motion to Dismiss, the entry of a preliminary injunction in this case is necessary and appropriate. Plaintiffs have demonstrated that there is a substantial likelihood of success on the merits of their claims because Defendants were not customers of Plaintiffs or their associated persons, and Defendants' arbitration proceeding does not arise in

connection with Plaintiffs' business activities.  As such, this dispute is not arbitrable.  Plaintiffs therefore respectfully request that this Court enter a preliminary injunction restraining and enjoining Defendants, their agents, attorneys, and all persons acting in concert or participation with them, or similarly situated with them, from proceeding with their claims pending against Plaintiffs in the arbitration styled *Gayle S. Bullard, et al., v. AXA Equitable Life Insurance Company, et al.*, FINRA Arbitration No. 08-00280.

Respectfully Submitted,


/s/ John N. Bolus
A. Inge Selden III (SEL003)
John N. Bolus (BOL022)
Andrea Morgan Greene (GRE102)

Attorneys for Plaintiffs
AXA Distributors, LLC and AXA Advisors, LLC

OF COUNSEL:

MAYNARD, COOPER & GALE, P.C.
2400 AmSouth/Harbert Plaza
1901 Sixth Avenue North
Birmingham, Alabama 35203-2602
(205) 254-1000

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to the following:

Andrew P. Campbell
Caroline Smith Gidiere
Campbell, Gidiere, Lee, Sinclair & Williams, PC
2100-A SouthBridge Parkway, Suite 450
Birmingham, Alabama 35209


on this the 8th day of August, 2008.


/s/ John N. Bolus_____
OF COUNSEL

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

AXA DISTRIBUTORS,            )
LLC and AXA ADVISORS, LLC.,  )
                             )
        Plaintiffs,          )
                             )
v.                           )        CIVIL ACTION NO.: 1:08cv188
                             )
  GAYLE S. BULLARD, et al.,  )
                             )
        Defendants.          )

STATE OF NEW JERSEY )
                    )
COUNTY OF HUDSON    )

### AFFIDAVIT OF RICHARD LEE

Comes now Richard Lee, who, upon being duly sworn, does depose and say as follows:

1.    My name is Richard Lee.  I am competent to make this affidavit, and I have personal knowledge of the facts stated below.

2.    I am currently employed as Vice President of Accumulator New Business Operations with AXA Equitable Life Insurance Company in Secaucus New Jersey.  In my role as Vice President of Accumulator New Business Operations, I am familiar with the procedures for receipt of premiums and the manner in which annuity contracts are issued by AXA Equitable Life Insurance Company, formerly known as The Equitable Life Assurance Society of the United States.

3.    AXA Distributors does not receive and is not authorized to accept premiums from purchasers of variable annuity contracts issued by AXA Equitable Life Insurance

Page 1 of 3

Company. Instead, registered representatives of third party broker-dealers which sell these variable annuity contracts do so under written agreements specifying that premiums are to be made payable to AXA Equitable Life Insurance Company, or to the appropriate life insurance affiliate if issued by another affiliated life insurer. For example, attached as Exhibit A is the Broker-Dealer and General Agent Sales Agreement applicable to Raymond James Financial Services, Inc. ("Raymond James") dated March 27, 1996. Paragraph 4.5 specifically addresses the payment of premiums and requires that checks for premiums "shall be drawn to the order of the appropriate Equitable Life Company." Paragraph 2.4 also prohibits the receipt of "monies or Premiums" by a broker except for the purpose of forwarding funds to "an Equitable Life Company." AXA Distributors is not an affiliate which is an insurance company, and therefore it is not included in the defined term "an Equitable Life Company" under that agreement.

4.    I have attached as Exhibit B a true and correct copy of one of the annuity contracts issued by AXA Equitable's predecessor that was sold by a Raymond James representative, although it has been redacted to remove personal information. The contract shows the issuer to be The Equitable Life Assurance Society of the United States. This example is typical of the annuity contracts that I understand were issued to the purchasers involved in this case. AXA Distributors is not a party to the annuity contract.

FURTHER AFFIANT SAITH NOT.

Executed on this the 7th day of August, 2008.

Richard Lee

Sworn to before me this the ___7___ day of August, 2008.

_Hanna Masse_
Notary Public
My commission expires:

HANNA MASSE
NOTARY PUBLIC NEW JERSEY
NO. 2183452
QUALIFIED IN PASSAIC COUNTY
EXPIRES 2/01/2011

**Exhibit A**

# BROKER-DEALER AND GENERAL AGENT

## SALES AGREEMENT

AGREEMENT, by and among Equitable Distributors, Inc. ("Distributor"), Investment Management & Research, Inc. ("Broker-Dealer") and Planning Corporation of America ("General Agent").

## WITNESSETH:

WHEREAS, the Distributor and the Broker-Dealer are both broker-dealers registered with the Securities and Exchange Commission under the Securities Exchange Act of 1934, as amended ("1934 Act"), and members of the National Association of Securities Dealers, Inc.;

WHEREAS, the General Agent, whose licensed agents are also registered representatives of the Broker-Dealer, is an insurance agency duly licensed to sell variable life insurance and variable annuities in any state or other jurisdiction in which the General Agent intends to perform hereunder;

WHEREAS, The Equitable Life Assurance Society of the United States ("Equitable") has appointed the Distributor as principal underwriter or distributor of the Variable Accounts and the MVA Interests and as distributor of the Contracts and has authorized the Distributor to recommend persons for appointment as agents of Equitable to solicit applications for the sale of the Contracts;

WHEREAS, it is intended that the General Agent shall be authorized to offer and sell the Contracts to the general public subject to the terms and conditions set forth more fully herein;

WHEREAS, Equitable has authorized the Distributor to enter into separate written agreements with broker-dealers registered under the 1934 Act which agree to participate in the distribution of the Contracts, and the parties hereto desire that the Broker-Dealer be authorized to solicit applications for the sale of the Contracts;

WHEREAS, in the future, Contracts may be issued by an insurance company which is an Affiliate of Equitable and the Distributor may be authorized to promote the offer and sale of such Contracts in the same manner that Equitable has authorized the Distributor to act, as described above.

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and promises herein contained, the parties hereto agree as follows:

## ARTICLE I
### Definitions

§1.1    Defined Terms.  In addition to any terms defined elsewhere in this Agreement, the terms defined in this Section 1.1, whenever used in this Agreement (including in the Schedules and Exhibits), shall have the respective meanings indicated.

a.    *Affiliated Person or Affiliate* -- With respect to a person, any other person controlling, controlled by, or under common control with, such person.

b.        *Agent* -- An individual associated with the General Agent and registered with the NASD as a representative of the Broker-Dealer who is appointed by an Equitable Life Company as an insurance agent for the purpose of soliciting applications for the Contracts.

c.        *Broker-of-Record* -- The party designated in the Equitable Life Companies records as the person, with respect to a Contract, who is entitled to receive compensation payable with respect to such Contract and who is authorized to contact directly the owner of such Contract. In the case of compensation payable with respect to a Premium, the Broker-of-Record shall be the party designated as such in the records of an Equitable Life Company, at the time such Premium is accepted by such Equitable Life Company. In the case of any payment of compensation payable with respect to Contract value or client services, the Broker-of-Record shall be the party designated as such in the records of an Equitable Life Company, in accordance with the rules and procedures of the Equitable Life Companies at the time any such payment is payable. In the case of compensation payable on annuitization of a Contract, the Broker-of-Record shall be the party designated as such in the records of an Equitable Life Company on the annuity commencement date specified in such Contract.

d.        *Contract Prospectus* -- The prospectus for the interests under the Contracts included within a Contract Registration Statement and including any Contract prospectus or supplement separately filed under the 1933 Act. The Contract Prospectus also shall include the statement of additional information which is part of the Contract Registration Statement, unless the context otherwise requires.

e.        *Contract Registration Statements* -- The most recent effective registration statements, or most recent effective post-effective amendments thereto, relating to interests under the Contracts and in the Variable Accounts, as required by the 1933 Act and the 1940 Act, including financial statements therein and all exhibits thereto.

f.        *Contracts* -- The classes of life insurance policies and annuity contracts, including certificates, issued by Equitable or by an Affiliate of Equitable which are identified in Schedule I. Schedule I may be modified from time to time, as provided in Section 2.6.

g.        *Effective Date* -- April 24, 1995.

h.        *Equitable Life Companies or, individually, an Equitable Life Company* -- Equitable and any Affiliate of Equitable which is an insurance company.

i.        *MVA Interests* -- The market value adjustment interests under the Contracts.

j.        *NASD* -- National Association of Securities Dealers, Inc.

k.        *1940 Act* -- Investment Company Act of 1940, as amended.

l.        *1934 Act* -- Securities Exchange Act of 1934, as amended.

m.        *1933 Act* -- Securities Act of 1933, as amended.

n.        *Premium* -- Any premium, contribution or other consideration relating to the Contracts.

o.        *SEC or Commission* -- Securities and Exchange Commission.

p.    *Trust* — The Hudson River Trust and any other entity available for investment through the Variable Accounts under the Contracts.

q.    *Trust Prospectus* — The prospectus for the Trust included within the Trust Registration Statement and including any Trust prospectus or supplement separately filed under the 1933 Act. The Trust Prospectus also shall include the statement of additional information which is part of the Trust Registration Statement, unless the context otherwise requires.

r.    *Trust Registration Statement* — The most recent effective registration statement or most recent effective post-effective amendment thereto relating to the Trust as required by the 1933 Act and the 1940 Act, including financial statements therein and all exhibits thereto.

s.    *Variable Accounts* — Segregated asset accounts identified in Exhibit A, each of which has been established by an Equitable Life Company pursuant to state law as a funding vehicle for the Contracts. The Variable Accounts are divided into divisions that invest in shares of the Trust.

§1.2    Cross-References. All references in this Agreement to a Section, Article, Schedule or Exhibit are to a section, article, schedule or exhibit of this Agreement, unless otherwise indicated.

## ARTICLE II
### Authorization of Broker-Dealer and General Agent

§2.1    Authority to Distribute Contracts. Pursuant to the authority granted to it by Equitable, the Distributor hereby authorizes the Broker-Dealer, under the securities laws, and General Agent, under the insurance laws, each in a non-exclusive capacity, to distribute the Contracts. The Broker-Dealer and the General Agent accept such authorization and agree to use their best efforts to find purchasers for the Contracts in each case acceptable to the Equitable Life Company issuing such Contracts. The Broker-Dealer and the General Agent understand that the public offering of and solicitation for interests under the Contracts are not permitted to commence, or to continue, unless the Contract Registration Statements have become effective and, with respect to each state or other jurisdiction in which Contract applications are to be solicited, the Contracts are qualified for sale under all applicable securities and insurance laws. The Broker-Dealer and the General Agent agree that the solicitation of applications for the sale of the Contracts will commence as soon as practicable after the Contract Registration Statements have become effective.

§2.2    Notification by Distributor. The Distributor shall notify the Broker-Dealer and the General Agent:

a.    If there are no effective Contract Registration Statements, when the Contract Registration Statements have become effective;

b.    Of all states and other jurisdictions in which the Contracts are qualified for sale and of the states and other jurisdictions in which the Contracts may not be lawfully sold;

c.    Of any request by the SEC for any amendments or supplements to a Contract Registration Statement or of any request for additional information that must be provided by the Broker-Dealer or the General Agent or any Affiliate of the Broker-Dealer or the General Agent;

d.    Of the issuance by the SEC of any stop order with respect to a Contract Registration Statement or the initiation of any proceedings for that purpose or for any other purpose relating to the registration and/or offering of the Contracts;

e.     If any event occurs as a result of which the Contract Prospectus(es) or any sales literature for the Contracts would include any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein not misleading.

The Distributor will provide the Broker-Dealer and the General Agent with notification of these matters immediately by telephone, with notification in writing promptly thereafter.

§2.3     Authority to Recommend Agent Appointments.  The General Agent is vested under this Agreement with power and authority to select and recommend individuals who are associated with the General Agent and are registered representatives of the Broker-Dealer for appointment as agents of Equitable, and only individuals so recommended by the General Agent to the Distributor shall become Agents, provided that Equitable reserves the right in its sole discretion to refuse to appoint any proposed agent or, once appointed, to terminate the same at any time with or without cause.

§2.4     Limitations on Authority.  Neither the Broker-Dealer nor the General Agent shall possess or exercise any authority on behalf of the Distributor or the Equitable Life Companies other than that expressly conferred on the Broker-Dealer or the General Agent by this Agreement.  In particular, and without limiting the foregoing, neither the Broker-Dealer nor the General Agent shall have any authority, nor shall either grant such authority to any Agent, on behalf of the Distributor (i) to make, alter or discharge any Contract or other contract entered into pursuant to a Contract; (ii) to waive any Contract provision; (iii) to extend the time for payment of any Premiums; or (iv) to receive any monies or Premiums from applicants for or purchasers of the Contracts (except for the purpose of forwarding monies or Premiums to an Equitable Life Company and except as provided in Section 2.5).

§2.5     Insurer's Right to Reject Applications.  The Broker-Dealer and the General Agent acknowledge that each Equitable Life Company has the right in its sole discretion to reject any applications or Premiums received by it and to return or refund to an applicant such applicant's Premium.  In the event that an Equitable Life Company rejects an application solicited by an Agent, such Equitable Life Company will return any Premium paid by the applicant to such applicant and will promptly notify the General Agent of such action.  In the event that a purchaser exercises his or her free look right under a Contract, any amount to be refunded as provided in such Contract will be returned to the General Agent for refund to the purchaser on behalf of the Equitable Life Company that issued such Contract.

§2.6     Contracts Included Under Agreement.  Schedule I to this Agreement describes the life insurance and annuity contracts which are included as Contracts under this Agreement.  Schedule I may be amended from time to time by the Distributor, with the consent of the General Agent, to include other classes of annuity contracts or life insurance contracts issued by an Equitable Life Company and distributed by the Distributor pursuant to any distribution agreement with an Equitable Life Company which relates to the Contracts.  If the consent of the General Agent to an amendment to Schedule I is not given within 60 days following receipt of notice from the Distributor, the Distributor shall be entitled to conclude that such consent has been withheld.  The provisions of this Agreement shall apply with equal force to any additional Contracts unless the context otherwise requires.  Schedule I may be amended by the Distributor in its sole discretion from time to time to delete classes of annuity contracts or life insurance contracts.

§2.7     Independent Contractor Status.  The Distributor acknowledges that the Broker-Dealer and the General Agent are each independent contractors.  Accordingly, while the Broker-Dealer and the General Agent agree to use their best efforts to solicit applications for the Contracts, the Broker-Dealer and the General Agent are not obliged or expected to give full time and energies to the performance of their obligations hereunder or to sell or solicit a specified number of Contracts, nor are the Broker-Dealer and the General Agent obliged or expected to represent the Distributor or any Equitable Life Company

exclusively. Nothing herein contained shall constitute the Broker-Dealer, the General Agent, or any agents or representatives of the Broker-Dealer or the General Agent as employees of an Equitable Life Company or the Distributor.

## ARTICLE III
### Licensing and Registration of Broker-Dealer, General Agent and Agents

§3.1    <u>Broker-Dealer Qualifications</u>.  The Broker-Dealer represents that it is a broker-dealer registered with the SEC under the 1934 Act, and is a member of the NASD.  The Broker-Dealer must, at all times when performing its functions and fulfilling its obligations under this Agreement, be duly registered as a broker-dealer under the 1934 Act and in each state or other jurisdiction in which Broker-Dealer intends to perform its functions and fulfill its obligations hereunder and in which such registration is required, and be a member in good standing of the NASD.

§3.2    <u>General Agent Qualifications</u>.  The General Agent represents that it is a licensed life insurance agent where required to solicit applications.  The General Agent must, at all times when performing its functions and fulfilling its obligations under this Agreement, be duly licensed to sell the Contracts in each state or other jurisdiction in which the General Agent intends to perform its functions and fulfill its obligations hereunder.

§3.3    <u>Qualifications of Broker-Dealer Representatives</u>.  The Broker-Dealer represents and warrants that it shall take all necessary action to ensure that no individual shall offer or sell the Contracts on behalf of Broker-Dealer in any state or other jurisdiction in which the Contracts may lawfully be sold unless such individual is an associated person of Broker-Dealer (as that term is defined in Section 3(a)(18) of the 1934 Act), is not subject to a statutory disqualification (as that term is defined in the 1934 Act) and is duly registered with the NASD and any applicable state securities regulatory authority as a registered person of Broker-Dealer qualified to distribute the Contracts in such state or other jurisdiction.

§3.4    <u>Qualifications of General Agent's Agents and Appointment of Agents</u>.  The General Agent represents and warrants that it shall take all necessary action to ensure that no individual shall offer or sell the Contracts on behalf of the General Agent in any state or other jurisdiction unless such individual is duly appointed as an agent of the General Agent, duly licensed and appointed as an agent of the appropriate Equitable Life Company and appropriately licensed, registered or otherwise qualified to offer and sell the Contracts to be offered and sold by such individual under the insurance laws of such state or jurisdiction. The General Agent understands that certain states may require that a special variable contracts examination be passed by agent before he or she can solicit applications for the Contracts. Nothing in this Agreement is to be construed as requiring an Equitable Life Company to obtain a license or issue a consent or appointment to enable any particular agent to sell Contracts. Moreover, without limiting the generality of the foregoing, an Equitable Life Company shall not consider for appointment any individual who was a member of Equitable's career agency force within the preceding 12 months. All matters concerning the licensing of any individuals recommended for appointment by the General Agent under any applicable state insurance law shall be a matter directly between the General Agent and such individual. The General Agent shall furnish the Equitable Life Companies with proof of proper licensing of such individual or other proof, reasonably acceptable to the Equitable Life Companies, of satisfaction by such individual of licensing requirements prior to the appointment of any such individual as an agent of any Equitable Life Company. In conjunction with the submission of appointment papers for all such individuals as insurance agents of an Equitable Life Company, the General Agent shall be deemed to represent that each individual is competent and qualified to act as an agent for the Equitable Life Companies and to hold himself or herself out in good faith to the general public.

## ARTICLE IV
### Broker-Dealer and General Agent Compliance

§4.1    Supervisory Responsibilities of General Agent.  The General Agent shall train, supervise and be solely responsible for the conduct of the Agents in their solicitation activities in connection with the Contracts, and shall supervise Agents' strict compliance with applicable rules and regulations of any governmental or other insurance authorities that have jurisdiction over insurance contract activities, as well as the rules and procedures of the Equitable Life Companies pertaining to the solicitation, sale and submission of applications for the Contracts and the provision of services relating to the Contracts.  The General Agent shall be solely responsible for background investigations of the proposed agents to determine their qualifications, good character and moral fitness to sell the Contracts; in discharging this responsibility, the General Agent shall be permitted to rely upon information furnished by the Broker-Dealer.

§4.2    Supervisory Responsibilities of Broker-Dealer.  The Broker-Dealer shall be responsible for securities training, supervision and control of the Agents in connection with their solicitation activities and any incidental services with respect to the Contracts and shall supervise Agents' strict compliance with applicable federal and state securities laws and NASD requirements in connection with such solicitation activities and with the rules and procedures of the Equitable Life Companies.

§4.3    Compliance With Applicable Laws.  The Broker-Dealer and the General Agent hereby represent and warrant that they are in compliance with all applicable federal and state securities laws and regulations and all applicable insurance laws and regulations, including, without limitation, state insurance laws and regulations imposing insurance licensing requirements.  The Broker-Dealer and the General Agent each agree to carry out their respective sales and administrative activities and obligations under this Agreement in continued compliance with federal and state laws and regulations, including those governing securities and insurance-related activities or transactions, as applicable.  The Broker-Dealer and the General Agent shall notify the Distributor and the Equitable Life Companies immediately in writing if Broker-Dealer and/or the General Agent fail to comply with any of the laws and regulations applicable to either of them.

§4.4    Restrictions on Sales Activity.  The Broker-Dealer and the General Agent and Agents shall not offer or attempt to offer the Contracts, nor solicit applications for the Contracts, nor deliver Contracts, in any state or other jurisdiction in which the Contracts may not lawfully be sold or offered for sale.  For purposes of determining where the Contracts may be offered and applications solicited, the Broker-Dealer and the General Agent may rely on written notification, as revised from time to time, received from the Distributor.

§4.5    Premiums and Other Payments.  All Premiums and loan repayments shall be sent immediately to the appropriate Equitable Life Company at the address indicated in the rules and procedures of the Equitable Life Companies, or at such other address as the Equitable Life Companies or the Distributor may subsequently specify in writing.  Each initial Premium shall be accompanied by a properly completed application for a Contract, unless such Premium is submitted in accordance with the procedures set forth in Exhibit C, which have been accepted and agreed to by the Broker-Dealer and the General Agent, as provided in Exhibit C.  Checks in payment of Premiums or outstanding loans shall be drawn to the order of the appropriate Equitable Life Company.

§4.6    Misdirected Payments.  In the event that Premiums or loan repayments are sent to the General Agent or Broker-Dealer, rather than to the appropriate Equitable Life Company, the General Agent and Broker-Dealer shall immediately remit such Premiums to the appropriate Equitable Life Company at

the address indicated in the rules and procedures of the Equitable Life Companies. The General Agent and Broker-Dealer acknowledge that if any Premium or other payment is held at any time by either of them, such Premium or other payment shall be held on behalf of the client, and the General Agent or Broker-Dealer shall segregate such Premium or other payment from their own funds and immediately remit such Premium or other payment to the Equitable Life Company issuing the Contract pursuant to which such amounts have been paid.

§4.7    Delivery of Contracts.  Upon issuance of a Contract by an Equitable Life Company and delivery of such Contract to the General Agent, the General Agent shall promptly deliver such Contract to its purchaser.  For purposes of this provision, "promptly" shall be deemed to mean not later than five calendar days.  Consistent with its administrative procedures, each Equitable Life Company will assume that a Contract issued by it will be delivered by the General Agent to the purchaser of such Contract within five calendar days.  As a result, if a purchaser exercises the free look rights under a Contract, the Broker-Dealer and the General Agent shall indemnify the Equitable Life Company issuing a Contract for any market loss incurred by such Equitable Life Company that results from the General Agent's failure to deliver such Contract to its purchaser within a ten-calendar-day period.

§4.8    Restrictions on Communications.  Neither the Broker-Dealer nor the General Agent, nor any of their directors, partners, officers, employees, registered persons, associated persons, agents or affiliated persons, in connection with the offer or sale of the Contracts, shall give any information or make any representations or statements, written or oral, concerning the Contracts, the Variable Accounts or the Trust other than information or representations contained in the Contract and Trust Prospectuses, statements of additional information and Registration Statements, or in reports or proxy statements therefor, or in promotional, sales or advertising material or other information supplied and approved in writing by the Distributor.

§4.9    Directions Given on Behalf of Contract Owners.  The Broker-Dealer and the General Agent shall be solely responsible for the accuracy and propriety of any instruction given or action taken by an Agent on behalf of an owner or prospective owner of a Contract, including any instruction or action pursuant to Exhibit B.  Neither the Distributor nor the Equitable Life Companies shall have any responsibility or liability for any action taken or omitted by it or by them in good faith in reliance on or by acceptance of such an instruction or action.

§4.10    Restrictions on Sales Material and Name Usage.  The Broker-Dealer and the General Agent shall neither use nor authorize the use of any promotional, sales or advertising material relating to the Contracts, the Equitable Life Companies, the Variable Accounts, the MVA Interests or the Trust without the prior written approval of the Distributor.  Furthermore, the Broker-Dealer and the General Agent shall neither use nor authorize the use of the name of Equitable or of an Affiliate of Equitable, or any other name, trademark, service mark, symbol or trade style that is now or may hereafter be owned by Equitable or by an Affiliate of Equitable, except in the manner and to the extent that such use may be specifically authorized in writing by Equitable or the Distributor.

§4.11    Market Timing and Other Prohibitions.  The Broker-Dealer and the General Agent understand and acknowledge that the Distributor, in its sole discretion and at any time during the term of this Agreement, may restrict or prohibit the solicitation, offer or sale of Contracts and Premiums thereunder in connection with any so-called "market timing" or "asset allocation" program, plan, arrangement or service.  Should the Distributor determine in its sole discretion that the Broker-Dealer or the General Agent is soliciting, offering or selling, or has solicited, offered or sold, Contracts or Premiums subject to any so-called "market timing" or "asset allocation" program, plan, arrangement or service which is not permitted under this Agreement (an "unapproved program"), the Distributor may take such action which is necessary, in its sole discretion, to halt such solicitations, offers or sales.  Furthermore, in addition to any

indemnification provided in Article XI and any other liability that the Broker-Dealer and the General Agent might have, the Distributor may hold the Broker-Dealer and the General Agent liable for any damages or losses, actual or consequential, sustained by the Distributor or any of its Affiliates, or the Trust or any Equitable Life Company, as a result of any unapproved program which causes such losses or damages following solicitation, offer or sale of a Contract or Premium subject to any unapproved program or similar service made available by or through the Broker-Dealer or the General Agent. Notwithstanding any prohibitions which may be imposed pursuant to this Section 4.11, the Broker-Dealer and its registered representatives who are Agents may provide incidental services in the form of guidance to applicants and owners of Contracts regarding the allocation of Premiums and Contract value, provided that such services are (i) solely incidental to the Broker-Dealer's activities in connection with the sales of the Contracts, (ii) subject to the supervision and control of the Broker-Dealer, and (iii) furnished in accordance with rules and procedures prescribed by Equitable.

§4.12    Tax Reporting Responsibility.    The Broker-Dealer and the General Agent shall be solely responsible under applicable tax laws for the reporting of compensation paid to Agents and for any withholding of taxes from compensation paid to Agents, including, without limitation, FICA, FUTA, and federal, state and local income taxes.

§4.13    Maintenance of Books and Records.    The General Agent represents that it maintains and shall maintain such books and records concerning the activities of the Agents as may be required by the appropriate insurance regulatory agencies that have jurisdiction and that may be reasonably required by the Distributor to reflect adequately the Contracts processed through the General Agent.    The General Agent shall make such books and records available to the Distributor and/or an Equitable Life Company at any reasonable time upon written request by the Distributor.    The Broker-Dealer represents that it maintains and shall maintain appropriate books and records concerning the activities of the Agents as are required by the SEC, the NASD and other agencies having jurisdiction and that may be reasonably required by the Distributor to reflect adequately the Contracts processed through the General Agent.    Broker-Dealer shall make such books and records available to the Distributor and/or an Equitable Life Company at any reasonable time upon written request by the Distributor or an Equitable Life Company.

§4.14    Bonding of Agents and Others.    The Broker-Dealer represents that all directors, officers, employees, and registered representatives of the Broker-Dealer who are appointed pursuant to this Agreement as Agents for state insurance law purposes or who have access to funds of the Equitable Life Companies, including but not limited to funds submitted with applications for the Contracts or funds being returned to purchasers of Contracts, are and shall be covered by a blanket fidelity bond, including coverage for larceny and embezzlement, issued by a reputable bonding company.    This bond shall be maintained by the Broker-Dealer at the Broker-Dealer's expense.    Such bond shall be, at least, of the form, type and amount required under the NASD Rules of Fair Practice.    The Distributor may require evidence, satisfactory to it, that such coverage is in force, and the Broker-Dealer shall give prompt written notice to the Distributor of any cancellation or change of coverage.    The Broker-Dealer assigns any proceeds received from the fidelity bonding company to the Equitable Life Companies to the extent of each Equitable Life Company's loss due to activities covered by the bond.    If there is any deficiency amount, as a result of a deductible provision or otherwise, the Broker-Dealer shall promptly pay the affected Equitable Life Company such amount on demand, and the Broker-Dealer hereby indemnifies and holds harmless such Equitable Life Company from any such deficiency and from the costs of collection thereof (including reasonable attorneys' fees).

§4.15    Reports to Insurers.    The Broker-Dealer and the General Agent shall promptly furnish to each Equitable Life Company or its authorized agent any reports and information that such Equitable Life Company may reasonably request for the purpose of meeting such Equitable Life Company's reporting and

recordkeeping requirements under the insurance laws of any state, under any applicable federal or state securities laws, rules or regulations, or the rules of the NASD.

## ARTICLE V
### Standard of Conduct for Agents

§5.1    Basic Rules of Conduct.   The Broker-Dealer and the General Agent shall ensure that each Agent shall comply with a standard of conduct including, but not limited to, the following:

a.    An Agent shall be duly qualified, licensed and registered to solicit and participate in the sale of Contracts as provided in Article III.

b.    An Agent shall not solicit applications for the Contracts without delivering the appropriate Contract Prospectus(es) the Trust Prospectus and, where required by state insurance law (as set forth in a notice to be supplied by the Equitable Life Companies), the then currently effective statement of additional information for the Contracts, and any other information whose delivery is specifically required. In soliciting applications for the Contracts, an Agent shall only make statements, oral or written, which are in accordance with the Contract Prospectus, the Trust Prospectus and written sales literature regarding the Contracts authorized by the Distributor. An Agent shall utilize only those applications for the Contracts provided to the General Agent by the Distributor.

c.    An Agent shall recommend the purchase of a Contract to an applicant only if he or she has reasonable grounds to believe that such purchase is suitable for the applicant in accordance with, among other things, applicable regulations of any state regulatory authority, the SEC and the NASD. While not limited to the following, a determination of suitability shall be based on information supplied to an Agent after a reasonable inquiry concerning the applicant's insurance and investment objectives and financial situation and needs.

d.    An Agent shall require that any payment of an initial Premium, whether in the form of a check or otherwise, shall be drawn in U.S. dollars on a bank located in the United States and made payable to the appropriate Equitable Life Company and, if in the form of a check, signed by the applicant for the Contract or by a duly authorized representative of the applicant who is acceptable to the Equitable Life Companies. An Agent shall not accept third-party checks or cash for Premiums.

e.    All checks and applications for the Contracts received by an Agent shall be forwarded immediately to the processing office designated by the Equitable Life Companies.

f.    An Agent shall have no authority to endorse checks to an Equitable Life Company, except to the extent provided in Exhibit B.

g.    An Agent shall have no authority to alter, modify, waive or change any of the terms, rates, charges or conditions of the Contracts.

h.    An Agent shall make no representations concerning the continuation of non-guaranteed terms or provisions of the Contracts.

i.    An Agent shall have no authority to advertise for, on behalf of, or with respect to an Equitable Life Company, the Distributor, the Variable Accounts, the MVA Interests, the Contracts or the Trust without prior written approval and authorization from the Distributor.

j.      An Agent shall have no authority to solicit applications for Contracts or Premiums thereunder which will be subject to or in connection with any so-called "market timing" or "asset allocation" program, plan, arrangement or service which is an unapproved program.

k.      An Agent shall not furnish any transfer or other instructions by telephone to an Equitable Life Company on behalf of an owner of a Contract without having first obtained from such owner a written authorization in a form acceptable to the Equitable Life Companies.

l.      An Agent shall not encourage a prospective purchaser to surrender or exchange an insurance policy or contract issued by an Equitable Life Company in order to purchase a Contract or, conversely, to surrender or exchange a Contract in order to purchase another insurance policy or contract issued by an Equitable Life Company, except to the extent such surrenders or exchanges have been authorized by the Distributor. In the event that an insurance policy or contract issued by an Equitable Life Company is surrendered or exchanged in order to purchase a Contract, no compensation shall be paid under this Agreement.

m.      An Agent shall act in accordance with the rules and procedures of the Equitable Life Companies in connection with any solicitation activities relating to the Contracts.

