IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

AXA DISTRIBUTORS, LLC and )
AXA ADVISORS, LLC, )
            )
    Plaintiffs, )
            )
v. )      Case No. 1:08cv188
            )
GAYLE S. BULLARD et al., )
            )
    Defendants. )
            )

## SUPPLEMENTAL BRIEFING REGARDING VALIDITY OF THE ARBITRATION AGREEMENT

### I.    INTRODUCTION

The Court has requested supplemental briefing from the parties regarding the issue of whether there is a valid arbitration agreement between the parties in this case. There is a valid arbitration agreement if Ann Holman is an associated person of AXA Distributors, LLC, as that term is defined under the NASD Code of Arbitration. All parties concede that an agent or representative of a FINRA member is an associated person; the issue as framed by the Court here is whether Ann Holman is an agent, and thus an associated person, of AXA Distributors.

The definition of "person associated with a member" under the NASD Code includes "*a natural person engaged in the* investment banking or *securities*

1

*business who is directly or indirectly* controlling or *controlled by a member,* *whether or not any such person is registered or exempt from registration with* *NASD.*" NASD Code section 2100(r). Under Alabama agency law, Ann Holman was controlled by, and an agent of, AXA Distributors. The facts indicate that AXA Distributors controlled, and had the right to control, the manner in which she sold the products. Ann Holman is thus an associated person of AXA Distributors, and her customers have the right to invoke FINRA arbitration against AXA Distributors.

## II.    LEGAL ARGUMENT

### A. The Facts of the Relationship Between Ann Holman and AXA Distributors Show She Was an Agent of AXA Distributors.

Under Alabama law, agency is defined as the "fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and consent by the other so to act." *Carr v. Stillwaters Development Co., L.P.*, 83 F. Supp. 2d 1269, 1279 (M.D. Ala. 1998), *quoting* Restatement (2d) of Agency § 1 (1958). In determining whether an agency relationship exists under Alabama law, the test is "whether the alleged principal exercised a *right of control* over the manner of the alleged agent's performance." *Thrash v. Credit Acceptance Corp.*, 821 So. 2d 968, 972 (Ala. 2001) (emphasis in original). This "right-of-control test" requires only "that the

2

right be reserved, not that the right be actually exercised." *Id.* Control may be exercised either before or at the time of an agent's actions, and may be limited in scope:

> The right of control by the principal may be exercised by prescribing what the agent shall or shall not do before the agent acts, or at the time when he acts, or at both times. . . . . The control of the principal does not, however, include control at every moment; its exercise may be very attenuated and, as where the principal is physically absent, may be ineffective.

*Carr*, 83 F. Supp. 2d at 1280, quoting Restatement (2d) of Agency § 14 cmt. a.

> An agency may be either express or implied:

> An express agency is an actual agency created as a result of the oral or written agreement of the parties, and an implied agency is also an actual agency, the existence of which as a fact is proved by deductions or inferences from the other facts and circumstances of the particular case, including the words and conduct of the parties.

*Fisher v. Comer Plantation, Inc.*, 772 So. 2d 455, 465 (Ala. 2000) (quoting 3 Am.Jur.2d *Agency* § 18 (1986).

In determining the existence of an agency relationship, "[h]ow the parties characterize the relationship is of no consequence; it is the ***facts*** of the relationship that control." *Id*. (internal quotation marks omitted) (emphasis added). Even "a contract which, on its face, directly disclaims any agency relationship or which does not by its terms create such a relationship, will not preclude the finding of agency if there is independent evidence of a retained right of [c]ontrol." *Wood v.*

3

*Shell Oil Co.*, 495 So. 2d 1034 (Ala. 1986).    In this case, there is a contract between AXA Distributors and Raymond James, Ann Holman's former employer, which states that the relationship between AXA and Raymond James is that of an independent contractor.    *See* Exhibit B to Defendants' Reply Memorandum in Support of Their Motion for Preliminary Injunction.    Although there is no written contract between AXA Distributors and Ann Holman, the facts distinctly support the existence of an agency relation between AXA Distributors and Ann Holman, as independent evidence indicates.[1]

Other Alabama cases have found agency where the facts so indicated, even if one or both of the parties to the agency disclaimed an agency relationship.    For instance, in *Thrash*, the Alabama Supreme Court found that the facts indicated the existence of an agency relationship between a financing company and a

