IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| AXA DISTRIBUTORS, LLC, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:08-CV-188-WKW [WO] |
| | ) | |
| GAYLE S. BULLARD, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff AXA Distributors, LLC ("AXA Distributors") brings this action to enjoin the arbitration of disputes over the purchase of variable annuities distributed by AXA Distributors and purchased by Defendants.[1]  Defendants initiated arbitration proceedings against AXA Distributors under the rules of the Financial Industry Regulatory Authority ("FINRA"), formerly the National Association of Securities Dealers ("NASD").[2]  AXA Distributors asks the court to enjoin the arbitration in this action.  Three motions are pending and will be addressed in this opinion: Defendants' Motion to Dismiss or in the Alternative, Motion to Compel Arbitration (Doc. # 9); AXA Distributors' motion for preliminary

---

[1] AXA Advisors, LLC ("AXA Advisors") is also a plaintiff, but, on the representation of the Defendants that AXA Advisors is not implicated in the business activities made the basis of this action, AXA Advisors is not a proper subject of the motion to dismiss or compel.

[2] *See, e.g.*, About Finra, http://www.finra.org/AboutFINRA/index.htm (last visited Dec. 23, 2008).

injunction (Doc. # 12); and Defendants' motion to strike affidavit of John E. Pinto (Doc. # 29).  For the reasons that follow, all three motions are due to be denied.

## I.  JURISDICTION

The court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), and venue is appropriate under 28 U.S.C. § 1391(a).  The parties contest neither.[3]

## II.  BACKGROUND

### A.  Facts

In the mid-1990s, The Equitable Life Assurance Society of the United States, now AXA Equitable Life Insurance Company ("AXA Equitable"), developed and issued the Equitable Accumulator (the "Accumulator") variable annuity investment product.[4]  AXA Equitable did not market the Accumulator directly because it is not a broker-dealer, but instead entered into distribution arrangements with registered broker-dealers AXA Distributors for wholesale distribution, and AXA Advisors for retail distribution of the security.  AXA Distributors is described by AXA Equitable as an "indirect, wholly owned subsidiar[y]" of AXA Equitable, and "the distributor[] of the contract[] [with] responsibility

---

[3] Defendants initially challenged jurisdiction to consider the arbitrability question (*see* Mot. to Dismiss or Compel 6) but have since abandoned that argument (Mots. Hr'g Tr. 22, Aug. 1, 2008 (Doc. # 35)).  Even if not abandoned, the argument was due to be decided against Defendants; arbitrability "is undeniably an issue for judicial determination," *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986).  The only remaining argument with respect to dismissal is for a failure to state a claim.  (Mot. to Dismiss or Compel 1.)

[4] The Accumulator was described in company documents as "a combination fixed and variable deferred annuity designed to provide for the accumulation of retirement savings and for income at a future date." (Mot. to Dismiss or Compel Ex. C.)

for sales and marketing functions."  (Mot. to Dismiss or Compel Ex. F at 38.)  AXA

Distributors in turn entered into a Broker-Dealer and General Agent Sales Agreement

("Distribution Agreement") with the business predecessors of Raymond James Financial

Services, Inc. ("Raymond James"),[5] an agreement which identified Raymond James as a

broker-dealer for the retail distribution of the Accumulator.  Raymond James uses registered

representatives who are independent contractors (Hr'g Tr. 28) to sell a variety of financial

products, including in this case, the Accumulator.  Defendants purchased Accumulator

contracts from two Raymond James representatives, Ann Holman ("Ms. Holman"), and

Maxine Chappell ("Ms. Chappell").  In order to sell the Accumulator, it is undisputed that

Ms. Holman and Ms. Chappell were appointed non-exclusive insurance agents for AXA

Equitable.  (Verified Compl. ¶ 16 (Doc. # 1).)

　　　In its agreement with the NASD, as amended March 21, 1996, Equitable Distributors

(now AXA Distributors) agreed to limit its business activities as a broker-dealer to "a)

wholesaling variable and fixed contracts . . . through other broker/dealers and banks, and b)

distributing investment company securities on a wholesale basis only."  (NASD Agreement

(Pls.' Reply Mem. Ex. A).)   AXA Equitable described AXA Distributors as having

"responsibility for sales and marketing functions."  In furtherance of the sales and marketing

---

[5] In the interest of convenience and simplicity, this entity will be referred to as Raymond James. For the record, Investment Management & Research, Inc. was identified in the agreement as the "Broker-Dealer," and Planning Corporation of America was identified as the "General Agent."  (*See* Distribution Agreement (Pls.' Reply Mem. Ex. B (Doc. # 28)).)  Apparently, there was a merger of one or both of these companies into the Raymond James group of entities in 1998.

functions, AXA Distributors undertook several business functions to assist in the marketing of the Accumulator.  It directly provided training to Ms. Holman and Ms. Chappell with respect to the Accumulator's features and materials (Holman Aff. & Chappell Aff. (Defs.' Supplemental Br. Exs. 1 & 2 (Doc. # 34))), directly provided follow-up services to the customers of Ms. Holman and Ms. Chappell (Mot. to Dismiss or Compel Ex. C), and offered "effective sales ideas, and a commitment to excellent service to help [them] and [their] clients achieve their goals" (Mot. to Dismiss or Compel Ex. E).   According to correspondence from AXA Distributors to the Raymond James office from which Ms. Holman and Ms. Chappell worked, AXA Distributors offered "immediate marketing support and illustrations" and told the Raymond James representatives to "not hesitate to contact AXA Distributors for anything that [they] need[ed] to help grow [their] business." (Mot. to Dismiss or Compel Ex. E.)

Though they were non-exclusive agents of AXA Equitable when they marketed the Accumulator, Ms. Holman and Ms. Chappell were independent contractors, and therefore "associated persons" of Raymond James, which also served, by the then-NASD rules and the express terms of the Distribution Agreement, as their supervising broker-dealer (Distribution Agreement Articles III & IV).  Specifically, Raymond James agreed that it would "train, supervise and be solely responsible for the conduct of the Agents in their solicitation activities in connection with the Contracts" and cause its agent-representatives to comply strictly with the rules and procedures of AXA Equitable and all "federal and state securities

laws and NASD requirements" in connection with solicitation activities.  (Distribution Agreement §§ 4.1, 4.2.)  Thus, while they were agents of AXA Equitable, the issuer of the security, the agents were registered representatives of, and supervised by, a third-party broker-dealer.[6]

Sales procedures for marketing the Accumulator were straightforward.  Ms. Holman, for instance, took orders and payment from her customers.  (Holman Aff.)  Raymond James forwarded the funds collected by Ms. Holman (or, in some cases, which were already on deposit with Raymond James) to AXA Equitable, which retained the right under the Distribution Agreement to reject applications.[7]  (Distribution Agreement § 2.5; Holman Aff. ¶ 16.)  If the application was accepted, AXA Equitable issued the contract directly to the customer.  (*See* Distribution Agreement § 4.7.)   AXA Distributors sent follow-up correspondence directly to the customer, identifying at least in some cases Ms. Holman as as "your financial professional."  (Mot. to Dismiss or Compel Ex. C.)  AXA Distributors received remuneration for marketing from AXA Equitable, and forwarded commissions downstream to Raymond James, which then paid the selling agents, in this case, Ms. Holman and Ms. Chappell.  (William C. Miller Supplemental Aff. ¶ 10 (Pls.' Reply Mem. Affs.);

---

[6] Ms. Holman and Ms. Chappell are no longer associated with Raymond James.