## ARTICLE VI
### Responsibilities of Distributor for Marketing Materials and Reports

§6.1    _Prospectuses and Applications Provided by Distributor._ During the term of this Agreement, the Distributor will provide the Broker-Dealer and the General Agent, without charge, with as many copies of the Contract Prospectus(es), Trust Prospectus and applications for the Contracts, as the Broker-Dealer or the General Agent may reasonably request. Upon receipt from the Distributor of updated copies of the Contract Prospectus(es), Trust Prospectus and applications for the Contracts, the Broker-Dealer and the General Agent will promptly discard or destroy all copies of such documents previously provided to them, except such copies as are needed for purposes of maintaining proper records. Upon termination of this Agreement, the Broker-Dealer and the General Agent will promptly return, to the Distributor, all Contract and Trust Prospectuses, Contract applications, and other materials and supplies furnished by the Distributor to the Broker-Dealer or the General Agent or to the Agents.

§6.2    _Sales Material Provided by Distributor._ During the term of this Agreement, the Distributor will be responsible for providing and approving all promotional, sales and advertising material to be used by the Broker-Dealer and the General Agent. The Distributor will file such materials or will cause such materials to be filed with the SEC and the NASD, and with any state securities regulatory authorities, as required.

§6.3    _Information Provided by Distributor._ The Distributor will compile periodic marketing reports summarizing sales results to the extent reasonably requested by the Broker-Dealer or the General Agent.

## ARTICLE VII
### Commissions, Fees and Expenses

§7.1    _Compensation Schedule._ During the term of this Agreement, the Distributor shall pay to the General Agent (or to the Broker-Dealer, at the request of the General Agent) as compensation for Contracts for which it is the Broker-of-Record, the amounts set forth in Schedule II, as such Schedule II may be amended or modified at any time, in any manner and without prior notice by the Distributor, and subject to the other provisions of this Agreement. Any amendment to Schedule II will be applicable to any

Contract for which an application or initial Premium is received by an Equitable Life Company on or after the effective date of such amendment, in accordance with procedures established by the Distributor. Compensation with respect to any Contract shall be paid to the General Agent only for so long as the General Agent is the Broker-of-Record for such Contract.

§7.2    Limitations on Compensation.  No compensation or reimbursement of any kind other than that described in this Agreement is payable to the General Agent or the Broker-Dealer.  In addition, the Broker-Dealer and the General Agent recognize that, unless the provisions of Exhibit B apply to the receipt of an initial Premium, all compensation payable to the General Agent hereunder will be disbursed by or on behalf of the Distributor after each Premium is received and accepted by the appropriate Equitable Life Company.

§7.3    Expenses Paid by Broker-Dealer and General Agent.  Neither the Broker-Dealer nor the General Agent shall, directly or indirectly, expend or contract for the expenditure of any funds of the Distributor or any Equitable Life Company.  The Broker-Dealer and the General Agent shall each pay all expenses incurred by each of them in the performance of this Agreement, unless otherwise specifically provided for in this Agreement or unless the Distributor shall have agreed in advance in writing to share the cost of certain expenses.  Initial state appointment fees for agents of an Equitable Life Company who are associated with the General Agent will be paid by such Equitable Life Company unless otherwise paid by the General Agent or Broker-Dealer.  Renewal state appointment fees for any Agent shall be paid by such Equitable Life Company if, in the sole discretion of such Equitable Life Company, its minimum production and activity requirements for the payment of renewal appointment fees have been met by such Agent.  Each Equitable Life Company shall establish reasonable minimum production and activity requirements for the payment of renewal state appointment fees, which may be changed by such Equitable Life Company in its sole discretion at any time without notice.  Except as otherwise provided herein, the Broker-Dealer will be obligated to pay all state appointment fees, including, but not limited to, renewal appointment fees not paid for by an Equitable Life Company, transfer fees and termination fees, and any other fees required to be paid to obtain state insurance licenses for Agents.

§7.4    Offsets of Compensation Under Other Agreements.  With respect to commissions, compensation or any other amounts owed by the Distributor or any Affiliate of the Distributor to the Broker-Dealer or the General Agent under any other agreement, the Distributor shall have a right to set off against such amounts any monies payable by the General Agent under this Agreement, including Schedule II, to the Distributor, to the extent permitted by applicable law.  This right on the part of the Distributor shall not prevent both of them or either of them from pursuing any other means or remedies available to them to recover such monies payable by the General Agent.

§7.5    No Rights of Agents to Compensation Paid by Distributor.  Agents shall have no interest in this Agreement or right to any commissions to be paid by the Distributor to the General Agent.  The General Agent shall be solely responsible for the payment of any commission or consideration of any kind to Agents.  The General Agent shall have no interest in any compensation paid by an Equitable Life Company to the Distributor, now or hereafter, in connection with the sale of any Contracts under this Agreement.

## ARTICLE VIII
### Term and Exclusivity of Agreement

§8.1    Limited Classes of Contracts.  This Agreement relates solely to the Contracts identified in Schedule I.

§8.2    Term. This Agreement shall remain in effect for a period of one year from the Effective Date, and, unless terminated earlier pursuant to Sections 8.3 or 8.4, shall automatically continue in effect for one-year periods thereafter; provided, however, that it shall automatically terminate upon termination of any distribution agreement between the Distributor and an Equitable Life Company relating to the Contracts.

§8.3    Early Termination by Notice. This Agreement may be terminated by any party hereto by giving notice to the other parties at least sixty (60) days prior to an anniversary of the Effective Date.

§8.4    Termination for Cause. If Broker-Dealer or the General Agent shall default in their respective obligations under this Agreement, or breach any of their respective representations or warranties made in this Agreement, the Distributor may, at its option, cancel and terminate this Agreement without notice.

§8.5    Surviving Provisions. Upon termination of this Agreement, all authorizations, rights, and obligations hereunder shall cease except:

a.    the obligation to settle accounts hereunder, including the payment of compensation with respect to Contracts in effect at the time of termination or issued pursuant to applications received by an Equitable Life Company prior to termination or Premiums received under such Contracts subsequent to termination of this Agreement;

b.    the provisions with respect to indemnification set forth in Article XI;

c.    the provisions of Section 4.13 that require the General Agent and the Broker-Dealer to maintain certain books and records;

d.    the confidentiality provisions contained in Section 10.3; and

e.    the provisions of subparagraph 1. of Section 5.1 with respect to the surrender or exchange of a Contract.

In addition, after the termination of this Agreement, the General Agent shall continue to receive Contract information relating to each Contract issued pursuant to this Agreement, unless a Contract owner shall direct that such information not be so provided.

ARTICLE IX
Complaints and Investigations

§9.1    Cooperation in Investigations and Proceedings. The Distributor, the Broker-Dealer and the General Agent shall each cooperate fully in any insurance regulatory investigation, proceeding or inquiry or in any judicial proceeding arising in connection with the Contracts marketed under this Agreement. In addition, the Distributor, the Broker-Dealer and the General Agent shall cooperate fully in any securities regulatory investigation, proceeding or inquiry or in any judicial proceeding with respect to the Distributor, the Broker-Dealer, their Affiliates or their agents, to the extent that such investigation or proceeding is in connection with the Contracts marketed under this Agreement. Copies of documents received by any party to this Agreement in connection with any judicial proceeding shall be furnished promptly to all of the other parties.

§9.2    Notification and Related Requirements.  Without limiting the provisions of Section 9.1:

a.    The Broker-Dealer and the General Agent will be notified promptly of any customer complaint or notice of any regulatory investigation, proceeding or inquiry or any judicial proceeding received by the Distributor or an Equitable Life Company with respect to the Broker-Dealer, General Agent or any Agent.

b.    The Broker-Dealer and the General Agent will promptly notify the Distributor and the appropriate Equitable Life Company of any customer complaint or notice of any regulatory investigation, proceeding or inquiry or any judicial proceeding received by the Broker-Dealer, the General Agent or their Affiliates with respect to themselves, their Affiliates or any Agent in connection with any Contract marketed under this Agreement or any activity relating to any such Contract and, upon request by the Distributor, will promptly provide copies of all relevant materials to the Distributor.

c.    In the case of a customer complaint, the Distributor, the Broker-Dealer and the General Agent will cooperate in investigating such complaint, and any response by the Broker-Dealer or the General Agent to such complaint will be sent to the Distributor for written approval not less than five business days prior to its being sent to the customer or regulatory authority, except that if a more prompt response is required, the proposed response shall be communicated by telephone or facsimile.  The Distributor shall have final authority to determine the content of each such response.

ARTICLE X
Assignment, Amendment, Confidentiality

§10.1    Non-Assignable Except to Certain Affiliates.  This Agreement shall be non-assignable by the parties hereto, except that a party may assign its rights and obligations to any subsidiary of, or any company under common control with, such party, provided that:

a.    the assignee is duly licensed to perform all functions required of that party under this Agreement;

b.    the assignee undertakes to perform such party's functions hereunder; and

c.    in the event that the Broker-Dealer or the General Agent determines to assign its rights and obligations under this Agreement:

i.    such proposed assignment is approved in advance by the Distributor; and

ii.    the Broker-Dealer or the General Agent or assignee pays any state insurance agent appointment fees and any other charges or fees, including taxes, that become due and payable as a result of the assignment.

10.2    Prior Agreements and Amendments.  This Agreement constitutes the entire agreement between the parties hereto and supersedes all prior agreements, either oral or written, between the parties relating to the Contracts and, except for any amendment of Schedule I, pursuant to the terms of Section 2.6, or Schedule II, pursuant to the terms of Section 7.1, may not be modified in any way unless by written agreement.

§10.3    Confidentiality.  Each party to this Agreement shall maintain the confidentiality of any client list or any other proprietary information that it may acquire in the performance of this Agreement and

shall not use such information for any purpose unrelated to the administration of the Contracts without the prior written consent of the other parties.

### ARTICLE XI
### Indemnification

§11.1  Indemnification of Distributor.  The Broker-Dealer and the General Agent, jointly and severally, shall indemnify and hold harmless each Equitable Life Company, the Distributor and each person who controls or is associated with an Equitable Life Company or the Distributor within the meaning of such terms under the federal securities laws, and any officer, director, employee or agent of the foregoing, against any and all losses, claims, damages or liabilities, joint or several (including any investigative, legal and other expenses reasonably incurred in connection with, and any amounts paid in settlement of, any action, suit or proceeding or any claim asserted), insofar as such losses, claims, damages or liabilities arise out of or are based upon:

a.　　violation(s) by the Broker-Dealer, the General Agent or an Agent of federal or state securities laws or regulations, insurance laws or regulations, or any rule or requirement of the NASD;

b.　　any unauthorized use of sales or advertising material, any oral or written misrepresentations, or any unlawful sales practices concerning the Contracts, the Equitable Life Companies, the Variable Accounts, the MVA Interests or the Trust, by the Broker-Dealer, the General Agent or an Agent;

c.　　claims by the Agents or other agents or representatives of the General Agent or the Broker-Dealer for commissions or other compensation or remuneration of any type;

d.　　any action or inaction by any clearing broker or broker furnishing similar services through which the Broker-Dealer or the General Agent processes any transaction pursuant to this Agreement;

e.　　any failure on the part of the Broker-Dealer, the General Agent or an Agent to submit Premiums or applications for Contracts or accurate and proper instructions of a Contract owner or prospective owner to the Equitable Life Companies, or to submit the correct amount of a Premium, on a timely basis and in accordance with Sections 4.5 and 4.6 and the rules and procedures of the Equitable Life Companies.

f.　　any failure on the part of the Broker-Dealer, the General Agent, or an Agent to deliver Contracts to purchasers thereof on a timely basis in accordance with Section 4.7 and in accordance with the rules and procedures of the Equitable Life Companies; or

g.　　any other breach by the Broker-Dealer or the General Agent of any provision of this Agreement, including, without limitation, Section 5.1

This indemnification will be in addition to any liability which the Broker-Dealer and the General Agent may otherwise have.

§11.2  Indemnification of Broker-Dealer and General Agent.  The Distributor shall indemnify and hold harmless the Broker-Dealer and the General Agent and each person who controls or is associated with the Broker-Dealer or the General Agent within the meaning of such terms under the federal securities laws, and any officer, director, employee or agent of the foregoing, against any and all losses, claims, damages or liabilities, joint or several (including any investigative, legal and other expenses reasonably incurred in

connection with, and any amounts paid in settlement of, any action, suit or proceeding or any claim asserted), to which they or any of them may become subject under any statute or regulation, at common law or otherwise, insofar as such losses, claims, damages or liabilities arise out of or are based upon a breach by the Distributor of any provision of this Agreement. This indemnification will be in addition to any liability which the Distributor may otherwise have.

§11.3  Notification and Procedures.  After receipt by a party entitled to indemnification ("Indemnified Party") under this Article XI of notice of the commencement of any action or threat of such action, if a claim in respect thereof is to be made against any person obligated to provide indemnification under this Article XI ("Indemnifying Party"), such Indemnified Party will notify the Indemnifying Party in writing of the commencement thereof as soon as practicable thereafter, provided that the omission so to notify the Indemnifying Party will not relieve it from any liability under this Article XI, except to the extent that the omission results in a failure of actual notice to the Indemnifying Party and such Indemnifying Party is damaged solely as a result of the failure to give such notice.  The Indemnifying Party, upon the request of the Indemnified Party, shall retain counsel reasonably satisfactory to the Indemnified Party to represent the Indemnified Party and any others the Indemnifying Party may designate in such proceeding and shall pay the fees and disbursements of such counsel related to such proceeding.  In any such proceeding, any Indemnified Party shall have the right to retain its own counsel, but the fees and expenses of such counsel shall be at the expense of such Indemnified Party, unless (i) the Indemnifying Party and the Indemnified Party shall have mutually agreed to the retention of such counsel or (ii) the named parties to any such proceeding (including any impleaded parties) include both the Indemnifying Party and the Indemnified Party and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them.  The Indemnifying Party shall not be liable for any settlement of any proceeding effected without its written consent, but if such proceeding is settled with such consent or if final judgment is entered in such proceeding for the plaintiff, the Indemnifying Party shall indemnify the Indemnified Party from and against any loss or liability by reason of such settlement or judgment.

## ARTICLE XII
### Miscellaneous

§12.1  Headings.  The headings in this Agreement are included for convenience of reference only and in no way define or delineate any of the provisions hereof or otherwise affect their construction or effect.

§12.2  Counterparts.  This Agreement may be executed in two or more counterparts, each of which taken together shall constitute one and the same instrument.

§12.3  Severability.  If any provision of this Agreement shall be held or made invalid by a court decision, statute, rule or otherwise, the remainder of this Agreement shall not be affected thereby.

§12.4  Notices.  All notices under this Agreement shall be given in writing and addressed as follows:

if to the Distributor, to:

Equitable Distributors, Inc.
787 Seventh Avenue
New York, New York 10019
Attention: President

if to the Broker-Dealer or the General Agent, to:

<u>Planning Corporation of America</u>
<u>880 Carillon Parkway</u>
<u>St. Petersburg, FL 33716</u>
Attention: <u>James Sipe</u>

or to such other address as such party may hereafter specify in writing. Each such notice shall be either hand delivered or transmitted by certified United States mail, return receipt requested, and shall be effective upon delivery.

§12.5   <u>Governing Law</u>.   This Agreement shall be governed by and construed in accordance with the laws of the State of New York, excluding its conflict of laws provisions.

§12.6   <u>Scope of Sales Material References</u>.   For purposes of this Agreement, all references to sales, promotional, marketing or advertising material shall include, without limitation, advertisements (such as material published, or designed for use in, a newspaper, magazine or other periodical, radio, television, telephone or tape recording, videotape display, signs or billboards, motion pictures or other public media), sales literature (i.e., any written communication distributed or made generally available to customers or the public, including brochures, circulars, research reports, market letters, form letters, seminar texts, reprints or excerpts of any other advertisement, sales literature or published article), and educational or training materials or other communications distributed or made generally available to some or all Agents or employees of the Broker-Dealer or the General Agent.

§12.7   <u>No Waiver of Rights</u>.   The rights, remedies and obligations contained in this Agreement are cumulative and are in addition to any and all rights, remedies and obligations, at law or in equity, which the parties hereto are entitled to under state and federal laws. Failure of any party to insist upon strict compliance with any of the conditions of this Agreement shall not be construed as a waiver of any of the conditions, but the same shall remain in full force and effect. No waiver of any of the provisions of this Agreement shall be deemed, or shall constitute, a waiver of any other provisions, whether or not similar, nor shall any waiver constitute a continuing waiver.

§12.8   <u>Scope of Agreement</u>.   All Schedules and Exhibits to this Agreement are part of the Agreement.

### ARTICLE XIII
### Sales By or Through Banks

§13.1   <u>Applicability of Article; Supplemental Definitions</u>.   This Article XIII applies only if the Broker-Dealer or the General Agent distributes Contracts in one or more of the following circumstances (collectively referred to as "Bank-Related Sales"): (i) on the premises of a bank, trust company, savings bank, savings and loan association, or other institution (a) the deposits of which are insured by the Federal Deposit Insurance Corporation ("FDIC") or (b) which is chartered, organized, regulated or supervised under the authority of any federal or state bank or similar financial institution regulatory agency or authority (collectively, "Banks"); (ii) by means of personal, telephone, mail or other oral or written contacts originating from the premises of a Bank; or (iii) to persons which are referred to the Broker-Dealer or General Agent by a Bank. For purposes of this Article XIII, the term "Bank Regulatory Requirements" shall include (i) the *Interagency Statement on Retail Sales of Nondeposit Products* (February 15, 1994), published by the U.S. Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the FDIC and the U.S. Office of Thrift Supervision, as supplemented or amended from

time to time, and (ii) any federal or state laws, regulations, orders, directives, circulars, agreements in writing, memoranda, commitments in writing or other legal or supervisory requirements which may be administered, adopted, promulgated, enforced or applied with respect to any Bank-Related Sales under this Agreement (regardless of whether any such requirement is of general or specific applicability) by any federal or state bank or financial institution regulatory agency or authority.

§13.2   Written Agreements for Bank-Related Sales.  The authorization to distribute Contracts which is conferred on the Broker-Dealer and the General Agent under Article II shall not include Bank-Related Sales unless such activities are conducted under the terms of a written agreement with each and any Bank where such Bank-Related Sales will take place which complies in all respects with applicable Bank Regulatory Requirements.  The Broker-Dealer or General Agent shall, upon request of the Distributor, provide the Distributor with a copy of each such written agreement.  The Broker-Dealer and the General Agent shall have exclusive responsibility for ensuring strict compliance with the terms and conditions of any such written agreement.

§13.3   Compliance with Bank Regulatory Requirements.  The Broker-Dealer and the General Agent each represent and warrant, on behalf of itself and the Agents, that it is in compliance with all Bank Regulatory Requirements applicable to third parties engaged in Bank-Related Sales.  The Broker-Dealer and the General Agent shall have exclusive responsibility for ensuring strict compliance with all Bank Regulatory Requirements with respect to any Bank-Related Sales under this Agreement.  The Broker-Dealer and the General Agent each undertake to keep the Distributor promptly informed of any amendments, supplements or changes to applicable Bank Regulatory Requirements which may affect this Agreement.

§13.4   Production by Distributor of Certain Books and Records.  The Distributor agrees to provide to the Broker-Dealer or the General Agent, upon request, any books and records relating to Contracts distributed through Bank-Related Sales for purposes of making such records available for inspection by any federal or state bank or financial institution regulatory agency with jurisdiction over such Bank-Related Sales, or over a Bank through which such sales are conducted.  The Distributor's agreement under this Section 13.4 shall not constitute or represent in any respect an admission or acknowledgment by Distributor that such federal or state bank or financial institution regulatory authority has any jurisdiction over Distributor or the activities of the Distributor, and the Distributor expressly disclaims any such jurisdiction.

§13.5   Prospectuses and Applications Provided by Distributor; Sales Materials.  During the term of this Agreement, the Distributor will provide the Broker-Dealer and the General Agent, without charge, with as many copies of the Contract Prospectus(es), Trust Prospectus and applications for the Contracts, containing those disclosures specifically required by any applicable Bank Regulatory Requirements with respect to products not insured by the FDIC and similar matters, as the Broker-Dealer or the General Agent reasonably may request.  The Broker-Dealer and the General Agent shall have exclusive responsibility for ensuring the use and delivery of such materials, and any sales materials described in Article VI, in compliance with applicable Bank Regulatory Requirements.  The terms of Article VI otherwise shall govern the furnishing, use and return of such documents and materials.

§13.6   Supplemental Indemnification of Distributor.  In addition to the indemnifications provided to the Distributor under Section 11.1, the Broker-Dealer and the General Agent, jointly and severally, shall indemnify each person entitled to indemnification under Section 11.1 for any losses, claims, damages or liabilities (as described in Section 11.1) arising out of or based on violations or failures to comply with any Bank Regulatory Requirements.  The provisions of Article VI otherwise shall govern the terms and procedures with respect to any indemnifications provided under this Section 13.6.

§13.7   Construction With Other Provisions.  The provisions of this Article XIII are in addition to the other terms and conditions of this Agreement.  In the event of any inconsistency between the provisions of this Article XIII and any other term or condition of this Agreement, the requirements of this Article XIII and not such other term or condition, shall govern.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers.

INVESTMENT MANAGEMENT &
RESEARCH, INC.

By: _____

Title:   Vice President

PLANNING CORPORATION OF AMERICA

By: _____
Title:  President

Agreed to and accepted as of the _27_ day of
_March_, 1996 in New York, New York.

EQUITABLE DISTRIBUTORS, INC.

By: _____
Title: _____

NNG_1.DOC/30652
38635
38637
3/1/96

SA4                                    -18-

EXHIBIT A

Variable Accounts

Separate Account No. 45 of Equitable.

EXHIBIT B

**Planning Corporation of America ("PCA" or "we")**

**OVERVIEW OF PCA NETTING PROCEDURES**
Applicable to Raymond James & Associates, Inc., Investment Management & Research, Inc., and Robert Thomas Securities, Inc., annuity business

PCA has established a segregated bank account for the "Sole Benefit of our Clients". All premiums received on behalf of companies with which we have netting agreements are deposited into this account. Our netting agreements allow us to deposit checks made payable to the insurance company without endorsement. Checks made payable to the respective insurance companies are then drawn from this account and forwarded to the insurance company with the application and associated paperwork, as described below. A transmittal form is generated by our database (Attachment #1) and submitted with the application and other required paperwork to the insurance company. At this time, we issue a check for each application rather than one check or wire to each insurance company. A stamp indicating that the premium check was netted is placed on the check stub to eliminate confusion on the receiving insurance company's end. The transmittal also indicates the gross premium, retained commission (if any) and net premium remitted. In most all cases, we will net commissions and forward the balance to you via 2 day UPS service. We may, in some cases, elect not to net commissions due to time constraints (rate changes, product changes, etc.) and will, therefore, remit the gross premium.

9/95

Attachment #1

Tele

PLANNING CORPORATION OF AMERICA
INSURANCE OR ANNUITY APPLICATION TRANSMITTAL

TO  : ITT Hartford Life & Ann Ins. Co.(Putnam)          DATE: 02/12/96

ATTN: NEW BUSINESS

RE  :
      INSURED / ANNUITANT  CATHERINE B MAYES


DATE    : 02/12/96          GROSS PREMIUM:        $19,055.34
DOB     : 03/22/32          COMMISSION   :         $1,143.32
TYPE    : SPVA              NET PREMIUM  :        $17,912.02
PRODUCT : Putnam Capital Manager
AGENT   : JEFFREY L. HOOPER

Comments:

  ->   *** THIS IS AN IRA TRANSFER ***



    * * * *  I M P O R T A N T  -  APPLICATION CONFIRMATION  * * * *

So that we may verify your receipt of this application, we are requesting
that you complete the following information and return it to us in the
enclosed envelope, or if you prefer, FAX to 813-573-8317.


        POLICY NUMBER        _____

        POLICY EFFECTIVE DATE _____

        PROCESSED BY         _____


Insured/Annuitant: CATHERINE B MAYES          Our Record #:   237524
Insurance Company: ITT Hartford Life & Ann Ins. Co.    Transaction#: P9607901
Date Submitted   : 02/12/96
PCA Underwriter  : Nancy Mui
Agent Name       : JEFFREY L. HOOPER


* * * *   If there are any requirements necessary to complete this case,
          PLEASE contact PCA at 813-578-3800 Extension: 5372

 (Rpt: NETXMT)

EXHIBIT C

**Special Procedures for Initial Premium Transmittal**

As indicated in Section 4.5, an initial Premium which is not accompanied by a properly completed application for a Contract may be accepted by an Equitable Life Company if the Broker-Dealer and the General Agent have accepted, agreed to and complied with the procedures set forth in this Exhibit C.

*Wire Transmittal and Electronic Data Transmission*
*of Application Information*

1.     The Broker-Dealer will cause the initial Premium to be paid to the appropriate Equitable Life Company by wire transfer.

2.     The wire transfer will be accompanied by an electronic transmission of application information in a form prescribed by the Equitable Life Companies.

3.     The proposed Contract issuance will not occur in any of the following states: Kentucky, New York, North Carolina, Pennsylvania.

4.     The proposed Contract issuance will not involve any of the following:

a.     A contract replacement.

b.     A contract exchange within the meaning of Section 1035 of the Internal Revenue Code.

c.     The funding of benefits under a tax-qualified retirement plan or individual retirement account.

5.     The Broker-Dealer and the General Agent will advise the proposed owner of the Contract that, unless a transaction has been requested in writing by the owner and the signature of the owner has been guaranteed, no financial transactions with respect to the Contract shall be executed until a signed acknowledgment form has been received by the appropriate Equitable Life Company.

6.     Any cost associated with the correction of an error made in the investment of an initial Premium shall be borne by the Broker-Dealer, unless such error results directly from any improper action of an Equitable Life Company.

7.     If the owner of the Contract requests a return of the initial Premium after the Premium has been invested and the Contract issued, the provisions of subparagraph a.ii. of Schedule II shall apply.

*Wire Transmittal and Submission of Application*

1.     The Broker-Dealer will cause the initial Premium to be paid to the appropriate Equitable Life Company by wire transfer.

2.    The wire transfer will be accompanied by a simultaneous telephone facsimile transmission of application information in a form prescribed by the Equitable Life Companies.

3.    Any cost associated with the correction of an error made in the investment of an initial Premium shall be borne by the Broker-Dealer, unless such error results directly from any improper action of an Equitable Life Company.

4.    If no properly completed application for a Contract is received by an Equitable Life Company within the period of time specified by it, and the initial Premium is therefore returned to the proposed owner of the Contract, the provisions of subparagraph a.ii. of Schedule II shall apply.

The procedures set forth in this Exhibit C, as further described in the Contract Prospectus and as modified from time to time, are hereby accepted and agreed to as of the day and year first above written.

Investment Management & Research
[Broker-Dealer]

By: _____
William McGovern, Vice President

Planning Corporation of America
[General Agent]

By: _____
James H. Sipe, President

## SCHEDULE I

### Contracts

The Contracts made available through the Income Management Group of Equitable, including the following:

NQ Accumulator

Rollover IRA

Assured Growth Plan

NQ Assured Payment Plan
    (Certain Period and Life Annuity)

NQ Assured Payment Plan
    (Certain Period Only)

SCHEDULE II

Compensation

This Schedule II is attached to and made part of the Sales Agreement by and among Equitable Distributors, Inc. and the Broker-Dealer and General Agent.

*Compensation Schedule Effective July 17, 1995*

Compensation will be paid in the percentages of Premium shown below.

| Contract | Age of Contract owner upon acceptance of Premium | Aggregate Compensation | Base Commission | Expense Allowance* |
|---|---|---|---|---|
| NQ Accumulator | | | | |
| • Initial Premium $250,000 or less | 20 - 70 | 6.0 | 3.0 | 3.0 |
| | 71 - 78 | 5.0 | 2.5 | 2.5 |
| • Initial Premium over $250,000 | 20 - 70 | 5.0 | 2.5 | 2.5 |
| | 71 - 78 | 4.0 | 2.0 | 2.0 |
| Rollover IRA with Assured Payment Option or Assured Payment Option Plus | Under 59.5** | 5.0 | 2.5 | 2.5 |
| | 59.5 - 80 | 5.0 | 2.5 | 2.5 |
| | 81 - 83 | 4.0 | 2.0 | 2.0 |
| Rollover IRA without Assured Payment Option | 20 - 70 | 5.0 | 2.5 | 2.5 |
| | 71 - 78 | 4.0 | 2.0 | 2.0 |
| Assured Growth Plan | 20 - 70 | 5.0 | 2.5 | 2.5 |
| | 71 - 78 | 4.0 | 2.0 | 2.0 |
| NQ Assured Payment Plan ("APP") (Certain Period and Life Annuity) | Under 59.5** | 5.0 | 2.5 | 2.5 |
| | 59.5 - 80 | 5.0 | 2.5 | 2.5 |
| | 81 - 83 | 4.0 | 2.0 | 2.0 |

---

* Expense allowances are paid in accordance with Section 4228 of the New York Insurance Law and regulations thereunder. No payment received hereunder will be used to effect compensation in excess of the limits of Section 4228 for the sale of insurance.