---

[1] Agency may be established by the testimony of the agent. *McCarty v. Skelton*, 172 So. 901, 903 (Ala. 1937) ("[I]t has never been doubted that the agent, if otherwise competent, may testify as a witness to the fact of his agency and as to the nature and extent of his authority.").    Ann Holman has testified extensively via affidavits regarding the facts establishing her agency relationship with AXA Distributors and the extent of her authority under the agency relationship, and this testimony may be used by the Court to make a determination regarding the existence of an agency relationship between Ms. Holman and AXA Distributors. *See* Affidavit of Ann S. Holman, Supplemental Affidavit of Ann S. Holman. *See also* Affidavit of Maxine Chappel.    Maxine Chappel was another Raymond James broker who sold the AXA annuities, and her testimony corroborates Ms. Holman's.

4

repossession company where the financing company instructed the repossession company not to inform the debtor prior to repossession of the vehicle, and where the financing company had the power to, but did not, instruct the repossession company not to use a dish-washing liquid to lubricate the driveways of debtors to facilitate moving the vehicle being repossessed. *Thrash*, 821 So. 2d at 972.

In another case, in many respects analogous to this case, a creditor was held to be potentially liable as a principal for the acts of a retailer as agent. *See Anglin v. Household Retail Services, Inc.*, 17 F. Supp. 2d 1251 (M.D. Ala. 1998) (emphasis added). In *Anglin*, the Court found that testimony regarding a ***training relationship*** between the defendant and the retailer was enough to create a question of fact regarding the existence of an agency relationship between the two. *Id*. at 1257 (in which the plaintiff "cited to deposition testimony of [a witness] that he specifically, and Household Retail Services in general, trained distributors, who were then to train dealers, as to the parts of the program they wanted passed on . . . ."). "The key under Alabama law is that there must be an indicia of control over the ***specific aspect of a sale at issue*** in order to hold a creditor liable [as a principal] for fraud committed by the seller [as an agent]." *Id*. at 1255. Similarly, AXA Distributors had control over precisely the aspects of the sales to Defendants that gave rise to their fraud claims in the arbitration, and was responsible for

training Ann Holman and other brokers regarding the manner in which the variable annuities were to be sold, and what the brokers should tell the purchasers regarding the products.  *See* Supplemental Aff. of Ann S. Holman, ¶¶ 3-4, 6, 11, 13; Affidavit of Maxine Chappel,  ¶¶ 4-8.

In *Carr*, the defendants had an agency relationship where "even though the agreement denies agency, Insignia contracted to perform services for the benefit of StillWaters Development and subject to StillWaters Development's ongoing control." *Carr*, 83 F. Supp. 2d at 1280.  Similarly, AXA Distributors had control over the manner in which Raymond James and its representatives, including Ann Holman, sold its products, and participated in ongoing training and instruction for Ms. Holman and other brokers to sell its products in the manner in which AXA Distributors determined.  *See* Supplemental Aff. of Ann S. Holman, ¶¶ 3-13; Aff. of Maxine Chappel, ¶¶ 6-8.  As in *Carr*, where the defendants "had 'frequent conversations' and created a 'continuing relationship as [they] tried to mold and direct the entire operation,'" in this case, AXA Distributors had ongoing communications and a relationship with Ann Holman and other brokers selling AXA annuities, molding her representations and her sales operations.  *Carr*, 83 F. Supp. 2d at 1280.  *See* Supplemental Aff. of Ann S. Holman, ¶¶ 3-13; Aff. of Maxine Chappel, ¶¶ 6-8.

6

In *Ragsdale v. Life Ins. Co. of North America*, 632 So. 2d 465, 467 (Ala. 1994), an agency relationship existed where the insurance company had trained two of the city's employees to explain the insurance policy, and given them the responsibility to explain the policy to all other city employees. The court stated that the insurance company would not be allowed to give full power to explain the policy to the city and then avoid liability for the city's misrepresentations of the coverage under the policy. *Id*. at 468. The two city employees had become agents of the insurance company. Similarly, AXA Distributors trained Ann Holman to explain the product to customers, and she knew nothing other than what she was told by AXA Distributors. *See* Supplemental Aff. of Ann S. Holman, ¶¶ 3, 4, 9, 10, 13, 15. Ann Holman spoke frequently with AXA Distributors representatives regarding the manner in which she should sell the products. *Id*. at ¶¶ 5-12. *See also* Aff. of Maxine Chappel, ¶¶ 6-8. AXA Distributors cannot now avoid liability and disclaim that it has authorized Ann Holman as its agent to explain and sell the products.