[7] While AXA Distributors is a wholly owned subsidiary of AXA Equitable, this retained power is nevertheless deemed control retained by the issuer, not the distributor, and is not attributed to the distributor.

5

Distribution Agreement §§ 7.1, 7.5.)  It is undisputed that, in addition to the Accumulator, Ms. Holman and Ms. Chappell had several other financial products in their inventory.

In their arbitration Statement of Claim, Defendants seek damages from AXA Distributors in excess of one million dollars arising out of their purchases of the Accumulator.[8]  (Statement of Claim 12 (Verified Compl. Ex.).)  Their claims include fraud, suppression, negligent training and supervision, breach of contract, conversion, Alabama securities fraud, and unsuitable investment/suitability review.  (Statement of Claim 7-12.) Raymond James, Ms. Holman and Ms. Chappell are not named as respondents in the arbitration proceeding.  Interestingly, Ms. Holman is a claimant in the arbitration proceeding but is not named as a defendant in this action.[9]  The essence of the claims in arbitration is that Defendants were fraudulently induced to purchase the Accumulator "based upon representation that the annuity provided a guaranteed rate of return, guarantee of principal, and liquidity at the end of term."  (Mot. to Dismiss or Compel 2.)  Defendants also claim that AXA Distributors failed to disclose that these representations were false.  (Mot. to Dismiss or Compel 2.)  Arbitration of this dispute is premised solely on the characterization by Defendants of Ms. Holman and Ms. Chappell as "associated persons" of AXA Distributors

---

[8] AXA Equitable is also named as a respondent in the arbitration, but AXA Equitable is not a member of FINRA and is not required to submit to arbitration.  (*See* Verified Compl. 4 n.1.)

[9] Because "she was an associated person of Raymond James . . . during the relevant time period, . . . [Ms.] Holman may be entitled to rely upon different FINRA rules . . . to determine at least the eligibility of her claims for arbitration against the Plaintiffs."  (Verified Compl. 4 n. 1.)

when they marketed the Accumulator.  "Associated persons" is a term of art and law in the securities world.

## B.  FINRA Rules

FINRA is an industry association.  In connection with its FINRA membership, AXA Distributors bound itself, by subscribing to the FINRA Rules as a condition of membership, to arbitrate certain disputes between its customers and itself, or between its customers and its associated persons, when such customer disputes arise in connection with its (or the associated persons') business activities.  Because there is no written arbitration agreement between the parties, determining arbitration begins with Rule 12200 of the FINRA Rules relating generally to matters eligible for submission to arbitration.[10]  It requires arbitration if arbitration is requested by the customer, the dispute is between a customer and a member or associated person of a member, and the dispute "arises in connection with the business activities of the member of the associated person."  Rule 12200.

Rule 12100 defines "associated person," "customer," "member," and "person associated with a member."  "For purposes of the Code, the term 'member' means any broker or dealer admitted to membership in [FINRA] . . . ."  Rule 12100(o).  The terms "associated person" or "associated person of a member" means "a person associated with a member, as

_____

[10] The Securities and Exchange Commission ("SEC") approved new FINRA Rules, which became effective December 15, 2008, and apply to all claims filed on or after April 16, 2007. Order Approving FINRA Proposed Rule Changes, Exchange Act Release No. 34-58643, 73 Fed. Reg. 57,174 (Oct. 1, 2008); FINRA, Regulatory Notice 08-57, SEC Approves New Consolidated FINRA Rules, 2008 WL 4685588 (Oct. 16, 2008).  Authority arising under the NASD Code governs and guides interpretations of the FINRA Rules to the extent that there is no meaningful change from the NASD Code.

that term is defined in paragraph (r)."  Rule 12100(a).  Paragraph (r) contains a more

extensive definition of "person associated with a member":

> (1) A natural person registered under the Rules of FINRA; or
> (2) . . . a natural person engaged in the . . . securities business who is directly
> or indirectly . . . controlled by a member, whether or not any such person is
> registered or exempt from registration . . . .

Rule 12100(r).  "Customer" is defined simply, but not particularly helpfully, by what it "shall

not include" – a broker or dealer.  Rule 12100(i).  The imprecise language of the Rules

complicates the analysis of the legal characterization of Ms. Holman and Ms. Chappell, and

consequentially, the status of Defendants as customers of AXA Distributors.

## C.  Issue for Resolution

The only issue for resolution is whether this dispute will be arbitrated.  Because there

is no independent written arbitration agreement between Plaintiff and Defendants, the dispute

will be arbitrated only if Defendants were "customers" of AXA Distributors, thereby

invoking the FINRA Rules.  Defendants were not customers of AXA Distributors unless Ms.

Holman and Ms. Chappell were "associated persons" of AXA Distributors when they

marketed the Accumulator to Defendants.[11]  Ms. Holman and Ms. Chappell were not

associated persons of AXA Distributors unless they were directly or indirectly controlled by

AXA Distributors when they were marketing the Accumulator.

---

[11] "When an investor deals with a member's agent or representative, the investor deals with the
member." *Multi-Fin. Sec. Corp. v. King*, 386 F.3d 1364, 1370 (11th Cir. 2004).

8

## III.  STANDARDS OF REVIEW

A party may move to dismiss actions raised against that party for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  A motion pursuant to Rule 12(b)(6) tests the sufficiency of the complaint against the pleading standards set forth in Rule 8 of the Federal Rules of Civil Procedure.  "When considering a motion to dismiss, all facts set forth in the plaintiff's complaint 'are to be accepted as true and the court limits its consideration to the pleadings and exhibits attached thereto.'" *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000) (per curiam).

If a party is "aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement," it may petition a federal district court "for an order directing that such arbitration proceed in the manner provided for in [the] agreement." 9 U.S.C. § 4.  When addressing a Section 4 motion, the district court must determine whether there is a binding agreement to arbitrate and if so, whether the nonmovant has breached its obligation to arbitrate under that agreement.  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 22 n.27 (1983) (citing 9 U.S.C. §§ 4, 6).  If the existence of a binding agreement to arbitrate and the failure of the nonmovant to comply with that term are not at issue, the court must order arbitration.  9 U.S.C. § 4.  If either of these determinations is at issue, however, the court must "proceed summarily to the trial" to determine the issues.  *Id.*  The court can consider evidence outside of the pleadings for purposes of a motion to compel arbitration.  *See, e.g.*, *Chastain v. Robinson-Humphrey Co., Inc.*, 957 F.2d 851, 854 (11th Cir. 1992);

*Magnolia Capital Advisors, Inc. v. Bear Stearns & Co.*, 272 F. App'x 782, 785 (11th Cir. 2008) (per curiam) ("More specifically, we require a party resisting arbitration to 'substantiate[] the denial of the contract with enough evidence to make the denial colorable.'" (quoting *Wheat, First Sec. Inc. v. Green*, 993 F.2d 814 (11th Cir. 1993))).