** Applicable only if first annuity payment is made after annuitant reaches age 59-1/2.

| Contract | Age of Contract owner upon acceptance of Premium | Aggregate Compensation | Base Commission | Expense Allowance* |
|---|---|---|---|---|
| NQ Assured Payment Plan | | | | |
| (Certain Period Only) | | | | |
| Length of Certain Period | | | | |
| • 7-9 Years | 59.5 - 78 | 1.5 | 0.75 | 0.75 |
| • 10-12 Years | 59.5 - 78 | 2.0 | 1.0 | 1.0 |
| • 13-15 Years | 59.5 - 78 | 2.5 | 1.25 | 1.25 |
| Flexible Income Plan | 59.5 - 70 | 4.00 at Contract issue; | 2.0 | 2.0 |
| | | 1.00 when APP elected. | 0.50 | 0.50 |
| | 71 - 78 | 3.00 at Contract Issue; | 1.50 | 1.50 |
| | | 2.00 when APP elected. | 1.0 | 1.0 |

In the event that an insurance policy or contract issued by an Equitable Life Company is surrendered or exchanged in order to purchase a Contract, no compensation will be paid under this Schedule II, and the percentages shown above shall not apply.

*Return of Compensation in Specified Circumstances*

The following rules regarding "chargebacks" shall apply in connection with the offer and sale of Contracts under this Agreement:

a.    In the event that:

i.    a Premium is returned because an Equitable Life Company rejects the application for the Contract under which such Premium has been paid or because the Premium, or the related application, is not timely received by an Equitable Life Company as required herein, or a refund is made because a purchaser exercises his or her free look right under a Contract; or

---

* Expense allowances are paid in accordance with Section 4228 of the New York Insurance Law and regulations thereunder. No payment received hereunder will be used to effect compensation in excess of the limits of Section 4228 for the sale of insurance.

** Applicable only if first annuity payment is made after annuitant reaches age 59-1/2.

ii.    within the first six months after the date on which a Contract was issued, the purchaser surrenders the Contract, or otherwise rescinds the Contract, or the Contract annuitizes;

then, in any such event, upon request from the Distributor, the General Agent shall promptly repay to the Distributor any and all compensation received by the General Agent, based on all Premiums paid into the Contract, and shall pay any loss incurred as a result of a Premium being returned which was not timely received or for which an application was not timely received by an Equitable Life Company.

b.    If during the period from six months after the date of issuance of a Contract to the end of the first policy year of the Contract, the purchaser exercises a right to surrender the Contract, or otherwise rescinds the Contract, or the Contract annuitizes, then, in any such event, upon request from the Distributor, the General Agent shall promptly repay to the Distributor one-half (1/2) of any and all compensation received by the General Agent, based on all Premiums paid into the Contract.

The Distributor shall have the right to collect from the General Agent or to withhold from future payments of compensation due to the General Agent under this Agreement an amount equal to any reduction in compensation effected by this Schedule II, to the extent permitted by applicable law; provided, however, that this option on the part of the Distributor shall not prevent both the Distributor and the General Agent or either of them from pursuing any other means or remedies available to them to recover such compensation. For purposes of this Schedule II, the payment of a death benefit pursuant to the terms of a Contract shall not be deemed a surrender or rescission by a purchaser. The provisions of this Schedule II are not intended to impose any repayment obligation with respect to asset-based sales compensation of any kind paid to the General Agent.

NNG_1.DOC/30652
38635
38637
3/1/96

# MEMORANDUM

Date:     April 12, 1996

*File: left side of compliance file*

To:     File

From:     Mary A. Hyland

Subject:     Investment Management & Research, Raymond James and Robert Thomas

---

In the Sales Agreements for each of these firms, we change Section 4.7 Delivery of Contract as follows:

From:

As a result, if a purchaser exercises the free look rights under a Contract, the Broker-Dealer and the General Agent shall indemnify the Equitable Life Company issuing a Contract from any loss incurred by such Equitable Life Company that results from the General Agent's failure to deliver such Contract to its purchaser within a ten calendar day period.

To:

As a result, if a purchaser exercises the free look rights under a Contract, the Broker-Dealer and the General Agent shall indemnify the Equitable Life Company issuing a Contract for any market loss incurred by such Equitable Life Company that results from the General Agent's failure to deliver such Contract to its purchaser within a ten calendar day period.

If Income Manager offers additional products, in particular, life insurance to IM&R, Raymond James or Robert Thomas, this section of the agreement needs to be reviewed prior to the introduction of these products to these brokerage firms. These sales agreements need to be reviewed by IMG Senior Management and the Equitable Law Department to assure that this is an acceptable statement for Equitable in the sale of life insurance products by these three brokerage firms.

*Mary*

CC:

A. Simmonds
D. Witte

# AMENDMENT NO. 1 TO

## BROKER-DEALER AND GENERAL AGENT

### SALES AGREEMENT

The Agreement, effective as of ____March____, 1996, by and among Equitable Distributors, Inc. ("Distributor"), ____IM&R____ ("Broker-Dealer") and ____Planning Corp.____ ("General Agent"), is hereby amended as follows:

The portion of Schedule II (Compensation) which precedes the sub-heading *Return of Compensation in Specified Circumstances* is replaced by the form of Schedule II attached hereto, effective June 15, 1996, all of which is included in this Amendment No. 1.

IN WITNESS WHEREOF, the parties hereto have caused this Amendment No. 1 to the Agreement to be executed by their respective duly authorized officers.

Investment Management & Researc
[Broker-Dealer]

By: _____

Title: Vice President

Planning Corporation of America
[General Agent]

By: _____

Title: President

Agreed to and accepted as of the __2ND__ day of __July__, 1996 in New York, New York

EQUITABLE DISTRIBUTORS, INC.

By: _____
Title: President

41387

6/15/96

12/22/98  TUE 16:34 FAX 201 583 2933    IMG OPERATIONS
12/14/98  08:05 FAX 7147191596    EQUITABLE DISTRIBUTORS

*EFFECTIVE DATE 1/4/9*
*TAX ID #*
*CRD #*



December 4, 1998

*tel - 10th*

Jamie Shepherdson
President
Equitable Distributors, Inc.
660 Newport Center Drive
Suite 1200
Newport Beach, CA 92660

re: Investment Management & Research, Inc. and Robert Thomas Securities, Inc.
consolidating into Raymond James Financial Services, Inc.

Dear Jamie,

This letter is to advise you of a change impacting your relationship with the above mentioned broker/dealer affiliates of Planning Corporation of America (PCA).

On January 4, 1999, Investment Management & Research and Robert Thomas Securities will become Raymond James Financial Services, Inc. (RJFS). *THIS IS A NAME CHANGE ONLY, BASED ON OUR CURRENT UNDERSTANDING OF THE PROCESS.* To make this transition as smooth as possible, we ask that your company prepare an addendum/amendment to the existing selling agreements with the name change information. This can then be attached to the existing selling agreements with your company, and business will continue as usual with commissions payable to RJFS.

This consolidation requires a transfer of each RTS agent's appointment from RTS to RJFS as quickly as possible. IT IS IMPERATIVE THAT THIS CHANGE BE MADE QUICKLY ON YOUR INSURANCE COMPANY SYSTEMS. All commissions, including trails and renewals, must be paid through RJFS once the registration change has been made. Additionally, any trails or renewals on business listed as a "house account" or not currently assigned (orphans) to an active RTS agent must also be transferred to RJFS and paid accordingly.

WE NEED YOUR ASSISTANCE IN MAKING SURE THE PROPER CHANGES ARE MADE TO ASSURE A CONTINUATION OF BUSINESS WITHOUT INTERRUPTION.

## PLANNING CORPORATION
### OF AMERICA
Insurance General Agency

Subsidiary of Raymond James & Associates, Inc., affiliated with Investment Management & Research, Inc. and Robert Thomas Securities, Inc.
The Raymond James Financial Center  880 Carillon Parkway  P.O. Box 14527  St. Petersburg, Florida 33733-4527  (813) 578-3800

12/22/98  TUE 16:54 FAX 201 665 2853    IMG OPERATIONS
12/14/98  08:08 FAX 7147181598    EQUITABLE DISTRIBUTORS



Once the consolidation and name change have been completed, RJFS will have 3 separate operating divisions—Investment Management (currently IM&R), Securities (currently RTS) and Financial Institutions (FID). Tony Greene, currently President of IM&R, will be Chairman of RJFS and will oversee the Investment Management Division. Steve Putnam, currently President of RTS, will be President of RJFS as well as overseeing the Securities Division. Brewster Ellis will continue to be responsible for the Financial Institutions Division. As always, PCA is your contact for insurance/annuity marketing and sales as well as operations issues.

Should you have any questions, please contact me at 727-578-3800, ext. 5365, Marie Dremann (ext. 8209) or Jim Sipe (ext. 5364).

Sincerely,

Beth Maziad, FLMI, ACS
Vice President
Due Diligence and Compliance Coordinator

**PLANNING CORPORATION**
OF AMERICA
Insurance General Agency

...Raymond James & Associates, Inc., affiliated with Investment Management & Research, Inc. and Robert Thomas Securities, Inc.
...P.O. Box 11527, St. Petersburg, Florida 33733-4527  (813) 578-3800





Planning Corporation of America

December 29, 1998

AnnMarie Earwicker
Equitable Distributors, Inc.
660 Newport Center Drive
Suite 1200
Newport Beach, CA 92660

Re: Raymond James Financial Services

Dear AnnMarie,

Please consider this your authorization to transfer all existing Investment Management & Research (IM&R) and Robert Thomas Securities accounts to Raymond James Financial Services (RJFS) on 1/4/99. Effective 1/4/99, IM&R and Robert Thomas will be consolidated into RJFS.

Additionally, all registered representatives affiliated with IM&R or Robert Thomas must properly reflect their affiliation with the new entity as of 1/4/99.

Your prompt attention is appreciated. Should you have any questions, please contact me at 727-578-3800, ext. 5365.

Sincerely,

Beth Maziad, FLMI, ACS
Vice President

## PLANNING CORPORATION
### OF AMERICA
Insurance General Agency

Subsidiary of Raymond James & Associates, Inc., affiliated with Investment Management & Research, Inc. and Robert Thomas Securities, Inc.
The Raymond James Financial Center   880 Carillon Parkway   P.O. Box 14527   St. Petersburg, Florida 33733-4527   (813) 578-3800

** TOTAL PAGE.01 **

**Exhibit B**

Accumulator (NQ)

Ann S Holman
33 WILLIAMBURG PLACE
DOTHAN AL  36301

Owner:
Annuitant:
Certificate Number:

Product:        Accumulator (NQ)
State:          Alabama

# <u>a</u>ccumulator<sup>SM</sup>

# CERTIFICATE SUMMARY

*Annuitant*

*Owner*

Not Applicable
*Successor Owner/Annuitant*

*Beneficiary*

Accumulator (NQ)
*Certificate Type*

| September 8, 1998 | $18,418.04 | |
|---|---|---|
| *Contract Date* | *Initial Contribution* | *Certificate Number* |

Your Accumulator<sup>SM</sup> is a combination fixed and variable deferred annuity designed to provide for the accumulation of retirement savings and for income at a future date. Earnings generally accumulate on a tax-deferred basis until withdrawn or when distributions become payable. Withdrawals may be taxable and prior to age 59 ½ may also be subject to an additional 10% Federal income tax penalty.

This summary provides information regarding your initial investment allocations and highlights some of your annuity's key features and benefits. It is intended to provide only a brief overview of your Certificate and therefore does not represent all of the terms and conditions that apply under your Certificate.



**EQUITABLE**
*Member of the Global* AXA *Group*

The Equitable Life Assurance Society of the United States, New York, NY 10104

Equitable is a wholly owned subsidiary of The Equitable Companies Incorporated (EQ).
AXA-UAP, an insurance holding company, is EQ's largest shareholder.
Neither EQ nor AXA-UAP has responsibility for the insurance obligations of Equitable.

# baseBUILDER® BENEFITS

## YOUR baseBUILDER® INCOME BENEFIT

The baseBUILDER Income Benefit provides a minimum amount of guaranteed lifetime income through the application of the Annuity Account Value to an Income Manager® *(Life Annuity with a Period Certain)* payout annuity. As a result, regardless of how the Investment Funds perform, on the 7th and later Contract Date anniversary, you can convert your Equitable Accumulator into a guaranteed minimum amount of annual income for life (certain age restrictions apply).

Equitable calculates the baseBUILDER Income Benefit by compounding your contributions, less any withdrawals, at 6% annually* (until the Annuitant's age 80) and applying that amount to annuity purchase factors guaranteed when the Equitable Accumulator is issued. The Guaranteed Minimum Income Benefit does not provide an Annuity Account Value or guarantee investment performance. It is based on conservative actuarial factors; the level of income that is guaranteed may be less than would otherwise be provided by application of your Annuity Account Value using current annuity purchase factors. It should be regarded as a safety net.

You may exercise the Guaranteed Minimum Income Benefit within the 30-day period following each of the Contract Date anniversaries, beginning with the 7th Contract Date anniversary but not earlier than the Annuitant's age 60 nor later than the Annuitant's age 83. The table below shows the **minimum** amount of guaranteed lifetime income **you** would receive if you exercise this benefit on any one of the Contract Date anniversaries shown. **Income levels are based on your initial contribution of $18,418.04 for all allocations to the Investment Funds and Guaranteed Fixed Interest Accounts and assume no withdrawals or additional contributions.**

*\* Contributions allocated to the EQ/Money Market Fund (other than for Special Dollar Cost Averaging) and the Guaranteed Fixed Interest Accounts are compounded at 4% annually for this purpose.*

### YOUR GUARANTEED MINIMUM INCOME BENEFIT*
### ANNUAL INCOME PAYABLE FOR LIFE WITH 10-YEAR PERIOD CERTAIN*

*If Elected on Contract Date Anniversary*

| Year 1-6 | Year 7 | Year 10 | Year 15 | Year 20 |
|---|---|---|---|---|
| N/A | $1,329.73 | $1,801.78 | $2,689.84 | $4,090.85 |

*\*The period certain may be shorter for later election years*

## YOUR baseBUILDER® DEATH BENEFIT

Should the Annuitant pass away prior to your receiving annuity benefits, your named beneficiary will be paid a death benefit. The death benefit is equal to the amounts in the Investment Funds and Guaranteed Fixed Interest Accounts, or if greater, the Guaranteed Minimum Death Benefit.

The Guaranteed Minimum Death Benefit is an ''Annual Ratchet to Age 80.'' This simply means that on the Contract Date, the Guaranteed Minimum Death Benefit is equal to $18,418.04, the initial contribution. Thereafter, the Guaranteed Minimum Death Benefit is reset on each anniversary, until the Annuitant's age 80, to the Annuity Account Value if it is higher than the prior year's Guaranteed Minimum Death Benefit. The Guaranteed Minimum Death Benefit is adjusted for any subsequent contributions and withdrawals.

# baseBUILDER® BENEFITS

### IMPACT OF WITHDRAWALS ON baseBUILDER® BENEFITS

Please be aware that taking withdrawals from your Annuity Account Value will reduce the amount of the guaranteed benefits described above. Please remember that withdrawals may be taxable and prior to age 59 ½ may also be subject to an additional 10% Federal income tax penalty. Withdrawals may also be subject to a withdrawal charge and/or a positive or negative market value adjustment on contributions to the Guaranteed Fixed Interest Rate Accounts.

IM-97-67

# INVESTMENT ALLOCATIONS

## YOUR INVESTMENT FUNDS

You have made the following allocations to the Investment Funds. You may change your allocations at any time. To learn the daily unit values for each of the available funds, call 800/789-7771.

| INVESTMENT FUNDS | |
| --- | --- |
| **Investment Fund** | **Amount Allocated** |
| EQ/Money Market Fund | |
| Multimanager High Yield Fund | |
| EQ/AllianceBernstein Common Stock Fund | $4,604.51 |
| Multimanager Aggressive Equity Fund | $4,604.51 |
| EQ/AllianceBernstein Small Cap Growth Fund | |
| AXA Moderate Allocation Fund | |
| EQ/Small Company Index Fund | |
| EQ/JPMorgan Core Bond Fund | |
| EQ/AllianceBernstein Value Fund | |
| Multimanager Small Cap Value Fund | |
| MarketPLUS Large Cap Growth Fund | |
| EQ/Van Kampen Emerging Markets Equity Fund | |
| EQ/JPMorgan Value Opportunities Fund | |
| EQ/Capital Guardian Growth Fund | $9,209.02 |
| EQ/BlackRock International Value Fund | |

IM-97-67

# INVESTMENT ALLOCATIONS

## YOUR GUARANTEED FIXED INTEREST ACCOUNTS

If you invested in the Guaranteed Fixed Interest Account, you may change your allocations at any time. Call 800/789-7771 for a recording of guaranteed rates applicable to the Guaranteed Fixed Interest Accounts. Please note that any withdrawals (including transfers, surrender and deductions) from a Guaranteed Fixed Interest Account prior to its expiration date may result in a positive or negative market value adjustment, as well as a withdrawal charge and a 10% Federal income tax penalty for withdrawals prior to age 59 ½.

| GUARANTEED FIXED INTEREST ACCOUNTS | | |
|---|---|---|
| **Expiration Date** | **Guaranteed Interest Rate** | **Amount Allocated** |
| February 15, 1999 | | |
| February 15, 2000 | | |
| February 15, 2001 | | |
| February 15, 2002 | | |
| February 15, 2003 | | |
| February 15, 2004 | | |
| February 15, 2005 | | |
| February 15, 2006 | | |
| February 15, 2007 | | |
| February 15, 2008 | | |

IM-97-67

# SERVICES WE PROVIDE

### DOLLAR COST AVERAGING*

Through a systematic approach to investing, commonly referred to as Dollar Cost Averaging, you can gradually invest in the market and may actually reduce your average cost over time. The Equitable Accumulator℠ offers a special 12-month Dollar Cost Averaging program that is available at issue, as well as a longer program available at any time.

*Dollar Cost Averaging can neither guarantee a profit nor prevent a loss. Because it involves continuous investment in securities regardless of fluctuating price levels of such securities, you should consider your financial ability to continue to invest through periods of low prices before participating in this program.*

### TRANSFERS AMONG ACCOUNTS

Because market conditions and/or your personal circumstances may change over time, we've made it easy for you to modify your investments. You may transfer among Investment Funds and Guaranteed Fixed Interest Accounts and between such Funds and Accounts at any time — without an investment charge and without tax penalty. However, transfers from the Guaranteed Fixed Interest Accounts may result in a positive or negative market value adjustment. Call 800/789-7771 to make a change or for assistance from our customer service representatives. Please have your Certificate number available.

### OPTIONS AT EXPIRATION DATE OF GUARANTEED FIXED INTEREST ACCOUNTS

If you invested in the Guaranteed Fixed Interest Account, each one will reach its expiration date on February 15 in the year shown in the Investment Allocations page. You will be notified on or before December 31st prior to its expiration date. At that time you may transfer the value at expiration into any Guaranteed Fixed Interest Account we are then offering, or into the Investment Funds. You may also choose to withdraw all or part of the value at expiration (subject to any withdrawal charges and tax charges and/or penalties that may apply). If we have not received your election as of the expiration date, the value at expiration will be transferred into the Guaranteed Fixed Interest Account with the next earliest expiration date.

### AUTOMATIC INVESTMENT PLAN

You have the ability to systematically invest in the Accumulator from your bank accounts. The minimum amount for systematic investing is $100 monthly or $300 quarterly.

### REPORTS YOU WILL RECEIVE

**Confirmation Notices.** Each time you make a contribution, transfer assets or take a withdrawal, we will mail you a confirmation of the transaction.

**Quarterly Statements.** You will receive a statement at the end of each calendar quarter which summarizes all transactions since the last statement.

**Annual Statement.** Just after your Contract Date anniversary, you will receive an annual statement summarizing all policy activity, changes in investment performance for the year, as well as your current Annuity Account Value.

**Semi-Annual Reports On Investment Funds.** You will receive these reports every 6 months, for the periods ending June 30 and December 31.

### YOUR REGISTERED REPRESENTATIVE

PCA House Account
(727) 573-3800

Accumulator℠ is a service mark, and Income Manager® and baseBUILDER® are registered service marks
of The Equitable Life Assurance Society of the United States.
The Accumulator is issued by The Equitable Life Assurance Society of the United States
and distributed by AXA Distributors, LLC

IM-97-67

**Owner:**
**Annuitant:**
**Certificate Number:**    98 676 386
**Contract Date:**    September 8, 1998

## CERTIFICATE

Processing Office:  Income Management Group, P.O. Box 1547,
Secaucus, New Jersey 07096-1547

This is the Certificate which is issued under the terms of the Contract defined in Section 1.09.  This Certificate is issued in return for the application for coverage under the Contract and the Contributions to be made to us under the Contract.

In this Certificate, "we", "our" and "us" mean Equitable. "You" and "your" mean the Owner.

We will provide the benefits and other rights pursuant to the terms of this Certificate.

**TEN DAYS TO CANCEL -** Not later than ten days after you receive this Certificate, you may return it to us.  We will cancel it and refund any Contribution made to us, plus or minus any investment gain or loss which applies to the Investment Funds of the Separate Account from the date such Contribution was allocated to such Fund to the date of cancellation.

**New York,**
**THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES**

Chairman and Chief Executive Officer                    Senior Vice President, Secretary and Associate General Counsel

**THE PORTION OF ANNUITY ACCOUNT VALUE HELD IN THE SEPARATE ACCOUNT MAY INCREASE OR DECREASE IN VALUE (SEE PART II OF THIS CERTIFICATE).**

No. 94ICB

# TABLE OF CONTENTS

                                                                        Page

DATA

Part I        -        DEFINITIONS                                        3
Part II       -        INVESTMENT OPTIONS                                 6
Part III      -        CONTRIBUTIONS AND ALLOCATIONS                     10
Part IV       -        TRANSFERS AMONG INVESTMENT OPTIONS                11
Part V        -        WITHDRAWALS AND TERMINATION                       12
Part VI       -        DEATH BENEFITS                                    13
Part VII      -        ANNUITY BENEFITS                                  14
Part VIII     -        CHARGES                                           17
Part IX       -        GENERAL PROVISIONS                                19

TABLE OF GUARANTEED ANNUITY PAYMENTS                                     21

**ENDORSEMENTS -**

**<u>NOTICE OF TWENTY - DAY RIGHT TO CANCEL</u> -**

This Equitable Certificate has a provision giving you a ten day period (commencing with the date the Certificate is delivered) to cancel the Certificate.  We have been told that this Certificate replaces an existing annuity.  Therefore, since the decision to replace an existing annuity is an important one, the time period given to cancel this Certificate will be extended to twenty days.

No. 9320FLRCG

*Equitable Accumulator (NQ)*

## DATA

__PART A__ -- This part lists your personal data.

**Owner:**

**Annuitant:**                                             Age: 55        Sex: Female

**Contract:**  Group Annuity Contract No. AC 6725

**Certificate Number:**

| | |
|---|---|
| **Endorsements Attached:** | Minimum Income Benefit Endorsement |
| | Endorsement Applicable to Non-Qualified Certificates |
| | Endorsement Applicable to Market Value Adjustment Terms |
| | Rider to Endorsement Applicable to Market Value Adjustment Terms |

| | |
|---|---|
| **Issue Date:** | September 8, 1998 |
| **Contract Date:** | September 8, 1998 |
| **Annuity Commencement Date:** | September 8, 2033 |

**The maximum maturity age is age 90 -- see Section 7.03.**
The Annuity Commencement Date may not be later than the Processing Date which follows the Annuitant's 90th birthday.

**Guaranteed Benefits:**     Combined Guaranteed Minimum Income Benefit
and Guaranteed Minimum Death Benefit (Annual Ratchet to Age 80)

**Beneficiary:**

No. 94ICB                                      Data page 1              (1/98)

DATA Pages (cont'd)

**PART B** - -This part describes certain provisions of your Certificate.

**Initial Contribution Received (see Section 3.02):**    $18,418.04

**Investment Options available (see Part II); your allocation is also shown.**

| Investment Options | Allocation (see Section 3.01) |
|---|---|
| • EQ/Money Market Fund | |
| • Multimanager High Yield Fund | |
| • EQ/AllianceBernsteinCommon Stock Fund | $4,604.51 |
| • Multimanager Aggressive Equity Fund | $4,604.51 |
| • EQ/AllianceBernsteinSmall Cap Growth Fund | |
| • AXA Moderate Allocation Fund | |
| • EQ/Small Company Index Fund | |
| • EQ/JPMorgan Core Bond Fund | |
| • EQ/AllianceBernsteinValue Fund | |
| • Multimanager Small Cap Value Fund | |
| • MarketPLUS Large Cap Growth Fund | |
| • EQ/Van Kampen Emerging Markets Equity Fund | |
| • EQ/JPMorgan Value Opportunities Fund | |
| • EQ/Capital Guardian Growth Fund | $9,209.02 |
| • EQ/BlackRock International Value Fund | |

• **Guarantee Periods (Class I)**
   **Expiration Date and Guaranteed Rate**
   February 15, 1999
   February 15, 2000
   February 15, 2001
   February 15, 2002
   February 15, 2003
   February 15, 2004
   February 15, 2005
   February 15, 2006
   February 15, 2007
   February 15, 2008

                          **Total:**    $18,418.04

Investment Options shown are Investment Funds of our Separate Account No. 49 and Guarantee Periods shown are in the Guaranteed Period Account. See Endorsement Applicable to Market Value Adjustment Terms.

**"Types" of Investment Options (see Section 4.02):** Not applicable

**Guaranteed Interest Account (see Section 2.01):** Not available under this Certificate

**DATA Pages (cont'd)**

**Business Day (see Section 1.05):** A Business Day for this Certificate will mean generally any day on which the New York Stock Exchange is open for trading.

**Processing Dates (see Section 1.20):** A Processing Date is each Contract Date anniversary.

**Availability of Investment Options (see Section 2.04):** (See Data pages, Part C; Allocation Restrictions)

**Allocation of Contributions (see Section 3.01):** Except as indicated below, your initial and any subsequent Contributions are allocated according to your instructions.

If you selected Principal Assurance a portion of your initial Contribution is allocated by us to a Guarantee Period you have selected. The remaining portion of your initial Contribution is allocated to the Investment Funds according to your instructions. Any subsequent Contributions will be allocated according to your instructions. (See Data pages, Part C; Allocation Restrictions)

**Contribution Limits (see Section 3.02):** Initial Contribution minimum: $5,000. Subsequent Contribution minimum: $1,000. Subsequent Contributions can be made at any time up until the Annuitant attains age 84. We may refuse to accept any Contribution if the sum of all Contributions under all accumulation Certificateswith the same Annuitant would then total more than $1,500,000. We reserve the right to limit aggregate Contributions made after the first Contract Year to 150% of first year Contributions. We may also refuse to accept any Contribution if the sum of all Contributions under all Equitable Life annuity accumulation certificates/contracts that you own would then total more than $2,500,000.

**Transfer Rules (see Section 4.02):** Transfers among the Investment Options may be made at any time during the Contract Year.

**Allocation of Withdrawals (see Section 5.01):** Lump Sum Withdrawals - You must provide withdrawal instructions indicating from which Investment Options the Lump Sum Withdrawal and any withdrawal charge will be taken; Systematic Withdrawals - Unless you specify otherwise, Systematic Withdrawals will be withdrawn on a pro rata basis from your Annuity Account Value in the Investment Funds. If there is insufficient value or no value in the Investment Funds, any additional amount required or the total amount of the withdrawal, as applicable, will be withdrawn from the Guarantee Periods in order of the earliest Expiration Date(s) first.

**Withdrawal Restrictions (see Section 5.01):** Systematic Withdrawals - May not start sooner than 28 days after issue of this Certificate. You may elect to receive Systematic Withdrawals on a monthly, quarterly or annual basis subject to a maximum of 1.2% monthly, 3.6% quarterly and 15.0% annually of the Annuity Account Value as of the Transaction Date.

**Minimum Withdrawal Amount (see Section 5.01):** Lump Sum Withdrawals minimum - $1,000; Systematic Withdrawals minimum - $250.

**DATA Pages (cont'd)**

**Minimum Amount of Annuity Account Value After a Withdrawal (see Section 5.02):**  Requests for a withdrawal must be for either (a) 90% or less of the Cash Value or (b) 100% of the Cash Value (surrender of the Certificate).

We will **not** exercise our rights, described in Sections 5.02(b) and 5.02(c), to terminate the Certificate.

**Death Benefit Amount (see Section 6.01):**

The death benefit is equal to the Annuity Account Value or, if greater, the Guaranteed Minimum Death Benefit defined below.

*Guaranteed Minimum Death Benefit*
*Annual Ratchet to Age 80* - On the Contract Date, the Guaranteed Minimum Death Benefit is equal to the initial Contribution.  Thereafter, the Guaranteed Minimum Death Benefit is reset through the Annuitant's age 80, to the Annuity Account Value on a Contract Date anniversary if higher than the current Guaranteed Minimum Death Benefit, and is adjusted for any subsequent Contributions and withdrawals.

Each withdrawal will cause a reduction in your current Guaranteed Minimum Death Benefit on a pro rata basis.

**Normal Form of Annuity (see Section 7.04):**  Life Annuity 10 Year Period Certain

**Amount of Annuity Benefit (see Section 7.05):**  The amount applied to provide the Annuity Benefit will be (1) the Annuity Account Value for any life annuity form or (2) the Cash Value for any period certain only annuity form except that if the period certain is more than five years the amount applied will be no less than 95% of the Annuity Account Value.