**B.  Pursuant to the Contractual Relationship Between AXA Distributors and Raymond James, Ann Holman Was an Agent of AXA Distributors.**

As stated above, agency may be either express or implied. Agency "created as a result of the oral or written agreement of the parties" is express

agency. *Fisher*, 772 So. 2d at 465 (Ala. 2000) (quoting 3 Am.Jur.2d *Agency* § 18 (1986). Here, the Broker-Dealer and General Agent Sales Agreement between AXA Distributors and Raymond James creates an agency relationship by its terms, even though it characterizes Raymond James as an "independent contractor." The agreement reserves control over how Raymond James' representatives sell AXA Distributors' contracts to AXA Distributors. It specifically states, for instance that "Agents" such as Ann Holman "shall only make statements, oral or written, which are in accordance with the Contract Prospectus, the Trust Prospectus and written sales literature regarding the Contracts authorized by the Distributor," and that they must use only the contract applications provided by AXA Distributors. Exhibit B to Defendants' Reply Memorandum in Support of Their Motion for Preliminary Injunction, at 9. It states that an "Agent shall have no authority to alter, modify, waive or change any of the terms, rates, charges or conditions of the Contracts," nor shall they be able to "make . . . representations concerning the continuation of non-guaranteed terms or provisions of the Contracts" or "advertise for . . . the Distributor . . . [or] the Contracts . . . without prior written approval and authorization from the Distributor." *Id*. at 9. The "Agents" must adhere to AXA Distributors' approved "market timing" programs. *Id*. at 10. They "shall act in accordance with the rules and procedures of the Equitable Life Companies in

8

connection with any solicitation activities relating to the Contracts. *Id*. The agreement thus manifests direct control by AXA Distributors over *the manner in which* Ann Holman sold the contracts. Further, other evidence which Defendants have presented in this case show actual control by AXA Distributors over the manner in which Ann Holman sold the contracts.

Direct agency is not necessary for an agency relationship to exist, if the circumstances necessitate an agent using a sub-agent to accomplish the agency task. A sub-agent of an agent is the agent of the principal. *Schloss Bros. & Co. v. Gibson Dry Goods Co.*, 60 So. 436 (Ala. Civ. App. 1912) ("[W]here the employment and creation of agency is of such a nature as to carry with it the necessary implication that a subagent is to be employed in connection with the agency created, the principal is bound by the acts of such subagent while acting within the line of employment or scope or authority of agency."). Thus, even if an agency relationship exists only between AXA Distributors and Raymond James pursuant to the express terms of the Broker-Dealer and General Agent Sales Agreement, the fact that it was necessary for Raymond James to hire brokers to sell the contracts to facilitate the agency agreement makes Ann Holman a sub-agent able to bind the principal AXA Distributors. The agreement does manifest control over how Raymond James sells the contracts, including specifically and

9

completely restricting Raymond James from making any communications regarding the contracts other than those supplied by AXA Distributors and dictating the market timing of sales. *See* Exhibit B to Defendants' Reply Memorandum in Support of Their Motion for Preliminary Injunction, at 7. The Agreement acknowledges AXA Distributors' complete control over the information about the products, stating that the "Distributor shall notify the Broker-Dealer" if, among other things, "any event occurs as a result of which the Contract Prospectus(es) or any sales literature for the Contracts would include any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein not misleading." Exhibit B to Defendants' Reply at 3-4. It restricts the Broker-Dealer to the use of sales and advertising material approved in writing by AXA Distributors. *Id*. at 7.

The terms of the Agreement between the predecessors of AXA Distributors and Raymond James create an express agency relationship between AXA Distributors and Raymond James, and between AXA Distributors and Ann Holman.

**C.    AXA Distributors Also Had Indirect Control Over Ann Holman.**

The same facts cited above regarding the agency relationship between Ann Holman and AXA Distributors, and Maxine Chappel and AXA Distributors, also

10

demonstrate that AXA Distributors had indirect control over Ann Holman for purposes of establishing that she was a "person associated with" AXA Distributors under the NASD Code, and thus that there is a valid arbitration agreement between AXA Distributors and Defendants allowing them to bring claims against AXA Distributors regarding its misrepresentations and other tortious behavior regarding the marketing and sale of Defendants' AXA variable annuities.