## IV.  DISCUSSION

AXA Distributors contends that it has no legal obligation to arbitrate the FINRA dispute with Defendants "because (1) there is no agreement to arbitrate between Defendants and [] Plaintiffs, and (2) [] Defendants were not customers of [] Plaintiffs or their associated persons, nor does Defendants' arbitration proceeding arise in connection with Plaintiffs' business activities." (Verified Compl. 2.)  Thus, say Plaintiffs, Defendants must litigate. (Pls.' Reply Mem. 3.)  On the other hand, Defendants claim to have been "customers" of AXA Distributors, as that term applies under the FINRA Rules and applicable case law, when they purchased the Accumulator from persons associated with AXA Distributors, and thus are entitled to arbitrate their dispute with AXA Distributors.

The FINRA Rules constitute the arbitration agreement for disputes between customers and FINRA members or persons associated with FINRA members.  "[T]he [NASD] Code serves as a sufficient written agreement to arbitrate, binding its members to arbitrate a variety of claims with third-party claimants." *King*, 386 F.3d at 1367.  As to governing contract law, the courts "must interpret the [NASD] Code as it would a contract under the applicable state law." *Id.*  Thus, Alabama contract law applies, and it favors arbitration when there is doubt.

*Carroll v. W. L. Petrey Wholesale Co.*, 941 So. 2d 234, 235-37 (Ala. 2006).  Likewise, the Federal Arbitration Act, 9 U.S.C. §§ 1-16, creates a presumption in favor of arbitrability, but the Eleventh Circuit recently has been ambivalent as to whether that presumption applies when a court is determining whether an agreement to arbitrate exists.  *Compare King*, 386 F.3d at 1367 ("[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."), *with MONY Sec. Corp. v. Bornstein*, 390 F.3d 1340, 1342 n.1 (11th Cir. 2004) ("However, the presumption is not necessary in this case because we can decide the issue as a matter of law without resorting to a presumption.  Accordingly, we recognize that *King* addresses the applicable presumption, but we need not dwell on it in this case.").  Determining whether the presumption applies, however, is not necessary for the resolution of this case, as will become apparent.

The question for resolution is whether Ms. Holman and Ms. Chappell were associated persons of AXA Distributors when they marketed the Accumulator to Defendants.  Defendants urge the court to examine the question whether Defendants were customers of AXA Equitable as well, but this second question is subsumed in the first.   Clearly, Defendants were customers of the Raymond James registered representatives.   AXA Distributors is the broker-dealer and member of FINRA and thus, the AXA-related party subject to FINRA's arbitration rules; marketing the Accumulator is the business of AXA Distributors, and the parties have a dispute arising out of the marketing of the Accumulator to Defendants.  Therefore, if the Raymond James representatives were "associated persons"

of AXA Distributors, Defendants were customers of AXA Distributors. So, the salient issue can be reduced to whether the Raymond James registered representatives were associated persons of AXA Distributors.

Under Rule 12100(r), an "associated person" includes (1) a natural person (2) engaged in the securities business (3) who is directly or indirectly controlled (4) by a member (5) whether such person is registered or exempt from registration. It is undisputed that Ms. Holman and Ms. Chappell were natural persons engaged in the securities business who were directly controlled by Raymond James (a member), and that they were registered representatives. The ultimate question then becomes: Were they controlled directly or indirectly *by AXA Distributors* (also a member) at the relevant times? The facts impacting the question are largely undisputed.

## A. AXA's Arguments

AXA Distributors asserts that Ms. Holman and Ms. Chappell were not associated persons. First, they insist that the agents were associated persons of Raymond James only. In the Distribution Agreement, Raymond James agreed to "train, supervise and be solely responsible for the conduct of the Agents in their solicitation activities in connection with the Contracts." (Distribution Agreement § 4.1.) The agents were registered representatives of Raymond James who operated out of a Raymond James office and called on customers of Raymond James. Moreover, the agents had numerous products, not issued by or associated with any AXA entity, at their disposal to offer for sale to their customers,

including Defendants. Ms. Holman and Ms. Chappell offered independent investment advice without interference, influence or control of AXA Equitable.

For AXA Distributors, "associated persons" is a term of art that specifies those persons subject to regulatory control. (Pls.' Opp'n (Doc. # 19).)  In other words, a person who is supervised by a broker-dealer is an associated person of that broker-dealer, and any person not supervised by that broker-dealer cannot be an associated person of the broker-dealer.   At oral argument, when confronted with the question of the distinction between direct and indirect control, AXA Distributors' counsel distinguished "indirect" control as relating to persons who are not "direct" employees of a broker-dealer, but are perhaps employees of their independent contractor registered representative. (Hr'g Tr. 43-44.)[12]

_____

[12] The second argument posited by AXA Distributors is that "there must be some connection between the investors and the member firm or their associated person in order to support a finding that a customer relationship exists." (Pls.' Mem. Supp. Mot. for Prelim. Inj.13 (Doc. # 13).)  AXA Distributors finds comfort in the language of *Wheat, First Securities Inc.*, 993 F.2d 814.  At issue was whether parties who purchased tainted securities from Marshall & Company ("Marshall"), a predecessor firm which ultimately sold its assets to Wheat First, could compel Wheat First to arbitrate claims arising out of the Marshall transaction that occurred *before* the asset purchase.  In the asset purchase agreement, Wheat First "expressly did not assume any liability, known or unknown, fixed or contingent, of [Marshall]," and the court found that the investors were not customers because "[w]e cannot imagine that any NASD member would have contemplated that its NASD membership alone would require it to arbitrate claims which arose while a claimant was a customer of another member merely because the claimant subsequently became its customer. . . . We therefore hold that customer status . . . must be determined as of the time of the events providing the basis for the allegations of fraud." *Id*. at 816 (internal quotation marks omitted), 820.  The language giving aid and comfort to AXA Distributors is the observation that "Wheat First and Appellants had absolutely no relationship at the time of the alleged events that Appellants seek to arbitrate." *Id*. at 818. The rationale for this "nexus" argument is that courts should factor in the reasonable expectations of the FINRA member when considering compulsion to arbitrate.

To bolster its narrower view of the definition of "customer," AXA Distributors cites *Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc*., 264 F.3d 770 (8th Cir. 2001), a case which turned on whether business activities outside of investing or brokerage activities fall within the NASD arbitration net.  Rejecting a broad definition of "customer" in a "close call," the court declined to extend the definition "where the business relationship did not include [investing or brokerage activities]." *Id.* at 773.