**Interest Rate to be Applied in Adjusting for Misstatement of Age or Sex (see Section 7.06):**  6% per year

**Minimum Amount to be Applied to an Annuity (see Section 7.06):**  $2,000, as well as minimum of $20 for initial monthly annuity payment.

**DATA Pages (cont'd)**

**Guaranteed Minimum Income Benefit (see Section 7.08):** You may apply your Annuity Account Value during the period of time indicated below to purchase a minimum amount of guaranteed lifetime income under our Income Manager *(Life Annuity with a Period Certain)* payout annuity certificate. The Income Manager *(Life Annuity with a Period Certain)* payout annuity certificate provides payments during a period certain with payments continuing for life thereafter.

The period certain is based on the Annuitant's age at the time the Income Manager *(Life Annuity with a Period Certain)* is elected. The period certain is 10 years for Annuitant ages 60 through 80; 9 years for Annuitant age 81; 8 years for Annuitant age 82; and 7 years for Annuitant age 83.

The Guaranteed Minimum Income Benefit is available only if it is exercised within 30 days following the 7th or later Contract Date anniversary under this Certificate. However, it may not be exercised earlier than the Annuitant's age 60, nor later than the Annuitant's age 83.

On the Transaction Date that you exercise your Guaranteed Minimum Income Benefit, the lifetime income that will be provided under the Income Manager *(Life Annuity with a Period Certain)* will be the greater of (i) your Guaranteed Minimum Income Benefit, and (ii) the amount of income that would be provided by application of your Annuity Account Value as of the Transaction Date at our then current annuity purchase factors.

*Guaranteed Minimum Income Benefit Benefit Base* - The Guaranteed Minimum Income Benefit benefit base is equal to the initial Contribution on the Contract Date. Thereafter, the Guaranteed Minimum Income Benefit benefit base is credited with interest at 6% (4% for amounts in the Alliance Money Market Fund and Guarantee Periods) on each Contract Date anniversary through the Annuitant's age 80, and 0% thereafter, and is adjusted for any subsequent Contributions and withdrawals. The Guaranteed Minimum Income Benefit benefit base will also be reduced by any withdrawal charge remaining on the Transaction Date that you exercise your Guaranteed Minimum Income Benefit.

Your Guaranteed Minimum Income Benefit benefit base is applied to guaranteed minimum annuity purchase factors to determine the Guaranteed Minimum Income Benefit. The guaranteed minimum annuity purchase factors are based on (i) interest at 2.5% if the Guaranteed Minimum Income Benefit is exercised within 30 days following a Contract Date anniversary in years 7 through 9 and at 3% if exercised within 30 days following the 10th or later Contract Date anniversary and (ii) mortality tables that assume increasing longevity. See the attached table.

Your Guaranteed Minimum Income Benefit benefit base does not create an Annuity Account Value or a Cash Value and is used solely for purposes of calculating your Guaranteed Minimum Income Benefit.

DATA Pages (cont'd)

Your current Guaranteed Minimum Income Benefit benefit base will be reduced on a dollar-for-dollar basis as long as the sum of your withdrawals in any Contract Year is 6% or less of the beginning of Contract Year Guaranteed Minimum Death Benefit (described above). Once a withdrawal is made that causes cumulative withdrawals in a Contract Year to exceed 6% of the beginning of Contract Year Guaranteed Minimum Death Benefit, that withdrawal and any subsequent withdrawals in that Contract Year will cause a pro rata reduction to occur.

**Withdrawal Charges (see Section 8.01):** A withdrawal charge will be imposed as a percentage of each Contribution made to the extent that a withdrawal exceeds the Free Corridor Amount as discussed in Section 8.01 or, if the Certificate is surrendered to receive the Cash Value. We determine the withdrawal charge separately for each Contribution in accordance with the table below.

| Contract Year | Current and Maximum Percentage of Contributions |
|---|---|
| 1 | 7.00% |
| 2 | 6.00% |
| 3 | 5.00% |
| 4 | 4.00% |
| 5 | 3.00% |
| 6 | 2.00% |
| 7 | 1.00% |
| 8 and later | 0.00% |

The applicable withdrawal charge percentage is determined by the Contract Year in which the withdrawal is made or the Certificate is surrendered, beginning with "Contract Year 1" with respect to each Contribution withdrawn or surrendered. For purposes of the table, for each Contribution, the Contract Year in which we receive that Contribution is "Contract Year 1."

Withdrawal charges will be deducted from the Investment Options from which each withdrawal is made in proportion to the amount being withdrawn from each Investment Option.

**Free Corridor Amount (see Section 8.01):** 15% of Annuity Account Value at the beginning of the Contract Year minus any amount previously withdrawn during the Contract Year. Amounts withdrawn up to the Free Corridor Amount will not be deemed a withdrawal of Contributions.

Withdrawals in excess of the Free Corridor Amount will be deemed withdrawals of Contributions in the order in which they were made (that is, the first-in, first-out basis will apply).

The Free Corridor Amount does not apply when calculating the withdrawal charge applicable upon a surrender.

No. 94ICB                                          Data page 6          (1/98)

DATA Pages (cont'd)

**Charges Deducted from Annuity Account Value (see Section 8.02):**

(a)   Combined Guaranteed Minimum Income Benefit and Guaranteed Minimum Death Benefit Charge:  For providing the Combined Guaranteed Minimum Income Benefit and Guaranteed Minimum Death Benefit we will deduct annually on each Processing Date an amount equal to 0.30% of the Guaranteed Minimum Income Benefit benefit base (described above) in effect on such Processing Date. 0.30% is the maximum we will charge.

(b)   Charges for State Premium and Other Applicable Taxes:  A charge for applicable taxes, such as state or local premium taxes generally will be deducted from the amount applied to provide an Annuity Benefit under Section 7.02.  In certain states, however, we may deduct the charge from Contributions rather than at the Annuity Commencement Date.

The above charges will be deducted from the Annuity Account Value in the Investment Funds on a pro rata basis.  If there is insufficient value in the Investment Funds, all or a portion of the charges will be deducted from the Annuity Account Value with respect to the Guarantee Periods in order of the earliest Expiration Date(s) first.

**Number of Free Transfers (see Section 8.03):** Unlimited

**Daily Separate Account Charges (see Section 8.04):**

Mortality and Expense Risks Charge:
　　　　Current and Maximum          Annual rate of 1.10% (equivalent to a daily rate of 0.003032%).

Administration Charge:
　　　　Current and Maximum          Annual rate of 0.25% (equivalent to a daily rate of 0.000692%). We reserve the right to increase this charge to an annual rate of 0.35%.

No. 94ICB                               Data page 7          (1/98)

**DATA Pages (cont'd)**

<u>PART C</u> -- **This part lists the terms which apply to the Endorsement Applicable to Market Value Adjustment Terms (MVA Endorsement).**

**Allocation Restrictions (see Section 3.01):** If the Annuitant is age 76 or older, allocations may be made only to Guarantee Periods with maturities of five years or less; however, in no event may allocations be made to Guarantee Periods with maturities beyond the February 15th immediately following the Annuity Commencement Date.

**Transfers at Expiration Date (see item 1 of MVA Endorsement):** If no election is made with respect to amounts in the Guaranteed Period Account as of the Expiration Date, such amounts will be transferred into the Guarantee Period with the earliest Expiration Date.

**Market Value Adjustment (MVA) on Transfers and Withdrawals (see item 2 of MVA Endorsement):** The MVA (positive or negative) resulting from a withdrawal or transfer of a portion of the amount in a Guarantee Period will be a percentage of the MVA that would be applicable upon a withdrawal of all of the Annuity Account Value from a Guarantee Period. This percentage is determined by (i) dividing the amount of the withdrawal or transfer from the Guarantee Period by (ii) the Annuity Account Value in such Guarantee Period prior to the withdrawal or transfer.

**Transfer Rules (see Section 4.02):** Transfers may not be made to a Guarantee Period maturing in the current calendar year. Guarantee Periods to which transfers may be made are limited based on the attained age of the Annuitant (see Allocation Restrictions above).

**MVA Formula (see item 3 of MVA Endorsement):** The Guaranteed Rate for new allocations to a Guarantee Period is the rate we have in effect for this purpose even if new allocations to that Guarantee Period would not be accepted at the time. This rate will not be less than 3%.

The current rate percentage we use in item (c) of the formula is 0.00%. For purposes of calculating the MVA only, we reserve the right to add up to 0.25% to such current rate percentage.

**Separate Account (see item 5 of MVA Endorsement):** The portion of the assets of Separate Account No. 46 equal to the reserves and other contract liabilities will not be chargeable with liabilities which arise out of any other business we conduct.

**DATA Pages (cont'd)**

### Guaranteed Minimum Income Benefit
### Table of Guaranteed Minimum Annuity
### Purchase Factors
### For Initial Level Annual Income
### Single Life - Female

| Election Age | Purchase Factors on Contract Date Anniversaries 7 to 9 | Purchase Factors on Contract Date Anniversaries 10 and later |
|---|---|---|
| 60 | 4.62% | 4.98% |
| 61 | 4.71 | 5.06 |
| 62 | 4.80 | 5.15 |
| 63 | 4.90 | 5.25 |
| 64 | 5.00 | 5.35 |
| 65 | 5.11 | 5.46 |
| 66 | 5.22 | 5.57 |
| 67 | 5.34 | 5.69 |
| 68 | 5.47 | 5.81 |
| 69 | 5.60 | 5.95 |
| 70 | 5.75 | 6.09 |
| 71 | 5.89 | 6.24 |
| 72 | 6.05 | 6.39 |
| 73 | 6.22 | 6.56 |
| 74 | 6.40 | 6.73 |
| 75 | 6.58 | 6.92 |
| 76 | 6.77 | 7.11 |
| 77 | 6.98 | 7.31 |
| 78 | 7.19 | 7.52 |
| 79 | 7.41 | 7.74 |
| 80 | 7.64 | 7.97 |
| 81 | 8.01 | 8.34 |
| 82 | 8.42 | 8.75 |
| 83 | 8.87 | 9.21 |

Interest Basis:    2.5% on Contract Date anniversaries 7 through 9
and 3% on Contract Date anniversaries 10 and later
Non-participating

Mortality:    1983 Individual Annuity Mortality Table ''a'' for Female
projected with modified Scale G.

Factors required for annuity forms not shown in the above table will be calculated by us on the same actuarial basis.

No. 94ICB                                        Data page 9            (1/98)

# PART I - DEFINITIONS

## SECTION 1.01  ANNUITANT

"Annuitant" means the individual shown as such in the Data pages, or any successor Annuitant.

## SECTION 1.02  ANNUITY ACCOUNT VALUE

"Annuity Account Value" means the sum of the amounts held for you in the Investment Options.

## SECTION 1.03  ANNUITY BENEFIT

"Annuity Benefit" means a benefit payable by us as described in Part VII.

## SECTION 1.04  ANNUITY COMMENCEMENT DATE

"Annuity Commencement Date" means the date on which annuity payments are to commence as described in Section 7.03.  Such date is the date shown in the Data pages and is subject to change as described in Section 7.03.

## SECTION 1.05  BUSINESS DAY

A "Business Day" is any day on which we are open and the New York Stock Exchange is open for trading, or any other day specified in the Data pages.  Our Business Day ends at 4:00 p.m., Eastern time, or such other time as we state in writing to you.

## SECTION 1.06  CASH VALUE

"Cash Value" means an amount equal to the Annuity Account Value, less any charges that apply as described in Part VIII and any charges that may apply as described in any applicable Endorsement(s).

## SECTION 1.07  CERTIFICATE

"Certificate" means this certificate including the Data pages and any endorsement(s).  It is a summary of the Contract terms which affect you.

## SECTION 1.08  CODE

"Code" means the Internal Revenue Code of 1986, as amended at any time, or any corresponding provisions of prior or subsequent United States revenue laws.

## SECTION 1.09  CONTRACT

"Contract" means the Group Annuity Contract named in the Data pages.  A copy of the contract is on file with us.  You may ask to see it at any reasonable time.

## SECTION 1.10  CONTRACT DATE

"Contract Date" means the earlier of (a) the date on which the Annuitant is enrolled under the Contract according to our enrollment procedures and (b) the date of enrollment under a prior Contract. Such date is shown in the Data pages.

## SECTION 1.11  CONTRACT YEAR

"Contract Year" means the twelve month period starting on (i) the Contract Date and (ii) each anniversary of the Contract Date, unless we agree to another period.

## SECTION 1.12  CONTRIBUTION

"Contribution" means a payment made to us under the Contract. See Section 3.01.

## SECTION 1.13  EMPLOYER

"Employer" means, if applicable, an employer as defined in an endorsement hereto.

## SECTION 1.14  GUARANTEED INTEREST RATE

"Guaranteed Interest Rate" means the effective annual rate(s) at which interest accrues on amounts in the Guaranteed Interest Account.

## SECTION 1.15  INVESTMENT FUND

"Investment Fund" means a sub-fund of a Separate Account. An Investment Fund may invest its assets in a separate class (or series) of shares of a specified trust or investment company where each class (or series) represents a separate portfolio in such trust or investment company.

## SECTION 1.16  INVESTMENT OPTION

"Investment Option" means the Guaranteed Interest Account, a Separate Account, or an Investment Fund of a Separate Account or, if described in an Endorsement hereto, each Guarantee Period in the Guaranteed Period Account (Separate Account No. 46).

## SECTION 1.17  OWNER

"Owner" means the person or entity shown as such in the Data pages, or any successor owner.

## SECTION 1.18  PLAN

"Plan" means, if applicable, the annuity program sponsored by the Employer and as may be defined in an endorsement hereto.

## SECTION 1.19  PRIOR CONTRACT

"Prior Contract" means another contract or certificate issued by us and from which the Owner and we have agreed to transfer amounts to this Contract.

No. 94ICB

Page 4

## SECTION 1.20  PROCESSING DATE

"Processing Date" means the day(s) we deduct charges from the Annuity Account Value.  The Data pages show how often a Processing Date will occur.

## SECTION 1.21  PROCESSING OFFICE

"Processing Office" means the Equitable administrative office shown on the cover page of this Certificate, or such other location we may state upon written notice to you.

## SECTION 1.22  SEPARATE ACCOUNT

"Separate Account" means any of the Separate Accounts (except our Separate Account No. 46) described or referred to in Sections 2.02 and 2.05.

## SECTION 1.23  TRANSACTION DATE

The Transaction Date is the Business Day we receive at the Processing Office a Contribution or a transaction request providing the information we need.  Transaction requests must be in a form acceptable to us.

No. 94ICB

# PART II - INVESTMENT OPTIONS

## SECTION 2.01 GUARANTEED INTEREST ACCOUNT

Any amount held in the Guaranteed Interest Account becomes part of our general assets, which support the guarantees of the Contract and other contracts.

The amount in such Account at any time is equal to:

- all amounts that have been allocated or transferred to such Account, plus

- the amount of any interest credited, less

- all amounts that have been withdrawn (including charges) or transferred from such Account.

We will credit the amount held in such Account with interest at effective annual rates that we set. We will also set a minimum Guaranteed Interest Rate that will remain in effect through a stated twelve-month period or a calendar year. The Data pages show the initial Rate(s) to apply.

We guarantee that any rate so set after your Contract Date will never be less than the minimum rate shown in the Data pages.

## SECTION 2.02  SEPARATE ACCOUNT

We have established the Separate Account(s) and maintain such Account(s) in accordance with the laws of New York State. Income, realized and unrealized gains and losses from the assets of the Separate Account(s) are credited to or charged against it without regard to our other income, gains or losses. Assets are placed in the Separate Account(s) to support the Contract and other variable annuity contracts and certificates. Assets may be placed in the Separate Account(s) for other purposes, but not to support contracts or policies other than variable annuities and variable life insurance.

The Data pages set forth the Separate Account(s). A Separate Account may be subdivided into Investment Funds.

The assets of a Separate Account are our property. The portion of such assets equal to the reserves and other contract liabilities will not be chargeable with liabilities which arise out of any other business we conduct. We may transfer assets of a Separate Account in excess of the reserves and other liabilities with respect to such Account to another Separate Account or to our general account.

We may, at our discretion, invest Separate Account assets in any investment permitted by applicable law. We may rely conclusively on the opinion of counsel (including counsel in our employ) as to what investments we may make as law permits.

**SECTION 2.03  SEPARATE ACCOUNT ACCUMULATION UNITS AND UNIT VALUES**

The amount you have in an Investment Fund at any time is equal to the number of Accumulation Units you have in that Fund multiplied by the Fund's Accumulation Unit Value at that time. "Accumulation Unit" means a unit which is purchased in a Separate Account. "Accumulation Unit Value" means the dollar value of each Accumulation unit in a Separate Account on a given date. (If Investment Funds apply as described in Section 2.02, then the terms of this Section 2.03 apply separately to each Fund, unless otherwise stated.)

Amounts allocated or transferred to a Separate Account are used to purchase Accumulation Units of that Account. Units are redeemed when amounts are deducted, transferred or withdrawn.

The number of Accumulation Units you have in a Separate Account at any time is equal to the number of Accumulation Units purchased minus the number of Units redeemed in that Account up to that time. The number of Accumulation Units purchased or redeemed in a transaction is equal to the dollar amount of the transaction divided by the Account's Accumulation Unit Value for that Transaction Date.

We determine Accumulation Unit Values for each Separate Account for each Valuation Period. A "Valuation Period" is each Business Day together with any consecutive preceding non-business days. For example, for each Monday which is a Business Day, the preceding Saturday and Sunday will be included to equal a three-day Valuation Period.

Unless the following paragraph applies, the Accumulation Unit Value for a Separate Account for any Valuation Period is equal to the Accumulation Unit Value for the immediately preceding Valuation Period multiplied by the ratio of values "(i) " and "(ii) ". Value "(i) " is the value of the Separate Account at the close of business at the end of the current Valuation Period, before any amounts are allocated to or withdrawn from the Separate Account in that Period. Value "(ii)" is the value of the Separate Account at the close of business at the end of the preceding Valuation Period, after all allocations and withdrawals were made for that Period. For this purpose, "value of the Separate Account" means the market value or, where there is no readily available market, the fair value of the assets allocated to the Separate Account, as determined in accordance with our rules, accepted accounting practices, and applicable laws and regulations.

To the extent the Separate Account invests in Investment Funds, and the assets of the Funds are invested in a class or series of shares of a specified trust or investment company, the Accumulation Unit Value of an Investment Fund for any Valuation Period is equal to the Accumulation Unit Value for that Fund on the immediately preceding Valuation Period multiplied by the Net Investment Factor for that Fund for the current Valuation Period. The Net Investment Factor for a Valuation Period is (a) divided by (b) minus (c), where

(a)     is the value of the Investment Fund's shares of the related portfolio of the specified trust or investment company at the end of the Valuation Period (before taking into account any amounts allocated to or withdrawn from the Investment Fund for the Valuation Period and after deduction of investment advisory fees and direct operating expenses of the specified trust or investment company; for this purpose, we use the share value reported to us by the specified trust or investment company);

No. 94ICB                                                          Page 7

(b)    is the value of the Investment Fund's shares of the related portfolio of the specified trust or investment company at the end of the preceding Valuation Period (taking into account any amounts allocated or withdrawn for that Valuation Period);

(c)    is the daily Separate Account charges (see Section 8.04) for the expenses and risks of the Contract, times the number of calendar days in the Valuation Period, plus any charge for taxes or amounts set aside as a reserve for taxes.

## SECTION 2.04  AVAILABILITY OF INVESTMENT OPTIONS

Section 3.01 describes how Contributions are allocated among Investment Options based on your election.  Your election is subject to the following:

(a)    If the Contributions are made pursuant to the terms of a Plan, then Investment Options available may be subject to the terms of such Plan, as reported to us by the Owner.

(b)    We have the right to limit the number of Options which you may elect.

The Data pages list which Options are available as of the Contract Date.

## SECTION 2.05  CHANGES WITH RESPECT TO SEPARATE ACCOUNT

In addition to the right reserved pursuant to subsection (b) of Section 2.04, we have the right, subject to compliance with applicable law, including approval of Certificate owners if required:

(a)    to add Investment Funds (or sub-funds of Investment Funds) to, or to remove Investment Funds (or sub-funds) from, the Separate Account, or to add other separate accounts;

(b)    to combine any two or more Investment Funds or sub-funds thereof;

(c)    to transfer the assets we determine to be the share of the class of contracts to which the Contract belongs from any Investment Fund to another Investment Fund;

(d)    to operate the Separate Account or any Investment Fund as a management investment company under the Investment Company Act of 1940, in which case charges and expenses that otherwise would be assessed against an underlying mutual fund would be assessed against the Separate Account;

(e)    to operate the Separate Account or any Investment Fund as a unit investment trust under the Investment Company Act of 1940;

(f)    to deregister the Separate Account under the Investment Company Act of 1940, provided that such action conforms with the requirements of applicable law;

(g)    to restrict or eliminate any voting rights as to the Separate Account;

(h)    to cause one or more Investment Funds to invest some or all of their assets in one or more other trusts or investment companies.

If the exercise of these rights results in a material change in the underlying investment of a Separate Account, you will be notified of such exercise, as required by law.

A Separate Account or Investment Fund which may be added by us as described above may be one with respect to which (i) there may be periods during which Contributions may be restricted pursuant to the maturity terms of such Account or Fund, (ii) amounts therein may be automatically liquidated pursuant to the investment policy of the Account, and (iii) investments therein may mature. We will have the right to reallocate amounts arising from liquidation or maturity according to your allocation instructions then in effect unless you specify other instructions with respect to such amounts. If no such allocation instructions have been made, the reallocation will be made to a designated Investment Option, or to the next established Account or Fund of the same type as described in this paragraph, if applicable, as specified in the Data pages.

No. 94ICB                                                          Page 9

# PART III - CONTRIBUTIONS AND ALLOCATIONS

## SECTION 3.01 CONTRIBUTIONS, ALLOCATIONS

You elect which Investment Options will be available under the Certificate subject to the terms of Section 2.04. Once this election is made, you may allocate Contributions to, or transfer among, only these Options. You may add or subtract Options by sending us a written request, but we have the right to decline your request.

You also elect how to allocate Contributions among the Options chosen. If you are not the Annuitant, you may delegate to the Annuitant authority to allocate Contributions. You need not allocate Contributions to each Option you have chosen. You may change the allocation election at any time by sending us the proper form. Allocation percentages must be in whole numbers (no fractions) and must equal 100%.

Each Contribution is allocated (after deduction of any charges that may apply) in accordance with the allocation election in effect on the Transaction Date. Contributions made to a Separate Account purchase Accumulation Units in that Account, using the Accumulation Unit Value for that Transaction Date.

## SECTION 3.02   LIMITS ON CONTRIBUTIONS

We have the right not to accept any Contribution which is less than the amount shown in the Data pages. The Data pages indicate other minimum and maximum Contribution requirements which may apply. We also have the right, upon advance notice to you, to:

(a)     change such requirements to apply to Contributions made after the date of such change, and

(b)     discontinue acceptance of Contributions under the Contract with respect to all Owners or with respect to all Owners to whom the same type of Certificate applies.

# PART IV - TRANSFERS AMONG INVESTMENT OPTIONS

## SECTION 4.01  TRANSFER REQUESTS

You may request to transfer all or part of the amount held in an Investment Option to one or more of the other Options.  The request must be in a form we accept.  All transfers will be made on the Transaction Date.  Transfers are subject to the terms of Section 4.02 and to our rules in effect at the time of transfer.  With respect to a Separate Account, the transfers will be made at the Accumulation Unit Value for that Transaction Date.

## SECTION 4.02  TRANSFER RULES

The transfer rules which apply are described in the Data pages.  A transfer request will not be accepted if it involves less than the minimum amount, if any, stated in the Data pages (unless the Annuity Account Value is less than such amount).  We have the right to change our transfer rules.  Any change will be made upon advance notice to you.

The Investment Funds may consist of funds which are classified as ''Type A'' Investment Options or ''Type B'' Investment Options or any other type which may be specified in the Data pages, as we designate in our discretion for purposes of the transfer rules described in the Data pages.  The Data pages specify whether such Investment Options are designated Type A or Type B or another type as well as the minimum or maximum limits on transfers which apply.

# PART V - WITHDRAWALS AND TERMINATION

## SECTION 5.01  WITHDRAWALS

Unless otherwise stated in the Data pages, you may request, pursuant to our procedures then in effect, a withdrawal from the Investment Options before the Annuity Commencement Date and while the Annuitant is alive.  The request must be in a form we accept.

On the Transaction Date, we will pay the amount of the withdrawal requested or, if less, the Cash Value. The amount to be paid plus any Withdrawal Charge which applies (see Section 8.01) will be withdrawn on a pro-rata basis from the amounts held for you in the Investment Options, unless you elect otherwise and unless otherwise stated in the Data pages.

We will not accept a withdrawal request if it involves less than the minimum amount, if any, stated in the Data pages.  Further conditions or restrictions may apply if stated in the Data pages or in an endorsement hereto.

## SECTION 5.02  TERMINATION

This Certificate will terminate if one or more of the following events occurs, unless otherwise specified in the Data pages:

(a)  If a withdrawal made under Section 5.01 would result in an Annuity Account Value of an amount less than the minimum amount stated in the Data pages, we will so advise you and have the right to pay you such Value.  In that case this Certificate will be terminated.

(b)  Before the Annuity Commencement Date, we have the right to pay the Cash Value and terminate this Certificate if no Contributions are made during the last three completed Contract Years, and the Annuity Account Value is less than the amount described in item (a) above.

(c)  We also have the right to terminate this Certificate if no Contributions have been made within 120 days of the Contract Date.

## PART VI - DEATH BENEFITS

### SECTION 6.01  DEATH BENEFIT

Upon receipt of due proof that the Annuitant has died before the Annuity Commencement Date, we will pay a death benefit to the beneficiary named under Section 6.02.  Payment may be subject to the terms of Section 6.02 and any special rules which may apply as described in any endorsement hereto.

The amount of the death benefit is described in the Data pages.

The death benefit will be paid as an Annuity Benefit or in a single sum, as described in Section 6.02.

### SECTION 6.02  BENEFICIARY

You give us the name of the beneficiary who is to receive any death benefit payable on the Annuitant's death.  You may change the beneficiary from time to time during the Annuitant's lifetime and while coverage under the Contract is in force.  Any such change must be made in writing in a form we accept. A change will, upon receipt at the Processing Office, take effect as of the date the written form is executed, whether or not you are living on the date of receipt.  We will not be liable as to any payments we made before we receive any such change.

You may name one or more persons to be primary beneficiary on the Annuitant's death and one or more other persons to be successor beneficiary if the primary beneficiary dies before the Annuitant.  Unless you direct otherwise, if you have named two or more persons as beneficiary, the beneficiary will be the named person or persons who survive the Annuitant and payments will be made to such persons in equal shares or to the survivor.

Any part of a death benefit payable as described in Section 6.01 for which there is no named beneficiary living at the Annuitant's death will be payable in a single sum to the Annuitant's surviving children.  The payments will be made in equal shares, or should none survive or should there be none, then to the Annuitant's estate.

If you so elect in writing, any amount that would otherwise be payable to a beneficiary in a single sum may be applied to provide an Annuity Benefit, on the form of annuity elected by you, subject to our rules then in effect.  If at the Annuitant's death there is no election in effect, the beneficiary may make such an election.  In the absence of any election by either you or the beneficiary, we will pay the death benefit in a single sum.

Any naming of a beneficiary is subject to the terms of the Plan, if one applies, including any terms requiring spousal consent.

# PART VII ANNUITY BENEFITS

## SECTION 7.01  ANNUITY BENEFIT

Payments under an Annuity Benefit will be made monthly.  You may elect instead to have the Annuity Benefit paid at other intervals, such as every three months, six months, or twelve months, instead of monthly, subject to our rules at the time of your election or as otherwise stated in the Data pages or any endorsement hereto.  This election may be made at the time the Annuity Benefit form as described in Section 7.02 is elected.  In that event, all references in this Certificate to monthly payments will, with respect to the Annuity Benefit  to which the election applies, be deemed to mean payments at the frequency elected.

## SECTION 7.02  ELECTION OF ANNUITY BENEFITS

As of the Annuity Commencement Date, provided the Annuitant is then living, the Annuity Account Value will be applied to provide the Normal Form of Annuity Benefit (described below).  However, you may instead elect (i) to have the Cash Value paid in a single sum, (ii) to apply the Annuity Account Value or Cash Value, whichever applies pursuant to the first paragraph of Section 7.05, to provide an Annuity Benefit of any form offered by us or one of our subsidiary life insurance companies , or (iii) to apply the Cash Value to provide any other form of benefit payment we offer, subject to our rules then in effect and applicable laws and regulations.  At the time an Annuity Benefit is purchased, we will issue a supplementary contract which reflects the Annuity Benefit terms.

We will provide notice and election forms to you not more than six months before the Annuity Commencement Date.

We will have the right to require you to furnish any information we need to provide an Annuity Benefit.  We will be fully protected in relying on such information and need not inquire as to its accuracy or completeness.

## SECTION 7.03 COMMENCEMENT OF ANNUITY BENEFITS

Before the Annuity Commencement Date, you may elect to change such Date to any date after your election is filed (other than the 29th, 30th, or 31st of any month).  You must do this in writing.  The change will not take effect until your written election is received and accepted by us at our Processing Office.

However, no Annuity Commencement Date will be later than the first day of the month which follows the date the Annuitant attains the "maximum maturity age" or, if later, the tenth anniversary of the Contract Date.  The current maximum maturity age is shown in the Data pages,  but may be changed by us in conformance with applicable law.