In addition, the fact that the money paid by customers went straight through to AXA Equitable, the parent company of AXA Distributors, and the fact that Ann Holman had no discretion over pricing or over how she sold the products, indicates that AXA Distributors had, at a minimum, indirect control over Ann Holman in her sales of AXA annuities. *See* Supplemental Aff. of Ann Holman, ¶¶ 14-16; *see also* Exhibit B at 9 (stating that an "Agent shall have no authority to alter, modify, waive or change any of the terms, rates, charges or conditions of the Contracts").

## III.  CONCLUSION

For the above reasons, Ann Holman was an agent and thus an associated person of AXA Distributors.  The Defendants have a right to invoke FINRA arbitration against AXA Distributors pursuant to the valid arbitration agreement between the parties.

Respectfully Submitted,


/s/ Caroline Smith Gidiere
One of the Attorneys for Defendants

Andrew P. Campbell
Caroline Smith Gidiere
Campbell, Gidiere, Lee, Sinclair
    and Williams, PC
2100A SouthBridge Parkway, Suite 450
Birmingham, Alabama 35209
(205) 803-0051
Fax: (205) 803-0053
acampbell@cgl-law.com
cgidiere@cgl-law.com

12

## CERTIFICATE OF SERVICE

I hereby certify that on August 8th, 2008, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Andrea Morgan Greene, Esq.
Armistead Inge Selden, III, Esq.
John Norman Bolus, Esq.
**MAYNARD, COOPER, & GALE, P.C.**
1901 Sixth Avenue North
2400 AmSouth/Harbert Plaza
Birmingham, AL  35203

/s/ Caroline Smith Gidiere
Of Counsel

13

EXHIBIT "1"

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

AXA DISTRIBUTORS, LLC and )
AXA ADVISORS, LLC, )
                    )
    Plaintiffs, )
                    )
v. )    Case No. 1:08cv188
                    )
GAYLE S. BULLARD et al., )
                    )
    Defendants. )
                    )

## SUPPLEMENTAL AFFIDAVIT OF ANN S. HOLMAN

1.    My name is Ann S. Holman. I am over the age of eighteen and have personal knowledge of the facts set forth herein.

2.    This affidavit is in supplementation of my prior affidavit in this case.

3.    All of the information and training that I had or received on the Accumulator variable annuity came directly from AXA Distributors. I received no training on the product from Raymond James Financial Services ("RJFS") or its insurance arm, Planning Corporation of America ("PCA"). In fact, PCA and RJFS both directed my questions regarding the Accumulator annuity back to AXA Distributors.

1

4.    AXA Distributors had absolute discretion and control of how I sold the product, including what I told the customer. I had regular, if not daily, contact with representatives of AXA Distributors, who came to into my office to provide training and direction on the product.

5.    Based on my experience, AXA Distributors divided its territory into districts, and employed an individual in every district that it termed the "outside wholesaler." This individual was the AXA Distributors representative assigned to be the liaison between AXA Distributors and the financial planners in his district who were selling the variable annuities. It was his job to train me and the other Raymond James brokers on how to sell the products, to keep us informed of any new products, to provide us with sales literature and prospectuses and train us on that literature, and to keep us informed of any changes in the products.

6.    The original AXA Distributor outside wholesaler for my district was Jeff Place, who introduced me to the Accumulator annuity. Mr. Place worked in the field, calling on agents or financial planners, and called on me and my partner, Maxine Chappell at our offices in Dothan, Alabama. During that initial meeting, he told me that AXA had a variable annuity that guaranteed the client would lose no money. He explained the product to me in detail, stating the client would have to stay invested for seven years and pay a fee for the guarantee of principal.

2

7.    Tim McCabe succeeded Mr. Place as the outside wholesaler for our region. When Mr. McCabe came on board, I questioned him regarding the liquidity feature and he repeated the assurance that the client could receive up to 90% of the guaranteed principal as a lump sum without annuitizing the contract. Mr. McCabe came to my office regularly, at least every six weeks, to provide continued training, education, and assistance on selling the AXA Accumulator.

8.    AXA Distributors also employed what it termed an "inside wholesaler," who was assigned the same geographic territory as the outside wholesaler but worked from a desk at AXA Distributors. The "inside wholesaler" for my district was Mike Gass. When I would call the 1-800 number for the AXA Distributors "Sales Desk," I would be directed to Mr. Gass, because I was within his geographic region. If he was unavailable, someone else could answer my questions, but Mike would always follow up on the call.