AXA Equitable is somewhat handicapped because it has to prove the negative.  It claims that the Raymond James representatives were not AXA Equitable associated persons because they were never appointed such; it had no supervisory control or responsibility for the Raymond James agents - by agreement and FINRA rules, Raymond James supervised them; it was prohibited from retail activities by the terms of its FINRA membership; and it marketed wholesale to Raymond James, which marketed retail through its registered representatives.  AXA Distributors therefore had no direct or indirect control over the Raymond James representatives.[13]

Thus, AXA Distributors concludes that, because the Raymond James representatives were not controlled directly or indirectly by AXA Distributors, they could not be "associated persons" of AXA Distributors under the Rules.  *Ergo*, if the representatives were not associated persons of AXA Distributors, then Defendants cannot be customers of AXA

---

AXA Distributors additionally rejects the notion that the Rule 12100(i) defines "customer."  The Rule, which is entitled "Definitions," says *in toto*: "A customer shall not include a broker or dealer."  *Id*.  According to AXA Distributors, "that definition is not intended to imply that every person or entity in the universe that is not a broker or dealer is a customer of every FINRA member firm."  (Pls.' Reply Mem. 7.)

All these arguments, consuming dozens of pages, miss the mark.  It is undisputed that Defendants were customers of the Raymond James representatives.  If it is found that Defendants were dealing with associated persons of AXA Distributors when they purchased the Accumulator, they were dealing with AXA Distributors, and thus, were customers of AXA Distributors.

[13] Though Plaintiffs make the more specific following points to argue that Defendants were not customers, the arguments bear on whether Ms. Holman and Ms. Chappell were "associated persons."  Defendants were not customers of AXA Distributors, AXA Distributors argues, because it never conducted any business with any of them; never took an application or cash from them; never opened an account for them and never sent them an account statement; and never executed a retail order or confirmation of order for them.  In short, there was "absolutely no relationship whatsoever" between them.  (Pls.' Mem. Supp. Mot. for Prelim. Inj. 10-11.)

Distributors.  If Defendants are not customers, they are not entitled to arbitration of this dispute.

**B. Defendants' Arguments**

Defendants advance a broader definition of "associated person."  Their contentions can be summed up in one statement: "Plaintiff's sole business was to sell and market the products at issue in this case and to train and supervise others who sell and market the products, and Plaintiff was involved in and received compensation for each sale."  (Defs.' Reply 4 (Doc. # 21).)  Leaning on the "indirect control" component of the definition of "associated person," Defendants point out that AXA Distributors conducted all the training on the Accumulator; directed the Raymond James representatives in sales techniques; advised the Raymond James representatives on how to sell the Accumulator and retained discretion over how it was marketed; provided direct customer and sales support, including prospectuses and marketing materials; and made post-sale contact with the investors.  It is undisputed by AXA Distributors that Raymond James provided no direct training on the Accumulator.  The training consisted of AXA Distributors training events (*see* Holman Aff. ¶ 4; Chappell Aff. ¶ 3) and Raymond James training events conducted by AXA Distributors' representatives (*see* Holman Aff. ¶ 13; Chappell Aff. ¶ 4).  Ms. Holman and Ms. Chappell deny any knowledge of the Accumulator except that which they received from the AXA entities.  AXA Distributors explained the complicated product to them, taught them how to sell it, answered their questions almost daily, gave them quotes and illustrations, and directed

15

and instructed them on interpreting the quarterly statements.  (*See* Holman Aff.; Chappell

Aff.)  Indeed, AXA Distributors wrote Ms. Holman in March of 2000 that it was "always

ready to answer [her] questions . . . give [her] a quote or a hypothetical illustration . . .

provide [her] with marketing materials . . . help [her] in any way we can."  (Mot. to Dismiss

or Compel Ex. H. (ellipses in original).)[14]  Defendants conclude that these activities amount

to indirect control as contemplated by the definition of associated person in Rule 12100(r).[15]

Defendants also argue generally that the fact that AXA Distributors benefitted financially

from the sales of the Raymond James representatives is relevant.

## C.  Analysis

### 1.      Preliminary Discussion of Controlling Sources

Because the parties point to no case directly on point factually, and the court has found

none, the cases upon which the parties rely are not particularly helpful in determining

whether AXA Distributors controlled the Raymond James representatives.  AXA Distributors

relies upon *Wheat First* for the proposition that one cannot be a customer of a broker-dealer

if one has absolutely no relationship with the broker-dealer at the time of the event causing

the dispute.  This is not an instructive conclusion when it is undisputed that Defendants are

---

[14] To be fair, the same letter to Ms. Holman refers to "your client" or "your clients" three times - never to "our" clients.  (Mot. to Dismiss or Compel Ex. H.)

[15] A subset of the indirect control argument is that, having undertaken to train, direct and support the representatives of Raymond James, AXA Distributors had a duty to do so with due care.  This argument can be taken as support for the state-law claims, not for arbitration.  Of note, this is as close as Defendants come to suggesting that AXA Distributors had a duty to supervise the Raymond James representatives.

customers of the persons who sold them the Accumulator, and the issue is whether the persons selling it were associated with AXA Distributors.  To that scenario, *Wheat First* does not speak.   Likewise, Defendants rely upon the somewhat related but factually distinguishable cases, *King*, 386 F.3d 1364 and *Bornstein*, 390 F.3d 1340.  (*See* Defs.' Reply 5.)  *King* and *Bornstein* are not apropos because in both cases it was undisputed that the registered representative was an associated person of the broker-dealer and the investor was a customer of the associated person.[16]

The essence of the dispute is whether the registered representative is an associated person of, in effect, two broker-dealers, Raymond James and AXA Distributors.  The matter can be resolved only by interpretation and application of the FINRA Rules under state-law contract principles.   In this exercise, the plain and unambiguous meaning of the Rules applies, unless ambiguities in the Rules are evident, in which case, parole evidence can be

---

[16] In *King* and *Bornstein*, the issue was whether the broker-dealer would be compelled to arbitrate when its admitted agent or representative (associated person) sold securities not issued, marketed or approved by the broker-dealer to customers of the associated person.  The issue in both turned on whether the customer of an associated person is also the customer of the broker-dealer who supervised the associated person, even if the broker-dealer had no knowledge of the transaction.  In both cases, the broker-dealer was compelled to arbitrate because the court ultimately found that the investor was a customer of both the associated person and the broker-dealer.

considered.[17]  Of the Rules, only Rule 12100(r) defines "person associated with a member."[18]

The Rule references "a member," which the court takes to mean, without any ambiguity, any

member of FINRA, therefore inclusive of AXA Distributors.  Direct or indirect control is not

defined in the Rules.

The definition of an "associated person" is also found in the Securities Exchange Act

of 1934 ("Exchange Act") but its definition differs slightly from that in the FINRA Rules.

Indeed, at least four circuits have held that the definition of "associated person" in 15 U.S.C.

§ 78(c)(21) of the Exchange Act does not trump the FINRA's definition of "associated

person."  "[N]othing in the [Exchange Act] prohibits a self-regulatory organization (such as

the NASD) from using a term for its own purposes (in applying its *own* rules and regulations)

in a way that is narrower than the way that term is defined in the [Exchange Act]."  *Burns

v. N.Y. Life Ins. Co.*, 202 F.3d 616, 621 (2d Cir. 2000) (joining the D.C. and 5th Circuits)

(pointing out that the SEC must approve of the NASD's rules and that the NASD's definition

did not result "in any rule or practice that is inconsistent with the statute or any regulatory

command of the SEC" (citing *Shearson/Am. Express, Inc. v. McMahon*, 482 U.S. 220, 233-

---

[17]  AXA has submitted the affidavits of John Pinto (Pls.' Reply Mem. Affs.) and William C. Miller (Pls.' Mem. Supp. Mot. for Prelim. Inj. Ex. C) as parole evidence on the *legal* issues.