## SECTION 7.04 ANNUITY BENEFIT FORMS

The "Normal Form" of Annuity Benefit is an Annuity Benefit payable on the Life-Period Certain Annuity Form described below, unless another Form is to apply pursuant to the terms of the Plan, if applicable, the requirements of the Employee Retirement Income Security Act of 1974 (ERISA), as amended, or any other law that applies.  The Data pages will state the Normal Form which applies.  We

may offer other annuity forms as available from us or from one of our affiliated or subsidiary life insurance companies. Such a form may, for example, include the Joint and Survivor Life Annuity Form which provides monthly payments while either of two persons upon whose lives such payments depend is living. The monthly amount to be continued when only one of the persons is living will be equal to a percentage, as elected, of the monthly amount that was paid while both were living.

The Life-Period Certain Annuity is an annuity payable during the lifetime of the person upon whose life the payments depend, but with 10 years of payments guaranteed (10 years certain period). That is, if the original payee dies before the certain period has ended, payments will continue to the beneficiary named to receive such payments for the balance of the certain period.

## SECTION 7.05 AMOUNT OF ANNUITY BENEFITS

If you elect pursuant to Section 7.02 to have an Annuity Benefit paid in lieu of the Cash Value, the amount applied to provide the Annuity Benefit will, unless otherwise stated in the Data pages or required by applicable laws or regulations, be (i) the Annuity Account Value if the annuity form elected provides payments for a person's remaining lifetime or (ii) the Cash Value if the annuity form elected does not provide such lifetime payments.

The amount applied to provide an Annuity Benefit may be reduced by a charge for any taxes which apply on annuity purchase payments. If we have previously deducted charges for taxes from Contributions, we will not again deduct charges for the same taxes before an Annuity Benefit is provided. The balance will be used to purchase the Annuity Benefit on the basis of either (i) the Tables of Guaranteed Annuity Payments or (ii) our then current individual annuity rates, whichever rates would provide a larger benefit with respect to the payee.

## SECTION 7.06 CONDITIONS

We may require proof acceptable to us that the person on whose life a benefit payment is based is alive when each payment is due. We will require proof of the age of any such person on whose life an Annuity Benefit is based.

If a benefit was based on information that is later found not to be correct, such benefit will be adjusted on the basis of the correct information. The adjustment will be made in the number or amount of the benefit payments, or any amount used to provide the benefit, or any combination. Overpayments by us will be charged against future payments. Underpayments will be added to future payments. Our liability is limited to the correct information and the actual amounts used to provide the benefits.

If the age (or sex, if applicable as stated in the Tables of Guaranteed Annuity Payments) of any person upon whose life an Annuity Benefit depends has been misstated, any benefits will be those which would have been purchased at the correct age (or sex). Any overpayments or underpayments made by us will be charged or credited with interest at (a) the rate shown in the Data pages or (b) the then current Guaranteed Interest Rate; we will choose which rate will apply on a uniform basis for like Certificates. Such interest will be deducted from or added to future payments.

If we receive acceptable proof that (i) a payee entitled to receive any payment under the terms of the Contract is physically or mentally incompetent to receive such payment or a minor, (ii) another person or an institution is then maintaining or has custody of such payee, and (iii) no guardian, committee, or other representative of the estate of such payee has been appointed, we may make the payments to such

other person or institution. In the case of a minor, the payments will not exceed $200, or such other amount as may be shown in the Data pages. We will have no further liability with respect to the payments so made.

If the amount to be applied hereunder is less than the minimum amount stated in the Data pages, we may pay the amount to the payee in a single sum instead of applying it under the annuity form elected.

## SECTION 7.07  CHANGES

We have the right, upon advance notice to you, to change at any time after the fifth anniversary of the Contract's register date and at intervals of not less than five years, the actuarial basis used in the Tables of Guaranteed Annuity Payments. However, no such change will apply to (a) any Annuity Benefit provided before the change or (b) Contributions made before such change which are applied to provide an Annuity Benefit.

# PART VIII - CHARGES

## SECTION 8.01 WITHDRAWAL CHARGES

The amount of the Withdrawal Charge is stated in the Data pages. We have the right to change the Charge shown in the Data pages with respect to future Contributions, subject to any maximum stated in the Data pages. We will give you notice of any change.

If specified in the Data pages, a ''Free Corridor Amount'' will apply as follows:

''Free Corridor Amount'' means an amount equal to the percentage, stated in the Data pages, of the Annuity Account Value, minus the total of all prior withdrawals (and associated Withdrawal Charges) made as described in Section 5.01 in the current Contract Year. We have the right to change the Free Corridor Amount, but it will always be a percentage between 0% and 30% if so provided in the Data pages.

If the amount of a withdrawal made under Part V is more than the Free Corridor Amount (defined above), we will (a) first withdraw from the Investment Options, on the basis described in Section 5.01, an amount equal to the Free Corridor Amount, and (b) then withdraw from the Investment Options an amount equal to the excess of the amount requested over the Free Corridor Amount, plus a Withdrawal Charge if one applies.

For purposes of this Section, amounts withdrawn up to the Free Corridor Amount will not be deemed a withdrawal of any Contributions. We have the right to carry forward the Free Corridor Amount into a future Contract Year, if not used in any Year, if so stated in the Data pages.

Any withdrawals in excess of the Free Corridor Amount will be deemed withdrawals of Contributions in the reverse order in which they were made. That is, Contributions will be withdrawn on a last-in, first-out basis unless the Data pages state that a first-in, first-out basis will apply.

In addition, the Annuitant's years of participation under the Prior Contract, if applicable, will be included for purposes of determining the Withdrawal Charge, if so specified in the Data pages in accordance with our rules then in effect.

If specified in the Data pages we have the right to reduce or waive the Withdrawal Charge upon such events as stated in the Data pages. Moreover, the Withdrawal Charge will be reduced if needed in order to comply with any applicable state or federal law.

## SECTION 8.02  ADMINISTRATIVE AND OTHER CHARGES DEDUCTED FROM ANNUITY ACCOUNT VALUE

As of each Processing Date, we will deduct Administrative Charges or other Charges related to the administration and/or distribution of this Certificate from the Annuity Account Value. Such Charges are shown in the Data pages.

If specified in the Data pages, the Charges will be deducted in full or prorated for the Contract Year, or portion thereof, in which the Contract Date occurs or in which the Annuity Account Value is withdrawn

or applied to provide an Annuity Benefit or death benefit. If so, the Charges will be deducted when withdrawn or so applied.

The amount of any such Charge will in no event exceed any maximum amount shown in the Data pages, subject to any maximum amount permitted under any applicable law.

We have the right to change the amount of the Charges with respect to future Contributions. We will give you advance notice of any such change.

## SECTION 8.03  TRANSFER CHARGES

We have the right to impose a charge with respect to any transfer among Investment Options after the number of free transfers, shown in the Data pages, made on behalf of an Annuitant. The amount of such charge will be set forth in a notice from us to you and will in no event exceed any maximum amount stated in the Data pages.

## SECTION 8.04  DAILY SEPARATE ACCOUNT CHARGE

Assets of the Investment Funds will be subject to a daily asset charge. This daily asset charge is for mortality risk, expenses and expense risk that we assume, as well as for financial accounting and death benefits if specified in the Data pages. The charge will be made pursuant to item (c) of "Net Investment Factor" as defined in Section 2.03. Such charge will be applied after any deductions to provide for taxes. It will be at a rate not to exceed the maximum annual rate stated in the Data pages. We have the right to charge less on a current basis; the actual charge to apply, for at least the first Contract Year, is also stated in the Data pages.

## SECTION 8.05 CHANGES

In addition to our right to reduce or waive charges as described in this Part VIII, we have the right, upon advance notice to you, to increase the amount of any charge stated in the Data pages, subject to (a) any maximum amount provided in this Part VIII or the Data pages and (b) with respect to Withdrawal Charges and Administrative or Other Charges deducted from the Annuity Account Value, the application of any increase only to Contributions made after the date of the change.

## PART IX - GENERAL PROVISIONS

### SECTION 9.01  CONTRACT

The Contract is the entire contract between the parties.  It will govern with respect to our rights and obligations.

The Contract may not be changed, nor may any of our rights or rules be waived, except in writing and by our authorized officer.  In addition to the rights of change reserved by us as provided in this Certificate, the Contract may be changed by amendment or replacement upon agreement between the Contract Holder and us without the consent of any other person provided that any such change does not reduce any Annuity Benefit provided before such change and provided that no rights, privileges or benefits under the Contract and this Certificate with respect to Contributions made hereunder prior to the effective date of such change may be adversely affected by an amendment without the consent of the Contract Holder and each Certificate Owner.

### SECTION 9.02  STATUTORY COMPLIANCE

We have the right to change the Contract without the consent of any other person in order to comply with any laws and regulations that apply.  Such right will include, but not be limited to, the right to conform the Contract to reflect changes in the Code, in Treasury regulations or published rulings of the Internal Revenue Service, ERISA, and in Department of Labor regulations.

The benefits and values available under the Contract will not be less than the minimum benefits required by any state law that applies.

### SECTION 9.03  DEFERMENT

The use of proceeds to provide a payment of a death benefit and payment of any portion of the Annuity Account Value (less any Withdrawal Charge that applies) will be made within seven days after the Transaction Date.  Payments or use of proceeds from the Investment Funds can be deferred for any period during which (1) the New York Stock Exchange is closed or trading is restricted, (2) sales of securities or determination of the fair value of an Investment Fund's assets is not reasonably practicable because of an emergency, or (3) the Securities and Exchange Commission, by order, permits us to defer payment in order to protect persons with interests in the Investment Funds.  We can defer payment or transfer of any portion of the Annuity Account Value in the Guaranteed Interest Account for up to six months while you are living.

### SECTION 9.04  REPORTS AND NOTICES

At least once each year until the Annuity Commencement Date, we will send you a report showing:

    (a)    the dollar amount in the Guaranteed Interest Account;

    (b)    the total number of Accumulation Units in each Separate Account or Investment Fund;

    (c)    the Accumulation Unit Value;

    (d)    the dollar amount in each Separate Account or Investment Fund;

    (e)    the Cash Value; and

    (f)    the amount of the death benefit.

The terms which require us to send you a report as described above or any written notice as described in any other Section will be satisfied by our mailing any such report or notice to your last known address as shown in our records.

All written notices sent to us will not be effective until received at the Processing Office. Your Certificate Number should be included in all correspondence.

## SECTION 9.05 ASSIGNMENTS, NONTRANSFERABILITY, NONFORFEITABILITY

No amounts payable under the Contract to a payee other than you may be assigned by that payee unless permitted herein, nor will they be subject to the claims of creditors or to legal process, except to the extent permitted by law. Other restrictions may apply if stated in any endorsement hereto.

## SECTION 9.06 MANNER OF PAYMENT

We will pay all amounts hereunder by check (in United States dollars) or, if so agreed by you and us, by wire transfer. All amounts payable by you must be paid by check payable to us (in United States dollars) or by any other method acceptable to us.

## TABLE OF GUARANTEED ANNUITY PAYMENTS

**Amount of Annuity Benefit payable monthly on the Life Annuity Form with Ten Years Certain provided by application of $1,000.**

| Monthly Income Ages | Males | Females | Age | Monthly Income Males | Females |
|---|---|---|---|---|---|
| 60 | 4.12 | 3.70 | 76 | 5.95 | 5.26 |
| 61 | 4.20 | 3.76 | 77 | 6.10 | 5.40 |
| 62 | 4.29 | 3.83 | 78 | 6.25 | 5.55 |
| 63 | 4.38 | 3.90 | 79 | 6.40 | 5.70 |
| 64 | 4.48 | 3.98 | 80 | 6.56 | 5.85 |
| 65 | 4.58 | 4.06 | 81 | 6.72 | 6.01 |
| 66 | 4.68 | 4.14 | 82 | 6.88 | 6.18 |
| 67 | 4.79 | 4.23 | 83 | 7.04 | 6.34 |
| 68 | 4.90 | 4.32 | 84 | 7.20 | 6.51 |
| 69 | 5.02 | 4.42 | 85 | 7.36 | 6.67 |
| 70 | 5.14 | 4.52 | 86 | 7.51 | 6.84 |
| 71 | 5.26 | 4.63 | 87 | 7.67 | 7.00 |
| 72 | 5.39 | 4.75 | 88 | 7.81 | 7.16 |
| 73 | 5.52 | 4.87 | 89 | 7.96 | 7.32 |
| 74 | 5.66 | 4.99 | 90 | 8.09 | 7.47 |
| 75 | 5.80 | 5.12 | | | |

The amount of income provided under an Annuity Benefit payable on the Life Annuity form with Ten Years Certain is based on 2.5% interest and the 1983 Individual Annuity Mortality Table "a" projected with modified Scale "G".

Amounts required for ages or for annuity forms not shown in the above Table or for other annuity forms will be calculated by us on the same actuarial basis.

If a variable annuity form is available from us and elected pursuant to Section 7.02, then the amounts required will be calculated by us based on the 1983 Individual Annuity Mortality Table "a" projected with modified Scale "G" and a modified two year age setback and on an Assumed Base Rate of Net Investment Return of 5.0%.

## THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES

Effective immediately, Contract Form No. 1050-94IC and the Certificates issued under the Contract is amended as follows:

The following new section is added at the end of **PART VII - ANNUITY BENEFITS**:

### SECTION 7.08  MINIMUM INCOME BENEFIT

If so specified in the Data pages, when the Annuity Account Value is applied to a plan of income payments (described therein) during the period of time specified in the Data pages, such payments will not be less than an amount described in the Data pages.  The provisions of this Section do not affect or reduce your right to elect an Annuity Benefit as described above in Section 7.02.

**New York,**

**THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES**

Chairman and Chief Executive Officer          Senior Vice President, Secretary and Associate General Counsel

No. 96ENGMIBIC

# ENDORSEMENT
## APPLICABLE TO NON-QUALIFIED CERTIFICATES

This Endorsement applies only to the Owner of a Non-Qualified Certificate.

**1.    Contributions (Section 3.01):**

We have the right not to accept any Contribution which is less than the amount(s) stated in the Data pages.

**2.    Owner Death Distribution Rules (Section 6.01):**

Upon the death of you, as Owner, before the Annuity Commencement Date:

(a)    If you are both the Owner and the Annuitant, we will pay the death benefit described in Section 6.01. Any part of a death benefit for which there is no named beneficiary living at your death will be payable in a single sum to your children who survive you in equal shares, or should none survive, then to your estate.

Under the following circumstances, the death benefit described in Section 6.01 of the Certificate will not be paid at your death before the Annuity Commencement Date and the coverage under the Contract will continue with your surviving spouse as Successor Annuitant and Owner:

(i)    you are married at your death;

(ii)    the person named as death beneficiary under Section 6.02 of the Certificate is your surviving spouse; and

(iii)    you have additionally requested that your spouse become "Successor Annuitant and Owner" of your Certificate if your spouse survives you.

(b)    If you are not the Annuitant, the named beneficiary will succeed as Owner. The entire amount in the Investment Options (after any Withdrawal Charge) must be fully paid within five years after your death, or payments must begin within one year after your death as a life annuity or installment option for a period of not longer than the life expectancy of the named beneficiary. If you have not elected a form of payment as described in Section 6.02, we will make a single sum payment to the beneficiary on the fifth anniversary of your death. Subject to our rules at the time of payment, the beneficiary may elect to apply such a single sum payment to a new non-qualified annuity contract to be owned by the beneficiary. Instead of a single sum payment, the beneficiary may elect to receive an Annuity Benefit or a payout option which satisfies the terms of Section 72(s) of the Code and our rules at the time. However, if the named beneficiary is your spouse, full payment of amounts under the Certificate must be made not later than five years after the spouse's death.

No. 94ENNQI

If payments under an Annuity Benefit had begun before your death, such payments will continue to be made pursuant to the terms of such Benefit.

If the Annuitant dies before the entire amount under the Certificate is paid, we will pay the death benefit as described in Section 6.01.

(c)    Unless you direct otherwise, the named beneficiary will also be the person who succeeds as Owner on your death while the Annuitant is alive as described in Section 6.02. You may change any beneficiary or successor Owner from time to time during the Annuitant's lifetime and while the Certificate is in force, as described in item (a) above.

(d)    If you are not the Annuitant, you may name another person to be the successor Owner and to receive the amounts to be paid under (b) above. You may also name another person to be successor Owner if the first choice as successor Owner dies before you. If you have so named two or more persons to succeed as Owner and more than one survive, they will share equally unless you direct otherwise. If no person named as beneficiary to receive the death benefit survives the Annuitant, we will pay the death benefit in a single sum to you. In the event of your death after the Annuitant, but before we pay such death benefit, the benefit will be payable in a single sum to the children who survive you, in equal shares, or should none survive, to your estate.

If you die before the Annuity Commencement Date while the Annuitant is still living, and if no person named as successor Owner is living at the Owner's death, the beneficiary will be deemed to be, in this order, (i) your surviving spouse, (ii) the Annuitant, (iii) the children who survive you, in equal shares, or (iv) your estate.

**3.    Assignments (Section 9.05):**

Notwithstanding the terms of Section 9.05, you may assign the Certificate and the rights described therein before the Annuity Commencement Date. We will not be bound by an assignment unless we have received it and it is in writing. Your rights and those of any other persons referred to in the Certificate and this Endorsement will be subject to the assignment. We assume no responsibility for the validity of any assignment.

No. 94ENNQI

# ENDORSEMENT
## APPLICABLE TO MARKET VALUE ADJUSTMENT TERMS

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**The terms of this Endorsement contain a market value adjustment ("MVA") formula which may result in adjustments, positive or negative, in benefits. An MVA will not apply upon transfer to a new Guarantee Period or other Investment Option on the Expiration Date or pursuant to item 1 below.**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**1.    Guaranteed Period Account**

We will specify one or more Guarantee Periods in the Guaranteed Period Account. For each such Guarantee Period, we guarantee to credit an interest rate (called the Guaranteed Rate). Interest will be credited daily to amounts in the Guaranteed Period Account. The duration of each Guarantee Period provided at any time and the Guaranteed Rate that applies to each Period will be furnished by us upon request. The Guarantee Period(s) and the Rate for each such Period you initially elect are shown in the Data pages.

You may elect one or more Guarantee Period(s), according to our rules then in effect. Contributions and transfers to be made to the Guaranteed Period Account as described in Section 3.01 will be allocated to the Guarantee Period(s) according to your election. Contributions and transfers into the Guaranteed Period Account will receive the Guaranteed Rate applicable to the elected Guarantee Period as of the Business Day we receive your Contribution or transfer request at our Processing Office. The amount held with respect to a given Guarantee Period is called the Guaranteed Period Amount which reflects Contributions and transfers made to the Guaranteed Period Account, plus interest at the Guaranteed Rate(s), minus any withdrawals, transfers and charges, if any, deducted from the Guaranteed Period Account.

The last day of a Guarantee Period is the Expiration Date. We will notify you at least 15 but not more than 45 days before the Expiration Date of each Period. You may elect one of the following three options effective at the Expiration Date, none of which will result in a market value adjustment:

(a)    to transfer the Guaranteed Period Amount into a Guarantee Period of any duration which we then offer;

(b)    to transfer the Guaranteed Period Amount to another Investment Option;

(c)    to make a withdrawal of the Guaranteed Period Amount (subject to any Withdrawal Charges which apply pursuant to Section 8.01).

No. 94ENMVAI

If no election is made on or prior to the Expiration Date, the Guaranteed Period Amount (without any market value adjustment) will be transferred into the Investment Option described in the Data pages. During the 30 days following the Expiration Date, the full Guaranteed Period Amount (less any withdrawals or transfers made or charges deducted during such 30 day period) may be transferred into a new Guarantee Period or other Investment Option. In no event may you elect a Guarantee Period which extends beyond the Annuity Commencement Date.

The "Guaranteed Period Account" is our Separate Account No. 46 that we use to account for amounts allocated to Guarantee Periods under this Certificate. All amounts allocated to a Guarantee Period, whether Contributions or transfers, become part of the Guaranteed Period Account.

2. **Transfers, Withdrawals, Death and Annuity Benefits**

If you request, other than as described in item 1 above, a transfer to another Investment Option as described in Section 4.01 or a withdrawal as described in Section 5.01, any such transfer or withdrawal from a Guaranteed Period Amount will be subject to a market value adjustment described below. For this purpose, the Annuity Account Value in Separate Account No. 46 will be after the market value adjustment. The market value adjustment will be in addition to any charges which apply as described in Section 8.01.

In addition, amounts applied from a Guaranteed Period Amount to provide a death benefit as described in Section 6.01, an annuity as described in Section 7.02, or any other annuity form offered by us, will be subject to a market value adjustment, unless otherwise provided in the Data pages.

Payment or transfers from the Guaranteed Period Account may be deferred for up to six months while you are living.

3. **Market Value Adjustment**

The market value adjustment with respect to each Guarantee Period that applies to you is determined as follows:

(a)   We determine the Guaranteed Period Amount that will be payable on the Expiration Date, using the Guaranteed Rate for such Guarantee Period.

(b)   We determine the period remaining in your Guarantee Period (based on the Business Day we receive your transaction request at our Processing Office or effective date for such determination) and convert it to fractional years based on a 365 day year. For example, three years and 12 days becomes 3.0329.

No. 94ENMVAI

(c)    We determine the current Guaranteed Rate which applies to new Contributions, for the same class of Certificates as yours, under a Guarantee Period with the same Expiration Date as your Guarantee Period. We add to such current Rate a percentage which is no greater than that shown in the Data pages.

(d)    We determine the present value of the Guaranteed Period Amount payable at the Expiration Date, using the period determined in (b) and the rate determined in (c).

(e)    We subtract the current Guaranteed Period Amount from the result in (d). The result is the Market Value Adjustment, which may be positive or negative, applicable to such Guarantee Period.

If we are not offering a Guarantee Period to which the "current Guaranteed Rate" would apply, we will use the Rate at the closest Expiration Date. If we are no longer offering new Guarantee Periods, we will use a procedure for determining such current Rate that is stated in the Data pages or which we will develop and file with insurance supervisory official of the appropriate jurisdiction.

4.    **Reports and Notices**

We will report the values under this Endorsement with the reports sent out as described in Section 9.04. Such report will include the Guaranteed Period Amount, market value adjustment, and Annuity Account Value in Separate Account No. 46.

No. 94ENMVAI

## THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES

Effective immediately, Equitable hereby amends the **Endorsement Applicable to Market Value Adjustment Terms** Form No. 94ENMVAI as follows:

The following new section is added at the end of the Endorsement after **Item 4 Reports and Notices:**

5.     **Separate Account**

We have established Separate Account No. 46 and maintain it in accordance with the laws of New York State. Income, realized and unrealized gains and losses from the assets of the Separate Account are credited to or charged against it without regard to our other income, gains or losses. Assets are placed in this Separate Account to support the Certificate and other annuity contracts and certificates. The assets of a separate account are our property. If so stated in the Data pages, the portion of such assets equal to the reserves and other contract liabilities will not be chargeable with liabilities which arise out of any other business we conduct. We may transfer assets of a separate account, including assets of the Guaranteed Period Account, in excess of the reserves and other contract liabilities with respect to such account to another separate account or to our general account.

**New York,**

## THE EQUITABLE LIFE ASSURANCE SOCIETY OF THE UNITED STATES

Chairman and Chief Executive Officer          Senior Vice President, Secretary and Associate General Counsel

No. 96ENMVAI

# Exhibit B



## Introduction

## Testing/Training - Roles & Responsibilities

## Introduction

FINRA welcomes you to your new career as a FINRA member firm registered representative. This brochure—tailored for prospective and currently employed registered representatives and other securities industry professionals—addresses testing and qualifications issues, how registered representatives are to conduct business, and the need for professionalism and fair dealing with investors. Not every situation you encounter can be covered in a publication of this size and some of the points covered may not apply to your firm's business. In your training, you will learn that there is an extensive support system available to help you comply with these requirements.

Authorized by an act of Congress in 1938, FINRA is a membership self-regulatory organization (SRO) of securities firms. FINRA sets the overall strategic direction and policy agendas of the whole organization, oversees the effectiveness of its subsidiaries, and ensures that the organization's statutory and self-regulatory obligations are fulfilled.

FINRA regulates the securities markets for the ultimate benefit and protection of the investor. FINRA helps ensure that member firms and their employees comply with FINRA and Municipal Securities Rulemaking Board (MSRB) rules, as well as federal and state securities laws and regulations.

Among FINRA's many functions is the maintenance of the qualification, employment, and disciplinary histories of registered securities employees of member firms through the Web Central Registration Depository (CRD®) system. This system was developed jointly by the North American Securities Administrators Association (NASAA) and FINRA. It is a registration data bank and application processing facility. In addition to FINRA representative and principal registrations, the Web CRD system also processes applications for agent registration in all states, the District of Columbia, Puerto Rico, and for the securities exchanges. The Web CRD system permits individuals seeking registration with multiple organizations and states to do so by submitting a single form and a combined payment of fees to FINRA. In addition to individual registration, the Web CRD system also processes the membership registration and withdrawal forms for broker/dealers.

Records of securities professionals are available to the public through FINRA BrokerCheck, which pulls data from the Web CRD system. Information is free to investors for personal use. The telephone number of FINRA BrokerCheck is (800) 289-9999. For more information, visit FINRA BrokerCheck.

## Registration, Testing, and Qualifications

Any securities professional associated with a member firm—including partners, officers, directors, branch managers, department supervisors, and salespersons—must register with FINRA. The registration application requires information about the individual's prior employment and disciplinary history. FINRA prescribes two levels of qualification and registration:

- Registered representatives, generally sales personnel.
- Principals, generally officers of the firm and other management personnel involved in the day-to-day operation of the firm's investment banking or securities business.

As part of the registration process, securities professionals must pass examinations administered by FINRA to demonstrate competence in the areas in which they will work. These mandatory qualification examinations cover a broad range of subjects on the markets, as well as the securities industry and its regulatory structure, ensuring a minimum level of understanding and expertise. The areas in which candidates are tested include federal securities laws; Securities and Exchange Commission (SEC) and FINRA rules and regulations; securities products; the operation and interrelation of financial markets; economic theory and kinds of risk; corporate financing, accounting, and balance sheet analyses;

portfolio theory and analysis; fair sales practices, including solicitation and presentation; types of customer accounts; and tax treatment of various investments.

Prospective principals of securities firms must pass additional examinations that test their knowledge of supervisory rules in the areas of investment banking, trading and market making, retail sales activities, and financial responsibility rules. Financial and operational principals must further demonstrate a thorough knowledge of the requirements regarding recordkeeping, net capital, customer reserves, financial reporting, and credit.

In addition to its own examinations, FINRA administers for the securities industry and the states approximately 30 different examinations to individuals seeking to become registered representatives or principals of securities firms.

## PROCTOR System

PROCTOR® is a computer system specifically designed for the administration and delivery of computer-based testing and training. The PROCTOR system is currently delivering over 440,000 exams and over 175,000 training sessions per year. PROCTOR exams and training are provided at FINRA-authorized delivery locations nationwide. For a listing of centers testing and their hours of operation, view the exam locations or contact the Gateway Call Center at (301) 590-6500.

You should be aware of two major features of PROCTOR-administered sessions:

1. The system delivers exams and training sessions daily. Once enrolled on the PROCTOR system, you can make an appointment at a FINRA-authorized delivery location or center at your convenience.

2. You receive your score as soon as you complete the exam. FINRA posts your score on the Web CRD system within two business days following your exam/continuing education session.

By using the PROCTOR system, FINRA has reduced significantly the turnaround time associated with the qualification and registration of representatives and principals in the securities industry.

## Exam/Training Sessions Available

FINRA administers the following sessions on the PROCTOR system:

**Client-Series ID/Title**
1-3 National Commodity Futures Exam
1-4 Registered Options Principal Exam
1-5 Interest Rate Options Exam
1-6 Investment Company Products/Variable Contracts Representative Exam
1-7 General Securities Representative Exam
1-9 General Securities Sales Supervisor-Options Module
1-10 General Securities Sales Supervisor-General Module
1-11 Assistant Representative-Order Processing Qualification Exam
1-12 NYSE Branch Manager Exam
1-14 NYSE Compliance Officer Examination
1-15 Foreign Currency Options Qualification Exam
1-17 Limited Registered Representative Exam
1-22 Direct Participation Programs Representative Exam
1-23 General Securities Principal Sales Supervisor Module
1-24 General Securities Principal Exam
1-26 Investment Company Products/Variable Contracts Principal Exam
1-27 Financial and Operations Principal Exam
1-28 Introducing Broker/Dealer Financial and Operations Principal Exam
1-30 Branch Managers Exam—Futures
1-31 Futures Managed Funds Exam
1-32 Limited Futures Exam—Regulation
1-34 Retail Off-Exchange Forex Examination
1-37 Canada Module of the General Securities Registered Representative Exam (with options questions)
1-38 Canada Module of the General Securities Registered Representative Exam

1-39 Direct Participation Programs Principal Exam
1-42 Registered Options Limited Representative Exam
1-44 Pacific Exchange Market Maker Exam
1-45 Pacific Exchange Floor Broker/Market Maker Exam
1-46 Pacific Exchange Floor Broker Exam
1-51 Municipal Fund Securities Principal Exam
1-52 Municipal Securities Representative Exam
1-53 Municipal Securities Principal Exam
1-55 Limited Representative-Equity Trader Exam
1-62 Corporate Securities Limited Representative Exam
1-63 Uniform Securities Agent State Law Exam
1-65 Uniform Investment Adviser Law Exam
1-66 Uniform Combined State Law Exam
1-72 Government Securities Representative Exam
1-82 Limited Representative-Private Securities Offerings Exam
1-86 Research Analyst Part 1 Analysis Module
1-87 Research Analyst Part II Regulations Module
1-91 FDIC Examiner Technical Evaluation
1-92 FDIC New Technical Evaluation Examination
1-161 Supervisory Analyst Part 1
1-162 Supervisory Analyst Part 2

**Continuing Education Regulatory Element Programs**
2-101 General Program
2-106 Series 6 Program for Investment Company Products/Variable Contracts Representatives
2-201 Supervisor Program

## Appointments/Enrollment

Before you can schedule an appointment to take an exam, your firm must file the proper application form through the Web CRD system. A scheduling window will be posted on the Web CRD system upon approval. For persons associated with non-FINRA member firms, FINRA Field Support Services mails a PROCTOR enrollment confirmation to your firm.