9.    Between 1997 and 2000, when I was actively selling the Accumulator annuity, I probably talked to Mr. Gass at least once a day and sometimes several times a day. That is because this product was extremely new to me and to the industry and was extremely complex. I had never sold a product like this before. And, AXA was the first company to come out with a variable annuity with a "living benefit" that provided liquidity. Raymond James did not provide me with

3

any training on the AXA Accumulator, outside of sponsoring annual conferences at which representatives of AXA Distributors made presentations as set out in Paragraph 7. My only training on and understanding of the product came through Mr. McCabe, and his predecessor, Jeff Place, and Mike Gass. That is, without the training and education and direction provided by AXA Distributors, I would have had no understanding of the AXA Accumulator or ability to sell it.

10.    As I would begin to sell an Accumulator annuity to a prospective client and as I continued to service Accumulator the annuities, I routinely and habitually called the AXA Distributors Sales Desk for assistance and spoke either to Mr. Gass or another AXA Distributors representative that might be covering Mr. Gass on a particular day. Each time, I would ask Mr. Gass or others to tell me again how 90% liquidity feature works at the end of the annuity term if the investor goes to the living benefit. Each time, a representative of AXA Distributors would explain that AXA employed a convoluted formula to calculate 12 periodic payments and then at the end of those 12 payments, then the liquid amount would be about 90% of the amount originally invested plus the 6% roll up or GMIB value showing on the account statements. I asked them this over and over and over and each time I would receive the same response. I frequently would ask them to do calculations for illustration and they always explained that the calculations could not be

4

performed until the end of the holding period but that the amount be approximate the amount they originally contributed plus the 6% roll up compounded annually. I passed these exact representations on to the client on an on-going basis.

11.    I called AXA Distributors and asked them to walk me through the liquidity feature each time I sold the product because I wanted to make sure I understood the product and how to sell it; it was very complicated and I was unfamiliar with it. Further, there was nothing in writing from AXA Distributers that explained the liquidity feature and I just kept wanting to make sure and reassure myself that I was representing and presenting this product correctly and that I had not misunderstood anything.

12.    I became so familiar with Mr. Gass that he came to Dothan, Alabama, on a couple of occasions for my annual client appreciation dinners, and he was available to talk to my clients about their product on the retail level.

13.    Every year, Raymond James would provide a week-long annual conference. AXA Distributors always made presentations at those conferences and I always attended all of AXA Distributors' conferences.    Wholesalers other than my geographic "wholesalers" i.e., Mr. McCabe and Mr. Gass, made the presentations at the annual conferences.  The presentations of the other AXA Distributors were consistent with those of Mr. McCabe and Mr. Gass.

14.    I had no discretion on the pricing of the contracts.    The pricing of sub-accounts with the Accumulator annuity were set by AXA and were based on a price per unit, which was subject to market fluctuation.  There were fees embedded in those sub-accounts.    Other annual fees were associated with the variable annuities for accounts under a specified value.    However, I had absolutely no discretion over pricing.

15.    I had no discretion over how I sold the product.

16.    The checks for the contracts were made payable directly to AXA Equitable about 90% of the time.  The other 10% comprise instances in which a client had funds in a Raymond James account that were transferred into an AXA annuity.


I declare under the penalty of perjury pursuant to the laws of the State of Alabama that the foregoing is true and correct.  Executed this the _8_ th day of August, 2008, in Dothan, Alabama.

Ann Holman


STATE OF ALABAMA          )
COUNTY OF                         )


6

Before me, Ann Holman, who being by me first duly sworn, deposes and says that the facts alleged in the foregoing Affidavit are true and correct to the best of her knowledge and belief.

Sworn to and subscribed to before me this ___9th___ day of August, 2008.

Notary Public
My Commission Expires: 10/5/2011

7

EXHIBIT "2"

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

AXA DISTRIBUTORS, LLC and   )
AXA ADVISORS, LLC,   )
   )
      Plaintiffs,   )
   )
v.   )
   )
GAYLE S. BULLARD et al.,   )
   )
      Defendants.   )
   )

## AFFIDAVIT OF MAXINE CHAPPEL

1.    My name is Maxine Chappell.  I am over the age of eighteen and have personal knowledge of the facts set forth herein.