[18]  "Person associated with a member" is also defined in the FINRA By-Laws, and it includes a person "directly or indirectly . . . controlled by a member."  FINRA, FINRA By-Laws Art. I(gg).  Rule 0160 states that "[t]he terms in the Rules, if defined in the FINRA By-Laws, shall have the meaning as defined in the FINRA By-Laws unless the term is defined differently in a Rule, or unless the context of the term is defined differently in a Rule, or unless the context of the term within a Rule requires a different meaning."  Thus, cases and FINRA (or formerly NASD) guidance elucidating definitions in the By-Laws that, by this standard, carry the same definition as in the Rules, are applicable and referred to in this analysis.  Subsequent discussion of the FINRA Rules incorporates applicable interpretations of the By-Laws.

34 (1987)[19])); *see also Paul Revere Variable Annuity Ins. Co. v. Kirschhofer*, 226 F.3d 15, 21 (1st Cir. 2000) ("[I]n the absence of any specific reference to touchstones outside the NASD Code, there is not the slightest reason to believe that the drafters of the NASD Manual considered . . . the Exchange Act to be part of the 'context' relevant in deciding whether to adhere to the definition stated in the by-laws."). The First Circuit more explicitly has counseled against relying on the Exchange Act at all to interpret the FINRA Rules: "[I]t is much more plausible that the drafters [of the NASD Manual] intended to direct interpreters to the text, structure, and purpose of the NASD's various regulations and practices rather than to an endless (and ever-changing) array of outside factors . . . ." *Paul Revere Variable Annuity Ins. Co.*, 226 F.3d at 21. Because the Exchange Act and the then-NASD Rules "serve very different purposes," the First Circuit reasoned, "it is hardly surprising that they employ dissimilar definitions." *Id.* at 22.

The way in which the Exchange Act's and FINRA's definitions of "associated person" conflict, however, is not implicated in this case. *Cf. Burns*, 202 F.3d at 620 (highlighting the difference between the provisions with respect to the inclusion or exclusion of "company"). Additionally, the cases interpreting the "directly or indirectly" controlled language in the

---

[19] "Since the 1975 amendments [of the Exchange Act] . . . the [SEC] has had expansive power to ensure the adequacy of the arbitration procedures employed by the [self-regulatory organizations ("SRO")]. No proposed rule change may take effect unless the SEC finds that the proposed rule is consistent with the requirements of the Exchange Act; and the [SEC] has the power, on its own initiative to 'abrogate, add to, and delete from' any SRO it if finds such changes necessary or appropriate to further the objectives of the Act. In short, the [SEC] has broad authority to oversee and to regulate the rules adopted by the SROs relating to customer disputes, including the power to mandate the adoption of any rules it deems necessary to ensure that arbitration procedures adequately protect statutory rights." *Shearson/Am. Express, Inc.*, 482 U.S. at 233-34 (citations omitted).

Exchange Act are not motivated by policy implications that appear to deviate from FINRA's purposes.  Furthermore, the Eleventh Circuit has not ruled on the interplay between these provisions in this context.  For these reasons, the following "associated person" analysis will draw not only from case law on the FINRA and formerly-NASD language, and from FINRA and NASD decisions,[20] but also on case law interpreting the same language in the Exchange Act.[21]

## 2.    Defining Direct and Indirect Control

The pivotal definition of the FINRA Rules at issue is of "control," and the key distinction is between direct and indirect control.  Black's Law Dictionary defines the noun "control" as "[t]he direct or indirect power to direct the management and policies of a person or entity, whether through ownership of voting securities, by contract, or otherwise; the power or authority to manage, direct, or oversee."  *Black's Law Dictionary* 253 (8th ed. 1999); *see also id.* (defining the verb "control" as "to exercise power or influence over" or

---

[20] AXA Distributors urges the court to afford deference to FINRA's interpretation of its own regulations.  (Pls.' Supplemental Reply Mem. 4 (Doc. # 33).)  It is not clear, however, that a "controlling weight" deference applies to the review of NASD decisions.  Nevertheless, in light of *Paul Revere Variable Annuity Insurance Co.*, the prudence in considering an association's interpretation of its own rules, and the fact that the SEC delegated authority to NASD, the NASD interpretations factor into the analysis.  *See, e.g., Nat'l Planning v. Achatz*, No. 02-cv-0196E (SR), 2002 WL 31906336, at *2 (W.D.N.Y. Dec. 17, 2002) (noting in the slightly different context of considering an arbitration rule on composing an NASD panel, that "courts should be wary about disregarding NASD Rules and should accord deference to the NASD's interpretation of its Rules" ); *Kashner Davidson Sec. Corp. v. Mscisz*, 531 F.3d 68, 71 n.1 (1st Cir. 2008) (describing the relationship between the SEC and NASD).

[21] It is appropriate to consider terminology as it is used throughout a statutory scheme.  *See, e.g., United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988).  Though the NASD is not a part of the Exchange Act, the interrelatedness between the SEC and the NASD justifies comparing the language.  *See Credit Suisse Sec. (USA) LLC v. Billing*, 127 S. Ct. 2383, 2395 (2007) (describing the interrelatedness).

"[t]o regulate or govern"). Webster's defines "direct" as "characterized by . . . a close [especially] logical, causal, or consequential relationship" and "marked by absence of intervening agency, instrumentality, or influence." *Webster's Third International Dictionary (Unabridged)* 640 (1961). Indirect means "not straightforward and open" or "not directly aimed at or achieved." *Webster's*, *supra*. These definitions alone, however, are too general to resolve the meaning of control, or the distinction between direct and indirect control.

Courts tend to define direct and indirect control, both as used in the FINRA Rules and former NASD Code, and the Exchange Act, not expressly but through the description of factors. In *John Hancock Life Ins. Co. v. Wilson*, 254 F.3d 48 (2d Cir. 2001), the court found an independent insurance agent and investment broker an "associated person" under the NASD Code despite his working from home; the agent was authorized, through a sales representative agreement, to sell life insurance and annuities on behalf of John Hancock, a broker-dealer member. *Id.* at 51. In *First Liberty Inv. Group v. Nicholsberg*, 145 F.3d 647 (3d Cir. 1998), the court reviewed the factual realities of a business relationship and found an "associated person," eschewing labels that the parties chose for that relationship. *Id.* at 652. Even though an agreement between First Liberty and Nicholsberg specifically named him as an "independent contractor," that denomination was "not controlling in the face of the conflicting reality." *Id.* It was the "parties' *total* relationship," including limitations on Nicholsberg and First Liberty in conducting their business, that dictated the result. *Id.*

The total relationship amounted to at least "indirect control."[22]  *First Liberty Inv. Group*, 145 F.3d at 642.  The court highlighted the following underlying facts and provisions of the agreement: (1) First Liberty's provision of facilities to Nicholsberg for executing transactions; (2) First Liberty's appointing Nicholsberg's office to offer and solicit sales of securities; (3) First Liberty's giving Nicholsberg geographic exclusivity; (4) Nicholsberg's agreeing to comply with First Liberty's manual; (5) Nicholsberg's agreeing to First Liberty's prior approval before he sent correspondence or caused advertising pertaining to securities solicitation; and (6) Nicholsberg's promising not to engage in a security transaction with any other individual or broker-dealer.  *Id.*  Underlying those factors was also a policy concern.  If First Liberty could "escape the NASD arbitration requirements simply by calling someone acting in Nicholsberg's capacity an independent contractor, [it] could easily frustrate NASD's firm policy of submitting industry disputes to binding arbitration."[23]  *Id.*[24]

---

[22] The court also found that the relationship "plac[ed] Nicholsberg in much the same practical position that would be occupied by a branch manager."  *First Liberty Inv. Group*, 145 F.3d at 652.