For the Continuing Education Program, you automatically become registered upon your anniversary date. The Web CRD system notifies your firm of the enrollment period via an electronic notification to your "CE Required" Firm Queue.

After your firm receives your enrollment notification, you can call a conveniently located delivery location to schedule an appointment for the session. Due to the many sessions administered, you should schedule your session as far in advance as possible. This way you can secure an appointment on the desired date. In addition to the desired appointment date, the location staff will need to know:

- your name and Social Security number;
- name of your firm;
- telephone number where you or your employer can be reached; and
- client ID, the name of the session, or its identifying series ID. Note: The client ID for all exams is "1" and the client ID for Continuing Education is "2".

The location staff will not schedule an appointment for a date past the expiration date stated on your enrollment confirmation. If your enrollment expires, FINRA will re-enroll you upon receipt of another exam request form.

An enrollment is valid for the period stated on the enrollment notification when it is issued. You must accept any appointment time available within the remaining enrollment period. However, if you call a location at least 10 business days before your enrollment expires, and there are no appointment times available, FINRA may extend your enrollment to the next available appointment at the location.

In these examples, extensions would not be granted:

- You call before your enrollment expires, and there are appointment times available before the expiration date, and you are unable or unwilling to accept the available opening(s).
- You call before the enrollment expires, and there are no appointments available before the

expiration date and you are unable or unwilling to take the first available appointment after the expiration date.
- You call after the expiration date.

In no case will more than one extension be granted for an enrollment.

An appointment can be made for you before you receive your enrollment notification; however, the appointment will not be honored unless your enrollment is valid on the PROCTOR system at least seven business days before your appointment.

You may make an appointment for two or more different exams on the same day (for example, a FINRA exam and the state law exam), but you must make an appointment for both exams before the exam date. Such arrangements will also depend on the availability of computer scheduling at the delivery location.

You may cancel an appointment on a timely basis without penalty before the scheduled session. An appointment cancellation will be considered timely if effected according to the following schedule:

| If Appointment is Scheduled for: | Cancellation Must be Effected no Later Than Noon on: |
|---|---|
| Monday | Thursday of the preceding week |
| Tuesday | Friday of the preceding week |
| Wednesday | Monday of the same week |
| Thursday | Tuesday of the same week |
| Friday, Saturday, Sunday | Wednesday of the same week |

If a holiday occurs during the normal cancellation period, this schedule adjusts to define "timely cancellation" as one day earlier than stated above.

If your cancellation is not timely, FINRA will charge a cancellation fee equal to the exam fee to your firm. FINRA also will charge a cancellation fee to your firm if you do not appear for an appointment. Similarly, if you arrive so late that your session cannot begin without disturbing the delivery location schedule for that date, FINRA will charge your firm a cancellation fee.

All of the above events that cause FINRA members to be penalized also trigger penalties for non-FINRA members. For candidates associated with non-FINRA members, the penalty is the invalidation of the candidate enrollment itself. Such candidates must then reapply for the exam and submit a new exam fee before the generation of another enrollment on the PROCTOR system.

## Taking the Exam/Training

You should arrive at the authorized PROCTOR delivery center about 30 minutes before your scheduled appointment time. To gain admission to the center, you must provide one valid form of identification with your signature and your picture as issued by a government agency, such as a valid driver's license, passport, or military ID. If you do not have ID that is adequate, you must cancel your appointment until you obtain proper ID. You are also required to sign the center's "sign-in log," agree to the rules of conduct through your signature, and provide a single finger imprint.

FINRA sessions are closed-book. When you enter the center, you are not allowed to bring personal possessions, such as books, briefcases, and notes into the testing/training room. You may take only authorized material issued by center staff to the testing/training room. Neither the center staff nor FINRA is responsible for articles you are not allowed to bring to your session. The center staff will provide as much scratch paper as needed during the session. All materials, including used and unused scratch paper, must be returned to the center staff at the end of the session.

Calculators will be provided by the center staff to you upon request. Do not bring calculators with you for your exam—you will not be allowed to use them.

Severe penalties are imposed on you if you cheat on a FINRA-administered exam. These include suspension or bar from registration and a fine-usually in the thousands of dollars. After the suspension period, you will be required to re-qualify to activate your registration status.

The process for taking an exam or training on the PROCTOR system is easy-no previous computer experience is necessary. Before starting your session, an introductory lesson will familiarize you with the PROCTOR system and help you understand how the system operates.

Features of the PROCTOR system used for exam delivery include:

- Scroll bars that allow you to move the questions up or down at your convenience.
- A clock display that can be turned on to help you track the amount of time remaining during the session.
- A confirmation box that appears each time you answer a question so you can confirm your answer before proceeding to the next question.
- The ability to answer questions by either using the keyboard to type the letter corresponding to your answer or the mouse to point and click on your answer.
- The ability to mark questions you wish to review later so you can easily go back to them during your session.

FINRA identifies the appropriate sections and the number of questions in each section in the exam specifications. The PROCTOR system then randomly selects the questions for your exam on a section-by-section basis from the appropriate question bank. The system automatically tracks the difficulty level of each question and enforces selection criteria that will assure that each candidate receives an exam of comparable difficulty. Once the system measures and accepts an exam for presentation to you, it sequences the questions. The PROCTOR system places the difficult questions in the middle and the easier ones at the beginning and at the end of the exam.

You may review any question at any time before the allowed testing time for your exam expires. The introductory lesson demonstrates how to answer questions and flags them if you want to review them later. View an illustration of how an exam question appears on the PROCTOR system.

At the end of the allowed testing time or when you voluntarily stop your exam, the system determines your score and displays a grade result on the computer. The grade report will show whether you passed the exam. Within two business days, FINRA posts the results to the Web CRD system.

When completing a continuing education session you will be shown how to progress through the scenarios that are presented. Features include:

- A tool bar that provides you access to a help sequence and clock display.
- Feedback to your responses to the scenarios presented indicating their appropriateness for the situations.

For continuing education, at the end of your session, you will be given a report indicating whether you completed the session. Within two business days, FINRA posts the results to the Web CRD system.

Equipment problems do occasionally occur; normally center staff can quickly correct any difficulty you experience while taking a session. If you notice any malfunction with your computer, tell the center administrator immediately.

If the system malfunction lasts more than 30 minutes, you may choose to end your session. FINRA will re-enroll you and you will have to schedule a new appointment with the center staff. The staff will schedule as timely an appointment as possible.

## FINRA Special Arrangements Procedures

### Americans with Disabilities Act (ADA) Candidates
Special arrangements can be made to administer FINRA sessions to candidates with physical or learning disabilities. The FINRA Special Accommodations Eligibility Questionnaire and Special Accommodations Verification Request Form must be submitted to FINRA Field Support Services. The sponsoring firm should contact FINRA Field Support Services at (800) 999-6647 with any questions or for more information regarding this procedure.

Note: Candidates with transitory or temporary conditions that are not "impairments or disabilities" (e.g., pregnancy, sprains, fractures) are not eligible for special testing accommodations under the ADA. Those in need of accommodations should contact FINRA for information about a possible special testing arrangement that can be handled on a case-by-case basis.

**English as a Second Language (ESL)**
If English is your second language, you may request additional time for your session when scheduling your appointment. You must provide the location staff with an original letter from your firm on company letterhead indicating that English is your second language when you arrive at the appointment. The letter must also include your name, your Social Security number, the date of the exam, the client ID, and the Series ID, or name of the session you are taking, and bear the original signature of your supervisor/manager. Faxed or photocopied letters will not be accepted as authorization.

## FINRA-Authorized Delivery Locations

You may schedule an appointment at either a Pearson VUE or Prometric Testing Center:

- **Pearson VUE National Registration Center**
  Call (866) 396-6273 (toll free), or go to www.pearsonvue.com/finra for online scheduling.
- **Prometric**
  call (800) 578-6273 or go to www.prometric.com/finra for online scheduling.

## Holiday Schedule

The following holidays will be observed by all exam/training locations:

- New Year's Day
- Martin Luther King Day
- Presidents' Day
- Good Friday
- Memorial Day
- Independence Day
- Labor Day
- Thanksgiving Day
- Christmas Day

## Foreign Exams

For information regarding testing abroad, please refer to International Testing/CE Session Location Sites.

## Questions/More Information on PROCTOR

If you have questions on PROCTOR enrollments, PROCTOR appointment scheduling problems, or grade reports, inform the appropriate office personnel of your sponsoring firm. They are authorized to deal directly with FINRA Registration & Disclosure (CRD/IARD).

Questions on the **substantive content** of any FINRA-administered exam may be directed to the FINRA Gateway Call Center at (301) 590-6500.

## Obligations to Your Firm

As a qualified securities professional, you have an obligation to your firm to supply accurate information on the proper registration forms. You are also obliged to continue your education throughout your career under the Securities Industry Continuing Education Program.

## Registration

Your firm registers you by filing a Uniform Application for Securities Industry Registration or Transfer,

Form U-4, with FINRA. This Form also lists other SROs, such as the securities and options exchanges, and the states with which you are to be registered. It is important that all of the information you supply to your member firm in the preparation of the Form U-4 is complete and accurate. If, during its routine review of Form U-4 filings, FINRA discovers that any portion of the Form U-4 information you submit, especially relating to your personal history and past disciplinary or law enforcement encounters, is misleading or omits material information, disciplinary action may be taken and you could be barred from the securities industry. Now is a good time for you to review that filing with your supervisor and supply your firm with any missing information. You have a continuing obligation to update your Form U-4 promptly if any of the information changes or becomes inaccurate. This includes your home address or any of the questions involving customer complaints, criminal disclosure, regulatory disciplinary actions, civil judicial actions, terminations, or financial judgments. You promise to do this when you sign the Form U-4.

If you leave your firm for any reason, the firm has up to 30 days to supply you with a copy of the Uniform Termination Notice for Securities Industry Registration, Form U-5, which it files with FINRA. The Form U-5 indicates the date you left the firm and a brief reason why you left. You should review this Form for accuracy. If the information supplied on the Form U-5 is inaccurate or incomplete, you should notify your prior employer promptly. Also, your next FINRA member employer must obtain and review a copy of your most recent Form U-5. If your prior employer does not respond satisfactorily to a written request for a copy of your Form U-5, please notify FINRA.

Your firm is required to report on the Form U-5 any customer complaint, criminal action, regulatory action, investigation, internal review alleging rule violations, any investigation it may currently be conducting, and the reason for any involuntary termination.

It is important for you to understand that as a registered representative, you are an agent of your member firm. Whether you are an employee or a so-called "independent contractor" (for regulatory purposes there is no distinction between the two terms), you are obligated to follow all applicable securities laws and regulations. For example, you must get clearance from your member firm for certain personal financial activities. Accordingly, you should discuss with your supervisor any financial accounts that you or members of your immediate family have with other securities firms, relationships with other businesses, and any forms of compensation you receive from any source other than your firm.

As a registered representative, your work-related documents, such as correspondence with customers, new account forms, and copies of customer statements, must be reviewed and retained by your firm in special ways according to rules applicable to securities industry participants. Regardless of the name on the incoming envelope, these documents are also the property of the firm.

If you leave your firm, you may not take these documents without the permission of the firm. In addition, you need to discuss with your supervisor the conditions under which you may communicate with customers-especially during your training period.

Industry rules require that a registered principal supervise you and that you meet with this supervisor at least annually to formally discuss regulatory and compliance matters. If you do not know who your supervisor is, find out now. Your supervisor should familiarize you with your firm's written compliance procedures and guidelines, which every firm must maintain. You are expected to know and understand them.

After your registration is effective, you may conduct a securities business as an agent only while under the direct supervision of your firm. You cannot conduct any securities transactions other than with your member firm unless you get prior written approval to do so. Before accepting an offer to work part-time or off-hours with any other business concern, discuss this relationship with your supervisor.

Even if you are registered to sell only insurance-related securities products, you must be aware of FINRA rules and comply with them. Further, as an insurance agent you must familiarize yourself with, and obey, any restrictions that your firm may have concerning selling other companies' insurance products.

## Continuing Education

As a registered representative, you are also required to adhere to certain continuing education requirements during the course of your career. On July 1, 1995, NASD and other SROs adopted the Securities Industry Continuing Education Program (Program). The program includes periodic

computer-based training in regulatory matters (the Regulatory Element) and annual training programs provided by your firm to keep you informed on job- and product-related subjects (the Firm Element)..

The Regulatory Element requires you to complete one of the Regulatory Element computer-based training programs on the second anniversary of your initial securities registration and then every third year thereafter. Note, this schedule changes if you become the subject of a significant disciplinary action, which is a suspension, fine of $5,000 or more, or a statutory disqualification. If you become the subject of a significant disciplinary action or are otherwise ordered by a securities regulator, you will be required to complete a Regulatory Element computer-based training session immediately and your subsequent requirement anniversaries will be determined by the date of the significant disciplinary action and not your initial securities registration date.

All Regulatory Element programs focus on compliance, regulatory, ethical and sales practice standards. Their content is derived from rules and regulations applicable to all, as well as standards and practices widely accepted within the industry.

There are currently three different Regulatory Element programs: the S201 Supervisor Program for registered principals and supervisors; the S106 Series 6 Program for Investment Company Products/Variable Contracts Representatives; and the S101 General Program for all other registrations. If you have more than one securities registration, you take only one Regulatory Element program. Your firm will advise you which Regulatory Element Program to take and when you must take it.

The S101 General Program and the S106 Series 6 Program each comprise seven subject areas or modules. The content in each module relates to the respective registration category covered by each program.

The General and the Series 6 Programs have a similar design, while the Supervisor Program is different. The General and Series 6 programs feature scenarios depicting situations faced by registered persons in the course of their business. Scenarios in the General Program (S101) are text-based, while the Series 6 Program (S106) also features audio segments. After reading a scenario, you must demonstrate understanding of the issues by choosing the most appropriate response(s) to questions concerning the facts in the scenario. If you do not answer a sufficient number of questions correctly, you will view a tutorial about the topics in the module and you must try again with another scenario from that module. You must successfully complete one scenario in the module before you can advance to the next module.

Neither the S101 General Program nor the S106 Series 6 Program requires advance preparation; however it may be beneficial for you to familiarize yourself with the Regulatory Element Content Outline. You can view the content outlines by logging on to the Securities Industry Continuing Education Program Web site.

The Supervisor/Principal Program (S201) is specifically designed to enhance a supervisor's problem-detection and resolution skills. The program incorporates multimedia features that allow you to observe live situations, and view various documents such as account statements, portfolios and industry forms, in order to solve the problems presented in the exercise. Specific preparation for the S201 is not necessary and there is no content outline for this program.

If you fail to satisfy a Regulatory Element requirement within 120 days beginning with your anniversary date, your securities registration(s) becomes inactive until the requirement is satisfied. If your registration is inactive you will not be permitted to perform, or be compensated for, any activities that require a securities registration. If your registration remains inactive for two years it will be administratively terminated and you will be required to requalify for your registration by examination.

Firm Element continuing education has a different but complementary focus to the Regulatory Element training. Every year, your firm will evaluate and prioritize its training needs and prepare a written training plan designed to enhance your securities knowledge, skill, and professionalism. The training programs in your firm's Firm Element plan will generally cover the general investment features and associated risk factors, suitability and sales practice considerations, and applicable regulatory requirements of the securities products, services, and strategies you offer to the public.

Failure on your part to participate in the training programs stipulated by your firm will result in sanctions imposed on you by your firm, including possible termination.

**For more information on the Securities Industry Continuing Education Program, please view the information on www.securitiescep.com or contact:**

FINRA
Continuing Education
9509 Key West Avenue
Rockville, MD 20850
Phone: (301) 590-6500

## Obligations to Your Customers

The foundation of the securities industry is fair dealing with customers. Whether your work is with individuals, institutions, or business entities, your obligation in this profession is to serve your customers with honesty and integrity by putting their interests first and foremost.

The first step in serving your customers properly is to obtain a clear understanding of each customer's financial condition. You will obtain some of this information when opening a new customer's account with your firm. You may learn other information through conversations with your customer or checks your firm makes with credit agencies or other financial institutions. Because a customer's financial status is constantly changing, account records should be updated whenever necessary.

The second step in serving customers properly is for both you and the customer to have a clear understanding of the customer's investment objectives. As a professional, you will be trained to recognize the risks of various types of investments and to discuss with the customer which strategies are most suitable. Once you determine these objectives and record them in your customer's account records, you must make certain that specific recommendations for that customer fall within these objectives and would, therefore, be suitable. Just as your customer's financial position may change, your customer's investment objectives may change as well. You should, therefore, review your customer's investment objectives periodically, and make a written record of any changes as they occur.

## Securities Transactions

During your training period, you will learn about the "settlement" of securities transactions, when the seller delivers the securities sold and the buyer pays for the securities purchased. Depending on the security traded, settlement is usually three business days but may be the same day, the next day, or some other time period. It is important that you know Regulation T, margin, and the "prompt receipt and delivery" rules for the securities you sell and that you inform your customer of the consequences if timely settlement does not occur. To avoid misunderstandings later, it is advisable to do this prior to entering any order.

Orders for securities transactions are contracts. Unlike many business contracts, which are usually written, most securities orders are given orally. In your training, you will learn the terms used in the securities industry to describe how to place an order and, thereafter, settle it. Until you feel comfortable that your customer understands this process, take a few moments with each customer order to explain the mechanics of the transaction and the market conditions that may delay or prohibit its execution.

You must discuss each order with your customer prior to entering it, unless the customer has given written discretionary authority to you, which has been approved by your firm. An oral grant of discretionary authority is not sufficient and acting on such authority violates FINRA rules. Discretionary orders, you will learn, require more frequent supervisory review. You are strongly advised to first discuss the solicitation and opening of discretionary accounts with your supervisor before engaging in such activity.

## Fees Charged for Services

Federal and state securities laws, SEC rules, and FINRA regulations affect the fees charged for all transactions including, for example, placing new securities issues, secondary market offerings, and transactions involving mutual funds and variable contracts. You should always question situations in which you are asked to market securities with extraordinarily high markups, sales charges, or payouts. Remember, if your customer is to benefit, the investment's performance must first overcome the initial charges. When in doubt, ask your supervisor, consult the rule manuals, or call FINRA—you could be in violation of the FINRA pricing rules and become subject to significant disciplinary sanctions.

During your training, you will learn that FINRA and other regulators have rules regarding how much you can charge a customer for services. Generally, charges must be reasonable and not unfairly discriminatory among customers. For transactions in The Nasdaq Stock Market, exchange-listed securities traded in the over-the-counter market, and other OTC equity securities, markups (the amount charged above the market value) on principal transactions may take into account the type of security involved; its availability in the marketplace; its price; the size of the order; disclosure prior to effecting the transaction; the type of business in which your firm specializes; and the general pattern of markups at your firm. Rarely is a markup on equity securities above 5 percent considered fair or reasonable. Indeed, depending on the circumstances and the type of security involved, markups at or even below 5 percent may be considered unfair or unreasonable.

The 5 percent policy applies equally to agency transactions in that the amount of commissions charged for such transactions must meet the same "fair and reasonable" standard. Commissions approaching or exceeding 5 percent are subject to close regulatory scrutiny and must be justified, taking into account all relevant circumstances.

## FINRA BrokerCheck

The overwhelming majority of securities professionals conduct a fair and honest business. However, as with all professions, some organizations and individuals at times may not. FINRA is committed to providing investors with an opportunity to make informed decisions in today's complex investment landscape. Toward that end, FINRA provides FINRA BrokerCheck for investors to gain convenient access to information about securities firms and their associated personnel.

Created by NASD in 1987, the PDP allows investors (and others) to learn about the professional background, business practices, and conduct of FINRA member firms or their brokers. Investors may request disclosable information under the PDP by calling (800) 289-9999-a toll-free hotline operated by FINRA – or by visiting the FINRA BrokerCheck Web site.

Through the hotline or Internet site, investors can request a public report of background information that is disclosable under the PDP. This information is provided by brokers, firms, and regulators as part of the securities industry's registration and licensing process. Today there are over a half-million persons actively registered. Approximately 90 percent of these securities professionals have no reportable incidents.

PDP reports contain information required to be reported under securities industry rules, which generally include:

- Final disciplinary actions (relating to securities or commodities businesses) that have been taken by FINRA and other SROs, or by federal, state, and foreign securities agencies.
- Civil judgments and arbitration decisions in securities and commodities disputes involving public customers.
- Certain criminal convictions, information, and indictments.
- Settlements of $10,000 or more of customer complaints, arbitration claims, or civil suits involving securities or commodities transactions and allegations of sales practice.
- violations.
- Employment terminations after allegations were made involving violations of investment-related statutes or rules, fraud, theft, or failure to supervise investment-related activities.
- Bankruptcies filed within the last 10 years and outstanding judgments and liens.
- Bonding company denials of coverage, payout, or revocation.
- Any suspension or revocation to act as an attorney, accountant, or federal contractor.
- Pending disciplinary actions taken by industry regulators that relate to securities or commodities business.
- Pending arbitrations and civil proceedings involving securities or commodities transactions.
- Pending complaints alleging sales practice violations and compensatory damages of $5,000 or more.
- Open examinations that are deemed formal investigations involving regulatory or criminal matters.

When evaluating the information in the PDP report, it is important to remember that a number of items involve pending actions or allegations that may be contested and have not been resolved or proven. The items may, in the end, be withdrawn or dismissed, resolved in favor of the registered person, or

concluded though a negotiated settlement with no admission or conclusion of wrongdoing.

## Other Regulated Areas

Advertising, sales literature, business cards, e-mail, communications with the public (such as seminar announcements), and most print and electronic correspondence in the securities industry are subject to regulatory review and approval. Some items may require scrutiny by your compliance officer or even advance filing with FINRA. Other items require formal recordkeeping. Always have your supervisor approve any written material you prepare or wish to use before delivering it to your customer or prospect.

Never use the Internet or other electronic means to solicit or conduct any securities-related activities unless your member firm grants its prior approval to do so.

Microcap fraud has been an area of increased regulatory, enforcement, and rulemaking efforts. The issuers of microcap securities are generally thinly capitalized, and there may be little information available about these issuers' financial results and business operations. These securities are not listed on a registered exchange or The Nasdaq Stock Market. They trade on the OTC Bulletin Board,® in the "Pink Sheets" published by The National Quotation Bureau, and in other over-the-counter quotation media where there are no qualitative or quantitative listing standards. As in all recommended transactions, prior to recommending a purchase of these securities, ensure that you have adequate information about the issuer to form a reasonable basis for your recommendation and ensure that the recommended purchase is suitable for your customer. Proposed rules, if adopted, will require the review of specific information prior to such recommendations.

"Penny stock" fraud in also an area of regulatory focus, and there are a number of very specific federal laws and regulations that are applicable. Transactions in certain "designated" low-priced securities may require special account documentation, customer disclosure, and suitability review. Stocks not listed on The Nasdaq Stock Market or a national securities exchange and selling for less than $5 per share may fall into this category.

Before recommending microcap or penny stock securities to customers, ask your supervisor whether specific sales practice requirements apply.

## Sample Practices That Violate Regulations

FINRA rules require you to observe high standards of commercial honor and just and equitable principles of trade. The FINRA rules also prohibit any manipulative, deceptive, or fraudulent actions (NASD Rules 2110 and 2120).

The following are examples of specific practices with which new representatives should be familiar since they constitute serious violations of industry regulations. These practices may harm the customer; another member firm; the integrity of the marketplace; the issuer of the securities; or the public in general; and, they could end your career in the securities business. In your training, you should learn more about these and other situations and how to avoid them.

1. Rumors, knowingly false and misleading statements, incomplete information—Recommendations, analyses, and statements to customers must have a reasonable basis in fact. Withholding material information from a customer could be considered fraud. If you tell your customer to buy or sell a security based on a "hot tip," you may have committed securities fraud. If the "hot tip" is not real, or is not "hot," you have misled your customer. If it is a "hot tip," you may be violating insider-trading rules (see below). Either way, you can be subject to civil liability, disciplinary action, and even criminal charges.

2. The SEC, FINRA, and the exchanges have developed a series of trade practice rules to ensure that traders and market makers execute orders at the best prices and exercise market discretion in the interest of their customers.

   These include:

o Insider Trading (SEC Rule 10b-5)—It is illegal to use or pass on to others material, nonpublic information or enter into transactions while in possession of such information.

o Backing away (NASD IM-3320)—A market maker in a given security is obliged to honor the quoted bid and ask prices for a minimum quantity.

o Trading ahead of customer limit orders (NASD IM-2110-2)—FINRA members acting as market makers are prohibited from trading ahead of customer limit orders and must ensure that such orders are executed at the most favorable price possible under prevailing market conditions.

o Front-running (NASD IM-2110-3)—A broker/dealer is prohibited from buying or selling a security or an option on a security while in possession of material, non-public information concerning an imminent block transaction in the security or option on the security.

o Trading ahead of research reports (NASD IM-2110-4)—FINRA member firms are prohibited from trading activity that changes the firm's position in a Nasdaq® or exchange-listed security traded in the third market, or in any derivative security based on or related to the underlying security, in anticipation of the issuance of a research report in that security.

o Anti-Intimidation/Coordination (NASD IM-2110-5)—A FINRA member firm may not coordinate its prices (including quotations), trades, or trade reports with any other member; direct or request another member to alter a price (including a quotation); or engage, directly or indirectly, in any conduct that threatens, harasses, coerces, intimidates, or otherwise attempts improperly to influence another member. This includes any attempt to influence another member to adjust or maintain a price or quotation and refusals to trade or other conduct that retaliates against or discourages the competitive activities of another market maker or market participan

4. Commingling—You are not permitted to place customers' checks or money intended for transactions involving securities into your own bank account or your insurance business account, regardless of the amount of money or the length of time involved. Mishandling customer funds, such as money intended for insurance products, is a serious violation of FINRA rules and could result in prosecution by state or federal criminal agencies.

5. Churning (NASD IM-2310-2)—Frequent trading, or trading that is not consistent with the financial goals and risk tolerance of your customer, in a discretionary account (or an account over which you exercise de facto discretion) is an abuse of your control over the customer's account. You can be found liable to your customer for damages and may be disciplined by FINRA.

6. Suitability (NASD Rule 2310)—You must have reasonable grounds for believing each recommendation to a customer is suitable on the basis of the customer's other securities holdings and financial situation, among other factors.

7. Free-riding and withholding (NASD Rule 2110-1)—New issues of securities that immediately begin trading at a higher price than originally offered must be distributed to the public. They may not be placed in your account under any circumstances, and only under strict guidelines may they be placed in the accounts of financial services industry personnel or their immediate families.

8. Selling away (NASD Rule 3040)—Selling securities without processing the order through your firm and without your firm's permission or knowledge is a violation of FINRA rules. Even products that you may not consider to be securities, such as leasing arrangements or promissory notes, may be securities under federal or state law. Check with your firm before engaging in any securities transactions for any purpose.

9. Sharing in accounts—The sharing of profits or losses in an account with a customer is generally prohibited. Before contemplating entering into such an arrangement, you should read and become familiar with the appropriate provisions of NASD Rule 2330.

10. Conflicts of interest—Avoid even the appearance of conflict, let alone any actual conflict of interest, in transactions with your customers. For instance, if you own shares of a thinly traded

stock in your personal account, one has to question your true motivation in recommending large purchases of those shares to your customers when such a recommendation is likely to drive up the price of that stock.

11. Switching and break-point sales for mutual funds (NASD Rule 2830)—Mutual funds are typically long-term investments. Switching your customer among funds with similar investment objectives is usually a violation if it has no legitimate investment purpose and may needlessly impose another commission charge and increased tax liability on the customer. Recommending to a customer a mutual fund purchase for a quantity just beneath the point where the customer could save commission charges significantly by purchasing a few more shares may mean a bigger payment for you, but is not normally in the customer's best interests and is usually a violation.

12. Unauthorized trades—No matter how noble your intentions may be, never enter an order without the expressed and detailed permission of the customer unless you and your firm have been granted written discretionary authority by the customer.

13. Parking securities and maintaining fictitious accounts—Holding or hiding securities in someone else's or a fictitious account is misleading and strictly prohibited.

14. Failure to cooperate—If the FINRA staff asks you to provide information or testify in person, you must cooperate. Failure to cooperate or respond in a full, complete, and honest manner to any such request will normally result in a fine and a suspension or bar from the industry. In addition, under FINRA regulations, you must keep FINRA informed of your home address so that you may be reached in the event of a staff investigation; failure to do so may deny you the ability to provide input to the staff and have an impact on your registration status with FINRA.

15. Cheating on exams (NASD Rule 1080)—This rule prohibits an applicant from receiving assistance while taking a qualification examination. In instances where cheating or possession of unauthorized materials is demonstrated, the registered person or applicant found guilty of such behavior is normally barred from the securities industry.

All of FINRA's rules are listed on the NASD Manual.


## Overseers of the Securities Industry

**The Congress of the United States of America**
Over the decades, Congress has enacted and periodically revised several major laws that structure the U.S. securities markets. These statutes define which financial instruments are considered securities, how these securities are registered for initial placement as new issues, and how markets such as The Nasdaq Stock Market may operate. The statutes also provide for SROs such as FINRA. Congress oversees the SEC which, in turn, performs a similar function for all of the country's SROs, including FINRA.

**Securities and Exchange Commission**
The SEC is the federal agency charged with administering federal securities laws and providing federal oversight of the securities industry. The SEC enacts rules to implement the provisions of the federal securities laws. It also oversees the adoption of rules and the administration of discipline by SROs such as FINRA.

**Self-Regulatory Organizations**
FINRA, the MSRB, and the stock exchanges are referred to as SROs because of their statutory mandate to regulate this nation's securities markets, brokerage firms, and their personnel. FINRA and the exchanges have regulatory and enforcement powers to help monitor and maintain compliance with rules of fair practice for the industry and promote high standards of business conduct for the benefit of investors, member firms, and issuers of securities. The MSRB is an SRO with rulemaking authority for banks and securities firms engaged in municipal securities activities, but has no inspection or enforcement authority. Instead, FINRA is charged with inspection responsibility and enforcement of the MSRB's rules for its members. The qualification tests you will take to become registered are all administered by FINRA and were created by one or several of these SROs.