2.    This affidavit is in supplementation of the prior affidavit I gave in this case.

3.    AXA Distributers' (Equitable) representative Jeff Place introduced the Accumulator annuity to me and to Ann Holman, who was my partner at the time. He told us that AXA had a variable annuity that would guarantee that the client would lose no money.  He came to our office in Dothan and explained the product stating that the client would have to stay invested for a certain period of time and pay a fee for the guarantee of principal.  Tim McCabe took over Jeff Place's position at a later date.  Mike McDaniel was another AXA Distributer

representative that I worked with on a regular basis and who provided training and instruction on the product.

4.     After several months, I had not sold any Accumulator annuities.  Ann Holman and I both attended a Raymond James Leaders' Circle Conference at the Grove Park Inn in Ashville, North Carolina.  AXA Distributers was a presenter at the Conference.  After the presentation, the AXA Distributers representative asked why I had not sold the investment, and when I told him it was because the client would have to annuitize the contract to get the guaranteed principal, he explained the "Income Manager" to me, which, he explained, allowed the Accumulator investor to access up to 90%, as a lump sum instead of an annuity,  of the cash value, which was explained to me as the amount the client invested plus 6 percent interest compounded annually minus any funds the client had withdrawn.

5.     When we returned home, we called the AXA Distributers regional representative, Tim McCabe, who informed us that the AXA Distributers representative at the Leaders Circle Conference was correct, that the client could access 90% of the cash value (as explained above) as a lump sum.  When I asked where in the prospectus that information was to be found, he told me that the Accumulator with the Basebuilder had an Income Manager prospectus that contained the information, which prospectus would be provided to the client at the time of annuitization.

6.    AXA Distributers representatives, Tim McCabe, Mike Gass, Mike McDaniel, and Rand Pointer provided additional and continual training and guidance of the Accumulator product and how it must be sold, instructing us to make sure and have the client purchase the BaseBuilder option so that they would be entitled to the 90% liquidity feature at the end of the annuity term.   I passed all of those representations on to the client and that is exactly how I sold the Accumulator.

7.    AXA Distributers had complete discretion over how I sold the product and provided all of the training that I received on the product.  Raymond James did not train me on the product, except to host conferences at which AXA Distributers representatives made presentations.  AXA Distributers' representatives, including Tim McCabe, Mike McDaniel, and Rand Pointer actually came to my office to provide me training and Mike Gass answered my questions on the phone from his Sales Desk.

8.    I was in constant contact with our regional AXA Distributers representatives, talking to them about one question or another on a regular basis from about 1997 through 2000 when I was actively selling the Accumulator annuity.   Due to their efforts, and this assistance they gave me, I was able to sell the product to my clients.  Without their explanations and help on what to tell my clients, I would not have been able to sell the product.

9.     AXA Distributers was aware of how I sold the product and supported the way in which I was selling the product.  In the Fall 1999, I received a call from Tuck Wieler, a broker from a competitor brokerage firm, Regions Brokerage, who stated that I was making misrepresentations to my clients about the AXA (then Equitable) Accumulator variable annuity because, in his estimation, there was no product on the market that had any guarantees.  I responded to him by explaining that I invested my clients in a reputable company and with a good quality investment program but refused to educate him on the product as he was a competitor.

10.     After that time, I began receiving numerous reports from various clients or potential clients that had either interacted directly with Mr. Weiler or attended a Regions Bank seminar conducted by Mr. Weiler or other representatives of Regions Bank  that I was "lying" about the Accumulator product because there was no such guarantee feature as I was representing.

11.     After one such report from a prospective client, Barbara Kogut, I called the AXA Distributers "outside wholesaler" for our region, Timothy McCabe, to discuss the situation.  Mr. McCabe got on the phone with me and Ms. Kogut and conducted a conference call via speakerphone.  Mr. McCabe asked her to repeat what she had been told by a representative of Regions Bank.  She explained to Mr. McCabe that a representative of Regions Bank had told her that if

she put in $50,000 in the Accumulator annuity and there was a down market and the $50,000 dropped to a value of $25,000 *and* she exercised the 90% liquidity feature when the market was down, she would only get 40% to 60% of the $25,000. Mr. McCabe asked her to repeat herself so that he could be clear on what she had been told. Ms. Kogut repeated the scenario. I then read out loud the paragraph on page 5 of the Income Manager Prospectus that addresses the 90% feature. Mr. McCabe responded that Equitable stood behind what it had written and stood behind me and my partner at that time, Ann Holman.