[23] The NASD acknowledged, albeit by implication, that it construes the definition of "associated person" broadly "as it must in order to take regulatory action in circumstances where a person's connection with a member firm implicates the public interest."  *Dist. Bus. Conduct Comm. v. Paramount Invs. Int'l, Inc.*, No. C3A940048, 1995 WL 1093392 (NASDR Oct. 20, 1995) (affirming the District Business Conduct Committee's decision, which the NASD noted, included the observation that it "had always construed [the 'associated person'] definition broadly").

[24] The Eleventh Circuit has addressed NASD language only briefly.  It found an individual, Riccard, "was a natural person engaged in the securities business who was controlled by member Prudential at the time of the 1995 events giving rise to the dispute," and thus, was an associated person under the NASD By-Laws.  *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1287 n.6, 1288 n.7 (11th Cir. 2002).  The parties had considered Riccard an employee of Prudential at all relevant times.  *Id.* at 1286 n.3.

Though FINRA has not provided clear guidance on what control means, it has provided some signals as to its meaning.  FINRA's Uniform Application for Broker-Dealer Registration (Form BD) defines control as "power, directly or indirectly, to direct the management or policies of a company, whether through ownership of securities, by contract, or otherwise."[25]  But that definition begs the question of what directing management or policies entails. Furthermore, the question of whether an individual is controlled *by* a broker-dealer is not presumptively synonymous with the definition of control for purposes of registration.

An NASD interpretive letter's discussion of "associated persons" under the NASD By-laws, although not binding, targets some relevant indicia of control.  In a letter to Pamela M. Krill, the NASD commented on a proposed arrangement not entirely dissimilar to the arrangement here.[26]  CAI was an insurance agency that intended to register as a broker-dealer and become a member of the NASD.  CAI asked the NASD whether in that event, CAI could pay commissions from sales of variable annuity products and mutual funds shares to its insurance agent employees, who, by agreement, would become registered representatives at

_____

[25] FINRA, Current Uniform Registration Forms for Electronic Filing in Web CRD, Form BD, http://www.finra.org/web/groups/industry/@ip/@comp/@regis/documents/appsupportdocs/p005260.pdf (last visited Dec. 23, 2008).

[26] NASD, Interpretive Ltr. (Feb. 3, 2003), http://www.finra.org/Industry/Regulation/Guidance/InterpretiveLetters/P002661 (last visited Dec. 23, 2008).

the same time of another broker-dealer and NASD member.[27]  In determining whether the registered representatives were under the control of CAI and thus, deemed associated persons of CAI as well, the court looked to several indicia of control, some of which pertain specifically to the registered representatives' status as CAI's employees, but others that did not.  The NASD noted how CAI would maintain control over the employee-registered representatives' commission payments, would issue paychecks to them, determine their benefits levels, help determine which securities products they would offer, and provide office space for securities-related activities.  These factors for the most part relate to control CAI would have as an employer over the agent-representatives.  The interpretive guidance continued, however, by noting other factors of control: (1) that CAI would retain a portion of the securities commission revenues; (2) that the other broker-dealer would receive only a flat fee for supervising, training, and providing administrative services to the agents-representatives; (3) that CAI "potentially could have a greater financial interest in the securities-related activities of the registered representatives" than the other broker-dealer; and (4) that the registered representatives appeared to be selling the products on behalf of CAI.

In a separate interpretive letter, in a factual situation less on point but still relevant, the NASD declined to find that one member broker-dealer (Firm A) controlled the representatives of another (Firm B) based on these factors: (1) Firm B's representatives

---

[27] In our case, certain facts are distinguishable – AXA Distributors had already registered as an NASD Member prior to the agreement with the broker-dealer of the registered representatives and the registered representatives were not *employees* of AXA Distributors but insurance agents of AXA Equitable.  The discussion of control, however, is still applicable.

"perform[ed] their functions solely as salaried employees" of Firm B; (2) Firm B's representatives did not "solicit securities transactions or make other recommendations"; and (3) Firm B's representatives did not "retain ownership or control of accounts opened and forwarded" to Firm A.[28]   Importantly, the NASD also stated: "Since the activities of [Firm B's] registered representatives on behalf of [Firm A] occur pursuant to a contract between the two members, [Firm B's] registered representatives are not employed, directly or indirectly, outside the scope of their relationship with their employing member [Firm B]" and do not receive compensation outside that scope.   *Id.*   The contract between the outside firm and employing firm helped to buffer the employing firm's employees from being deemed "controlled" by the outside firm.[29]

The word "control" comes up in analogous contexts under the Exchange Act.   The Exchange Act defines "associated persons," in relevant part as "any person directly or indirectly controlling, controlled by . . . such broker or dealer."   15 U.S.C. § 78c(a)(18) (omitting distinguishable language).   In a case applying this definition to the relationship between a securities broker barred from the U.S. market and a U.S. securities broker, *Sec. Exch. Comm'n v. Zahareas*, 272 F.3d 1102, 1004 (8th Cir. 2002), the Eighth Circuit chided the district court for "judicially grafting onto the statute . . . an expansive clause."   *Id.* at

---

[28] NASD, Interpretive Ltr., Apr. 22, 1998, http://www.finra.org/Industry/Regulation Guidance/InterpretiveLetters/P005274 (last visited Dec. 23, 2008).

[29] The National Adjudicatory Council's decision in *Department of Enforcement v. Respondent 1*, No. CAF000029, 2002 WL 970381 (NASDR Mar. 21, 2002) also addressed the meaning of "associated person."   The facts in that case, however, are so distinguishable that extrapolating from its findings does not aid the analysis.