**State Legislatures and Commissions**
All states have "blue sky" laws regulating securities activities in their respective states. Generally, both you and your firm must be registered in each state in which you do business with customers. The rules

of these jurisdictions are well-developed and often lengthy. Before you accept an order from a customer, you must check with your supervisor to be sure that both you and your firm are properly registered to do business in that state. Similarly, states have registration and exemption requirements concerning the securities offered to their residents. When in doubt about a particular security, ask your supervisor before executing a transaction.

## NASD Investigations

Examiner staff are located in 15 <u>District Offices</u> and in the Executive Office in Washington, DC. Their primary responsibilities include monitoring the activities of FINRA members and their associated persons for compliance with FINRA, federal, MSRB, and other SRO rules and regulations.

When FINRA staff investigate allegations of wrongdoing (routine examinations of member firms, reports of an associated person's termination from a member firm, customer complaints, and/or any other indications of rule violations) they normally and routinely contact the member firm, registered representative, customers, and other involved parties to obtain information about the events being investigated. Should you be contacted by FINRA staff as the result of an examination or investigation, you must cooperate fully and answer all written and oral inquiries clearly and truthfully. This requirement continues for up to two years after you leave the securities industry, during which time FINRA retains regulatory and enforcement jurisdiction over you. However, the running of the two-year period can begin anew in the event an amendment is filed within two years of your original notice of termination, disclosing certain reportable misconduct. Your firm should be apprised of any FINRA investigation in which you may be involved. You will, in most cases, have to update and amend your Form U-4 with your firm as a result of a FINRA investigation or customer complaint, among other factors.

At the conclusion of a FINRA staff investigation, a report is prepared, and apparent violations of rules and regulations are considered for possible disciplinary action. If a formal disciplinary action is initiated, the firm and individuals named as respondents will receive a written statement of all charges and will be entitled to a hearing before a three-person panel consisting of two industry peers and chaired by a Hearing Officer who is an attorney employed by FINRA. Respondents have the right to be represented by counsel and to present witnesses and evidence in their defense. If violations are deemed to have been committed, penalties may include substantial monetary fines; suspension of an individual's registration for days, weeks, months, or years; or even a permanent bar from holding any job in the industry.

The media and the membership are also notified if a fine greater than $10,000 or a suspension or bar is imposed. The Board of Governors has published and made available to all member firms a listing of sanction guidelines that sets forth the typical sanctions that may be expected for various rule violations. You are strongly encouraged to obtain the sanction guidelines from your employer and become familiar with these as a means of better understanding the importance of maintaining compliance with FINRA rules and regulations.

FINRA informs state or federal authorities if it uncovers suspected egregious violations by member firms and their associated persons. Federal and state regulatory authorities likewise have the power to discipline firms and registered representatives and may bring civil or criminal proceedings for violations of their laws and rules.

## NASD Ombudsman

The FINRA Office of the Ombudsman provides a forum for member firms and their associated persons, public investors, and FINRA staff members to voice their concerns of unfair practices or disparate treatment. The objective of the Ombudsman's Office as an independent, neutral, and confidential source of assistance, is to receive and address concerns and complaints from any source concerning the operations, enforcement, or other activities of FINRA or any of its staff members. Where established procedures exist currently regarding the application of rules, policies, procedures, or interpretations, the Ombudsman will direct the matter to the appropriate office, department, or company. The function of the Ombudsman's Office is not intended to be an appeals forum for unpopular decisions made in other forums, or an arbitrary alternative to a program that already exists.

The Ombudsman will always attempt to assist you in identifying the appropriate method of resolving your problem or complaint, even if the Office does not become directly involved in the matter.

The Ombudsman's Office was created in response to a recommendation from the FINRA Select Committee on Structure and Governance and ratified by the FINRA Board of Governors Audit Committee, as an alternative channel of communication—complementing, but not replacing, FINRA's comprehensive program of formal resolution channels that include adjudication and dispute resolution. It has unrestricted access to all company functions, records, and personnel. The Ombudsman Office does not have direct authority over FINRA personnel or the departments it reviews.

The Office of the Ombudsman is a department staffed with several Ombudsmen, men and women who are trained and have experience in handling a variety of matters. The Ombudsman, as a designated neutral party, has the responsibility of maintaining strict confidentiality concerning matters that are brought to his/her attention unless given explicit permission to do otherwise. The only exception, at the sole discretion of the Ombudsman, is where a threat of serious physical harm to individuals appears imminent or a critical breach of security is probable. The Ombudsman will take all reasonable steps to protect any records or files pertaining to confidential discussion from inspection by all other persons, including management.

For more information, contact the FINRA Ombudsman's Office at:

FINRA Office of the Ombudsman
P.O. Box 9492
Gaithersburg, Maryland 20898-9492
Phone: (240) 386-6270
Toll-Free Number: (888) 700-0028
Email: FINRA Office of the Ombudsman

## Dispute Resolution

FINRA Dispute Resolution operates the largest arbitration and mediation forum in the securities industry. FINRA Dispute Resolution resolves disputes in a fair, expeditious, and cost-effective manner between customers and securities firms and their associated persons and between associated persons and securities firms.

In arbitration, impartial persons who are knowledgeable in the areas in controversy decide disputes between two or more parties. At the hearing, each party gets a full and fair opportunity to present its position through documentary evidence and testimony. Thereafter, the arbitrators render a final and binding decision subject only to review by a court on a very limited basis. For most disputes with an amount in controversy less than $25,000, an arbitrator decides the case based upon the parties' written submissions.

Although filing, processing, and hearing fees are required, arbitration is typically less expensive and less time-consuming than court proceedings.

FINRA rules require that all brokers and brokerage firms submit to arbitration to resolve investment-related disputes with their customers. Mediation, however, is a voluntary process in which the mediator, an impartial person trained in facilitation and negotiation techniques, helps the parties reach a mutually acceptable resolution. In mediation, as distinguished from arbitration, the mediator does not impose a solution, but rather, works with the parties to create their own solution.

Mediation is an informal, flexible process that is generally less expensive than arbitration. Mediation proceeds expeditiously and approximately 80 percent of the cases in the FINRA Mediation Program result in settlement. However, in the unlikely event that a settlement is not reached, the parties may still arbitrate their dispute.

Arbitrations at FINRA are conducted in accordance with the Code of Arbitration Procedure as developed by the Securities Industry Conference on Arbitration. Mediations are conducted in accordance with the rules developed by the FINRA Arbitration and Mediation Committee. The SEC has oversight authority over both processes.

Arbitration and mediation are separate from the functions performed by the District Offices, which include surveillance and enforcement functions that may result in the assessment of sanctions or other disciplinary measures against member firms or their associated persons.

## Conclusion

You are beginning a potentially rewarding career, both personally and professionally, in a high-profile service industry. The key to your long-term success is integrity and service.

You have a legal and moral obligation to place the interests of your customers above all else, particularly your own financial interests. You hold the investor's confidence in your hands. Do not engage in acts or practices that could destroy that confidence not only in you but also in your firm and the U.S. securities markets.

Remember: You are not alone. Your firm, its supervisory and compliance staff, its management, and your FINRA District Office staff are always available to help you. Best wishes in your new profession.

©2008 FINRA. All rights reserved. | Legal Notices and Privacy Policy.
FINRA is a trademark of the Financial Industry Regulatory Authority, Inc.

# Exhibit C

## IN THE UNITED STATES DISTRICT COURT
### FOR THE MIDDLE DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **AXA DISTRIBUTORS,** | ) |
| **LLC and AXA ADVISORS, LLC.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )   **CIVIL ACTION NO.: 1:08cv188** |
| | ) |
| **GAYLE S. BULLARD, et al.,** | ) |
| | ) |
| **Defendants.** | ) |

**STATE OF GEORGIA** )
)
**COUNTY OF** Forsyth )

### AFFIDAVIT OF TIMOTHY H. MCCABE

Comes now Timothy H. McCabe, who, upon being duly sworn, does depose and say as follows:

1.    My name is Timothy H. McCabe. I am competent to make this affidavit, and I have personal knowledge of the facts stated below.

2.    I am currently a Southeast Regional Vice President for KBS Capital Markets Group LLC ("KBS"). I was employed as a wholesaler for AXA Distributors LLC ("AXA Distributors") from October 1997 to February 2000. In my role as a wholesaler for AXA Distributors, my territory was based in the Southeast and included the entire State of Alabama. I served as a wholesaler of various products issued by AXA Equitable Life Insurance Company ('AXA Equitable") to numerous brokerage firms and serviced multiple individual offices of those brokerage firms, including the Raymond James Financial Advisors, Inc. ("Raymond James") offices in which Ann Holman and Maxine Chappell were registered representatives.

3.     I have reviewed the Affidavits submitted by Ann Holman and Maxine Chappell in this case which generally allege that AXA Distributors made misrepresentations to them that the AXA Accumulator variable annuity provided a guarantee of principal, return, account value and a lump sum certain at maturity and that AXA Distributors controlled the manner in which they sold AXA Equitable annuities.  Based on my personal experience as a wholesaler marketing and servicing AXA Accumulator annuities to Raymond James, I can say unequivocally that for the time period I was involved for AXA Distributors, these allegations are false.

4.     In my role as a wholesaler, I provided brokerage firms with product information and conducted educational programs related to various AXA Equitable products, including the AXA Accumulator variable annuity.  I also provided post-sale support to brokerage firms in connection with the sales of AXA Equitable products by the brokerage firms' registered representatives.  I never engaged in the sale of any AXA Equitable product to any retail customer.   Instead, all sales of AXA Equitable products were made by the registered representatives of other brokerage firms such as Ms. Holman and Ms. Chappell.

5.     During my tenure with AXA Distributors, neither I nor AXA Distributors played any role in controlling the manner in which AXA Equitable products were sold to retail clients.  I never made an investment recommendation to any retail client of Ms. Chappell or Ms. Holman.  I did not assist Ms. Chappell or Ms. Holman in deciding whether any specific investment was appropriate for any specific retail client, nor did I evaluate whether any investment was suitable for any particular client.  While I met certain clients or prospective clients of Ann Holman or Maxine Chappell on one occasion when I was asked to be a part of a seminar about a variety of products where other non-AXA Equitable products were also part of

the seminar, and on one occasion to answer questions as part of sales support for Ann Holman, I did not sell annuities or ever take an application from a prospective client. In addition, I did not play any role in deciding which features of the AXA Accumulator were appropriate for any individual retail client. Nor did I assist any retail client in determining which annuity mutual fund subaccount asset allocation or reallocation was appropriate for their Accumulator. In addition, AXA Distributors did not supervise Ms. Holman or Ms. Chappell, nor did I understand it to have the duty or ability to instruct them regarding their recommendations for, or representations to their retail clients.

6.      During every educational program that I attended and every conversation that I participated in or witnessed, at no time was any representation made to Ms. Holman or Ms. Chappell that the AXA Accumulator provided a guarantee of principal, return, account value or other guarantee of a certain lump sum at maturity. Nor was any representation made that the Accumulator was "as safe as a CD." In addition, AXA Distributors provided both Ms. Holman and Ms. Chappell with Accumulator annuity prospectuses, sales literature, marketing materials, applications and contracts on numerous occasions. Each of these documents clearly and accurately disclosed that the annuities did not provide a guarantee of principal, return, account value or other lump sum certain. To the best of my knowledge, all of the AXA Accumulator materials I provided to Ms. Holman and Ms. Chappell by AXA Distributors were accurate and consistent with all of the oral representations made to Ms. Holman and Ms. Chappell regarding the nature and features of the AXA Accumulator. For example, attached as Exhibit 1 is an Accumulator sales brochure that AXA Distributors provided to Ann Holman and Maxine Chappell on multiple occasions, which clearly indicated that a principal investment in the Accumulator was subject to a loss in value and was not guaranteed. The brochure also clearly

stated that the annuity's guaranteed living benefit did not guarantee the annuity's account value or cash value. In addition, attached as Exhibit 2 is an annuity brochure which I routinely used in wholesaling the product. This brochure states that the annuity's living benefit compounds annuity contributions at 5% to determine a benefit base only. It further states that the benefit base is not a cash value or account value and is only available to the client through annuitization of the contract.

      7.    During the time period that I dealt with Ms. Holman and Ms. Chappell as a wholesaler for AXA Distributors, neither of them indicated to me that they believed that the Accumulator provided a guarantee of principal, return, account value or lump sum certain at the end of the annuity term. Rather, as Raymond James brokers who sold numerous Accumulator policies, my belief was that they understood the product, and more specifically, that the annuity's guaranteed living benefit did not create a guarantee of principal, return, account value, or any lump sum certain at the end of the annuity term.

      FURTHER AFFIANT SAITH NOT.

      Executed on this the _7th_ day of August, 2008.

                                          Timothy H. McCabe

Sworn to before me this the _7th_ day of August, 2008.

_Faye Hixon_
Notary Public
My commission expires: _6-24-09_

# Exhibit 1


EQUITABLE

**New!**
EQ/Alliance
Technology
Portfolio
Inside

a c c u m u l a o

A variable annuity with the innovative baseBUILDER® guarantee

that helps protect your future and your family

... our products as a beauty group is designed to meet client needs and changing life situations. For more than a century, high quality insurance and annuity products have been the hallmark of Equitable. Innovative from the start, we have continued to meet the changing needs of the marketplace. In 1976, we pioneered variable life insurance. Equitable is among the nation's leading providers of life and annuity products. We are a respected leader in the financial industry.

■ Not FDIC Insured       ■ Not Bank Guaranteed       ■ May Lose Value



# t h e   a c c u m u l a t o r<sup>SM</sup>

The Equitable Accumulator is a variable annuity designed for people who've targeted a portion of their assets for long-term growth potential. People who seek to beat inflation, curb taxes and help reduce risk.

Whether part of your personal savings program or part of your formal retirement plan, the Accumulator can be an excellent way to seek growth and help build wealth. It combines three major advantages for wealth accumulation:

- **Professional investment management**

- **Tax advantages***

- **baseBUILDER® guaranteed protection**

With all these advantages, the Accumulator can help you *build, enhance* and—most important—*protect* your financial future.

▶

The Accumulator offers the innovative **baseBUILDER** guarantee—extended protection that can provide security over your lifetime (see inside for details).

This guarantee is backed by the claims-paying ability of Equitable.

* If you are buying the Accumulator to fund a retirement plan that already provides tax-deferral under sections of the Internal Revenue Code (such as IRA, QP and Rollover TSA) you should do so for the Accumulator's features and benefits other than tax deferral. In such situations, tax-deferral of the Accumulator is not an additional benefit. References throughout this brochure to tax advantages, such as tax-deferral and tax-free transfers, are subject to this consideration.

# build
## your assets

### with leading investment managers

When it comes to long-term investing, the engine that drives your dollars' growth potential is the team of skilled professionals who manage your investment funds. That's why Equitable has selected the Accumulator's investment managers from among the industry's most experienced and highly regarded money management firms. While past performance is no guarantee of future results, all have excellent credentials in the key facets of the investment management business, including research capabilities, organizational stability, risk management and long-term track record.

**A Wide Selection of Funds and Guaranteed Accounts**

Our talented line-up manages twenty-two different funds for Accumulator investors, giving you an array of choices: a range of objectives, styles and strategies; actively managed and index funds; domestic and international.* You can select whatever combination best reflects your approach to long-term investing and makes you feel the most comfortable.

To add even more flexibility, we've included "guaranteed period" accounts with 10 different maturities, ranging from approximately one to 10 years.** Each account offers a guaranteed interest rate—you know exactly what its value will grow to at maturity.

**Special Features for Building Assets**

Accumulator offers a number of valuable features to help you build your investment dollars.

- No front-end sales charge***
- No IRS investment limits†
- Dollar-cost averaging
- Free transfers among funds
- Quarterly performance reports



For more information about these features, see the final page of this brochure.









**MORGAN STANLEY ASSET MANAGEMENT INC.**

**JPMorgan**

**PUTNAM** INVESTMENTS



**Plus...10 Guaranteed Period Accounts***

- Guaranteed interest rates when held to maturity
- 10 different maturities, ranging from approximately 1 to 10 years

---

\*    Investments in foreign securities may mean potentially greater rewards, but may also involve greater risk.

\*\*   Guaranteed period accounts are not available in Maryland. Each guaranteed period account matures on February 15th. Withdrawals or transfers from your guaranteed period accounts prior to their maturity dates will result in market value adjustments, which may increase or decrease the value of your guaranteed period accounts. Guarantees are based on the claims-paying ability of Equitable.(See the prospectus for details.)

\*\*\* There are withdrawal charges, which apply to the extent that withdrawals exceed 15% of your annuity account value. There is never a withdrawal charge on a contribution after its 7th contract year or for annuitants age 86 or older at contract issuance. The declining withdrawal charge for annuitant issue ages 84 and 85 differs for contracts issued in PA. (See the prospectus for details.)

†    Non-qualified or rollovers/transfers from qualified plans.

# enhance
## your assets

## through powerful tax advantages

When you make investments that aren't part of a tax-qualified retirement plan, taxes can nip at your return every step of the way. They get you when you earn a dividend or realize a capital gain—even when you reinvest it. Taxes can take a sizable bite when you switch from one fund to another. All those taxes are more than a mere annoyance—they can *slow down* investment growth.

That's the beauty of the Accumulator. It features tax advantages.

**It Pays to Put Off Paying Taxes**
With the Accumulator, you pay *no* current income taxes on any earnings until you withdraw your money. That's called "tax deferral." It means that 100% of your earnings can stay invested in the Accumulator investment funds and work toward additional growth.

It's easy to see that tax deferral can help your investment grow faster. What may be surprising is *how much faster*. (See "The Big Difference" on the next page.)

**Special Features for Enhancing Assets**
Accumulator offers features to help you enhance your investment dollars.

- No current taxes on transfers
- Free withdrawals*

For more information about these features, see the final page of this brochure.





## The Big Difference

Suppose you placed $50,000 in an investment that was taxable at 36%, and the same amount in a tax-deferred investment. Also, let's say both investments earn an 8%** return each year. After 25 years, the taxable investment would grow to $174,222. Meanwhile, the tax-deferred investment would grow to $342,424. That's a pre-withdrawal difference of $168,202.

**hypothetical example:**
# $50,000 earning
# 8% for 25 years**



**This hypothetical example is for illustrative purposes only. The 8% return is not intended to reflect the actual performance of any Accumulator contract or any other investment. Neither investment reflects any withdrawal charges, administration charges or investment management fees. The Accumulator imposes withdrawal charges on full or partial withdrawals during the first seven years a contribution is in the contract, which decline from 7% to 1% and cease thereafter. There is no withdrawal charge if the annuitant is age 86 or older at contract issuance. The declining withdrawal charge for annuitant issue ages 84 and 85 differs for contracts issued in PA. If selected, the baseBUILDER benefit imposes a 0.30% annual charge on the contributions compounded at 5% annually. Annual administration, mortality and expense risk and distribution charges of 0.25%, 1.10% and 0.20%, respectively, apply to assets in the investment funds. Investment management fees vary by investment fund. The fees and charges would reduce investment performance. The 36% tax rate is based on 2000 Federal income tax rates and may or may not reflect *your* actual tax rate. Any capital gains on a taxable investment would be taxed at a lower rate. This rate does *not* reflect any state income taxes to which you may be subject.

† If the Accumulator's annual administration charge and mortality and expense risk and distribution charges had been reflected, these figures would have been $238,568 and $170,683, respectively.

Even when you consider the taxes that must be paid at withdrawal, the tax-deferred investment can still provide a considerable advantage. Assuming a 36% tax rate on withdrawals (at retirement, many people are in a *lower* tax bracket), you'd still receive $237,151 after taxes are paid.* That's $62,929 more than the taxable investment. What's more, if you choose to annuitize, as opposed to taking a lump sum withdrawal, a portion of your income is deemed a non-taxable return of principal (assuming your variable annuity is not part of a tax-qualified plan).

* Withdrawals of taxable amounts are subject to income taxation at ordinary income rates and, in addition, may be subject to a 10% Federal income tax penalty if made before you reach age 59 1/2. Adjustments resulting from early withdrawals will reduce the guaranteed benefits. This adjustment can be greater or less than the actual amount withdrawn.

# protect

## your assets

## with an innovative guarantee

It's a known fact that the financial markets have generally rewarded investors who can ignore the ups and downs and stay invested for the long term. That's why the Accumulator offers the optional baseBUILDER® guarantee—an Equitable innovation that can help you feel more comfortable leaving your money invested for the long term without overreacting to short-term dips.

### The baseBUILDER Guarantee

The baseBUILDER is a combination of protection benefits guaranteed by Equitable. It is distinct because it can provide protection for your beneficiaries should you die (before you annuitize) as well as for *you* while you live. The baseBUILDER is available for an additional 0.30% charge assessed against contributions allocated to the investment funds compounded at 5% annually.*

### Protects Your Beneficiaries

The baseBUILDER provides a *guaranteed death benefit* for your beneficiaries should you die at a time when the markets are down.

### Protects Your *Future*

The baseBUILDER also provides a *guaranteed income benefit* that you can rely on if you need to start taking income at a time when the markets are down.**

### It's a "Minimum" Only

Although your account value depends on the markets, your baseBUILDER guarantee is certain and predictable from day-one regardless of how the markets behave. What's more, the baseBUILDER is a "minimum" only, a "safety net" you'll really need only if you die or need to start receiving income at a time when the markets are behaving badly. Of course, withdrawals made prior to accessing this feature are not guaranteed and are subject to market risks and you may incur a loss of principal.

# The baseBUILDER®

## A predictable "safety net" in down markets

- **Protects your beneficiaries if you die:** Your beneficiaries are guaranteed to receive *at least* a return of the amount of money you invested compounded at 5% annually (through age 80).* †

  If you prefer, when you purchase your Accumulator contract, you can choose a guaranteed minimum death benefit that has an "annual ratchet" (through age 80) rather than 5% annual growth. With the ratchet (not illustrated here), your beneficiaries are guaranteed to receive *at least* the highest annuity account value achieved on any contract anniversary prior to your death.

- **Protects you if you need to start taking income:** Regardless of how your investment funds have performed, on your tenth** or later contract anniversary you can convert your Accumulator into a single or joint life annuity payout option. Equitable calculates the baseBUILDER income benefit by compounding your contributions at 5% annually*** † (through age 80) and applying that amount to annuity purchase factors guaranteed when your Accumulator contract is issued.††

## Not needed in up markets

- **If you die:** Your beneficiaries would receive your full account value—either as a lump sum or lifetime payout annuity.

- **If you need to start taking income:** You could take your account value as a lump sum, annuitize it, or begin systematic withdrawals.††



Initial Investment

| 10 years | 15 years | 20 years |

Hypothetical Account Value
(For illustrative purposes only. Does not represent the performance of any Accumulator investment fund or any other investment.)

baseBUILDER 5% Benefit Base
(Not a cash value or account value.)

* The baseBUILDER option offers you a guaranteed income benefit combined with the contractual guaranteed death benefit. The guaranteed death benefit is also provided under your contract even if you do not elect baseBUILDER. In this case, the baseBUILDER benefit charge does not apply. The selection of baseBUILDER must be made when you purchase your Accumulator contract and cannot be changed later. The baseBUILDER guaranteed income benefit is subject to state availability. Other limitations apply. See the prospectus for details, including charges and fees.

** Date of initial availability may vary depending on your age at contract issuance. You can exercise the guaranteed income benefit on the tenth or later contract anniversary if you purchase your Accumulator contract between the ages of 50 and 75; (for issue ages 45 - 49, on any contract anniversary once annuitant reaches age 60; for issue ages 20 - 44, on the 15th or later contract anniversary). In no event later than annuitant age 85.

*** Contributions allocated to the Alliance Money Market Fund and the guaranteed period accounts are accumulated at 3% annually for this purpose.

† Early withdrawals will be subject to an adjustment which will reduce the guaranteed benefits. Withdrawals are deducted from the death benefit on a proportional basis which can increase or decrease the actual amount of the withdrawal.

†† If, at the time you need to start taking income, your account value would produce a higher income when applied to current annuity purchase factors, you would receive that higher amount. Income taxes are due on taxable amounts upon withdrawal and annuity income received prior to age 59 1/2 may be subject to a 10% Federal income tax penalty. Withdrawal charges apply on full or partial withdrawals during the first seven years a contribution is in contract, and decline from 7% to 1% and cease thereafter. There is no withdrawal charge if the annuitant is age 86 and older at contract issuance. The declining withdrawal charge for annuitant issue ages 84 and 85 differs for contracts issued in PA. (See the prospectus for details.)

# special features to help you build, enhance, protect...and *use* your accumulator dollars

### No IRS Investment Limits*
You can invest up to $1,500,000 in the Accumulator for your personal account.

### No Front-End Sales Charge
The Accumulator has no front-end charge. So 100% of your money goes to work immediately.**

### Dollar-Cost Averaging***
You can start off by putting your Accumulator dollars in our Dollar-Cost Averaging Account where it earns a guaranteed rate of interest and is automatically allocated into the investment funds of your choice. You can select a 6-month, 12-month or 18-month program.

### No Charges or Taxes on Transfers
The Accumulator gives you the flexibility to change your investment mix at any time with no fees—and without paying any current taxes.†

### Quarterly Performance Reports
You'll receive detailed updates on the performance of your Accumulator investment funds. These reports allow you to monitor your portfolio and make sure it's on target with the goals you've set with your financial representative.

### Free Withdrawals
During the first seven years after you make an investment, you may withdraw up to 15% of your annuity account value each year without a withdrawal charge.† After seven years, you can withdraw as much of the investment as you like free from any withdrawal charges.††

### Attractive Payout Alternatives†††
When your future arrives and you need income, the Accumulator has the payout plan to suit your lifestyle. (Depending on your age at contract issuance certain annuity payout options may not be available, see the prospectus for details.)
- Lump Sum
- Systematic Withdrawals
- Traditional Annuity Payouts
- Equitable *Income Manager*® Plans
- Substantially Equal Payments



---

\*   Traditional IRAs are subject to a $2,000 annual contribution limit. Applies to non-qualified money or rollovers/transfers from qualified plans only.
\*\*  There are withdrawal charges, which apply only to the extent that withdrawals exceed 15% of your annuity account value at the beginning of the year. The "free corridor" does not apply to a contract surrender. There is never a withdrawal charge on a contribution after its 7th contract year and there is no withdrawal charge if the annuitant is age 86 or older at contract issuance. The declining withdrawal charge for annuitant issue ages 85 and 85 differs for contracts issued in PA. Other charges also apply. (See the prospectus for details.)
\*\*\* Dollar Cost Averaging does not insure a profit or protect against loss. Investors should weigh their ability to sustain investments during periods of market downturns.
†   Withdrawals or transfers out of guaranteed period accounts prior to maturity will result in market value adjustments.
††  Withdrawals of taxable amounts are subject to income taxation at ordinary income rates and, in addition, may be subject to a 10% Federal income tax penalty if made before you reach age 59 1/2. Adjustments resulting from early withdrawals will reduce the guaranteed benefits.
††† Available if you have not exercised the baseBUILDER option. Withdrawal charges and other charges may apply. See the prospectus for details.

Variable annuities are long-term investment vehicles designed for retirement purposes.

This brochure must be preceded or accompanied by a current Equitable Accumulator prospectus, which contains detailed information about the Accumulator contract, including risks, charges and expenses. You should read this entire brochure and review the prospectus carefully before purchasing a contract.

Guarantees described in this brochure are based on the claims-paying ability of The Equitable Life Assurance Society of the United States. **Investment fund performance is not guaranteed.** The Accumulator certificate is subject to declining withdrawal charges and has limitations. For costs and complete details of coverage, call your financial advisor.

*Income Manager* and *baseBUILDER* are registered service marks and *Accumulator* is a service mark of The Equitable Life Assurance Society of the United States.

The Accumulator deferred variable annuity is issued by The Equitable Life Assurance Society of the United States (Equitable) and distributed by Equitable Distributors, Inc., New York, NY 10104. Equitable is a wholly owned subsidiary of AXA Financial, Inc. AXA, an insurance holding company, is AXA Financial, Inc.'s largest shareholder. Neither AXA nor AXA Financial, Inc. has any responsibility for the insurance obligations of Equitable. All guarantees are based on the claims-paying ability of Equitable. March 2000.

 EQUITABLE

The Equitable Life Assurance Society
of the United States
1290 Avenue of the Americas
New York, NY 10104

© Copyright 2000 The Equitable Life Assurance Society of the United States
All Rights Reserved
Contract Form #94IC, #95IM and state variations
Cat#: 127942 (Rev. 3/00)

ED

**Exhibit 2**

# EQUITABLE

# baseBUILDER® What it is and is not

**T**he baseBUILDER is a bear market protection feature that is guaranteed by Equitable and is available only in the Accumulator℠ variable annuity.

It provides protection in two ways:

**The Living Benefit**—This optional benefit can protect you by offering a level of minimum guaranteed income for life.

**The Death Benefit**—Protects your beneficiaries with a contractually guaranteed minimum lump-sum Death Benefit should you die. It is available at no extra charge even if you don't select baseBUILDER.

And, both of these guaranteed minimum benefits are definite and predicable right from day one.

## How It Works

Equitable calculates your baseBUILDER guaranteed benefits by compounding your contributions (less withdrawals) at 5% annually (through annuitant's age 80).* This amount is called your benefit base.

**Living Benefit**—Equitable applies your benefit base to guaranteed annuity purchase factors. This enables you (on the tenth** or later contract anniversary) to convert your Accumulator into an immediate annuity with a guaranteed lifetime income stream, regardless of how your investment funds have performed.

**Death Benefit**—If you should die before annuitizing your contract, your beneficiaries are entitled to receive *at least* your contributions (adjusted for withdrawals) plus the 5% compounded growth (through annuitant's age 80)*— once again, regardless of how your investment funds have performed.***

* If you allocate contributions to the Alliance Money Market Fund or to the guaranteed period accounts, they will accumulate at 3% annually. The benefit base will be adjusted for withdrawals. The Living Benefit and the guaranteed 5% compounded Death Benefit options are not available in New York.