12.    I sent a memo to Mr. McCabe, through Mike Gass, another AXA Distributers employee, documenting the conversation and all of the accounts I had received of interference by representatives of Regions Bank. *See* Exhibit A. Within a month, counsel for AXA, the Equitable sent a letter to counsel for Regions Bank advising it of the disparaging comments about AXA's Accumulator by Regions' representatives and that its representatives were inaccurately describing the Accumulator product in its seminars. *See* Exhibit B. The assistance provided by Mr. McCabe and other AXA Distributers employees assisted me in the sales of the product because I was able to show prospective clients AXA's letter to Regions confirming that our representations about the product were correct. Without that letter, it would have been difficult to overcome the disparaging

representations made by Regions Bank. I considered this direct sales assistance and they told me to share this information with my customers.

13.    As with any problem or question that arose with regard to my sales of Accumulator product, my first step was to call AXA Distributers.

Further affiant sayeth not.

I declare under the penalty of perjury pursuant to the laws of the State of Alabama that the foregoing is true and correct. Executed this the 8th day of August, 2008, in _Dothan_, Alabama.

_Maxine Chappell_
Maxine Chappell

STATE OF ALABAMA          )

COUNTY OF _Henry_         )

Before me, Maxine Chappell, who being by me first duly sworn, deposes and says that the facts alleged in the foregoing Affidavit are true and correct to the best of her knowledge and belief.

Sworn to and subscribed to before me this _8th_ day of ~~May~~ August, 2008.

_Cecilia A. Gordon_
Notary Public
My Commission Expires: _01-25-2011_

EXHIBIT "A"

**Raymond James
Financial Services, Inc.**

# Memo

**To:**   Mr. Timothy McCabe

**From:**   Ann Holman and Maxine Chappell

**Date:**   01/03/00

**Re:**   Equitable Accumulator/Regions Brokerage/Barbara Kogut

---

This memo is in reference to the conference call between Tim McCabe, Maxine Chappell of Raymond James Financial Services, and Barbara Kogut (a prospective client) via speakerphone. Tim McCabe asked Barbara Kogut to explain what she was told by the representative from Regions Bank, and also how she came in possession of the 2 pages of faxed information she had with her (copies have been faxed to you). Her explanation was if a client put $50,000 into Equitable Accumulator with the Basebuilder, and if it is an up market, the account goes up to $75,000. However, if it is a down market the $50,000 dropped to $25,000, and the client should exercise the 90% feature, the client would actually get only 40% to 60% of the $25,000. Tim asked her to repeat herself, so that he could be clear on what she had been told, and she repeated the same scenario. Maxine read the paragraph on page 5 of Income Manager Prospectus to address the 90% feature, and Tim said that the Equitable stood behind whatever they had put in writing and also stood behind Ann and Maxine. As to how she came in possession of the fax, she told Tim and Maxine that she had received the fax from Tuck Wieler who informed Barbara Kogut that he had received the fax (2 pages) from Christopher Hess at the Equitable. Someone had hand written the comment "False Faith Builder" on 1 page of the fax. When questioned about who had written on the fax, Barbara did not know if it was written by Tuck Wieler or the gentleman at the Equitable.

Tim McCabe confirmed to Barbara Kogut that they have stopped the processing of their two Equitable Accumulator Contracts.

In early fall of 1999, Maxine received a phone call from Tuck Wieler of Regions Brokerage who immediately said, "We have a big problem with you talking about any kind of guaranteed investment with clients." He stated that there was no product on the market that had any guarantees attached of any kind. He then said, "You must be putting your clients in an index annuity, and representing it as guaranteed." Maxine stated that she had never used an index

annuity as an investment option. His reply was, "Then what are you investing your clients in?" Maxine told him she invested her clients in a good, solid, reputable company that had a good quality investment program. She further stated that he was her competition and she did not intend to educate him on her investments. Maxine then told Mr. Wieler that she did not appreciate the way he was talking to her. He replied, "I can talk to you any way I please as long as you are representing bad investments." He also stated that he could "tell our clients" about these bad investments. Maxine then expressed to Mr. Wieler that if he wanted to approach her with a friendly attitude they can be friendly competition, and that there is enough business in this town for everyone.