1106.  Specifically, the circuit court declined to include in the definition of "associated person," "registered representative."  *Id.* at 1107.  The court also noted there was no precedent that "providing and verifying paperwork" amounted to control.  *Id.* at 1106. Instead, the court focused on the lack of evidence that the broker-dealer controlled Zahareas's means and manner of performance. *Id.*  The broker-dealer "knew little about how [he] conducted his business . . . [,] provided none of the workplace instruments such as telephones or computers" and did not hire or monitor his employees.  *Id.*  Judge Bright, in dissent, listed other factual circumstances that persuaded him of the opposite conclusion – that under Black's Law Dictionary's definition of control, the broker-dealer exercised control.  *Id.* at 1108 (Bright, J., dissenting).  Zahareas steered Greek investors to the broker-dealer, those customers received account numbers and materials from the broker-dealer, it provided Zahareas with its account opening materials, applications, tax forms, and margin agreements, and it reviewed and approved new account information from him on the new customers.  *Id.*  All of those factors, however, were not enough to convince the majority that the broker-dealer controlled an individual.[30]  *Id.* at 1106.

In a federal district court case from the Southern District of New York, the court listed various facts in support of its finding that the defendant violated an SEC order by willfully associating with various broker-dealer firms.  *Sec. Exch. Comm'n v. Telsey*, Fed. Sec. L. Rep. (CCH) ¶ 95,871 (Mar. 13, 1991).  With one broker-dealer, Tesley had his own telephone and

---

[30] Admittedly, the opinion was tied to the statute's express purpose, as well as the statute's plain language.  *Zahareas*, 272 F.3d at 1106.

desk, solicited accounts for the broker-dealer, prepared order tickets, filled out account forms, used the broker-dealer's NASDAQ machine to trade on behalf of the broker-dealer's proprietary account, quoted bids and offers when asked, traded in stocks for the broker-dealer, went into its offices almost daily during business hours, had a registered representative number for identifying his customer's order tickets so that he could receive commissions, and was compensated for his association with the broker-dealer. *Id.* He was also associated with other broker-dealers based on those and additional facts including describing himself as a "principal" of the broker-dealer and bringing in new customers. *Id.*

The Exchange Act also uses "control" in defining control liability. The Exchange Act imposes liability on "[e]very person who, directly or indirectly controls any person liable under any provision" of the pertinent chapter, rule, or regulation unless the controlling person acted in good faith. 15 U.S.C. § 78t(a). The Eleventh Circuit recently has expounded on this language. *See Laperriere v. Vesta Ins. Group Inc.*, 526 F.3d 715 (11th Cir. 2008) (per curiam). In discussing the definition of controlling person, the court explained that "Congress recognized that it would be difficult, if not impossible, to enumerate or anticipate the many ways in which actual control may be exercised and expressly declined to define the term 'control,' leaving courts free to decide issues of control on a case by case basis."[31] *Id.*

---

[31] The court also noted that the SEC's more specific definition of control, promulgated as a regulation, "like the statute, does not attempt to formulate a precise definition of 'control' applicable to all cases, but is intended only to provide some guidance, leaving a determination of whether control exists dependent on the particular factual circumstances of each case." *Laperriere*, 526 F.3d at 723. The regulation defines control as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 230.405 (West 2008).

27

at 722-23.  As the Ninth Circuit announced, control for purposes of control liability, like control under the Rules and the then-NASD By-Laws, is not limited to the relationship of employees or agents, and employers, but includes independent contractors.  *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1574 (9th Cir. 1990) (en banc).  To limit control by excluding independent contractors would "frustrate Congress's goal of protecting investors." *Id.*  The court made a point of tying control to supervision.[32]  *Id.* (In describing the outcome had it not found that independent contractors could be associated persons, the court noted the broker-dealer could have thereby "avoid[ed] *a duty to supervise* simply by entering into a contract that purports to make the representative . . . an 'independent contractor.'" (emphasis added)).

Control that triggers liability can be indirect as well, though the difference between direct and indirect control remains largely unexplained.[33]  The Eighth Circuit approached a definition of "indirect control" in *Martin v. Shearson Lehman Hutton, Inc.*, 986 F.2d 242 (8th Cir. 1993).  There, it held that control liability "reaches persons who have only 'some indirect means of discipline or influence' less than actual direction." *Id.* at 244 (quoting *Myzel v.*

---

[32] The company tried to contract away supervision by stating it had "no right to control or direct" the sales contractor, "'not only as to the result to be accomplished by the work but also as to the details and means by which the result is accomplished,'" except for oversight and instructions required for legal compliance, and left the contractor "'completely free'" to control the results and means.  *Hollinger*, 914 F.2d at 1574 n.7 (quoting the contract).

[33] For instances in which control is defined, in the SEC regulation for example, the definition of control includes a reference to both "direct" and "indirect" *embedded* in the definition of control.  It is unclear, in those instances, whether "direct" or "indirect" within the definition of "control" sufficiently address what direct and indirect control mean.

*Fields*, 386 F.2d 718, 738 (8th Cir. 1967)); *accord Harrison v. Dean Witter Reynolds, Inc.*, 974 F.2d 873, 880-81 (7th Cir. 1992) (quoting the Eighth Circuit).  The Seventh Circuit describes control that is indirect as the *potential* to control.  The culpable party must have "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised."  *Id.* at 882; *see also Rochez Bros., Inc. v. Rhoades*, 527 F.2d 880, 890-91 (3d Cir. 1975).   The distinction between direct and indirect control otherwise must be gleaned by deciphering a distinction between the two from the facts of cases that interpret control.

3.    **Application: AXA Distributors Did Not Directly or Indirectly Control the Raymond James Representatives**

AXA Distributors did not control the Raymond James representatives by any of the foregoing definitions of control.[34]  Two features of this relationship account predominantly for why AXA Distributors did not control the Raymond James representatives: (1) the contractual relationship, which was between AXA Distributors and *Raymond James*, not its registered representatives; and (2) the separation of AXA Equitable from AXA Distributors. It is significant that it was Raymond James, and not its registered representatives, that entered into a contract with AXA Distributors, and that Raymond James retained control over its

---

[34] The contract between AXA Distributors and Raymond James states that "[n]othing [therein] shall constitute [Raymond James] or any agents or representatives of [Raymond James] as employees of [AXA Equitable] or [AXA Distributors]" (Distribution Agreement § 2.7), and Raymond James is an independent contractor and not employee under the contract (Distribution Agreement § 2.7).  Contractual language, however, is not dispositive of whether AXA Distributors controlled the Raymond James representatives.  Determining control depends the factual details of the relationship, as well as the agreement.

registered representatives.  It is also significant that any control the AXA entities retained over the Raymond James representatives was lodged in AXA Equitable.

AXA Distributors' sales agreement was with Raymond James, not its registered representatives.  (Distribution Agreement 1.)  Raymond James sold products of other companies. (Distribution Agreement § 2.7.) The registered representatives did not use AXA Distributors' facilities for their sales.[35]  (*See* Holman Aff. ¶ 4; Chappell Aff. ¶ 3.)  Raymond James retained the duties to train and supervise the registered employees more generally, and to be fully responsible for their solicitation activities.  (Distribution Agreement § 4.1.) Raymond James provided the seminar where Ms. Holman and Ms. Chappell were trained by AXA Distributors on the Accumulator (Chappell Aff. ¶ 4); they otherwise were not trained at AXA Distributor's facilities.  *Raymond James* agreed that its representatives who were appointed AXA Equitable's agents would not solicit applications for contracts without certain materials and would only make statements with that information, and that AXA Distributors would be responsible for supplying the relevant materials.  (Distribution Agreement, §§ 5.1(b), 6.1, 6.2.)  Even if AXA Distributors conducted the actual training for Ms. Holman and Ms. Chappell, that factor alone is not enough to determine that AXA Distributors controlled them, especially in light the intermediary contractual party Raymond James.