**I**mportant facts to remember about the baseBUILDER Living Benefit:

**■** **Assuming the investment funds perform reasonably well, it would not be an optimal way to annuitize.** The baseBUILDER is a protection feature only. It is meant to serve as a bear market safety net. You would elect the baseBUILDER Living Benefit only if the following two conditions occurred together: 1) at a certain point in time, you absolutely needed to start receiving income; and 2) your account value applied to current annuity purchase factors would produce less income than the baseBUILDER Living Benefit.

**2** **It is an annuity payout option.** The baseBUILDER compounds your contributions at 5%* to determine a benefit base only. The benefit base is not a cash value or account value and is only available to you through annuitization.

**3** **It is not free.** There is an annual charge for adding the baseBUILDER Living Benefit and combining it with the guaranteed Death Benefit. This charge is 3-tenths of a percent (0.30%) of your contributions compounded at 5%.* There is no additional charge for selecting the Death Benefit alone.

**4** **It is optional.** If you do not feel that the protection offered by the Living Benefit is worth the expense in your situation, you can select the Death Benefit alone. This selection must be made at contract issuance and cannot be changed later.

** Applicable for annuitant issue ages 50/75.* For issue ages 45-49, you may exercise the Living Benefit option on any contract anniversary once annuitant reaches age 60; and for issue ages 20-44, on the 15th or later contract anniversary; in no event later than annuitant ages 85. Other limitations, including state availability, apply. See the prospectus for details.

*** If you prefer, you can choose a guaranteed Death Benefit that has an annual ratchet (through annuitant's age 80) rather than 5% annual growth. See the prospectus for details.



## The Death Benefit

Initial Contribution $100,000

5% Compounded Death Benefit

Hypothetical pattern of account value

Years    10    15

## Two Death Benefit Choices:(1)(2)

1. **Guaranteed 5% Compounded**—Your beneficiaries will receive the greater of the current account value or the value of your contributions compounded at 5% annually (through annuitant's age 80)[2]; or

2. **Annual Ratchet**—Beneficiaries will receive the greater of your total contributions less withdrawals, or the highest account value achieved on any contract anniversary (through annuitant's age 80).



## The Living Benefit[3]

Initial Contribution $100,000

Benefit Base

Living Benefit (Income Level) $10,425 $9,627

Hypothetical pattern of account value

■ Not available

Anniversary    10    15

- Access to a guaranteed level of future income—payable in the form of an Income Manager® life annuity with period certain—no matter how your investment funds perform.

- Living Benefit is calculated by compounding the value of your contributions at 5% annually through annuitant's age 80[2] and applying this amount to guaranteed annuity purchase factors.

- Available on the 10th or later contract anniversary date (certain restrictions, including ages, apply—see the prospectus for details).

- The baseBUILDER Living Benefit may help you feel more comfortable remaining invested in the markets, even in downturns.

**Investment performance is not guaranteed.**

[*]Not available in New York.

[1]Death Benefit choice must be selected at contract issuance and cannot be changed. For issue ages 80-90, guaranteed Death Benefit equals contributions less withdrawals.

[2]Death Benefit choice must be selected at contract issuance and cannot be changed. For issue ages 80-90, guaranteed period accounts accumulate at 3% annually. Withdrawals will reduce the benefit base.

[3]Contributions allocated to the Alliance Money Market Fund or guaranteed period accounts accumulate at 3% annually. Withdrawals will reduce the benefit base. The benefit base is subject to an annual charge of 0.30% (charged against the benefit base only). It must be selected at contract issuance and cannot be changed. The benefit base cannot be guaran-teed.The Living Benefit is optional for an annual charge. Allocations to the Alliance Money Market Fund or allocations on the benefit base accrue on is not a cash value or account value. This hypothetical illustration of the Living Benefit assumes no withdrawals, transfers, or allocations to the Alliance Money Market Fund or allocations on teed period accounts. Actual account value patterns differed in the past and will differ in the future. Illustration assumes issue age 60 (male). $100,000 contribution and exercise on contract date anniversaries shown using the Income Manager life with period certain payout annuity. Life only annuity payout option is also available.

This material must be preceded or accompanied by a current Accumulator prospectus that provides more complete information including all fees and charges. Please read the prospec-tus carefully before purchasing a contract. Variable annuities are long-term investment vehicles designed for retirement purposes. Taxes are due upon withdrawal and withdrawals made prior to age 59½ may be subject to a 10% federal income tax penalty. Early withdrawals will reduce the guaranteed benefits and cash surrender value. Annuities are issued by The Equitable Life Assurance Society of the United States (Equitable), New York, NY 10104 and distributed by Equitable Distributors, Inc. Accumulator is a service mark and baseBUILDER and Income Manager are... based on the claims paying ability of Equitable. Form #s: 941C, 951M and state variations.    March 2000. HD9855ML

98-1347A

# Exhibit D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **AXA DISTRIBUTORS,** | ) | |
| **LLC and AXA ADVISORS, LLC.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO.: 1:08cv188** |
| | ) | |
| **GAYLE S. BULLARD, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

| | |
|---|---|
| **STATE OF ILLINOIS** | ) |
| | ) |
| **COUNTY OF DUPAGE** | ) |

### AFFIDAVIT OF BRON URBANICK

Comes now Bron Urbanick, who, upon being duly sworn, does depose and say as follows:

1.    My name is Bron Urbanick. I am competent to make this affidavit, and I have personal knowledge of the facts stated below.

2.    I was employed as a wholesaler for AXA Distributors LLC ("AXA Distributors") from March 1998 to February 2008. In my role as a wholesaler for AXA Distributors, my territory included the entire State of Illinois. I served as a wholesaler of various products issued by AXA Equitable Life Insurance Company ('AXA Equitable") to numerous brokerage firms and serviced multiple individual offices of those brokerage firms, including the Howe, Barnes Hoefer & Arnett, Inc. ("Howe Barnes") office in which Christine Mallul was a registered representative.

6.      During my tenure with AXA Distributors, neither I nor AXA Distributors played any role in controlling the manner in which AXA Equitable products were sold to retail clients. I never made an investment recommendation to any retail client of Ms. Mallul. I did not assist Ms. Mallul in deciding whether any specific investment was appropriate for any specific retail client, nor did I evaluate whether any investment was suitable for any particular client. In addition, I did not play any role in deciding which features of the AXA Accumulator were appropriate for any individual retail client. Nor did I assist any retail client in determining which annuity mutual fund subaccount asset allocation or reallocation was appropriate for their Accumulator. In addition, AXA Distributors did not supervise Ms. Mallul, nor did I understand it to have the duty or ability to instruct her regarding her recommendations for, or representations to her retail clients.

7.      During every educational program that I attended and every conversation that I participated in or witnessed, at no time was any representation made to Ms. Mallul that the AXA Accumulator provided a guarantee of principal, return, account value or liquidity at the end of the annuity term. Nor was any representation made that the Accumulator was "as safe as a CD." In addition, AXA Distributors provided Ms. Mallul with Accumulator annuity prospectuses, sales literature, marketing materials, applications and contracts on numerous occasions. Each of these documents clearly and accurately disclosed that the annuities did not provide a guarantee of principal, return, account value or liquidity at the end of the annuity term. To the best of my knowledge, all of the AXA Accumulator materials provided to Ms. Mallul by AXA Distributors were accurate and consistent with all of the oral representations made to Ms. Mallul regarding the nature and features of the AXA Accumulator.

8.      During the time period that I dealt with Ms. Mallul as a wholesaler for AXA Distributors, she never indicated to me that she believed that the Accumulator provided a guarantee of principal, return, account value or liquidity at the end of the annuity term.  Rather, as a Howe Barnes broker who sold numerous Accumulator policies, my belief was that she understood the product and more specifically, that the annuity's guaranteed living benefit and guaranteed death benefit did not guarantee the annuity's principal, return, account value, or liquidity at the end of the annuity term.


FURTHER AFFIANT SAITH NOT.


Executed on this the _7th_ day of August, 2008.

_____
Bron Urbanick


Sworn to before me this the _7th_ day of August, 2008.

_____
Notary Public
My commission expires: 12/26/09

OFFICIAL SEAL
BERTHA MACIAS
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:12/26/09

# Exhibit E

**Location:** NASD > Manual > Rules of the Association > Conduct Rules (2000–3000) > 3000. Responsibilities Relating to Associated Persons, Employees, and Others' Employees > 3010. Supervision

## 3010. Supervision

### (a) Supervisory System

Each member shall establish and maintain a system to supervise the activities of each registered representative, registered principal, and other associated person that is reasonably designed to achieve compliance with applicable securities laws and regulations, and with applicable NASD Rules. Final responsibility for proper supervision shall rest with the member. A member's supervisory system shall provide, at a minimum, for the following:

(1) The establishment and maintenance of written procedures as required by paragraphs (b) and (c) of this Rule.

(2) The designation, where applicable, of an appropriately registered principal(s) with authority to carry out the supervisory responsibilities of the member for each type of business in which it engages for which registration as a broker/dealer is required.

(3) The designation as an office of supervisory jurisdiction (OSJ) of each location that meets the definition contained in paragraph (g) of this Rule. Each member shall also designate such other OSJs as it determines to be necessary in order to supervise its registered representatives, registered principals, and other associated persons in accordance with the standards set forth in this Rule, taking into consideration the following factors:

(A) whether registered persons at the location engage in retail sales or other activities involving regular contact with public customers;

(B) whether a substantial number of registered persons conduct securities activities at, or are otherwise supervised from, such location;

(C) whether the location is geographically distant from another OSJ of the firm;

(D) whether the member's registered persons are geographically dispersed; and

(E) whether the securities activities at such location are diverse and/or complex.

(4) The designation of one or more appropriately registered principals in each OSJ, including the main office, and one or more appropriately registered representatives or principals in each non-OSJ branch office with authority to carry out the supervisory responsibilities assigned to that office by the member.

(5) The assignment of each registered person to an appropriately registered representative(s) and/or principal(s) who shall be responsible for supervising that person's activities.

(6) Reasonable efforts to determine that all supervisory personnel are qualified by virtue of experience or training to carry out their assigned responsibilities.

(7) The participation of each registered representative and registered principal, either individually or collectively, no less than annually, in an interview or meeting conducted by persons designated by the member at which compliance matters relevant to the activities of the representative(s) and principal(s) are discussed. Such interview or meeting may occur in conjunction with the discussion of other matters and may be conducted at a central or regional location or at the representative's(') or principal's(') place of business.

### (b) Written Procedures

(1) Each member shall establish, maintain, and enforce written procedures to supervise the types of business in which it engages and to supervise the activities of registered representatives, registered principals, and other associated persons that are reasonably designed to achieve compliance with applicable securities laws and regulations, and with the applicable Rules of NASD.

(2) Tape recording of conversations

(A) Each member that either is notified by NASD or otherwise has actual knowledge that it meets one of the criteria in paragraph (b)(2)(H) relating to the employment history of its registered persons at a Disciplined Firm as defined in paragraph (b)(2)(J) shall establish, maintain, and enforce special written procedures for supervising the telemarketing activities of all of its registered persons.

(B) The member must establish and implement the supervisory procedures required by this paragraph within 60 days of receiving notice from NASD or obtaining actual knowledge that it is subject to the provisions of this paragraph.

A member that meets one of the criteria in paragraph (b)(2)(H) for the first time may reduce its staffing levels to fall below the threshold levels within 30 days after receiving notice from NASD pursuant to the provisions of paragraph (b)(2) (A) or obtaining actual knowledge that it is subject to the provisions of the paragraph, provided the firm promptly notifies

the Department of Member Regulation, NASD, in writing of its becoming subject to the Rule. Once the member has reduced its staffing levels to fall below the threshold levels, it shall not rehire a person terminated to accomplish the staff reduction for a period of 180 days. On or prior to reducing staffing levels pursuant to this paragraph, a member must provide the Department of Member Regulation, NASD with written notice, identifying the terminated person(s).

(C) The procedures required by this paragraph shall include tape-recording all telephone conversations between the member's registered persons and both existing and potential customers.

(D) The member shall establish reasonable procedures for reviewing the tape recordings made pursuant to the requirements of this paragraph to ensure compliance with applicable securities laws and regulations and applicable rules of NASD. The procedures must be appropriate for the member's business, size, structure, and customers.

(E) All tape recordings made pursuant to the requirements of this paragraph shall be retained for a period of not less than three years from the date the tape was created, the first two years in an easily accessible place. Each member shall catalog the retained tapes by registered person and date.

(F) Such procedures shall be maintained for a period of three years from the date that the member establishes and implements the procedures required by the provisions of this paragraph.

(G) By the 30th day of the month following the end of each calendar quarter, each member firm subject to the requirements of this paragraph shall submit to NASD a report on the member's supervision of the telemarketing activities of its registered persons.

(H) The following members shall be required to adopt special supervisory procedures over the telemarketing activities of their registered persons:

A firm with at least five but fewer than ten registered persons, where 40% or more of its registered persons have been associated with one or more Disciplined Firms in a registered capacity within the last three years;

A firm with at least ten but fewer than twenty registered persons, where four or more of its registered persons have been associated with one or more Disciplined Firms in a registered capacity within the last three years;

A firm with at least twenty registered persons, where 20% or more of its registered persons have been associated with one or more Disciplined Firms in a registered capacity within the last three years.

For purposes of the calculations required in subparagraph (H), firms should not include registered persons who:

(1) have been registered for an aggregate total of 90 days or less with one or more Disciplined Firms within the past three years; and

(2) do not have a disciplinary history.

(I) For purposes of this Rule, the term "registered person" means any person registered with NASD as a representative, principal, or assistant representative pursuant to the Rule 1020, 1030, 1040, and 1110 Series or pursuant to Municipal Securities Rulemaking Board ("MSRB") Rule G-3.

(J) For purposes of this Rule, the term "disciplined firm" means either a member that, in connection with sales practices involving the offer, purchase, or sale of any security, has been expelled from membership or participation in any securities industry self-regulatory organization or is subject to an order of the Securities and Exchange Commission revoking its registration as a broker/dealer; or a futures commission merchant or introducing broker that has been formally charged by either the Commodity Futures Trading Commission or a registered futures association with deceptive telemarketing practices or promotional material relating to security futures, those charges have been resolved, and the futures commission merchant or introducing broker has been closed down and permanently barred from the futures industry as a result of those charges; or a futures commission merchant or introducing broker that, in connection with sales practices involving the offer, purchase, or sale of security futures is subject to an order of the Securities and Exchange Commission revoking its registration as a broker or dealer.

(K) For purposes of this Rule, the term "disciplinary history" means a finding of a violation by a registered person in the past five years by the Securities and Exchange Commission, a self-regulatory organization, or a foreign financial regulatory authority of one or more of the provisions (or comparable foreign provision) listed in IM-1011-1 or rules or regulations thereunder.

(L) Pursuant to the Rule 9600 Series, NASD may in exceptional circumstances, taking into consideration all relevant factors, exempt any member unconditionally or on specified terms and conditions from the requirements of this paragraph. A member seeking an exemption must file a written application pursuant to the Rule 9600 Series within 30 days after receiving notice from NASD or obtaining actual knowledge that it meets one of the criteria in paragraph (b)(2) (H). A member that meets one of the criteria in paragraph (b)(2)(H) for the first time may elect to reduce its staffing levels pursuant to the provisions of paragraph (b)(2)(B) or, alternatively, to seek an exemption pursuant to paragraph (b)(2)(L), as appropriate; such a member may not seek relief from the Rule by both reducing its staffing levels pursuant to paragraph (b)(2)(B) and requesting an exemption.

(3) The member's written supervisory procedures shall set forth the supervisory system established by the member pursuant to paragraph (a) above, and shall include the titles, registration status and locations of the required supervisory personnel and the responsibilities of each supervisory person as these relate to the types of business engaged in, applicable securities laws and regulations, and the Rules of this Association. The member shall maintain on an internal record the names of all persons who are designated as supervisory personnel and the dates for which such designation is or was effective. Such record shall be preserved by the member for a period of not less than three years, the first two years in an easily accessible place.

(4) A copy of a member's written supervisory procedures, or the relevant portions thereof, shall be kept and maintained in each OSJ and at each location where supervisory activities are conducted on behalf of the member. Each member shall amend its written supervisory procedures as appropriate within a reasonable time after changes occur in applicable securities laws and regulations, including the Rules of this Association, and as changes occur in its supervisory system, and each member shall be responsible for communicating amendments through its organization.

**(c) Internal Inspections**

(1) Each member shall conduct a review, at least annually, of the businesses in which it engages, which review shall be reasonably designed to assist in detecting and preventing violations of, and achieving compliance with, applicable securities laws and regulations, and with applicable NASD rules. Each member shall review the activities of each office, which shall include the periodic examination of customer accounts to detect and prevent irregularities or abuses.

(A) Each member shall inspect at least annually every office of supervisory jurisdiction and any branch office that supervises one or more non-branch locations.

(B) Each member shall inspect at least every three years every branch office that does not supervise one or more non-branch locations. In establishing how often to inspect each non-supervisory branch office, the firm shall consider whether the nature and complexity of the securities activities for which the location is responsible, the volume of business done, and the number of associated persons assigned to the location require the non-supervisory branch office to be inspected more frequently than every three years. If a member establishes a more frequent inspection cycle, the member must ensure that at least every three years, the inspection requirements enumerated in paragraph (c)(2) have been met. The non-supervisory branch office examination cycle, an explanation of the factors the member used in determining the frequency of the examinations in the cycle, and the manner in which a member will comply with paragraph (c)(2) if using more frequent inspections than every three years shall be set forth in the member's written supervisory and inspection procedures.

(C) Each member shall inspect on a regular periodic schedule every non-branch location. In establishing such schedule, the firm shall consider the nature and complexity of the securities activities for which the location is responsible and the nature and extent of contact with customers. The schedule and an explanation regarding how the member determined the frequency of the examination schedule shall be set forth in the member's written supervisory and inspection procedures.

Each member shall retain a written record of the dates upon which each review and inspection is conducted.

(2) An office inspection and review by a member pursuant to paragraph (c)(1) must be reduced to a written report and kept on file by the member for a minimum of three years, unless the inspection is being conducted pursuant to paragraph (c)(1)(C) and the regular periodic schedule is longer than a three-year cycle, in which case the report must be kept on file at least until the next inspection report has been written. The written inspection report must also include, without limitation, the testing and verification of the member's policies and procedures, including supervisory policies and procedures in the following areas:

(A) Safeguarding of customer funds and securities;

(B) Maintaining books and records;

(C) Supervision of customer accounts serviced by branch office managers;

(D) Transmittal of funds between customers and registered representatives and between customers and third parties;

(E) Validation of customer address changes; and

(F) Validation of changes in customer account information.

If a member does not engage in all of the activities enumerated above, the member must identify those activities in which it does not engage in the written inspection report and document in the report that supervisory policies and procedures for such activities must be in place before the member can engage in them.

(3) An office inspection by a member pursuant to paragraph (c)(1) may not be conducted by the branch office manager or any person within that office who has supervisory responsibilities or by any individual who is directly or indirectly supervised by such person(s). However, if a member is so limited in size and resources that it cannot comply with this limitation (e.g., a member with only one office or a member has a business model where small or single-person offices report directly to an office of supervisory jurisdiction manager who is also considered the offices' branch office manager), the member may have a principal who has the requisite knowledge to conduct an office inspection perform the inspections. The member, however, must document in the office inspection reports the factors it has relied upon in determining that it is so limited in size and resources

that it has no other alternative than to comply in this manner.

A member must have in place procedures that are reasonably designed to provide heightened office inspections if the person conducting the inspection reports to the branch office manager's supervisor or works in an office supervised by the branch manager's supervisor and the branch office manager generates 20% or more of the revenue of the business units supervised by the branch office manager's supervisor. For the purposes of this subsection only, the term "heightened inspection" shall mean those inspection procedures that are designed to avoid conflicts of interest that serve to undermine complete and effective inspection because of the economic, commercial, or financial interests that the branch manager's supervisor holds in the associated persons and businesses being inspected. In addition, for the purpose of this section only, when calculating the 20% threshold, all of the revenue generated by or credited to the branch office or branch office manager shall be attributed as revenue generated by the business units supervised by the branch office manager's supervisor irrespective of a member's internal allocation of such revenue. A member must calculate the 20% threshold on a rolling, twelve-month basis.

## (d) Review of Transactions and Correspondence

### (1) Supervision of Registered Representatives

Each member shall establish procedures for the review and endorsement by a registered principal in writing, on an internal record, of all transactions and for the review by a registered principal of incoming and outgoing written and electronic correspondence of its registered representatives with the public relating to the investment banking or securities business of such member. Such procedures should be in writing and be designed to reasonably supervise each registered representative. Evidence that these supervisory procedures have been implemented and carried out must be maintained and made available to the Association upon request.

### (2) Review of Correspondence

Each member shall develop written procedures that are appropriate to its business, size, structure, and customers for the review of incoming and outgoing written (i.e., non-electronic) and electronic correspondence with the public relating to its investment banking or securities business, including procedures to review incoming, written correspondence directed to registered representatives and related to the member's investment banking or securities business to properly identify and handle customer complaints and to ensure that customer funds and securities are handled in accordance with firm procedures. Where such procedures for the review of correspondence do not require review of all correspondence prior to use or distribution, they must include provision for the education and training of associated persons as to the firm's procedures governing correspondence; documentation of such education and training; and surveillance and follow-up to ensure that such procedures are implemented and adhered to.

### (3) Retention of Correspondence

Each member shall retain correspondence of registered representatives relating to its investment banking or securities business in accordance with <u>Rule 3110</u>. The names of the persons who prepared outgoing correspondence and who reviewed the correspondence shall be ascertainable from the retained records and the retained records shall be readily available to the Association, upon request.

## (e) Qualifications Investigated

Each member shall have the responsibility and duty to ascertain by investigation the good character, business repute, qualifications, and experience of any person prior to making such a certification in the application of such person for registration with this Association. Where an applicant for registration has previously been registered with the Association, the member shall review a copy of the Uniform Termination Notice of Securities Industry Registration (Form U-5) filed with the Association by such person's most recent previous NASD member employer, together with any amendments thereto that may have been filed pursuant to Article V, Section 3 of the Association's By-Laws. The member shall review the Form U-5 as required by this Rule no later than sixty (60) days following the filing of the application for registration or demonstrate to the Association that it has made reasonable efforts to comply with the requirement. In conducting its review of the Form U-5 and any amendments thereto, a member shall take such action as may be deemed appropriate.

Where an applicant for registration has been previously registered with a registered futures association ("RFA") member that is or has been registered as a broker/dealer pursuant to Section 15(b)(11) of the Act ("notice-registered broker/dealer") with the SEC to trade security futures, the member shall review a copy of the Notice of Termination of Associated Person (Form 8-T) filed with the RFA by such person's most recent previous RFA member employer, together with any amendments thereto. The member shall review the Form 8-T as required by this Rule no later than sixty (60) days following the filing of the application for registration or demonstrate to the Association that it has made reasonable efforts to comply with the requirement. In conducting its review of a Form 8-T and any amendments, a member shall take such action as may be deemed appropriate.

## (f) Applicant's Responsibility

Any applicant for registration who receives a request for a copy of his or her Form U-5 from a member pursuant to this Rule shall provide such copy to the member within two (2) business days of the request if the Form U-5 has been provided to such person by his or her former employer. If a former employer has failed to provide the Form U-5 to the applicant for registration, such person shall promptly request the Form U-5, and shall provide it to the requesting member within two (2) business days of receipt thereof. The applicant shall promptly provide any subsequent amendments to a Form U-5 he or she receives to the requesting member.

## (g) Definitions

(1) "Office of Supervisory Jurisdiction" means any office of a member at which any one or more of the following functions take place:

(A) order execution and/or market making;

(B) structuring of public offerings or private placements;

(C) maintaining custody of customers' funds and/or securities;

(D) final acceptance (approval) of new accounts on behalf of the member;

(E) review and endorsement of customer orders, pursuant to paragraph (d) above;

(F) final approval of advertising or sales literature for use by persons associated with the member, pursuant to Rule 2210(b)(1), except for an office that solely conducts final approval of research reports; or

(G) responsibility for supervising the activities of persons associated with the member at one or more other branch offices of the member.

(2)(A) A "branch office" is any location where one or more associated persons of a member regularly conducts the business of effecting any transactions in, or inducing or attempting to induce the purchase or sale of any security, or is held out as such, excluding:

(i) Any location that is established solely for customer service and/or back office type functions where no sales activities are conducted and that is not held out to the public as a branch office;

(ii) Any location that is the associated person's primary residence; provided that

a. Only one associated person, or multiple associated persons who reside at that location and are members of the same immediate family, conduct business at the location;

b. The location is not held out to the public as an office and the associated person does not meet with customers at the location;

c. Neither customer funds nor securities are handled at that location;

d. The associated person is assigned to a designated branch office, and such designated branch office is reflected on all business cards, stationery, advertisements and other communications to the public by such associated person;

e. The associated person's correspondence and communications with the public are subject to the firm's supervision in accordance with Rule 3010;

f. Electronic communications (e.g., e-mail) are made through the member's electronic system;

g. All orders are entered through the designated branch office or an electronic system established by the member that is reviewable at the branch office;

h. Written supervisory procedures pertaining to supervision of sales activities conducted at the residence are maintained by the member; and

i. A list of the residence locations is maintained by the member;

(iii) Any location, other than a primary residence, that is used for securities business for less than 30 business days in any one calendar year, provided the member complies with the provisions of paragraph (A)(2)(ii)a. through h. above;

(iv) Any office of convenience, where associated persons occasionally and exclusively by appointment meet with customers, which is not held out to the public as an office; *

(v) Any location that is used primarily to engage in non-securities activities and from which the associated person(s) effects no more than 25 securities transactions in any one calendar year; provided that any advertisement or sales literature identifying such location also sets forth the address and telephone number of the location from which the associated person(s) conducting business at the non-branch locations are directly supervised;

(vi) The Floor of a registered national securities exchange where a member conducts a direct access business with public customers; or

(vii) A temporary location established in response to the implementation of a business continuity plan.

(B) Notwithstanding the exclusions in paragraph (2)(A), any location that is responsible for supervising the activities of persons associated with the member at one or more non-branch locations of the member is considered to be a branch

office.

(C) The term "business day" as used in Rule 3010(g)(2)(A) shall not include any partial business day provided that the associated person spends at least four hours on such business day at his or her designated branch office during the hours that such office is normally open for business.

---

\* Where such office of convenience is located on bank premises, signage necessary to comply with applicable federal and state laws, rules and regulations and applicable rules and regulations of the NYSE, other self-regulatory organizations, and securities and banking regulators may be displayed and shall not be deemed "holding out" for purposes of this section.

Amended by SR-FINRA-2007-008 eff. Dec. 19, 2007.
Amended by SR-NASD-2006-037 eff. July 3, 2006.
Amended by SR-NASD-2005-033 eff. Aug. 1, 2005.
Amended by SR-NASD-2005-004 eff. July 25, 2005
Amended by SR-NASD-2002-162 and SR-NASD-2004-116 eff. Jan. 31, 2005.
Amended by SR-NASD-2002-40 eff. Oct. 15, 2002.
Amended by SR-NASD-2002-04 eff. Oct. 14, 2002.
Amended by SR-NASD-99-28 eff. Aug. 16, 1999.
Amended by SR-NASD-98-52 eff. March 15, 1999.
Amended by SR-NASD-98-86 eff. Nov. 19, 1998.
Amended by SR-NASD-97-69 eff. August 17, 1998.
Amended by SR-NASD-98-45 postponed eff. date of provision in Notice to Members 98-11.
Amended by SR-NASD-98-31 eff. Apr. 7, 1998, postponed eff. date of provision in Notice to Members.
Amended by SR-NASD-98-10 postponed eff. date.
Amended by SR-NASD-97-24 eff. Feb. 15, 1998.
Amended by SR-NASD-97-41 eff. Sept. 4, 1997.
Amended eff. June 12, 1989; Apr. 30, 1992.

**Selected Notices to Members:** 86-65, 88-84, 89-34, 89-57, 91-48, 92-18, 96-33, 96-59, 96-82, 98-11, 98-18, 98-38, 98-52, 98-96, 99-03, 99-45, 04-71, 05-67, 06-13, 07-64.

**Selected SEC Decisions:**
Juan Carlos Schidlowski, SEC Rel. No. 34-23347 (1986).
Wedbush Securities, Inc. (f/k/a Wedbush Noble, Cooke, Inc.), SEC Rel. No. 34-25504 (1988).
Seco Securities, Inc. and Stanley Richards, SEC Rel. No. 34-26054 (1988).

## IM-3010-1. Standards for Reasonable Review

In fulfilling its obligations pursuant to Rule 3010(c), each member must conduct a review, at least annually, of the businesses in which it engages, which review must be reasonably designed to assist in detecting and preventing violations of and achieving compliance with applicable securities laws and regulations and with NASD Rules. Each member shall establish and maintain supervisory procedures that must take into consideration, among other things, the firm's size, organizational structure, scope of business activities, number and location of offices, the nature and complexity of products and services offered, the volume of business done, the number of associated persons assigned to a location, whether a location has a principal on-site, whether the office is a non-branch location, the disciplinary history of registered representatives or associated persons, etc. The procedures established and the reviews conducted must provide that the quality of supervision at remote offices is sufficient to assure compliance with applicable securities laws and regulations and with NASD Rules. With respect to a non-branch location where a registered representative engages in securities activities, a member must be especially diligent in establishing procedures and conducting reasonable reviews. Based on the factors outlined above, members may need to impose reasonably designed supervisory procedures for certain locations and/or may need to provide for more frequent reviews of certain locations.

Amended by SR-NASD-2006-037 eff. July 3, 2006
Adopted by SR-NASD-2003-104 eff. May 1, 2006.

**Selected Notice:** 05-67.

---