Listed below are specific clients who have talked with us and Regions Bank about their investments, and reported back to us with the following information:

- Carolyn Lumpkin, from GTE had a rollover for approximately $375,000. She talked with us, then talked to Regions Brokerage, and specifically said to us, "They said some really bad things about you."

- At a public seminar we held at our office, we had a couple approach us, and tell us that a Regions representative had sent them to find out what we were selling, and to report back to Regions.

- The representatives of Regions held a seminar sometime back in October, where two of our clients were invited to attend. Billy and Sarah Martin (recent retiree's from Sony) did attend, and left in the middle of the presentation. They came straight over to our office and told us that Tuck Wieler and John Haverik said publicly that Ann and Maxine are "lying" about investments. They said there is no such investment with a guarantee feature like the one we are representing. Mr. and Mrs. Martin told us that the meat of the seminar was bashing the Equitable Accumulator. Mr. Martin and the representatives from Regions "had a few words," and the representative told Mr. Martin that he wanted to see what we were selling that had a guarantee. As a result of this seminar for Sony employees where the aforementioned occurred, much confusion was planted in the minds of many potential clients. As a result, these potential clients decided not to go with us or Regions Brokerage. They instead just put money in CDs at the Sony Credit Union.

- Another client of ours (Patsy Compton) came in, and signed all the paper work to open two contracts with Equitable Accumulator. The money to open these contracts was to be transferred from Regions Brokerage to the Equitable. When the representatives from Regions learned of this transaction, they again stated that we were grossly misrepresenting this investment which caused the client much grief and confusion. As a result, she decided to go with only one of the Equitable contracts, so she could monitor before continuing the rest of the investment process.

Mrs. Compton is a recent widow, and did not need this confusion in her life. She was so disturbed as to what these representatives had said about us, she decided to move all of her business from Regions. She stated that they never made a proposal to her, or recommendation on anything positive. They only tore down what we had recommended, and the way we conduct our business.

- We also lost another GTE Retiree (Terry Hurt). She had $225,000 going into Equitable Accumulator. She was also told basically the same scenario.

We have calculated approximately $100,000 in lost commissions due to problems that we have experienced with the representatives from Regions Brokerage.

Tim, we appreciate very much your help in resolving this ongoing problem. It has been a very unpleasant experience, and as you can see, it has been very costly for us and the Equitable. Please advise us if we can provide you with any additional information.

EXHIBIT "B"



**EQUITABLE**

*Member of the Global* ⬛ *Group*

*Michael P. Scher*
*Vice President and Counsel*
*(212) 314-3910, Fax: (212) 707-1990*
*michael.scher@equitable.com*

*LAW DEPARTMENT*

February 3, 2000

(By Fax: 205-326-7751)

Alan Deer, Esq.
Regions Financial Corporation
Office of the General Counsel
P. O. Box 10247
Birmingham, AL 35202

Re: <u>Disparagement – Regulatory Supervision</u>

Dear Mr. Deer:

On behalf of AXA Advisors, LLC and its affiliate The Equitable Life Assurance Society of the United States ("AXA/Equitable"), I am writing to request your assistance in investigating reports of disparagement of certain AXA/Equitable products. The products involved in the allegations of disparagement are distributed through an affiliate of AXA/Equitable, Equitable Distributors, Inc. ("EDI") and, by distribution arrangements, through sales representatives of Raymond James Financial Services ("Raymond James").

AXA/Equitable has received reports from registered representatives with Raymond James in Dothan, Alabama, and an EDI associate, concerning negative activities directed at the Equitable Accumulator variable annuity by Mr. Tuck Wieler, a representative of Regions Investment Company.

The allegations state that certain potential purchasers of the Accumulator variable annuity product are advised that they are being sold "bad investments." The allegations also state that seminars were held in which Raymond James' clients in attendance reported that the Regions representatives disparaged the product and that the seminars inaccurately described the Accumulator product. Mr. Wieler canceled an appointment made with him to explain the Accumulator product.

Alan Deer, Esq.                    2                    February 3, 2000

Please do independently review this information and verify the facts for appropriate action. Disparagement is contrary to the norms of the industry and to the concerns of fair competition serving the best interests of the public. The purpose of this letter is to provide you with information necessary for the discharge of supervisory obligations arising by law and other regulatory and public duties.

If I can provide any additional information or if I can answer any questions you may have, please do contact me.

Very truly yours,

Michael Scher

121622