---

[35] Although Ms. Holman and Ms. Chappell stated that AXA Distributors provided the training for the Accumulator, that training was not at AXA Distributors' facilities, nor was any of the business solicitation.  (*See* Holman Aff. & Chappell Aff.)

Case 1:08-cv-00188-WKW-TFM   Document 36   Filed 12/24/08   Page 31 of 35


Additionally, though both AXA entities stood to gain by the arrangement, Raymond James directly received payment to distribute to its brokers and retained a portion for itself. To the extent that the agreement between AXA Distributors and Raymond James dictated the representatives' actions, that was an agreement that the supervising broker-dealer entered into and the supervisory broker-dealer retained responsibility over the representatives' actions, not to mention, the power and responsibility to discipline the representatives. (Distribution Agreement §§ 4.1, 4.9.) The factual circumstances of the arrangement do not undermine these roles. Ms. Holman and Ms. Chappell have attested only to constant communication with and assistance from AXA Distributors. (*See* Holman Aff. & Chappell Aff.) But AXA Distributors' control of the *information* for selling the products is not the same as control of Ms. Holman and Ms. Chappell in the brokering activities.

Also important to finding that AXA Distributors did not control the Raymond James registered representatives is the fact that AXA Equitable, and not AXA Distributors, retained control over the sales arrangement. AXA Equitable had discretion to refuse to appoint a proposed agent or to terminate her with or without cause, and to reject applications or premiums. (Distribution Agreement §§ 2.3, 2.5.) AXA Distributors did not retain any commissions on the sales. (Miller Supplemental Aff. ¶ 10.) Instead, it received an annual allowance from AXA Equitable "for its distribution activity," based in part on volume, and that allowance was a "pass-through for compensation" to brokers like Raymond James. (Miller Supplemental Aff. ¶ 10.) *Raymond James* paid out the commissions due to *its*

31

brokers, retaining the portion to which it was entitled.  (Miller Supplemental Aff. ¶ 10; *see also* Distribution Agreement, §§ 7.1, 7.5; Defs.' Reply Ex. A at 15 of original.)  Registered representatives forwarded premiums and loan repayments to AXA Equitable, not to AXA Distributors.  (Distribution Agreement § 4.5.)

AXA Distributors' business was to distribute securities on a wholesale basis to other broker-dealers, not to enter into relationships directly with registered representatives of other broker-dealers.  (NASD Agreement.)  The circumstances of the relationship bear this out, and the relationship does not amount to control.  To the extent that the Raymond James representatives steered customers to AXA Equitable, to the extent that AXA Distributors provided the materials and applications for that business, and to the extent that those entities were involved in reviewing and approving that business, at least one circuit has found that those factors alone do not amount to "control," at least with respect to control liability. Furthermore, AXA Distributors only provided the materials and applications.  It was, in effect, a marketing entity segmented off from AXA Equitable.

This arrangement may permit an entity like AXA Distributors, or AXA Equitable for that matter, to avoid responsibilities under the FINRA Rules, but that is a policy matter for other institutions to address.  Based on the facts submitted by the parties, along with their briefs, and on an institutional reticence to transform a complicated business arrangement into a nefarious web of evasion, this court finds AXA Distributors did not control the registered representatives of Raymond James.  Because Ms. Holman and Ms. Chappell were not

32

"associated persons" of AXA Distributors, Defendants were not customers of AXA Distributors, and therefore, the FINRA Rules do not govern. Defendants have no agreement with Plaintiffs to arbitrate. Thus, the Motion to Dismiss or in the Alternative, Motion to Compel Arbitration (Doc. # 9) is due to be denied.

**4.    Preliminary Injunctive Relief**

AXA Distributors also requests preliminary and permanent injunctive relief to restrain Defendants from proceeding with their claims against AXA Distributors, which are currently in FINRA arbitration.[36]  (Verified Compl. ¶¶ 27-30.)  A federal court may issue three types of injunctions: (1) "a 'traditional' injunction, which may be issued as either an interim or permanent remedy for certain breaches of common law, statutory, or constitutional rights"; (2) a statutory injunction; or (3) an injunction under the All Writs Act.  *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097, 1098 & 1099 (11th Cir. 2004) (footnote omitted). AXA Distributors requests a "traditional" injunction.  (*See* Pls.' Mot. for Prelim. Inj. ¶ 1.)

The type of injunction at issue in this case, however, is *not* a traditional injunction. *Klay*, 376 F.3d at 1098.  A party requesting injunctive relief against defendants who have initiated (or presumably continued in) arbitration even though a federal court denied their motion to compel arbitration on those claims, "[has] no cause of action against the defendants upon which the injunction [would be] based." *Id.*  "'Wrongful arbitration' . . .

---

[36] AXA Advisors is not entitled to preliminary injunctive relief for the reasons discussed in this analysis.

is not a cause of action for which a party may sue." *Id.*  Thus, a plaintiff seeking this relief must proceed under a different type of injunction.  *Id.*

The parties in this case have not argued that relief is appropriate as a matter of statutory law, and as the Eleventh Circuit has not resolved the availability of statutory injunctive relief for enjoining arbitration, *Klay*, 376 F.3d at 1099, injunctive relief on this basis will not be awarded.  Injunctive relief is also unavailable under the All Writs Act, 28 U.S.C. § 1651(a).  *Klay*, 376 F.3d at 1099, 1113.  The All Writs Act codifies the "traditional, inherent power" of courts to protect their jurisdiction derived from another source, and allows courts to "safeguard not only ongoing proceedings, but potential future proceedings, as well as already-issued orders and judgments." *Id.* at 1099 (footnotes omitted).  Arbitrating nonarbitrable claims, however, is "a pointless endeavor" and for that reason, "does not threaten or undermine" a district court's order that denies a motion to compel or that court's jurisdiction over pending cases.  *Id.* at 1113.  The arbitrators lack jurisdiction over nonarbitrable issues, so a ruling would have no impact on a federal action, and parties would be unable to enforce any ruling in their favor.  *Id.*  Thus, preliminary injunctive relief is not appropriate.  *Id.*  "The defendants remain free to arbitrate the nonarbitrable claims in what will be nothing more than a moot court session." *Id.*

## V.  CONCLUSION

For the foregoing reasons, it is ORDERED that:

(1)     Defendants' Motion to Dismiss or in the Alternative, Motion to Compel Arbitration (Doc. # 9) is DENIED;

(2)     Plaintiffs' Motion for Preliminary Injunction (Doc. # 12) is DENIED; and

(3)     Defendants' Motion to Strike Affidavit of John E. Pinto (Doc. # 29) is DENIED as moot.

Done this 24th day of December, 2008.

/s/  W.  Keith Watkins
UNITED STATES DISTRICT JUDGE